# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| SALVATORE VACIRCA, ) | |
|     Plaintiff ) | |
| ) | |
| v. ) | **DOCKET NO. 05-11419-MLW** |
| ) | |
| NATIONAL MACHINERY COMPANY ) | |
| AND NATIONAL MACHINERY, LLC, ) | |
|     Defendants ) | |
| _____ ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## NATIONAL MACHINERY LLC'S MOTION FOR SUMMARY JUDGMENT

Because National Machinery LLC ("NMLLC") did not design, manufacture, sell or service the product involved in this lawsuit and, indeed, did not even exist until after plaintiff's accident, NMLLC is not subject to the liability asserted by plaintiff. Therefore, this Court should grant NMLLC's motion for summary judgment.

## I.    INTRODUCTION.

Plaintiff, Salvatore Vacirca ("Vacirca"), has brought this action against defendants The National Machinery Company and NMLLC as a result of an on-the-job injury on August 2, 2001, while operating a National Machinery 700 Ton Maxipress Forge Press, Serial No. 18225. Plaintiff alleges that The National Machinery Company designed, manufactured, and shipped the press machine in 1946 and that this machine was defective, causing plaintiff's injuries. (Statement of Undisputed Material Facts ("SUF"), ¶ 1.)

In addition to suing The National Machinery Company, the designer, manufacturer and seller of the press, plaintiff has sued NMLLC, the purchaser of The National Machinery Company's assets in 2002 after a foreclosure and public sale under Article 9 of the Uniform

Commercial Code ("U.C.C."). (SUF ¶ 2.) NMLLC did not exist prior to 2002. (SUF ¶ 32.)

Plaintiff's claims against NMLLC fail as a matter of law because:

* The undisputed facts establish that the acquisition of The National Machinery Company's assets by foreclosure and public sale pursuant to Article 9 of the U.C.C. did not include an implied or express assumption of The National Machinery Company's liabilities.

* The undisputed facts establish that The National Machinery Company's ownership did not arrange the foreclosure and public sale, and that following the sale, The National Machinery Company and NMLLC maintained separate corporate identities, and did not experience continuity of ownership or management. Therefore, as a matter of law, NMLLC cannot be a "mere continuation" of The National Machinery Company and did not have a "de facto" merger with The National Machinery Company.

* The undisputed facts establish that it was The National Machinery Company's creditor that initiated the foreclosure and public sale, and there is no evidence to support any claim that inadequate consideration was paid by NMC Acquisition LLC ("Acquisition") for the senior debt held by The National Machinery Company's senior, secured lenders, or for the assets of The National Machinery Company following the foreclosure and public sale pursuant to Article 9 of the U.C.C. Therefore, as a matter of law, The National Machinery Company did not fraudulently enter into the transaction to escape its liabilities.

* NMLLC cannot be held liable as a successor under the "product line" theory because Massachusetts law does not recognize the theory as an exception to the general rule of non-liability for successor corporations.

Therefore, NMLLC requests that this Court grant it summary judgment as to plaintiff's amended complaint.

## II.     STATEMENT OF UNDISPUTED FACTS.

### A.     The National Machinery Company Defaulted on Loans And Its Assets Were Subsequently Foreclosed Upon And Sold.

On December 17, 2001, First National Bank of Chicago (later renamed Bank One and

ultimately Chase) and six other lenders (collectively referred to herein as the "Lenders") notified The National Machinery Company that it had defaulted on loans that it had secured in November of 1998 from the Lenders.  (SUF ¶ 4.)  At the time of the default, the amount The National Machinery Company owed to the lenders was approximately $33.5 million.  (SUF ¶ 5.)  The National Machinery Company was insolvent, i.e., the liquidation value of its assets was not sufficient to cover this debt.  (SUF ¶ 6.)

Upon this default, the Lenders froze The National Machinery Company's line of credit.  (SUF ¶ 7.)  One effect of this action was that checks The National Machinery Company had previously written drawing on its line of credit with the Lenders were rendered bad, and only those checks that the Lenders considered necessary to preserve the security for their debt were ultimately paid.   (SUF ¶ 8.)  Following the default and continuing through January of 2002, the Lenders allowed sufficient funds to keep a "skeleton crew" available at The National Machinery Company in order to collect accounts receivable and maintain the property.  (SUF ¶ 9.)   While The National Machinery Company had employed approximately 500 employees working for it in the manufacture of cold form presses (for shaping metal), ball headers (for manufacturing ball bearings), and threaders (for putting threads on metal) as of the date the Lenders froze the line of credit, thereafter, only ten to twenty people remained on the payroll.  (SUF ¶ 10.)

In February of 2002, the Lenders made sufficient funds available to increase The National Machinery Company's payroll to approximately fifty employees.  (SUF ¶ 11.)  This allowed The National Machinery Company to begin filling orders from customers for parts that were already in stock.  (SUF ¶ 12.)  However, after December 17, 2001, the Lenders did not make funds available sufficient to allow The National Machinery Company to take any new

orders for machines that required additional manufacturing, The National Machinery Company's primary line of business. (SUF ¶ 13.)

Throughout 2001, The National Machinery Company and its majority shareholder who also controlled its Board of Directors, Citicorp Venture Capital ("CVC"), had taken steps to try and save the company. First, The National Machinery Company entered into a series of forbearance agreements with the Lenders between April of 2001 and August of 2001 while The National Machinery Company struggled with its ability to pay down the debt. (SUF ¶ 14.) In the fall of 2001, in an effort to conserve cash flow, The National Machinery Company's senior management took pay-cuts of approximately 30%. (SUF ¶ 15.)

In addition, these events had led CVC to actively shop The National Machinery Company during 2001 in an effort to find a new lender to refinance the business. During 2001, CVC and its consultants, Deloitte & Touche, brought in several groups identified to The National Machinery Company management as potential groups to refinance the business in an effort to save the business. (SUF ¶ 16.) None of these individuals or groups ended up refinancing The National Machinery Company. (SUF ¶ 17.) CVC also considered the option of a bankruptcy for The National Machinery Company, but there were not even sufficient funds to pay the bankruptcy lawyers and ultimately CVC decided not to pursue that option. (SUF ¶ 18.)

Moreover, the Lenders' step of freezing The National Machinery Company's line of credit on December 17, 2001 was not the last step in this saga. Rather, during the time that followed The National Machinery Company's default, the Lenders brought to The National Machinery Company's main facility in Tiffin, Ohio, other parties interested in acquiring The National Machinery Company's debt. (SUF ¶ 19.) One of the parties who ultimately bid on the debt position and control over the security interests securing that debt was CVC itself; however,

for unknown reasons, CVC dropped its bid. A second party that bid on these positions was a company by the name of the Park Corporation ("Park"). Finally, a third entity that bid was called NMC Acquisition, LLC ("Acquisition"). Acquisition and its members had no relationship to either CVC or Park. (SUF ¶ 20.)

The Lenders considered the bids proposed by both Park and Acquisition and ultimately accepted Acquisition's bid to acquire the senior debt position and related security interests for $19 million on February 6, 2002. (SUF ¶ 21.) On February 12, 2002, Acquisition formally purchased that debt and those liens. None of the consideration for this purchase was stock in Acquisition and all of the consideration went to the Lenders, not to either CVC or The National Machinery Company. (SUF ¶ 22.)

On February 13, 2002, Acquisition provided notice to The National Machinery Company and its affiliates that Acquisition had purchased The National Machinery Company's debt. (SUF ¶ 23.) That same day, Acquisition also advised The National Machinery Company and its affiliates that they were in default and that Acquisition demanded immediate payment thereof. Furthermore, Acquisition notified these entities that it intended to proceed under Ohio's codification of Article 9 of the Uniform Commercial Code, Section 601 et seq., codified at Ohio Revised Code § 1309.601 et seq., if immediate repayment was not made. (SUF ¶ 24.) Also on February 13, 2002, Acquisition sent to The National Machinery Company, National Machinery Company – Europe, Inc., The National Machinery Company - Michigan, and NMC Holding Company a Notification of Disposition of Collateral, advising them, their affiliates, secured creditors and secondary obligors of Acquisition's intent to conduct a public sale of all personal property collateral, to be held on February 26, 2002. (SUF ¶ 25.) Acquisition advertised the public sale in both the *Advertiser-Tribune* of Tiffin, Ohio, the location of The National

209664/0002/924194/Version #:.2

Machinery Company's headquarters, and *The Blade* of Toledo, Ohio, the closest major city. (SUF ¶ 26.)

On February 26, 2002, a public sale of substantially all personal property of The National Machinery Company, National Machinery Company – Europe, Inc., and The National Machinery Company – Michigan was held at a law office in Tiffin, Ohio. The sale was conducted pursuant to Terms of Sale that were distributed to all attendees at the beginning of the proceedings. Both the Terms of Sale and the conduct of the sale itself were clear that the foreclosure and sale was held pursuant to Section 610 of Article 9 of the U.C.C., codified at Ohio Revised Code § 1309.610. (SUF ¶ 27; Ex. H, at NMLLC00092 ("This is a public foreclosure sale and is being conducted pursuant to section 1309.610 of the Ohio Revised Code.").)

At 10:00 a.m., Brent Howard commenced the sale proceedings, and a transcript of the sale and sign-in sheet were retained. At the sale, Acquisition bid $16 million of the secured debt it had acquired for the assets being sold. (SUF ¶ 28; Ex. H, NMLLC00090-98.) There were no other bidders and Acquisition's bid was accepted. (Id.) Accordingly, a Foreclosure Bill of Sale and Transfer Statement for the assets of The National Machinery Company, National Machinery Company – Europe, Inc., and The National Machinery Company – Michigan was issued to Acquisition. The Bill of Sale expressly provides that it is not conveying any of the National Machinery Company's liabilities to Acquisition. (SUF ¶ 29; Ex. I, at NMLLC 00100.)[1]

---

[1] While substantially all of the assets of The National Machinery Company were acquired by Acquisition pursuant to this foreclosure and public sale, certain of The National Machinery Company's real estate assets and the stock in The National Machinery Company's subsidiaries (but not stock of The National Machinery Company) were subsequently acquired by Acquisition on October 4, 2002 pursuant to a Global Settlement Agreement and Mutual Release with CVC. (SUF ¶ 30.)

209664/0002/924194/Version #:.2

B.     **Acquisition Forms NMLLC And Contributes
       To It the Assets of the National Machinery Company.**

Acquisition was formed on December 27, 2001 in the State of Delaware as a Limited Liability Company.  (SUF ¶ 31.)  Acquisition formed NMLLC as an Ohio Limited Liability company and wholly-owned subsidiary on March 5, 2002.  (SUF ¶ 32.)  That same day, Acquisition capitalized NMLLC by contributing to it, by a Bill of Sale, all assets, rights and properties then owned by Acquisition, other than the remaining National Machinery Company debt and associated liens and mortgages.  (SUF ¶ 33.)

C.     **NMLLC's Operations Begin.**

On or about March 5, 2002, NMLLC began selling cold form machines, ball headers, threaders and other large cold form machines.  NMLLC also provided after-market servicing for these machines.  (SUF ¶ 34.)  At the time that NMLLC began its operations, it employed approximately 150 employees, almost all of whom were previously employees of The National Machinery Company.  (SUF ¶ 35.)  However, CVC, The National Machinery Company's majority and controlling shareholder, did not, and does not, have any role with NMLLC, and the directors who were appointed by CVC and controlled The National Machinery Company Board of Directors have had no role with NMLLC since it began its operations.  (SUF ¶ 36.)

III.     **ARGUMENT**

A.     **STANDARD OF REVIEW.**

Summary judgment should be granted if the pleadings, depositions, admissions and affidavits establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 252 (1986); Richardson v. Matthews, 882 F. Supp. 6, 9 (D. Mass. 1995). Material

facts are those that are defined by substantive law and are necessary to apply the law. Anderson,

477 U.S. at 248; Logan Equipment Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1195 (D.

Mass. 1990). Disputes over unnecessary, trivial facts do not prevent courts from granting

motions for summary judgment. Anderson, 477 U.S. at 248; Logan Equipment Corp., 736 F.

Supp. at 1195.

> **B.  NMLLC IS ENTITLED TO SUMMARY JUDGMENT ON ALL
> OF PLAINTIFF'S CLAIMS BECAUSE IT IS NOT LIABLE UNDER
> ANY SUCCESSOR LIABILITY THEORY FOR PLAINTIFF'S
> CLAIMS AGAINST THE NATIONAL MACHINERY COMPANY.**

NMLCC did not exist prior to March 5, 2002. It was not involved in any way with the

original design, manufacture, or sale of the subject press in 1946, or with any subsequent

inspection or maintenance through August 2, 2001, when plaintiff was injured. Thus, the central

issue regarding the two product counts, negligence and breach of implied warranty related to the

design, manufacture, and sale of the subject press, concerns the liability of NMLCC for the

actions of defendant The National Machinery Company. The law is well settled on this issue.[2]

"The general rule in the majority of American jurisdictions, including Massachusetts, is

that 'a company which purchases the assets of another company is not liable for the debts and

---

[2] Massachusetts substantive law likely governs this dispute. Massachusetts has a adopted a functional choice of law approach that largely emulates the "most significant relationship test" as enunciated in Section 145 of the Restatement (Second) of Conflicts of Laws (1971), to determine the applicable law in tort actions. See Bushkin Ass'n, Inc. v. Raytheon Co., 393 Mass. 622, 631, 473 N.E.2d 662 (Mass. 1985); Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 646, 632 N.E.2d 832 (Mass. 1994). In personal injury cases, the state where the injury occurred usually has the most significant relationship to the cause of action, and thus that law usually applies. Cosme, 417 Mass. at 646; Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333 (Mass. 1983). In this case, because plaintiff resides in Massachusetts and his injury occurred in Massachusetts, Massachusetts likely has the most significant relationship to the occurrence and the parties. In any event, following Ohio law, the state where the machine was manufactured, leads to the same conclusion here. See Flaugher v. Cone Automatic Machine, Co., 30 Ohio St. 3rd 60, 62, 507 N.E.2d 331, 334 (1987). Furthermore, choice of law analysis is unnecessary when, as here, that choice will not affect the outcome of the case because the law of both jurisdictions is the same. Cohen, 389 Mass. at 332, n.7.

209664/0002/924194/Version #:.2

liabilities of the transferor.'" Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1447 (1st Cir. 1995)

(quoting Dayton v. Peck, Stow & Wilcox Co., 739 F.2d 690, 692 (1st Cir. 1984)); see also

Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc., 313 F.3d 616 (1st Cir. 2002);

Cargill, Inc. v. Beaver Coal & Oil Co., 424 Mass. 356, 359, 676 N.E.2d 815, 818, (Mass. 1997);

McCarthy v. Litton Industries, Inc., 410 Mass. 15, 21, 570 N.E.2d 1008, 1012, (Mass. 1991);

Guzman v. Mrm/Elgin, 409 Mass. 563, 566, 567 N.E.2d 929, 931, (Mass. 1991). This general

rule furthers the public policy in favor of the free alienation of capital. National Gypsum Co. v.

Continental Brands Corp., 895 F. Supp. 328, 333 (D. Mass. 1995). "By permitting firms to

freely dispose of their assets without encumbrance, the rule, at least in theory, insures that those

assets will be allocated to their most efficient use, thus benefiting the economy as a whole." Id.

 The four exceptions to the general rule of non-liability are as follows:  (1) there exists an

express or implied agreement of assumption;  (2) the transaction amounts to a consolidation or

merger of the purchaser or seller corporation;  (3) the purchaser is merely a continuation of the

seller; or  (4) the transaction is for the fraudulent purpose of escaping liability for the seller's

obligations. Carreiro, 68 F.3d at 1447 (quoting Dayton, 739 F.2d at 692). These principles are

applicable to products liability actions. Roy v. Bolens Corp., 629 F. Supp. 1070, 1072 (D. Mass.

1986). The burden is on the party challenging the sale to demonstrate successor liability under

one of the exceptions. Dayton, 739 F.2d at 692.  For reasons discussed below, plaintiff cannot

demonstrate that any of the exceptions apply in this case.

209664/0002/924194/Version #:.2

1.    **NMLLC Only Purchased the Assets of The National Machinery Company and Specifically Disclaimed Any Transfer of Liabilities.**

The first exception does not apply here because NMLLC did not expressly or impliedly agree to assume the liabilities of The National Machinery Company.  In fact, the Bill of Sale connected with Acquisition's purchase of The National Machinery Company's assets at public auction specifically provided that The National Machinery Company did not convey any of its liabilities to Acquisition:

> This Foreclosure Bill of Sale and Transfer Statement does not convey, and the Buyer shall not assume, directly or indirectly, any liabilities or obligations of the Debtor of any kind whatsoever and all of such liabilities and obligations are hereby disclaimed by the Buyer absolutely.

(SUF ¶ 29; Ex. I, at NMLLC 00100.)

2.    **NMLLC's Purchase of National Machinery Company's Assets did not Result in a De Facto Merger because the Two Companies Retained Separate Corporate Identities with Different Ownership and Management.**

The second exception is also inapplicable.  In <u>Motorsport Eng'g Inc. v. Maserati, S.p.A.</u>, 183 F. Supp. 2d 209 (D. Mass. 2001), this court explained:

> Courts are guided by four factors in determining whether a de facto merger has occurred for the purposes of establishing successor liability: (1) continuity of management, personnel, physical locations, assets, and general business operations; (2) continuity of shareholders; (3) whether the selling corporation liquidated and dissolved as soon as legally and practically possible; and (4) whether the purchasing corporation assumed the obligations of the seller necessary for uninterrupted continuation of the seller's normal business operations.

<u>Id</u>. at 220-221.  <u>See</u> <u>also</u> <u>Cargill, Inc.</u>, 424 Mass. at 359-60, 676 N.E.2d at 818.  Of these factors, the First Circuit has held that "continuity of shareholders" is the key element in determining whether a merger has occurred.  <u>Motorsport Eng'g Inc.</u>, 183 F. Supp. 2d at 220-21 (citing

209664/0002/924194/Version #:.2

Dayton, 739 F.2d at 693); see also Scott v. NG US 1, Inc., 67 Mass. App. Ct. 474, 486-87, 854 N.E.2d 981, 991 (Mass. App. Ct. 2006). Continuity of shareholders usually exists where "the purchaser corporation exchanges its own stock as consideration for the seller corporation's assets so that the shareholders of the seller corporation become a constituent part of the purchaser corporation." Motorsport Eng'g Inc., 183 F. Supp. 2d at 220-21 (quoting Dayton, 739 F.2d at 693).

In the present case, it is undisputed that Acquisition simply bought the bulk of The National Machinery Company's assets, and nothing more, at a public sale. There is no identity of ownership between The National Machinery Company and NMLLC. Since the formation of NMLLC in 2002, it has been a wholly-owned subsidiary of Acquisition. Acquisition, in turn, is a Delaware Limited Liability Company. CVC, The National Machinery Company's majority and controlling shareholder, did not, and does not, have any role with NMLLC, and the directors who were appointed by CVC and controlled The National Machinery Company Board of Directors have had no role with NMLLC since it began its operations. Both companies continued their separate existence following the sale of assets and NMLLC did not assume any obligations of The National Machinery Company in order to continue its operations.

> **3.    NMLLC was Not a Mere Continuation of The National Machinery Company because the Sale was Not Arranged by The National Machinery Company's Ownership so that it could Continue to Function in a New Corporate Form.**

Similarly, the third exception is also not applicable, largely for the same reasons the second exception does not apply. See Milliken & Co. v. Duro Textiles, LLC, 19 Mass. L. Rep. 509 (Mass. Super. Ct. 2005) ("The terms 'de facto merger' and 'mere continuation' are often used interchangeably and, in practice, appear to refer to the same concept."); National Gypsum Co., 895 F. Supp. at 336 (de facto merger analysis usually applied where ownership, assets and

management of one corporation are combined with those of another pre-existing entity; mere continuation analysis most often used where the owners of a selling entity set up the buyer in order to continue the business under a new form).

A mere continuation typically takes the form of a reorganization that transforms one corporate entity into another, where the purchasing corporation is merely a "new hat" for the seller. McCarthy v. Litton Indus., Inc., 410 Mass. 15, 22, 570 N.E.2d 1008, 1012 (1991). As with the de facto merger analysis above, the hallmark factors used to determine whether a successor corporation is a mere continuation of a predecessor corporation are continuity of directors, officers, and stockholders, and the continued existence of only one corporation after the sale of assets. 410 Mass. at 22, 570 N.E.2d at 1013. As noted above, different shareholders owned The National Machinery Company and NMLLC. The National Machinery Company's shareholders did not "set up" the asset purchase to continue under a "new hat." Moreover, The National Machinery Company continued to exist after the asset purchase. Therefore, NMLLC, as a matter of Massachusetts law, cannot be a "mere continuation" of The National Machinery Company. See McCarthy, 410 Mass. at 23, 570 N.E.2d at 1013.

### 4. Acquisition Initiated the Asset Sale; the Sale was not an Attempt by The National Machinery Company to Defraud its Creditors or Escape Liabilities.

The circumstances required under the fourth exception to the general rule of non-liability are also lacking here. The National Machinery Company's sale of assets in this case was not a fraudulent attempt to escape liability.[3] See U.S. Trust Co. v. Raritan River Steel Co. (In re Am. Spring Bed Mfg. Co.), 153 B.R. 365, 377 (Bankr. D. Mass. 1993) (quoting Dayton, 739 F.2d at

---

[3] To the extent that successor liability is based on a fraud theory, plaintiffs must plead it with the specificity required by Fed. R. Civ. P. 9(b). See JSB Indus. v. Nexus Payroll Servs., Inc., 2006 U.S. Dist. LEXIS 83274 (D. Mass. 2006). Plaintiffs have not done so here.

209664/0002/924194/Version #:.2

692). After a long period of turmoil and the ultimate foreclosure on its secured debt, The National Machinery Company's assets were sold at a public sale upon due notice. The sale was conducted pursuant to Terms of Sale that were distributed to all attendees at the beginning of the proceedings. Both the Terms of Sale and the conduct of the sale itself were clear that the foreclosure and sale was held pursuant to Section 610 of Article 9 of the U.C.C., codified at Ohio Revised Code § 1309.610.

Moreover, there is no allegation that the $19 million in secured debt that Acquisition bid to acquire the assets was inadequate. See, e.g., JSB Indus. v. Nexus Payroll Servs., Inc., 2006 U.S. Dist. LEXIS 83274 (D. Mass. 2006) (absent allegations of unreasonable purchase price, no fraud) (citing Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Ass'n Inc., 437 F. Supp. 1083, 1090-91 (D. Mass. 1977)). Finally, it cannot be contended that The National Machinery Company engineered the sale to escape its liabilities; to the contrary, Acquisition, The National Machinery Company's creditor, initiated the asset sale to recover on its lien.

### 5. NMLLC cannot be Liable as a Successor Under the "Product Line Theory" because Massachusetts has Firmly Rejected that Theory.

One final point merits brief discussion. In Ray v. Alad, 19 Cal. 3d 22, 560 P.2d 3 (1977), the Supreme Court of California introduced the "product line" theory exception to the general rule of a successor corporation's non-liability. Under that exception, where a "predecessor liquidates itself after the sale of its entire assets, plaintiffs subsequently injured by the products manufactured by the predecessor may recover against the successor." Kline v. Johns-Manville, 745 F.2d 1217, 1219 (9th Cir. 1984)(citing Ray).

In Guzman v. MRM/Elgin, the Massachusetts Supreme Court unequivocally rejected the "product line" exception, noting that none of the reasons articulated by the Ray Court for imposing strict liability on successor corporations were valid. 409 Mass. at 567-69. The Court

209664/0002/924194/Version #:.2

noted that placing the burden on one who did not place an injury-causing product in the stream of commerce was inconsistent with the goal of strict liability.  Id.  Guzman remains good law in Massachusetts.  McCarthy, 410 Mass. at 21 n. 4, 570 N.E.2d at 1012 n.4; Garcia v. Kusan, Inc., 39 Mass. App. Ct. 322, 330-31, 655 N.E.2d 1290, 1294-95 (Mass. App. Ct. 1995); National Gypsum Co., 895 F. Supp. at 340.  Therefore, plaintiffs cannot hold NMLLC accountable as a successor corporation under the "product line" theory.[4]

## IV.    CONCLUSION.

National Machinery LLC did not design, manufacture, sell or service the product involved in this lawsuit and, indeed, did not even exist until after plaintiff's accident.  There is no

---

[4] Even assuming, arguendo, that Massachusetts law recognized the "product line" theory, the facts here do not support such a theory of recovery.  First, plaintiff's remedy against the manufacturer of the machine has not been destroyed.  Defendant The National Machinery Company has indicated that it has a primary insurance policy with a limit of $1 million per occurrence ($175,000 self-insured retention) and an umbrella insurance policy with a limit of $15 million, excess of $1 million.  (SUF ¶¶ 37-38.)  Second, the acquisition of the debt position, and the ultimate purchase of The National Machinery Company's assets at the Article 9 public foreclosure sale did not cause a destruction of plaintiff's remedies against The National Machinery Company – it was the Lenders who held The National Machinery Company in default and froze its credit lines several months earlier that forced The National Machinery Company to cease its normal business operations.  See, e.g., Kline, 745 F.2d at 1220 (refusing to apply product line exception to afford a plaintiff "an additional remedy – one not accorded to any other creditor of [the predecessor company]");  Stewart v. Telex Comm., 1 Cal. Rptr. 2d 669, 676 (Cal. Ct. App. 1992) (affirming summary judgment for defendant successor corporation where the predecessor manufacturer declared bankruptcy and the successor corporation purchased assets from a bankruptcy sale); Lundell v. Sidney Mach.Tool Co., 236 Cal. Rptr. 70, 75 (Cal. Ct. App. 1987) (holding fact that several ownership changes had occurred "including a liquidation of assets" between the first sale of the predecessor company and the ultimate purchase by the defendant, "Defendants in the case at bench played no role in causing or contributing to the destruction of plaintiff's remedies" and the product line exception did not apply); and Nelson v. Tiffany Indus. Inc., 778 F.2d 533, 535 (9th Cir. 1985) (holding the product line exception did not apply where predecessor company filed a voluntary petition for Chapter 11 bankruptcy and, four months later, the defendant purchased the assets in a court-approved bankruptcy sale).

209664/0002/924194/Version #:.2

evidence to support any theory that National Machinery LLC is liable for the conduct of defendant The National Machinery Company.  Therefore, this Court should grant National Machinery LLC's motion for summary judgment.

Respectfully submitted,

**CLARK, HUNT & EMBRY**


___/s/ Mandi Jo Hanneke_____
William F. Ahern, Jr. (013365)
Mandi Jo Hanneke (657349)
55 Cambridge Parkway
Cambridge, MA  02142
(617) 494-1920

___/s/ Jeffrey B. Whitt_____
Jeffrey B. Whitt
William P. Robison
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive
Chicago, IL 60606
(312) 207-1000

209664/0002/924194/Version #:.2