# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ ) | | |
| **SALVATORE VACIRCA,** ) | | |
|     **Plaintiff** ) | | |
| ) | | |
| **v.** ) | **DOCKET NO. 05-11419-MLW** | |
| ) | | |
| **NATIONAL MACHINERY COMPANY** ) | | |
| **AND NATIONAL MACHINERY, LLC,** ) | | |
|     **Defendants** ) | | |
| _____) | | |

## DEFENDANT NATIONAL MACHINERY LLC'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant National Machinery LLC ("NMLLC") submits this Statement of Undisputed Material Facts, pursuant to Local Rule 56.1, in support of its motion for summary judgment on all claims asserted against it by plaintiff.

## I.    PLAINTIFF'S AMENDED COMPLAINT.

1.    Plaintiff, Salvatore Vacirca ("Vacirca"), has brought this action against defendants The National Machinery Company and NMLLC as a result of an on-the-job injury on August 2, 2001, while operating a National Machinery 700 Ton Maxipress Forge Press, Serial No. 18225.  (Exhibit 1, Am. Comp., ¶¶ 4, 6.)  Plaintiff alleges that The National Machinery Company designed, manufactured, and shipped the press machine in 1946 and that this machine was defective, causing plaintiff's injuries.  (Ex. 1, Am. Comp. ¶¶ 4, 11-12, 15-16; Exhibit 2, Dunlap Dep., p. 22; Exhibit 3, Stroup Dep., p. 101.)

2.    In addition to suing The National Machinery Company, the designer, manufacturer and seller of the press, plaintiff has sued NMLLC, the purchaser of The National Machinery Company's assets in 2002 after a foreclosure and public sale under Article 9 of the

Uniform Commercial Code ("U.C.C."). (Ex. 1, Am. Comp., Cts. III-IV; Exhibit 4, Certification of Robert Foster in Support of National Machinery LLC's Motion For Summary Judgment ("Foster Cert.") at ¶¶ 32-41.)

3.     Plaintiff's theories of recovery are negligence and breach of implied warranty against each defendant. (Ex. 1, Am. Comp., Cts. I-IV.)

## II.   THE NATIONAL MACHINERY COMPANY DEFAULTED ON LOANS AND ITS ASSETS WERE SUBSEQUENTLY FORECLOSED UPON AND SOLD.

4.     On December 17, 2001, First National Bank of Chicago (later renamed Bank One and ultimately Chase) and six other lenders (collectively referred to herein as the "Lenders") notified The National Machinery Company that it had defaulted on loans that it had secured in November of 1998 from the Lenders. (Ex. 4, Foster Cert. at ¶¶ 6, 16).

5.     At the time of the default, the amount The National Machinery Company owed to the lenders was approximately $33.5 million. (Id. at ¶ 10.)

6.     The National Machinery Company was insolvent, i.e., the liquidation value of its assets was not sufficient to cover this debt. (Id. at ¶ 16.)

7.     Upon this default, the Lenders froze The National Machinery Company's line of credit. (Id. at ¶16.)

8.     One effect of this action was that checks The National Machinery Company had previously written drawing on its line of credit with the Lenders were rendered bad, and only those checks that the Lenders considered necessary to preserve the security for their debt were ultimately paid. (Id. at ¶ 17.)

9.     Following the default and continuing through January of 2002, the Lenders allowed sufficient funds to keep a "skeleton crew" available at The National Machinery Company in order to collect accounts receivable and maintain the property. (Id. at ¶¶ 21-22.)

10.    While The National Machinery Company had employed approximately 500 employees working for it in the manufacture of cold form presses (for shaping metal), ball headers (for manufacturing ball bearings), and threaders (for putting threads on metal) as of the date the Lenders froze the line of credit, thereafter, only ten to twenty people remained on the payroll.  (Id. at ¶ 22.)

11.    In February of 2002, the Lenders made sufficient funds available to increase The National Machinery Company's payroll to approximately fifty employees.  (Id. at ¶ 23.)

12.    This allowed The National Machinery Company to begin filling orders from customers for parts that were already in stock.  (Id. at ¶ 25.)

13.    However, after December 17, 2001, the Lenders did not make funds available sufficient to allow The National Machinery Company to take any new orders for machines that required additional manufacturing, The National Machinery Company's primary line of business.  (Id. at ¶ 24.)

14.    Throughout 2001, The National Machinery Company and its majority shareholder who also controlled its Board of Directors, Citicorp Venture Capital ("CVC"), had taken steps to try and save the company.  First, The National Machinery Company entered into a series of forbearance agreements with the Lenders between April of 2001 and August of 2001 while The National Machinery Company struggled with its ability to pay down the debt.  (Id. at ¶ 9.)

15.    In the fall of 2001, in an effort to conserve cash flow, The National Machinery Company's senior management took pay-cuts of approximately 30%.  (Id. at ¶¶ 10-11.)

16.    In addition, these events had led CVC to actively shop The National Machinery Company during 2001 in an effort to find a new lender to refinance the business.  During 2001, CVC and its consultants, Deloitte & Touche, brought in several groups identified to The National

Machinery Company management as potential groups to refinance the business in an effort to save the business.  (Id. at ¶¶ 12-13.)

17.     None of these individuals or groups ended up refinancing The National Machinery Company.  (Id. at ¶ 14.)

18.     CVC also considered the option of a bankruptcy for The National Machinery Company, but there were not even sufficient funds to pay the bankruptcy lawyers and ultimately CVC decided not to pursue that option.  (Id. at ¶ 15.)

19.     Moreover, the Lenders' step of freezing The National Machinery Company's line of credit on December 17, 2001 was not the last step in this saga.  Rather, during the time that followed The National Machinery Company's default, the Lenders brought to The National Machinery Company's main facility in Tiffin, Ohio, other parties interested in acquiring The National Machinery Company's debt.  (Id. at ¶¶ 18-20.)

20.     One of the parties who ultimately bid on the debt position and control over the security interests securing that debt was CVC itself; however, for unknown reasons, CVC dropped its bid.  (Id. at ¶ 20.)  A second party that bid on these positions was a company by the name of the Park Corporation ("Park").  (Id.)  Finally, a third entity that bid was called NMC Acquisition, LLC ("Acquisition").  (Id. at ¶¶ 20, 29.)[1]  Acquisition and its members had no relationship to either CVC or Park.  (Id. at ¶¶ 20, 30.)

21.     The Lenders considered the bids proposed by both Park and Acquisition and ultimately accepted Acquisition's bid to acquire the senior debt position and related security interests for $19 million on February 6, 2002.  (Id. at ¶¶ 29, 31.)

---

[1] Acquisition has changed its name to NMC Group Global LLC.  (Ex. 4, Foster Cert. at ¶ 26.)

22.     On February 12, 2002, Acquisition formally purchased that debt and those liens. (Id. at ¶ 32.)  None of the consideration for this purchase was stock in Acquisition and all of the consideration went to the Lenders, not to either CVC or The National Machinery Company.  (Id.)

23.     On February 13, 2002, Acquisition provided notice to The National Machinery Company and its affiliates that Acquisition had purchased The National Machinery Company's debt.  (Id. at ¶ 33.)

24.     That same day, Acquisition also advised The National Machinery Company and its affiliates that they were in default and that Acquisition demanded immediate payment thereof. (Id. at ¶ 34.)  Furthermore, Acquisition notified these entities that it intended to proceed under Ohio's codification of Article 9 of the Uniform Commercial Code, Section 601 et seq., codified at Ohio Revised Code § 1309.601 et seq., if immediate repayment was not made. (Id.)

25.     Also on February 13, 2002, Acquisition sent to The National Machinery Company, National Machinery Company – Europe, Inc., The National Machinery Company - Michigan, and NMC Holding Company a Notification of Disposition of Collateral, advising them, their affiliates, secured creditors and secondary obligors of Acquisition's intent to conduct a public sale of all personal property collateral, to be held on February 26, 2002.  (Id. at ¶ 35.)

26.     Acquisition advertised the public sale in both the *Advertiser-Tribune* of Tiffin, Ohio, the location of The National Machinery Company's headquarters, and *The Blade* of Toledo, Ohio, the closest major city.  (Id. at ¶ 36.)

27.     On February 26, 2002, a public sale of substantially all personal property of The National Machinery Company, National Machinery Company – Europe, Inc., and The National Machinery Company – Michigan was held at a law office in Tiffin, Ohio.  The sale was conducted pursuant to Terms of Sale that were distributed to all attendees at the beginning of the

proceedings.  (<u>Id</u>. at ¶ 37.)  Both the Terms of Sale and the conduct of the sale itself were clear that the foreclosure and sale was held pursuant to Section 610 of Article 9 of the U.C.C., codified at Ohio Revised Code § 1309.610.  (<u>Id</u>.; Ex. H, at NMLLC00092 ("This is a public foreclosure sale and is being conducted pursuant to section 1309.610 of the Ohio Revised Code.").)

28.    At 10:00 a.m., Brent Howard commenced the sale proceedings, and a transcript of the sale and sign-in sheet were retained.  At the sale, Acquisition bid $16 million of the secured debt it had acquired for the assets being sold.  (<u>Id</u>.; Ex. H, NMLLC00090-98.)  There were no other bidders and Acquisition's bid was accepted.  (<u>Id</u>.)

29.    Accordingly, a Foreclosure Bill of Sale and Transfer Statement for the assets of The National Machinery Company, National Machinery Company – Europe, Inc., and The National Machinery Company – Michigan was issued to Acquisition.  (<u>Id</u>. at ¶ 38.)  The Bill of Sale expressly provides that it is not conveying any of the National Machinery Company's liabilities to Acquisition.  (<u>Id</u>., Ex. I, at NMLLC 00100.)

30.    While substantially all of the assets of The National Machinery Company were acquired by Acquisition pursuant to this foreclosure and public sale, certain of The National Machinery Company's real estate assets and the stock in The National Machinery Company's subsidiaries (but not stock of The National Machinery Company) were subsequently acquired by Acquisition on October 4, 2002 pursuant to a Global Settlement Agreement and Mutual Release with CVC.  (<u>Id</u>. at ¶ 42.)

III.    **ACQUISITION FORMS NMLLC AND CONTRIBUTES TO IT THE ASSETS OF THE NATIONAL MACHINERY COMPANY.**

31.    Acquisition was formed on December 27, 2001 in the State of Delaware as a Limited Liability Company.  (<u>Id</u>. at ¶¶ 28, 39.)

209664/0002/927285/Version #:.1

32.     Acquisition formed NMLLC as an Ohio Limited Liability company and wholly-owned subsidiary on March 5, 2002.  (Id. at ¶ 40.)

33.     That same day, Acquisition capitalized NMLLC by contributing to it, by a Bill of Sale, all assets, rights and properties then owned by Acquisition, other than the remaining National Machinery Company debt and associated liens and mortgages.  (Id. at ¶ 41.)

## IV.     NMLLC'S OPERATIONS BEGIN.

34.     On or about March 5, 2002, NMLLC began selling cold form machines, ball headers, threaders and other large cold form machines.  (Id. at ¶ 43.)  NMLLC also provided after-market servicing for these machines.  (Id.)

35.     At the time that NMLLC began its operations, it employed approximately 150 employees, almost all of whom were previously employees of The National Machinery Company.  (Id. at ¶ 44.)

36.     However, CVC, The National Machinery Company's majority and controlling shareholder, did not, and does not, have any role with NMLLC, and the directors who were appointed by CVC and controlled The National Machinery Company Board of Directors have had no role with NMLLC since it began its operations.  (Id. at ¶ 30.)

## V.     DEFENDANT THE NATIONAL MACHINERY COMPANY.

37.     St. Paul Travelers Surplus Lines Insurance Company issued a Products and Completed Work Liability Protection policy, number LC0 55 26462, to The National Machinery Company for the policy period 9/24/00 to 9/24/01.  The policy has limits of liability of $1 million per occurrence and in the aggregate, and a $175,000 self-insured retention amount. (Exhibit 5, Answers of Defendant, National Machinery Company, to Plaintiff's First Set of Interrogatories, No. 15.)

38.     RLI Insurance Company issued a Commercial Umbrella Liability policy to The National Machinery Company for the policy period 9/24/00 to 9/24/01, policy number OUL0044693.  The policy has limits of liability of $15 million, excess of $1 million.  (Id.)

Respectfully submitted,

**CLARK, HUNT & EMBRY**

__/s/ Mandi Jo Hanneke_____
William F. Ahern, Jr. (013365)
Mandi Jo Hanneke (657349)
55 Cambridge Parkway
Cambridge, MA  02142
(617) 494-1920

__/s/ Jeffrey B. Whitt_____
Jeffrey B. Whitt
William P. Robison
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive
Chicago, IL 60606
(312) 207-1000

209664/0002/927285/Version #:.1

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                      SUPERIOR COURT
                                                    C.A. # MICV2004-03022

SALVATORE VACIRCA,                          )
        Plaintiff                           )
                                            )
v.                                          )
                                            )
NATIONAL MACHINERY COMPANY,                 )
and NATIONAL MACHINERY, LLC,                )
        Defendants                          )

### AMENDED COMPLAINT WITH JURY CLAIM

NOW COMES the plaintiff and amends this complaint as a matter of course pursuant to
Massachusetts Rule of Civil Procedure 15(a).

1.    The plaintiff, Salvatore Vacirca ("Vacirca") is an individual who resides at 48
      Peterson Way, Tewksbury, Middlesex County, Massachusetts.

2.    The defendant, National Machinery Company ("National Machinery Co."), upon
      information and belief, is a foreign corporation with a principal place of business
      located at PO Box 648, Tiffin, Ohio 44883-2471. National Machinery Co. is
      subject to this Court's jurisdiction, both under the common law and the provisions
      of Massachusetts General Laws Chapter 223A.

3.    The defendant, National Machinery, LLC ("National Machinery, LLC"), upon
      information and belief, is a foreign corporation with a principal place of business
      located at 161 Greenfield Street, Tiffin, Ohio 44883-2471. National Machinery,
      LLC is subject to this Court's jurisdiction, both under the common law and the
      provisions of Massachusetts General Laws Chapter 223A.

4.    On or about August 2, 2001, the defendant, National Machinery Co., had
      contracted with Thermo Electron Corporation to design, manufacture, distribute,
      supply, sell, service, examine, evaluate, inspect and/or test a National Machinery
      700 Ton Maxipres Forge Press, Serial Number 18225 (hereinafter the
      "machine"). On or about August 2, 2001, the defendant, National Machinery Co.,
      had distributed, supplied, sold, service, examined, evaluated, inspected and/or
      tested the subject machine in Massachusetts.

5.    On or about August 2, 2001, the defendant, National Machinery, LLC, had
      contracted with Thermo Electron Corporation to design, manufacture, distribute,
      supply, sell, service, examine, evaluate, inspect and/or test the machine. On or
      about August 2, 2001, the defendant, National Machinery, LLC, had distributed,
      supplied, sold, service, examined, evaluated, inspected and/or tested the subject
      machine in Massachusetts.

6. On or about August 2, 2001, the plaintiff, Vacirca, while working for his employer, Thermo Electron Corporation, was operating the subject machine with all due care when the subject machine injured the plaintiff.

7. The plaintiff's claims against the defendant National Machinery Co., arise from the defendant's:
   a. transacting business in the Commonwealth of Massachusetts;
   b. contracting to supply services or things in the Commonwealth of Massachusetts;
   c. causing tortious injury by an act or omission in the Commonwealth of Massachusetts; and/or
   d. causing tortious injury in the Commonwealth of Massachusetts by an act or omission outside of the Commonwealth of Massachusetts and regularly doing and soliciting business and engaging in other persistent courses of conduct, and deriving substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts

8. The plaintiff's claims against the defendant National Machinery, LLC, arise from the defendant's:
   a. transacting business in the Commonwealth of Massachusetts;
   b. contracting to supply services or things in the Commonwealth of Massachusetts;
   c. causing tortious injury by an act or omission in the Commonwealth of Massachusetts; and/or
   d. causing tortious injury in the Commonwealth of Massachusetts by an act or omission outside of the Commonwealth of Massachusetts and regularly doing and soliciting business and engaging in other persistent courses of conduct, and deriving substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts

COUNT I

9. The plaintiff realleges and repeats each and every allegation contained in paragraphs 1 through 8 and incorporates each as if fully set forth herein.

10. This count is for negligence and is brought by the plaintiff against the defendant, National Machinery Co.

11. The defendant, National Machinery Co., was negligent with respect to the design, manufacture, distribution, supply, selling, servicing, examination, evaluation, inspection and/or testing of the subject machine and was negligent with respect to equipping the subject machine with adequate safeguards, warnings and/or instructions.

12. As the direct and proximate result of the defendant National Machinery's said negligence, the plaintiff sustained severe and permanent physical injury, suffered great pain of body and anguish of mind, required extensive hospital and medical

care and treatment, incurred medical expenses, lost time from work; and his ability to engage in normal and usual activities has been adversely affected.

WHEREFORE, the plaintiff, Salvatore Vacirca, demands judgment against the defendant, National Machinery Company, in an amount sufficient to compensate him for his losses and damages, together with interest and costs.

## COUNT II

13.    The plaintiff realleges and repeats each and every allegation contained in paragraphs 1 through 12 and incorporates each as if fully set forth herein.

14.    This Count is for Breach of Implied Warranty and is brought by the plaintiff against the defendant, National Machinery Co.

15.    The defendant, National Machinery Co., impliedly warranted to the plaintiff that the subject product and its component parts were merchantable, safe and fit for ordinary purposes.  The defendant, National Machinery Co., is a merchant with respect to goods of the kind involved in the accident.  The product, component parts of the product and the product warnings and instructions were defective, and therefore the product was not, in fact, merchantable, safe and fit as warranted by the defendant, National Machinery Co. The defendant therefore breached these warranties to the plaintiff.

16.    As the direct and proximate result of the defendant, National Machinery Co.'s said breaches of warranties, the plaintiff sustained severe and permanent physical injury, suffered great pain of body and anguish of mind, required extensive hospital and medical care and treatment, incurred medical expenses, lost time from work; and his ability to engage in normal and usual activities has been adversely affected.

WHEREFORE, the plaintiff, Salvatore Vacirca, demands judgment against the defendant, National Machinery Company, in an amount sufficient to compensate him for his losses and damages, together with interest and costs.

## COUNT III

17.    The plaintiff realleges and repeats each and every allegation contained in paragraphs 1 through 16 and incorporates each as if fully set forth herein.

18.    This count is for negligence and is brought by the plaintiff against the defendant, National Machinery, LLC.

19.    The defendant, National Machinery, LLC, was negligent with respect to the design, manufacture, distribution, supply, selling, servicing, examination, evaluation, inspection and/or testing of the subject machine and was negligent with respect to equipping the subject machine with adequate safeguards, warnings and/or instructions.

20.  As the direct and proximate result of the defendant National Machinery, LLC's said negligence, the plaintiff sustained severe and permanent physical injury, suffered great pain of body and anguish of mind, required extensive hospital and medical care and treatment, incurred medical expenses, lost time from work; and his ability to engage in normal and usual activities has been adversely affected.

WHEREFORE, the plaintiff, Salvatore Vacirca, demands judgment against the defendant, National Machinery, LLC, in an amount sufficient to compensate him for his losses and damages, together with interest and costs.

<div align="center">COUNT II</div>

21.  The plaintiff realleges and repeats each and every allegation contained in paragraphs 1 through 20 and incorporates each as if fully set forth herein.

22.  This Count is for Breach of Implied Warranty and is brought by the plaintiff against the defendant, National Machinery Co.

23.  The defendant, National Machinery, LLC, impliedly warranted to the plaintiff that the subject product and its component parts were merchantable, safe and fit for ordinary purposes.  The defendant, National Machinery, LLC, is a merchant with respect to goods of the kind involved in the accident.  The product, component parts of the product and the product warnings and instructions were defective, and therefore the product was not, in fact, merchantable, safe and fit as warranted by the defendant, National Machinery, LLC. The defendant therefore breached these warranties to the plaintiff.

24.  As the direct and proximate result of the defendant, National Machinery, LLC's said breaches of warranties, the plaintiff sustained severe and permanent physical injury, suffered great pain of body and anguish of mind, required extensive hospital and medical care and treatment, incurred medical expenses, lost time from work; and his ability to engage in normal and usual activities has been adversely affected.

WHEREFORE, the plaintiff, Salvatore Vacirca, demands judgment against the defendant, National Machinery, LLC, in an amount sufficient to compensate him for his losses and damages, together with interest and costs.

THE PLAINTIFF CLAIMS TRIAL BY JURY

Respectfully submitted,

SALVATORE VACIRCA
By his Attorney,

_____
Richard J. Sullivan
BBO # 554085
Sullivan & Sullivan, LLP
31 Washington Street
Wellesley, MA 02481
(781) 263-9400

# EXHIBIT 2

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

2

3                         - - -

4    Salvatore Vacirca,          )

                                 )

5                Plaintiff,       )

                                 )

6         vs.                     )    Case No. 05-11419-MLW

                                 )

7    National Machinery Company  )

     and National Machinery LLC, )

8                                 )

                 Defendants.      )

9

10                        - - -

11

12        Deposition of Donald Dunlap, a witness herein,

13    called on behalf of the plaintiff for oral

14    examination, pursuant to the Federal Rules of Civil

15    Procedure, taken before Jacqueline L. Reichert,

16    court reporter and Notary Public in and for the

17    State of Massachusetts, pursuant to notice, at the

18    Hampton Inn, Conference Room B,

19    2492 South State Route 231, Tiffin, Ohio on

20    Wednesday, December 6, 2006, commencing at

21    12:40 p.m.

22                        - - -

23

24

25

Page 22

1       meant?

2    A  "Date at last change."  If the machine was

3       sold to another customer, that would have a

4       last change date in there, or if this company

5       bought a machine from another customer it

6       would have it in there.  It was kind of a

7       paper trail to keep track where the machines

8       were.

9    Q  What was the date of, for this Thermo Wil

10      machine?

11   A  The last change?

12   Q  Yes, sir.

13   A  1994.  7/22/1994.

14   Q  Can you tell when it was Thermo -- that

15      National Machinery found out that

16      Thermo Electron had this machine as of

17      July of 1994?

18   A  I'm assuming that they bought it new.

19   Q  Let's go back up to the top box of that serial

20      number.  It shows that the machine was

21      actually originally manufactured in 1946?

22   A  Yes.

23   Q  So when you say they bought it new, you mean

24      they bought it from someone else?

25   A  No.  Original customer was 99999, I don't know

# EXHIBIT 3

Page 1

1        IN THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

2

3                   - - -

4  Salvatore Vacirca,      )

                      )

5         Plaintiff,     )

                      )

6    vs.              )  Case No. 05-11419-MLW

                      )

7  National Machinery Company )

  and National Machinery LLC, )

8                   )

         Defendants.    )

9

10                  - - -

11

12     Deposition of Gary Stroup, a witness herein,

13  called on behalf of the plaintiff for oral

14  examination, pursuant to the Federal Rules of Civil

15  Procedure, taken before Jacqueline L. Reichert,

16  court reporter and Notary Public in and for the

17  State of Massachusetts, pursuant to notice, at the

18  Hampton Inn, Conference Room B,

19  2492 South State Route 231, Tiffin, Ohio on

20  Wednesday, December 6, 2006, commencing at 9:18 a.m.

21                - - -

22

23

24

25

```
 1              code?  Original customer, it has "99999, 999,
 2              see original invoice."
 3                   Do you see that?
 4    A         Yes.
 5    Q         If you start from halfway down the page, it
 6              gives the machine number and then it gives the
 7              date originally shipped, November 1946?
 8    A         Yes.
 9    Q         And some machine codes 700 MP, that's
10              Maxipres?
11    A         Right.
12    Q         And then it says current customer and they're
13              given a number 11551?
14    A         Right.
15    Q         Thermo Wil?
16    A         Wilmington.
17    Q         That's Thermo Electric located in
18              Wilmington, Massachusetts?
19    A         Yes.
20    Q         And it says date add last charge, what dates
21              does that have?
22              MR. WHITT:      I'll object to the
23              interpretation of the document.
24    Q         Well, do the words say date, add/last --
25    A         Change.
```

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SALVATORE VACIRCA,<br>    **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | DOCKET NO. 05-11419-MLW |
| | ) | |
| | ) | **CERTIFICATION OF ROBERT** |
| NATIONAL MACHINERY COMPANY | ) | **FOSTER IN SUPPORT OF** |
| AND NATIONAL MACHINERY, LLC, | ) | **LLC'S MOTION FOR** |
| | ) | **NATIONAL MACHINERY** |
|     **Defendants** | ) | **SUMMARY JUDGMENT** |
| | ) | |

I, Robert Foster, hereby certify that:

1.    I am currently the Vice President of Finance for National Machinery LLC ("NMLLC"), as well as its Treasurer

2.    From 1989 through my resignation at the end of 2001, I was the Vice President of Finance for The National Machinery Company. In addition, from 1989 through my resignation at the end of 2001, I was the Secretary and Treasurer for The National Machinery Company

3.    In my capacity as Vice President of Finance, Secretary and Treasurer of The National Machinery Company, I have personal knowledge about the financial history of The National Machinery Company, the historical records showing the financial history of the Company since 1998, and the facts stated herein

4.    The records of the company kept in the normal and ordinary course of its business show that on or about November 6, 1998, Citicorp Venture Capital ("CVC") acquired a controlling interest in The National Machinery Company: it acquired a majority of the voting stock and the power to appoint a majority of The National Machinery Company's Board of Directors.

5      After CVC acquired this controlling interest, it appointed three of the five members of The National Machinery Company's Board of Directors  Between 1998 and 2002, those three positions remained under CVC's control.

6.     The records of the company kept in the normal and ordinary course of its business also show that in November of 1998, CVC caused The National Machinery Company to enter into a series of loan agreements and credit agreements with a group of banks, headed by First National Bank of Chicago (now known as Chase) (collectively the "Lenders")

7.     The records of the company kept in the normal and ordinary course of its business show that in connection with these November 1998 loan agreements, the Lenders entered into a Senior Subordinated Credit Agreement with The National Machinery Company by which the Lenders took a security interest in substantially all of the personal property of The National Machinery Company In exchange, the Lenders extended The National Machinery Company loans and financial accommodations of $55,000,000.

8.     The records of the company kept in the normal and ordinary course of its business show that over the course of the next two years, The National Machinery Company drew on this Line of Credit and the Lenders and The National Machinery Company entered into amendments to the Credit Agreement.

9.     By the beginning of 2001, The National Machinery Company determined that it would have difficulties meeting several of the financial covenants in the debt agreement with the Lenders.  As a result and in an effort to avoid defaulting on the agreement, between April and August of 2001, the Lenders and The National Machinery Company entered into a series of forbearance agreements.  The records of the company kept in the normal and ordinary course of its business show that each of these forbearance agreements allowed The National Machinery Company additional time in order to try and pay down the amount of debt it owed to the Lenders pursuant to the 1998 agreement, as amended and modified

209664/0002/925194/Version #: 1

10      The records of the company kept in the normal and ordinary course of its business show that during 2001, The National Machinery Company was paying down this debt with as much cash as it could make available, but by December 17, 2001, The National Machinery Company owed approximately $33,500,000 to the Lenders.

11.     One example of a way that The National Machinery Company was attempting to pay down its debt is that, in the fall of 2001, all of The National Machinery Company's senior management, myself included, took a pay cut of approximately 30%. This was done in order to make as much cash as possible available to pay down the debt owed to the Lenders.

12.     In addition to efforts to pay down the debt owed to the Lenders, The National Machinery Company's controlling shareholder, CVC, was taking steps during 2001 to try and find a new lender to refinance The National Machinery Company in order to save it

13.     Throughout 2001, CVC met with its consultants, Deloitte and Touche, at The National Machinery Company's facility in Tiffin, Ohio. During that timeframe, CVC and/or Deloitte and Touche brought in several individuals or groups that were represented to me to be individuals or groups considering refinancing The National Machinery Company.

14.     Ultimately, none of these individuals or groups refinanced The National Machinery Company from CVC.

15      CVC also considered the option of a bankruptcy for The National Machinery Company. However, there were not even sufficient funds to pay the bankruptcy lawyers and ultimately CVC abandoned that option.

16.     On December 17, 2001, the Lenders notified The National Machinery Company that they considered The National Machinery Company in default and froze The National Machinery Company's line of credit. The liquidation value of The National Machinery Company's assets was not sufficient to cover the debt then

owed to the Lenders

17      One effect of this action was that checks The National Machinery Company had previously written drawing on its line of credit with the Lenders were rendered bad, and only those checks that the Lenders considered necessary to preserve the security for their debt were ultimately paid

18.     Both before and after the Lenders froze The National Machinery Company's line of credit, the Lenders had their own consultant at The National Machinery Company's facility in Tiffin, Ohio.

19.     After freezing The National Machinery Company's line of credit, the Lenders and/or their consultant brought in at least one group that was represented to me to be considering acquiring the senior debt position of the Lenders and the corresponding security interest in the assets of The National Machinery Company

20.     One of the parties who ultimately bid on the debt position and control over the security interests securing that debt was CVC itself; however, for reasons that I do not know, CVC dropped its bid. A second party that bid on these positions was a company by the name of the Park Corporation ("Park"). Finally, a third entity that bid was called NMC Acquisition, LLC ("Acquisition") Acquisition and its members have no relationship to either CVC or Park

21.     While it appeared to me that the Lenders were shopping their interest in The National Machinery Company, the Lenders made only limited funds available to The National Machinery Company. Following December 17, 2001 and continuing into January of 2002, the Lenders made funds available for only limited operations, such as maintaining the property and collecting receivables.

22.     During this timeframe, The National Machinery Company had only a skeleton crew of about ten to fifteen people, including me, on its payroll As a point of comparison, prior to the Lenders freezing its line of credit, The National Machinery Company had approximately five hundred employees working for it on its payroll These employees were primarily involved in the manufacture of

4                                       209664/0002/925194/Version #:.1

cold form presses (for shaping metal), ball headers (for manufacturing ball bearings), and threaders.

23. In February 2002, however, the Lenders began making some more funds available to The National Machinery Company. By the end of February 2002, The National Machinery Company had approximately fifty people on its payroll

24. The records kept by the company in the normal and ordinary course of its business show that at all times after December 17, 2001, The National Machinery Company was unable to take orders from any customers that required the assembly of any new machines. Up until that point, the manufacture and sale of these machines was The National Machinery Company's primary line of business

25. However, after the Lenders began making more available in February of 2002, The National Machinery Company began taking orders for after-market parts that were then in stock.

26. In my position as Vice President of Finance and Treasurer for NMLLC, I am familiar with the individuals and entities involved with both NMLLC and NMC Acquisition LLC ("Acquisition") (now known as NMC Group Global LLC).

27. In my position as Vice President of Finance and Treasurer of NMLLC, I am familiar with the documents that describe the acquisition of debt by Acquisition and the ultimate formation and capitalization of NMLLC by Acquisition.

28. The Certificate of Formation attached hereto as Exhibit A is a true and correct copy of the Certificate of Formation of NMC Acquisition LLC dated December 27, 2001.

29. The Lenders ultimately accepted a bid from Acquisition to acquire the Lenders' senior debt position and related security interests for $19 million in or around February 6, 2002

30. CVC has never had any role with, or interest in, either NMLLC or Acquisition. Likewise, the directors named to The National Machinery Company Board of Directors by CVC have never had any role with, or interest in, either NMLLC or

209664/0002/925194/Version #:.1

Acquisition

31    The Letter of Intent attached hereto as Exhibit B is a true and correct copy of the
      Letter of Intent dated February 6, 2002, pursuant to which Acquisition proposed
      to acquire good and marketable title to all liens, claims, mortgages, interests,
      credits, notes, loans, rights and privileges owned or held by the Senior Lenders
      (collectively the "Senior Claims") in or against The National Machinery
      Company ("NMC"), an Ohio corporation, its parent NMC Holding Company, a
      Delaware corporation ("Holding"), and their subsidiaries (together with NMC and
      Holding the "NMC Entities") or any of their assets

32    The Assignment Agreement attached hereto as Exhibit C is a true and correct
      copy of the Assignment Agreement entered into between Bank One NA (formerly
      known as The First National Bank of Chicago) ("Bank One"), the CIT
      Group/Business Credit, Inc ("CIT"), Fleet National Bank ("Fleet"), The
      Huntington National Bank ("Huntington"), National City Bank ("National City"),
      Firstar Bank, N A ("Firstar") and Fifth Third Bank, Northwestern Ohio, N A
      ("Fifth Third") (collectively, the "Assignors") and NMC Acquisition LLC (the
      "Assignee"), dated as of February 12, 2002   By this document, Acquisition
      purchased from the Lenders the senior debt position they held related to The
      National Machinery Company.

33.   The Notice of Purchase attached hereto as Exhibit D is a true and correct copy of
      the Notice of Purchase of Senior Indebtedness sent to The National Machinery
      Company and its affiliates, NMC Holding Company ("Holding"), and Citicorp
      Venture Capital, Ltd ("CVC") dated February 13, 2002.  By this document
      Acquisition advised The National Machinery Company, its affiliates and its
      majority shareholder that it had purchased The National Machinery Company's
      debt from the Lenders.

34.   The Notice of Default attached hereto as Exhibit E is a true and correct copy of
      the Demand for Payment/Notice of Default sent to The National Machinery

209664/0002/925194/Version #: 1

Company and its affiliates, Holding, and CVC dated February 13, 2002. By this document, Acquisition advised The National Machinery Company, its affiliates and its majority shareholder that The National Machinery Company debt was in default and Acquisition demanded immediate payment thereof.

35. The Notification of Disposition of Collateral attached hereto as Exhibit F is a true and correct copy of The Notification of Disposition of Collateral to be held on February 26, 2002, sent to The National Machinery Company and its affiliates, Holding, CVC, the Ohio Department of Taxation, the Tax Commissioner's Office, and the Office of the Chief Counsel for the Ohio Department of Taxation and dated February 13, 2002. By this document, Acquisition notified these entities of Acquisition's intent to conduct a public sale of all personal property collateral securing The National Machinery Company's debt on February 26, 2002.

36. Acquisition advertised the public sale in both the *Advertiser-Tribune* of Tiffin, Ohio, the location of The National Machinery Company's headquarters, and *The Blade* of Toledo, Ohio, the closest major city.

37. The Terms of Sale attached hereto as Exhibit G is a true and correct copy of The Terms of Sale of the Assets of The National Machinery Company Dated February 13, 2002. Likewise, the Sales Transcript attached hereto as Exhibit H is a true and correct copy of the Transcript of the February 26, 2002 Sale of the Assets of The National Machinery Company and its affiliates. Both the Terms of Sale and the Sales Transcript identify the public sale that occurred on February 26, 2002, that it was being conducted pursuant to section 1309.610 of the Ohio Revised Code, Article 9 of the Uniform Commercial Code and that Acquisition was the only bidder for The National Machinery Company's assets.

38. The Foreclosure Bill of Sale attached hereto as Exhibit I is a true and correct copy of the Foreclosure Bill of Sale and Transfer Statement for the assets of The National Machinery Company, National Machinery Company – Europe, Inc., and

The National Machinery Company – Michigan issued to Acquisition by the Lenders, dated February 26, 2002

39.    The Second Amended and Restated Limited Liability Company Agreement attached hereto as Exhibit J is a true and correct copy of the Second Amended and Restated Limited Liability Company Agreement of NMC Acquisition LLC, A Delaware Limited Liability Company dated April 15, 2002 and effective as of February 11, 2002.

40.    The Operating Agreement attached hereto as Exhibit K is a true and correct copy of the Operating Agreement of National Machinery LLC entered into and effective as of March 5, 2002, by Acquisition, a Delaware Limited Liability company, as the sole member (the "Member") of the Company

41.    The Bill of Sale attached hereto as Exhibit L is a true and correct copy of the Bill of Sale from Acquisition to National Machinery LLC dated March 5, 2002 of all assets, rights and properties then owned by Acquisition, other than the remaining National Machinery Company debt and associated liens and mortgages

42.    While substantially all of the assets of The National Machinery Company were acquired by Acquisition pursuant to this foreclosure and public sale, certain of The National Machinery Company's real estate assets and the stock in The National Machinery Company's subsidiaries (but not stock of The National Machinery Company) were subsequently acquired by Acquisition on October 4, 2002 pursuant to a Global Settlement Agreement and Mutual Release with CVC, attached hereto as Exhibit M   Exhibit M is a true and correct copy of the Global Settlement Agreement and Mutual Release.

43.    On or about March 5, 2002, NMLLC began selling cold form machines, ball headers, threaders and other large cold form machines   NMLLC also provided after-market servicing for these machines.

44.    At the time that NMLLC began its operations, it employed approximately 150 employees, almost all of whom were previously employees of The National

Machinery Company.

45.    Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that all the foregoing is true and correct.

Dated: January 11, 2007

_____
Robert Foster

209664/0002/925194/Version #: 1

# EXHIBIT A

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "NMC ACQUISITION LLC",
FILED IN THIS OFFICE ON THE TWENTY-SEVENTH DAY OF DECEMBER, A.D.
2001, AT 2:30 O'CLOCK P.M.

NMLLC 00105

CONFIDENTIAL

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3473996  8100

010670699

AUTHENTICATION: 1528707

DATE: 12-27-01

DEC-27-2001  12:51          CT CORPORATION

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:30 PM 12/27/2001
010670699 - 3473996

## CERTIFICATE OF FORMATION
## OF
## NMC ACQUISITION LLC

ONE:        The name of the limited liability company is NMC Acquisition LLC.

TWO:        The address of the registered office is 1209 Orange Street, Wilmington, Delaware 19801, and the name of the registered agent for service of process is **The Corporation Trust Company**

Dated: December 27, 2001

James J. Greenberger, Authorized Person

H:\USERS\UB\Cwp\Form\NMC Acquisition LLC.wpd 12/27/01

NMLLC 00106

**CONFIDENTIAL**

TOTAL P.02

# EXHIBIT B

February 6, 2002

**PRIVATE & CONFIDENTIAL**

Bank One, NA, individually and
 as agent for all senior secured lenders to
 The National Machinery Company (hereafter
 referred to as the "Senior Lenders")
Bank One Plaza, 10 South Dearborn Street
Chicago, Illinois 60603
Attn: Kevin Christensen

Gentlemen:

This letter constitutes a Letter of Intent pursuant to which NMC Acquisition LLC, a Delaware limited liability company, or one or more other entities (collectively, the "Buyer") to be formed by Andrew H. Kalnow ("Kalnow"), proposes to acquire good and marketable title to all liens, claims, mortgages, interests, credits, notes, loans, rights and privileges owned or held by the Senior Lenders (collectively, the "Senior Claims") in or against The National Machinery Company, an Ohio corporation ("NMC"), its parent, NMC Holding Company, a Delaware corporation ("Holding"), and their subsidiaries (together with NMC and Holding, the "NMC Entities") or any of their assets.

1.    Contemplated Transaction.  At a time to be mutually agreed upon by Buyer and the Senior Lenders (the "Closing"), but not later than three (3) business days following the acceptance and return of this letter by all Senior Lenders, Buyer will purchase from the Senior Lenders, and the Senior Lenders will sell to Buyer, the Senior Claims for the consideration specified in paragraph 2 of this letter.

2.    Consideration to Senior Lenders.  In consideration for the Senior Claims, Buyer will pay to Bank One, N.A., as agent for the Senior Lenders (the "Agent"), $19,000,000 in immediately available funds at Closing.

3.    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the purchase of the Senior Claims is subject to the satisfaction of the following conditions on or prior to the Closing:

(a)    The Senior Claims shall include, at the time of the Closing, a valid, perfected, first priority security interest, pledge and mortgage on substantially all of the assets of Holding and NMC securing indebtedness owed to the Senior Lenders of not less than $33,500,000.  The Senior Lenders shall believe the Senior Claims to be valid and enforceable.  There shall be no liens recorded against any assets of the NMC Entities other than (i) liens recorded against real property assets that are junior and subordinate to the Senior Claims and other liens and easements that are not material, (ii) liens memorializing equipment leases in favor of IBM Corporation and Heller Financial, and (iii) liens securing the Senior Claims.



NMLLC 00004

CONFIDENTIAL

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 2

      (b)    The Senior Lenders shall own and be able to convey to Buyer at Closing good and marketable title to the Senior Claims free and clear of any liens, claims, encumbrances or restrictions of any kind whatsoever. No person other than a Senior Lender shall have any rights or interests in a Senior Claim.

      (c)    Since December 1, 2001, none of the Senior Lenders shall have waived, modified, released, sold, assigned, or granted a participation in a Senior Claim.

      (d)    None of the Senior Claims shall be the subject of any injunction or lawsuit (other than a bankruptcy stay) and no lawsuit shall be pending or threatened that seeks to challenge or enjoin Buyer's purchase of the Senior Claims or the validity or enforceability of any Senior Claim or otherwise seeks a remedy against the Senior Lenders.

      (e)    No material and adverse change shall have occurred in the business or prospects of NMC and its subsidiaries since February 4, 2002, and the business of NMC shall have been operated and managed in a substantially consistent manner during the period between January 1, 2002, and the Closing. Buyer, being generally familiar with the business of NMC prior to those dates, will accept all other business risk.

      (f)    Buyer and the Senior Lenders shall have entered into an Assignment Agreement and an Agency Assumption Agreement with respect to the Senior Claims and an assignment of the Agent's rights as agent containing terms that are reasonably acceptable to Buyer, the Agent and their respective counsel and Senior Lenders shall have performed all of their obligations under this Letter of Intent.

    4.    <u>Interim Working Capital; Access</u>. Following their acceptance of this Letter of Intent and prior to the Closing, the Senior Lenders will have no obligation to make any further advances to NMC and shall make no further collections with respect to the Senior Claims. Notwithstanding the foregoing, it is agreed that the proceeds of the Company's collection of a payment of approximately $400,000 from Pasotti prior to the date hereof belong to the Senior Lenders and will be paid to the Senior Lenders by NMC notwithstanding the sale of the Senior Claims to Purchaser. Senior Lenders will use their best efforts to provide Buyer and its representatives full access to NMC, its management and employees prior to Closing.

    5.    <u>Exclusivity</u>. Prior to 5:00 p.m. (Central Time) on Monday, February 11, 2002 (the "<u>Exclusivity Period</u>"), the Senior Lenders will negotiate exclusively with Buyer and its representatives concerning a purchase of the Senior Claims or any interest in or assets of the NMC Entities (a "<u>Possible Transaction</u>"). During the Exclusivity Period, the Senior Lenders will not encourage any person other than Buyer or its representatives to conduct a due diligence review of any NMC Entity, its assets or any of the Senior Claims in connection with a Possible Transaction. The Senior Lenders will promptly report to Buyer any inquires or offers received from third parties concerning a Possible

C:\windows\TEMP\LOI Purchase of Debt-4.DOC



NMLLC 00005

CONFIDENTIAL

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 3

Transaction and will immediately provide to Buyer copies of any written correspondence containing such inquiries or offers.

6.   No Publicity.  None of the Senior Lenders will disclose to the press or to any other person or entity the terms of this Letter of Intent or the terms of any purchase by Buyer of the Senior Claims without the prior written consent of Kalnow.  Prior to the Closing, the Senior Lenders will not disclose to any person or entity the identity of the Buyer or any of its affiliates, or make any statements to the press whatsoever, without the prior written consent of Kalnow.

7.   Earnest Money Deposit.  In order to evidence its good faith commitment to proceed with the transaction anticipated in this Letter of Intent, Buyer shall deposit the sum of $500,000 in escrow with the Agent within 24 hours following the Senior Lenders' acceptance and return of this Letter of Intent.  In the event that Buyer either (a) is unable or wrongfully refuses to close its purchase of the Senior Claims, or (b) refuses to close the purchase solely on account of the failure of the condition described in paragraph 3(e) of this Letter of Intent, the Senior Lenders shall be entitled to retain the $500,000 deposit as liquidated damages for Buyer's breach of contract.

The terms of this Letter of Intent shall remain open until 4:30 p.m. (central time), Wednesday, February 6, 2002, at which time this Letter of Intent shall expire if not by then accepted and returned to us by all of the Senior Lenders.  If this Letter of Intent correctly sets forth our mutual agreement, please so indicate by signing this letter in the space provided below and by faxing a copy to the undersigned at 312-322-9808 (with a copy to our counsel, James J. Greenberger, Esq. at 312-782-8416).  This Letter of Intent will constitute a binding legal obligation of each of the Buyer and the Senior Lenders following your timely acceptance hereof.  Timely acceptance and return of this Letter of Intent by all Senior Lenders is of the essence to the formation of a contract.

Very truly yours,

NMC ACQUISITION LLC

By: _____
        Andrew H. Kalnow, Managing Member

AGREED TO AND ACCEPTED:

BANK ONE, NA, individually and as agent
for the Senior Lenders

By: _____
Its:

C:\WINDOWS\TEMP\LOI Purchase of Debt-4.DOC



NMLLC 00006

CONFIDENTIAL

Received Feb 06 04:43PM (00:48) on SIA line (10) for 'BLEVIS'    WORKSRV3 printed OPE3C615877065A on Feb 06 04:49PM 2002 * Pg 2/2
MANAGED ASSETS            312 732 1775    02/06 '02 16:20 NO.768    02/02

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 3

Transaction and will immediately provide to Buyer copies of any written correspondence containing such inquiries or offers.

6.  No Publicity.  None of the Senior Lenders will disclose to the press or to any other person or entity the terms of this Letter of Intent or the terms of any purchase by Buyer of the Senior Claims without the prior written consent of Kalnow.  Prior to the Closing, the Senior Lenders will not disclose to any person or entity the identity of the Buyer or any of its affiliates, or make any statements to the press whatsoever, without the prior written consent of Kalnow.

7.  Earnest Money Deposit.  In order to evidence its good faith commitment to proceed with the transaction anticipated in this Letter of Intent, Buyer shall deposit the sum of $500,000 in escrow with the Agent within 24 hours following the Senior Lenders' acceptance and return of this Letter of Intent.  In the event that Buyer either (a) is unable or wrongfully refuses to close its purchase of the Senior Claims, or (b) refuses to close the purchase solely on account of the failure of the condition described in paragraph 3(c) of this Letter of Intent, the Senior Lenders shall be entitled to retain the $500,000 deposit as liquidated damages for Buyer's breach of contract.

The terms of this Letter of Intent shall remain open until 4:30 p.m. (central time), Wednesday, February 6, 2002, at which time this Letter of Intent shall expire if not by then accepted and returned to us by all of the Senior Lenders.  If this Letter of Intent correctly sets forth our mutual agreement, please so indicate by signing this letter in the space provided below and by faxing a copy to the undersigned at 312-322-9808 (with a copy to our counsel, James J. Greenberger, Esq. at 312-782-8416).  This Letter of Intent will constitute a binding legal obligation of each of the Buyer and the Senior Lenders following your timely acceptance hereof.  Timely acceptance and return of this Letter of Intent by all Senior Lenders is of the essence to the formation of a contract.

Very truly yours,

NMC ACQUISITION LLC

By: _____
     Andrew H. Kalnow, Managing Member

AGREED TO AND ACCEPTED:

BANK ONE, NA, individually and as agent
for the Senior Lenders

By: _Ken Christenson_
Its: _FIRST VP_

C:\TEMP~0\26189.DOC

NMLLC 00007

CONFIDENTIAL

Received Feb 06 04:56PM (01:56) on SEA line [T] for *RLEWIS*. MOBESBUC printed OPE3C6157220480 on Feb 06 04:23PM 2002 * Pg 2/2
02/08/2002 16:18 FAX 312 223 9031     TYCO CAPITAL.     @002/002

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By: _Anthony Alexander_
Its: _Vice President_

FLEET NATIONAL BANK,
as a Senior Lender

By: _____
Its:

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By: _____
Its:

NATIONAL CITY BANK,
as a Senior Lender

By: _____
Its:

FIRSTAR BANK, N.A.,
as a Senior Lender

By: _____
Its:

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By: _____
Its:

C:\TEMP\LO\ Purchase of Debt-2.DOC

NMLLC 00008

CONFIDENTIAL

Received Feb 06 03:56PM (01:16) on SEA line [93] for 'BLEVIS'    WORKSRV5 printed OPE3C6152630AF0 on Feb 06 04:01PM 2002 # Pg 2/2
02/06/02   14:49   ☎860 986 3162    FLEET BANK    ☑002

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By:_____
Its:

FLEET NATIONAL BANK,
as a Senior Lender

By: _Jeffrey Mc[illegible]___
Its: / Senior Vice President

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By:_____
Its:

NATIONAL CITY BANK,
as a Senior Lender

By:_____
Its:

FIRSTAR BANK, N.A.,
as a Senior Lender

By:_____
Its:

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By:_____
Its:

C:\Documents and Settings\sara49874.sad Settings\Temporary Internet Files\OLK3\8\LOI Purchase of Debt-2.DOC

NMLLC 00009

CONFIDENTIAL

Received Feb 06 02:46PM (00:36) on S&A Line [11] for 'RLEWIS'    WORKSRV4 printed OPE3C6142091EDC on Feb 06 03:32PM 2002 * Pg 2/2
Feb-06-02    03:48pm    From-                                   614-480-3056    T-580  P.002/002  F-223

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By:_____
Its:

FLEET NATIONAL BANK,
as a Senior Lender

By:_____
Its:

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By: *[signature]*
Its: Vice President

NATIONAL CITY BANK,
as a Senior Lender

By:_____
Its:

FIRSTAR BANK, N.A.,
as a Senior Lender

By:_____
Its:

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By:_____
Its:

C:\DOCUME~1\xldv0622.LOCALS~1\Temp\LOI Purchase of Debt 2.DOC

NMLLC 00010

CONFIDENTIAL

Received Feb 06 03:53PM (00:42) on SEA time (T) for 'BLEWIS'
02/06/02 WED 16:05 FAX 216 575 3033        NCB CREDIT ADMIN        WCHCSWV3 printed OPE3C6151DC0078 on Feb 06 04:01PM 2002 * ta 2/2
⊘002

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By: _____
Its: _____

FLEET NATIONAL BANK,
as a Senior Lender

By: _____    _____
Its: _____

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By: _____
Its: _____

NATIONAL CITY BANK,
as a Senior Lender

By: _Michael P. McBurney_
Its: _Assistant Vice President_

FIRSTAR BANK, N.A.,
as a Senior Lender

By: _____
Its: _____

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By: _____
Its: _____

C:\WINDOWS\Temporary Internet Files\OLKC3E4E.CI Purchase of Debt.J1.DOC

NMLLC 00011

CONFIDENTIAL

Received Feb 06 02:41PM (00:34) on S&A line (5) for "BLEVIS'   WORKSRV4 printed OPE3C6140CE4461 on Feb 06 03:32PM 2002 * Pg 2/2
Feb. 3. 2002  9:03AM  FIRSTAR CREDIT ADV                                    No.0382  P. 2/2

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By: _____
Its:

FLEET NATIONAL BANK,
as a Senior Lender

By: _____
Its:

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By: _____
Its:

NATIONAL CITY BANK,
as a Senior Lender

By: _____
Its:

FIRSTAR BANK, N.A.,
as a Senior Lender

By: _____
Its:   STEPHEN J. JONES
       V. CE PRESIDENT

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By: _____
Its:

C:\TEMP\001 Purchase of Debt-2.DOC

NMLLC 00012

CONFIDENTIAL

Received Feb 06 02:58PM (00:34) on EEA line (2) for 'BLEVIS'    WORKSRV4 printed OPE3C6144AC4CFF on Feb 06 03:32PM 2002 * Pg 2/2
FEB-05-2002   16:02       5/3 BANK COML LEND               419  2557134   P.02/02

National Machinery Company
Bank One, NA, individually and as agent
February 6, 2002
page 4

THE CIT GROUP/BUSINESS CREDIT, INC.,
as a Senior Lender

By: _____
Its:

FLEET NATIONAL BANK,
as a Senior Lender

By: _____
Its:

THE HUNTINGTON NATIONAL BANK,
as a Senior Lender

By: _____
Its:

NATIONAL CITY BANK,
as a Senior Lender

By: _____
Its:

FIRSTAR BANK, N.A.,
as a Senior Lender

By: _____
Its:

FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A.,
as a Senior Lender

By: _____
Its:  SENIOR VICE PRESIDENT

C:\WINDOWS\TEMP\1.01 Purchase of Debt-2.DOC

TOTAL P.02

NMLLC 00013

CONFIDENTIAL

# EXHIBIT C

EXECUTION COPY

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "**Assignment Agreement**") between BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO) ("**Bank One**"), THE CIT GROUP/BUSINESS CREDIT, INC. ("**CIT**"), FLEET NATIONAL BANK ("**Fleet**"), THE HUNTINGTON NATIONAL BANK ("**Huntington**"), NATIONAL CITY BANK ("**National City**"), FIRSTAR BANK, N.A. ("**Firstar**"), and FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A. ("**Fifth Third**") (collectively, the "**Assignors**") and NMC ACQUISITION LLC (the "**Assignee**") is dated as of February 12, 2002.  The parties hereto agree as follows:

1. PRELIMINARY STATEMENT.  The Assignors are party to a Credit Agreement with The National Machinery Company, dated as of November 6, 1998 (as amended, supplemented or modified from time to time is herein called the "**Credit Agreement**"), described in Item 1 of Schedule 1 attached hereto ("**Schedule 1**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.  Reference is hereby made to that certain Letter Agreement dated as of February 6, 2002, by and among the Assignors and the Assignee (the "**Letter of Intent**").

2. ASSIGNMENT AND ASSUMPTION.  Each Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases (a) from such Assignor all of such Assignor's right, title and interest to the Senior Claims (as defined in the Letter of Intent), including, but not limited to  (i) all of such Assignor's right to receive payment and performance of the Secured Obligations, (ii) all of such Assignor's rights and privileges under the Loan Documents, and (iii) all of such Assignor's rights and interests in and to the Collateral, and (b) assumes from such Assignor all of such Assignor's obligations under the Credit Agreement arising after the Effective Date, such that after giving effect to such assignment the Assignee shall have purchased pursuant to this Assignment Agreement from each Assignor, without limitation, the percentage interest specified in Item 3 of Schedule 1 for such Assignor of all outstanding rights and obligations described in clauses (a) and (b) above, respectively, of such Assignor under the Credit Agreement relating to the facilities listed in Item 3 of Schedule 1 and the other Loan Documents.

Notwithstanding the foregoing, the Assignors do not assign, and hereby expressly retain, their right to receive payment of the Pasotti Collection from the Borrower and their security interest in any identifiable proceeds of the Pasotti Collection.  The "Pasotti Collection" means a payment that Borrower received from the Pasotti Company (or a similarly-named entity) prior to the Effective Date in the amount of approximately 580,000 Euro.  To the extent that identifiable proceeds of the Pasotti Collection come into the possession or control of the Assignee, the Assignee agrees to hold such proceeds in trust and promptly to turn them over to the Agent for the benefit of the Assignors.  Assignee does not guaranty payment or collection of the Pasotti Collection.

The aggregate Commitment (or Loans, if the applicable Commitment has been terminated) purchased by the Assignee hereunder is set forth in Item 4 of Schedule 1.

3. EFFECTIVE DATE.  The effective date of this Assignment Agreement (the "**Effective Date**") shall be February 12, 2002, provided that payment is made by the Assignee

2349605

NMLLC 00014

CONFIDENTIAL

pursuant to Section 4 below on or prior to 5:00 p.m. (Chicago time) on such date. As of the Effective Date, subject to the Agent's receipt of the Payment Amount described in Section 4, (i) the Assignee shall have the rights and obligations of a Lender under the Loan Documents with respect to the rights and obligations assigned to the Assignee hereunder and (ii) each Assignor shall relinquish its respective rights and be released from its respective corresponding obligations under the Loan Documents with respect to the rights and obligations assigned to the Assignee hereunder.

4. PAYMENT OBLIGATIONS.

(i)    On the Effective Date, in consideration for the sale and assignment of the Loans hereunder, the Assignee shall pay to the Agent, for the benefit of the Assignors, $19,000,000 (the "Payment Amount"). On the Effective Date, the Agent shall release all Collected Amounts to the Assignee pursuant to wire instructions provided by the Assignee. The "Collected Amounts" means the amount of all collections, setoffs and other cash and property received by the Agent and any Assignor on account of the Secured Obligations during the period commencing on February 7, 2002 though the Effective Date, other than the Pasotti Collection. On the Effective Date immediately prior to the closing of the transaction contemplated in this Assignment Agreement, the Agent shall certify the amount of the Collected Amounts then known in the Agent in writing to the Assignee (the "Collections Certificate"). The Agent and the Assignors shall hold in trust and promptly turn over to the Assignee in the form received all additional collections and other cash and property of the Borrower received by them (other than the Pasotti Collection), received after the Effective Date, that were not included in the Collections Certificate. The Agent shall also promptly return, or credit to the Payment Amount, $1,000,000 delivered to the Agent by Andrew H. Kalnow in connection with Assignee's execution of the Letter of Intent.

(ii)    The Agent shall promptly deliver to each Assignor its Pro Rata Share of the Payment Amount received by the Agent, provided, that each Assignor hereby directs the Agent to reduce the amount paid by the Agent to such Assignor by an amount equal to (a) such Assignor's Pro Rata Share of the outstanding L/C Obligations and to deliver such amount to Bank One in its capacity as Issuing Bank as cash collateral for the outstanding L/C Obligations, plus (b) such Assignor's Pro Rata Share of the unpaid fees and expenses of the Agent's and the Lenders' professionals for payment thereof on the Effective Date.

5. WAIVER OF FEES. The processing fee required to be paid to the Agent pursuant to Section 13.3(B) of the Credit Agreement in connection with this Assignment Agreement is hereby waived.

6. REPRESENTATIONS AND WARRANTIES OF EACH ASSIGNOR; LIMITATIONS ON EACH ASSIGNOR'S LIABILITY. In order to induce Assignee to accept this Assignment Agreement, each Assignor represents and warrants that (i) it is the sole legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim created by such Assignor, (ii) the "Senior Claims" (as defined in the Letter of Intent) are valid and enforceable obligations of the Borrower, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles

2

NMLLC 00015

CONFIDENTIAL

(whether enforcement is sought by proceedings in equity or at law), (iii) such Assignor (A) has all necessary corporate power and authority to enter into this Assignment Agreement and (B) has obtained all necessary internal authorizations and approvals required for the execution and delivery of this Assignment Agreement and the other documents, instruments or agreements to be executed and delivered by it in connection herewith, (iv) this Assignment Agreement has been executed by an authorized officer of such Assignor and is legally binding and enforceable obligation of such Assignor, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law), (v) true, correct and complete copies of the Credit Agreement (together with all amendments and waivers thereto) and the other Loan Documents (as each have been amended) have been delivered to the Assignor, (vi) since December 1, 2001, such Assignor has not waived, modified, released, sold or assigned any of its rights in the Loan Documents, in the obligations evidenced thereby or in any of the Collateral, except for Advances made to or on behalf of the Borrower, (vii) no Person other than such Assignor shall have any rights or interest in the Senior Claims of such Assignor, (viii) on the Effective Date, the unpaid Secured Obligations total more than $33,500,000, and all such Secured Obligations arise from Loans and other financial accommodations validly made by the Assignors for the benefit of the Borrower, (ix) all of the Secured Obligations are in Default and, as of the Effective Date, none of the Defaults are the subject of any waiver or forbearance agreement, (x) the Required Lenders are presently entitled, under Section 9.1 of the Credit Agreement, to accelerate immediately the Secured Obligations and to exercise all rights under the Collateral Documents, and (xi) such Assignor's rights to exercise remedies under the Collateral Documents, and to retain for its own benefit the proceeds thereof, is not subject to a contractual restriction in favor of any Person. In addition, in order to induce Assignee to accept this Assignment Agreement, the Agent hereby represents and warrants that the Agent's rights to exercise remedies under the Collateral Documents on behalf of the Assignors, and to retain for the benefit of the Assignors the proceeds thereof, is not subject to a contractual restriction or subordination in favor of any Person. It is understood and agreed that neither the Agent nor any Assignor makes any other representation or warranty of any kind to the Assignee, except as expressly set forth in the preceding two sentences. Except as set forth in the first two sentences of this Section 6, neither the Assignors, the Agent, nor any other Lender, nor any of its officers, directors, employees, agents or attorneys shall be responsible for (i) the due execution, legality, validity, enforceability, genuineness, sufficiency or collectability of any Loan Document, including without limitation, documents granting any Assignor, Agent and the other Lenders a security interest in assets of the Borrower or any guarantor, (ii) any representation, warranty or statement made in or in connection with any of the Loan Documents, (iii) the financial condition or creditworthiness of the Borrower or any guarantor, (iv) the performance of or compliance with any of the terms or provisions of any of the Loan Documents, (v) inspecting any of the property, books or records of the Borrower, (vi) the validity, enforceability, perfection, priority, condition, value or sufficiency of any collateral securing or purporting to secure the Loans or (vii) any mistake, error of judgment, or action taken or omitted to be taken in connection with the Loans or the Loan Documents. All representations and warranties of the Assignors contained in this Assignment Agreement are material and shall survive delivery of this Assignment Agreement and the consummation of the transactions contemplated hereby.

3

NMLLC 00016

CONFIDENTIAL

7.   FURTHER ASSURANCES.

(i)      Upon the Agent's receipt of the Payment Amount, each Assignor shall promptly deliver all original copies of notes, securities or instruments held by such Assignor which evidence or secure the Senior Claims owed to it.  Upon reasonable notice, each Assignor shall provide any testimonies or affidavits reasonably requested by the Assignee in connection with any actions by the Assignee to collect the Senior Claims.

(ii)      Each Assignor hereby acknowledges that it may be in possession or control of certain property of the Borrower that has been pledged by the Borrower as Collateral, including deposit accounts and lockboxes maintained at such Assignor by the Borrower.  After the Effective Date, each Assignor agrees that such property shall be collateral for the Secured Obligations owed to the Assignee, and each Assignor further agrees that:

(a)      with respect to any deposit accounts or lockboxes of the Borrower, such Assignor will comply with the instructions originated by the Assignee directing the disposition of the funds in such deposit account or lockboxes without further consent by the Borrower or setoff (other than for normal and customary fees and charges of such Assignor for operating such deposit account or lockboxes); and

(b)      with respect to any negotiable documents, goods, instruments, money, tangible chattel paper or other tangible property of the Borrower now or in hereafter coming into the possession of such Assignor, such Assignor acknowledges that it holds and will hold such property for the benefit of the Assignee.

(iii)      On the Effective Date, or as soon thereafter as may be practical, the Agent will provide the Assignee or its counsel with:

(a)      a precise written description of the Secured Obligations outstanding on the Effective Date; and

(b)      copies of all notices of default, acceleration and termination of commitments that the Agent or any Assignor has delivered to Borrower and any guarantor of the Secured Obligations.

8.   REPRESENTATIONS AND WARRANTIES OF THE ASSIGNEE.  The Assignee (i) confirms that it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement, (ii) agrees that it will, independently and without reliance upon the Agent, any Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (iii) confirms that none of the funds, monies, assets or other consideration being used to make the purchase and assumption hereunder are "plan assets" as defined under ERISA and that its rights, benefits and interests in and under the Loan Documents will not be "plan assets" under ERISA, and (iv) represents and warrants to each Assignor that (a) the Assignee (1) has all necessary corporate power and authority to enter into this Assignment Agreement and (2) has obtained all necessary internal authorizations and approvals required for the execution and delivery of this Assignment

4

NMLLC 00017

CONFIDENTIAL

Agreement and the other documents, instruments or agreements to be executed and delivered by it in connection herewith, (v) this Assignment Agreement has been executed by an authorized officer of the Assignee and is legally binding and enforceable obligation of the Assignee, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). All representations and warranties of the Assignee contained in this Assignment Agreement are material and shall survive delivery of this Assignment Agreement and the consummation of the transactions contemplated hereby.

9.  SUBSEQUENT ASSIGNMENTS.  After the Effective Date, the Assignee shall have the right pursuant to Section 13.3(A) of the Credit Agreement to assign the rights which are assigned to the Assignee hereunder to any entity or person, provided that (i) any such subsequent assignment does not violate any of the terms and conditions of the Loan Documents or any law, rule, regulation, order, writ, judgment, injunction or decree and that any consent required under the terms of the Loan Documents has been obtained and (ii) unless the prior written consent of each Assignor is obtained, the Assignee is not thereby released from its obligations to the Assignors hereunder, if any remain unsatisfied, including, without limitation, its obligations under Sections 2 and 4 hereof.

10.  ENTIRE AGREEMENT.  This Assignment Agreement and the attached Notice of Assignment embody the entire agreement and understanding between the parties hereto and supersede all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

11.  GOVERNING LAW.  This Assignment Agreement shall be governed by and interpreted and enforced in accordance with the internal laws of the State of Illinois (including Section 735 ILCS 105/5-1 et seq., but otherwise without regard to the conflict of laws provisions thereof).

12.  RELEASE OF CLAIMS.  To the fullest extent permitted by applicable law, in consideration of the parties' execution of this Assignment Agreement and for other good and valuable consideration, each of the Assignors (and its respective successors and assigns) and the Assignee (on behalf of itself, Andrew H. Kalnow, and the other family members and associated trusts of Andrew H. Kalnow, and each of their successors, heirs and assigns (collectively, the "Kalnow Parties")) (each a "Releasor"), does hereby forever release, discharge and acquit the other party hereto and each of their respective parents, subsidiaries and affiliate corporations or partnerships, and their respective officers, directors, partners, trustees, shareholders, agents, attorneys and employees, and their respective successors, heirs and assigns, including, without limitation, the Kalnow Parties (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, causes of action (whether at law or equity), indebtedness and obligations (collectively, "Claims"), of every type, kind, nature, description or character, and irrespective of how, why or by reason of what facts, existing on the Effective Date, which in any way arise out of actions or omissions which occurred on or prior to the Effective Date with respect to the Borrower, the Obligations, the Credit Agreement, any Loan Document or any third parties liable in whole or in part for the Obligations, other than any Claim arising out of the representations and warranties expressly set forth in Sections 6 and 8 above.

5

NMLLC 00018

CONFIDENTIAL

13. <u>NOTICES</u>. Notices shall be given under this Assignment Agreement in the manner set forth in the Credit Agreement. For the purpose hereof, the addresses of the Assignee (until notice of a change is delivered) shall be 122 South Michigan Ave., Suite 1700, Chicago, Illinois 60603, Attention: Andrew H. Kalnow, Facsimile: (312) 322-9808 and E-mail: akalnow@alphacapital.com, with a courtesy copy to James J. Greenberger, Schwartz, Cooper, Greenberger & Krauss, 180 N. LaSalle Street, Suite 2700, Chicago, IL 60601, Facsimile: (312) 782-8416 and E-mail: jgreenberger@scgk.com. For purposes hereof, the addresses of the Assignors (until notice of a change is delivered) shall be as follows:

Mr. Kevin Christensen
Mail Code IL1-0631
Bank One NA
1 Bank One Plaza
Chicago, IL. 60670
Phone: (312) 336-2055
Fax: (312) 732-1755

Mr. Tony Alexander
Mr. Jerry Sepich
The CIT Group
10 S. LaSalle Street
21st Floor
Chicago, IL 60603
Phone: (312) 424-9756
Fax: (312) 424-9740

Mr. Jeffrey H. Robinson
Fleet National Bank
777 Main Street
Mail Stop CT EH 40221B
Hartford Connecticut 06115
Phone: (860) 986-2228
Fax: (860) 986-3162

Mr. David Kirkley
Huntington National Bank
41 South High Street
HC0733
Columbus, OH 43215
Phone: (614) 480-3848
Fax: (614) 480-3795

Mr. Michael McNierney
National City Bank
1900 East 9th Street
Loc.2083
Cleveland, OH 44114-3484

6

NMLLC 00019

CONFIDENTIAL

Phone: 216-222-3651
Fax: 216-222-3053

Mr. Timothy Holmes
National City Bank
1900 East 9th Street
Loc.2083
Cleveland, OH 44114-3484
Phone: (216) 222-9441
Fax: (216) 222-3053

Mr. Steve Jones
Firstar Bank, N.A.
425 Walnut Street, 8th Floor
Cincinnati, OH 45202
Phone: 513-632-2433
Fax: (513) 632-2540

Mr. Bill Behe
Fifth Third Bank, N.A.
606 Madison Avenue
Toledo, OH 43604
Phone: (419) 259-7135
Fax: (419) 259-7134

NMLLC 00020

CONFIDENTIAL

Received Feb 11 01:45PM (01:06) on S&A line [10] for 'RLEVIS'     WORKSRV3 printed 0PE3C67C8686441D on Feb 11 01:54PM 2002 * Pg 2/5
MANAGED ASSETS          312 732 1775          02/11 '02 13:19 NO.822  02/05

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO), as an Assignor

By: _K. Christensen_____

Name: KEVIN CHRISTENSEN

Title: 1ST VP

THE CIT GROUP/BUSINESS CREDIT, INC., as an Assignor

By: _____

Name:

Title:

FLEET NATIONAL BANK, as an Assignor

By: _____

Name:

Title:

THE HUNTINGTON NATIONAL BANK, as an Assignor

By: _____

Name:

Title:

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00021

CONFIDENTIAL

Received Feb 12 12:47PM (00:52) on SEA line (3) for 'RLEWIS'    WORKSRV3 printed 0PE3C690F34513E on Feb 12 01:01PM 2002 * Pg 4/4
02/12/02  13:45 FAX 3122239019                CIT BUSINESS CREDIT                                    @004

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

BANK ONE, NA (formerly known as THE
FIRST NATIONAL BANK OF CHICAGO), as
an Assignor

By: _____
Name:
Title:

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name: Jerome R. Sepich
Title: Vice President

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00022

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO), as an Assignor

By: _____
Name:
Title:

THE CIT GROUP/BUSINESS CREDIT, INC., as an Assignor

By: _____
Name:
Title:

FLEET NATIONAL BANK, as an Assignor

By: _____
Name: *Geffery Robinson*
Title: *Senior Vice President*

THE HUNTINGTON NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00023

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO), as an Assignor

By: _____
Name:
Title:

THE CIT GROUP/BUSINESS CREDIT, INC., as an Assignor

By: _____
Name:
Title:

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as an Assignor

By: _David A. Kubley_
Name: _David A. Kubley_
Title: _Vice President_

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00024

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _Michael P. McInerney_
Name: MICHAEL P. MCINERNEY
Title: ASSISTANT VICE PRESIDENT

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:

NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00025

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:    Stephen J. Jones
Title:    Vice President


FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:


SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00026

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:


FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name: William J. Behe
Title: Senior Vice President


NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:


SIGNATURE PAGE TO ASSIGNMENT AGREEMENT


NMLLC 00027

**CONFIDENTIAL**

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:


FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee

By: _____
Name:  Andrew H. Kalnow
Title:  Chairman of the Board


SIGNATURE PAGE TO ASSIGNMENT AGREEMENT


NMLLC 00028

CONFIDENTIAL

Received Feb 12 10:48AM (00:48) on S&A line [1] for *RLEWIS*
MANAGED ASSETS          312 732 1775       WORKSRV3 printed QPE3C68F3305C67 on Feb 12 12:20PM 2002 * Pg 4/4
                                           02/12 '02 10:22 NO.842  04/04

BANK ONE, NA, as Agent

By: _K. Christensen_

Name: KEVIN CHRISTENSEN

Title: 1ST VP

SIGNATURE PAGE TO ASSIGNMENT AGREEMENT

NMLLC 00029

CONFIDENTIAL

SCHEDULE 1

to Assignment Agreement

1.    Description and Date of Credit Agreement:

*Credit Agreement dated as of November 6, 1998 among The National Machinery Company, as Borrower, the institutions from time to time party thereto as lenders (the "Lenders"), and Bank One, NA (formerly known as The First National Bank of Chicago), as contractual representative of the Lenders, as amended by that certain Amendment No. 1 thereto dated as of December 31, 1998, that certain Amendment No. 2 and Waiver thereto dated as of March 17, 2000, that certain Forbearance Agreement and Amendment No. 3 dated as of July 3, 2001, that certain Forbearance Agreement and Amendment No. 4 dated as of August 31, 2001 and that certain Amendment No. 5 dated as of November 1, 2001.*

2.    Date of Assignment Agreement:  February 12, 2002

3.    Amounts to be Assigned:  (As of Date of Item 2 above):

|  | Revolving Loan Facility | Swing Line Facility | Tranche A Term Loans | Tranche B Term Loans |
|---|---|---|---|---|
| Total of Commitments (Loans) Under the Credit Agreement | $18,000,000 | $5,000,000 | $9,500,000.00 | $12,156,250.00 |
| Aggregate of all Payment Amounts to be paid by the Assignee to the Agent for the account of the Assignors hereunder: | $19,000,000 | | | |

NMLLC 00030

CONFIDENTIAL

| | Bank One:<br>a. Revolving Loan Facility<br>b. Swing Line Facility<br>c. Tranche A Term Loans<br>d. Tranche B Term Loans | CIT:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans | Fleet:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans | Huntington:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans |
|---|---|---|---|---|
| Assignee's Percentage of Each Assignor's Percentage of Facility Purchased Under the Assignment Agreement | a. 100%<br>b. 100%<br>c. 100%<br>d. 100% | a. 100%<br>b. 100%<br>c. 100% | a. 100%<br>b. 100%<br>c. 100% | a. 100%<br>b. 100%<br>c. 100% |
| Amount of Assigned Share of Facility Purchased From Each Assignor Under the Assignment Agreement | a. $2,264,390.14<br>b. $5,000,000<br>c.$1,727,272.75<br>d.$2,210,227.22 | a. $2,037,887.73<br>b. $1,554,545.45<br>c. $1,989,204.52 | a. $1,811,455.79<br>b.$1,381,818.18<br>c. $1,768,181.84 | a. $1,811,455.79<br>b.$1,381,818.18<br>c. $1,768,181.84 |
| Payment Amount for Each Assignor Under the Assignment Agreement* | $3,454,633.34 | $3,109,073.29 | $2,763,620.75 | $2,763,620.75 |
| Total (Net) Amount Paid by the Agent to Each Assignor** | $3,420,290.81 | $3,078,226.77 | $2,736,201.61 | $2,736,201.61 |

| | National City:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans | Firstar:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans | Fifth Third:<br>a. Revolving Loan Facility<br>b. Tranche A Term Loans<br>c. Tranche B Term Loans |
|---|---|---|---|
| Assignee's Percentage of Each Assignor's Percentage of Facility Purchased Under the Assignment Agreement | a. 100%<br>b. 100%<br>c. 100% | a. 100%<br>b. 100%<br>c. 100% | a. 100%<br>b. 100%<br>c. 100% |
| Amount of Assigned Share of Facility Purchased From Each Assignor Under the Assignment Agreement | a. $1,811,455.79<br>b.$1,381,818.18<br>c. $1,768,181.84 | a. $1,811,455.79<br>b.$1,381,818.18<br>c. $1,768,181.84 | a. $905,727.90<br>b. $690,909.08<br>c. $884,090.90 |

NMLLC 00031

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Payment Amount for Each Assignor Under the Assignment Agreement* | $2,763,620.75 | $2,763,620.75 | $1,381,810.37 |
| Total (Net) Amount Paid by the Agent to Each Assignor** | $2,736,201.61 | $2,736,201.61 | $1,368,100.79 |

*Each Assignor hereby directs the Agent to reduce the amount paid by the Agent to such Assignor by an amount equal to (i) such Assignor's Pro Rata Share of the outstanding L/C Obligations and to deliver such amount to Bank One in its capacity as Issuing Bank as cash collateral for the outstanding L/C Obligations, plus (ii) such Assignor's Pro Rata Share of the unpaid fees and expenses of the Agent's and the Lenders' professionals for payment thereof on the Effective Date.

**After giving effect to cash collateralizing outstanding L/C Obligations and payment of professional fees.

4.  Assignee's Aggregate
    Commitment Amount
    Purchased Hereunder:        Revolving Loan Facility: $18,000,000; Swing Line
                                Facility: $5,000,000

5.  Proposed Effective Date:    February 12, 2002

NMLLC 00032

CONFIDENTIAL

Received Feb 11 01:45PM (01:06) on S&A line [10] for 'RLEWIS'    WORKSRV3 printed OPE3C67CB68441D on Feb 11 01:54PM 2002 • Pg 3/5
MANAGED ASSETS              312 732 1775      02/11 '02 13:19 NO.822  03/05

Accepted and Agreed:

BANK ONE, NA (formerly known as THE
FIRST NATIONAL BANK OF CHICAGO), as
an Assignor

By: _Ken Christensen_
Name:  KEVIN CHRISTENSEN
Title:  1ST VP


THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor


By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor


By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor


By: _____
Name:
Title:


SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00033

CONFIDENTIAL

Received Feb 12 12:47PM (00:52) on S&A line (3) for 'RLEWIS'     WORKSRV3 printed OPE3C690F34513E on Feb 12 01:01PM 2002 * Pg 3/4
02/12/02  13:45 FAX 3122239018          CIT BUSINESS CREDIT          ☒003

Accepted and Agreed:

BANK ONE, NA (formerly known as THE
FIRST NATIONAL BANK OF CHICAGO), as
an Assignor

By: _____
Name:
Title:


THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _Jerome P. Sepich_
Name:  Jerome P. Sepich
Title:  Vice President


FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT


NMLLC 00034

CONFIDENTIAL

Accepted and Agreed:

BANK ONE, NA (formerly known as THE
FIRST NATIONAL BANK OF CHICAGO), as
an Assignor

By: _____
Name:
Title:


THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: *Jeffrey M. Robinson (signature)*
Name: *Jeffrey M Robinson*
Title: *Senior Vice President*


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00035

**CONFIDENTIAL**

Accepted and Agreed:

BANK ONE, NA (formerly known as THE
FIRST NATIONAL BANK OF CHICAGO), as
an Assignor

By: _____
Name:
Title:

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: *David W. Kirkley*
Name: *David A. Kirkley*
Title: *Vice President*

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00036

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _Michael P Henderson_
Name: MICHAEL P. HENDERSON
Title: ASSISTANT VICE PRESIDENT

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:

NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00037

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name: Stephen J. Jones
Title: Vice President

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:

NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00038

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name: William J. Behe
Title:   Senior Vice President

NMC ACQUISITION LLC, as the Assignee

By: _____
Name:
Title:

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00039

CONFIDENTIAL

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:

NMC ACQUISITION LLC, as the Assignee

By: _____
Name:   Andrew H. Kalnow
Title:   Chairman & CEO Board

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00040

CONFIDENTIAL

Received Feb 12 10:48AM (00:48) on S&A line [11] for 'RLEVIS'    WORKSRV3 printed 0PE3C68F3305C67 on Feb 12 12:20PM 2002 • Pg 3/4
MANAGED ASSETS                    312 732 1775         02/12 '02 10:22 NO.842  03/04

BANK ONE, NA, as Agent

By: _K. Christensen_
Name: KEVIN CHRISTENSEN
Title: 1ST VP

SIGNATURE PAGE TO SCHEDULE I TO ASSIGNMENT AGREEMENT

NMLLC 00041

CONFIDENTIAL

APPENDIX I

to Assignment Agreement

NOTICE

OF ASSIGNMENT

February 12, 2002

To:    Bank One, NA (formerly known as the First National Bank of Chicago), as Agent
One Bank One Plaza
Chicago, Illinois 60670
Attention: Kevin Christensen

THE NATIONAL MACHINERY COMPANY
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attention: Chief Financial Officer

From:  BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO)
("**Bank One**"), THE CIT GROUP/BUSINESS CREDIT, INC. ("**CIT**"), FLEET
NATIONAL BANK ("**Fleet**"), THE HUNTINGTON NATIONAL BANK
("**Huntington**"), NATIONAL CITY BANK ("**National City**"). FIRSTAR BANK, N.A.
("**Firstar**"), and FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A. ("**Fifth
Third**") (collectively, the "**Assignors**")

NMC ACQUISITION LLC (the "**Assignee**")

1.      We refer to that Credit Agreement (the "Credit Agreement") described in
Item 1 of Schedule 1 attached hereto ("Schedule 1"). Capitalized terms used herein and not
otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.

2.      This Notice of Assignment (this "Notice") is given and delivered to the
Agent pursuant to <u>Section 13.3(B)</u> of the Credit Agreement.

3.      The Assignors and the Assignee have entered into an Assignment
Agreement, dated as of February 12, 2002 (the "Assignment"), pursuant to which, among other
things, each Assignor has sold, assigned, delegated and transferred to the Assignee, and the
Assignee has purchased, accepted and assumed from the Assignors all of the Assignors'
respective outstanding rights and obligations under the Credit Agreement and all of the other
Loan Documents relating to the facilities listed in Item 3 of Schedule 1. The Effective Date of
the Assignment shall be February 12, 2002, provided that payment is made by the Assignee
pursuant to Section 4 of the Assignment Agreement on or prior to 5:00 p.m. (Chicago time) on
such date.

NMLLC 00042

CONFIDENTIAL

Received Feb 11 01:45PM (01:06) on S&A line [10] for 'RLEWIS'   WORKSRV3 printed 0PE3C67B68441D on Feb 11 01:54PM 2002 * Pg 4/5
MANAGED ASSETS           312 732 1775          02/11 '02 13:19 NO.822  04/05

4.      The Assignors and the Assignee hereby give to the Borrower and the Agent notice of the assignment and delegation referred to herein.

5.      The processing fee of $3,500 required by Section 13.3(B) of the Credit Agreement has been waived.

6.      The Assignee may request and direct that the Agent prepare and cause the Borrower to execute and deliver new notes or, as appropriate, replacement notes, to the Assignee. The Assignors and the Assignee, as applicable, each agree to deliver to the Agent the original note received by it from the Borrower upon its receipt of a new note in the appropriate amount.

7.      The Assignee hereby represents and warrants that none of the funds, monies, assets or other consideration being used to make the purchase pursuant to the Assignment are "plan assets" as defined under ERISA and that its rights, benefits, and interests in and under the Loan Documents will not be "plan assets" under ERISA.

8.      The Assignee authorizes the Agent to act as its contractual representative under the Loan Documents in accordance with the terms thereof. The Assignee acknowledges that the Agent has no duty to supply information with respect to the Borrower or the Loan Documents to the Assignee until the Assignee becomes a party to the Credit Agreement.

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO), as an Assignor

By:  _K. Christensen_
Name:  KEVIN CHRISTENSEN
Title:  1 ST  VP

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00043

CONFIDENTIAL

Received Feb 12 12:47PM (00:52) on SEA line [3] for 'RLEVIS'   WORKSRV3 printed OPE3C690F34513E on Feb 12 01:01PM 2002 * Pg 2/4
02/12/02  13:45 FAX 3122230019        CIT BUSINESS CREDIT                    @002

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _Jerome P. Sepich_
Name: Jerome P. Sepich
Title: Vice President

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00044

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor


By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _~Jeffrey M Robinson~_____
Name: Jeffrey H Robinson,
Title: Senior Vice President


THE HUNTINGTON NATIONAL BANK, as
an Assignor


By: _____
Name:
Title:


NATIONAL CITY BANK, as an Assignor


By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor


By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00045

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _David A. Hickley_
Name: _David A. Hickley_
Title: _Vice President_


NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT


NMLLC 00046

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


NATIONAL CITY BANK, as an Assignor

By: _Michael P. McKinney_
Name: MICHAEL P. McKINNEY
Title: ASSISTANT VICE PRESIDENT


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00047

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:    Stephen J. Jones
Title:       Vice President


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00048

CONFIDENTIAL

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name: William J. Behe
Title: Senior Vice President


NMC ACQUISITION LLC, as the Assignee


By: _____
Name:
Title:

ACKNOWLEDGED AND CONSENTED TO:

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
   OF CHICAGO), as Agent

By: _____
   Name:
   Title:

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00049

CONFIDENTIAL

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee

By: _____
Name: Andrew H. Kalnow
Title: Chairman of the Board


ACKNOWLEDGED AND CONSENTED TO:


BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
    OF CHICAGO), as Agent

By:_____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00050

CONFIDENTIAL

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee


By: _____
Name:
Title:


ACKNOWLEDGED AND CONSENTED TO:


BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
    OF CHICAGO), as Agent

By: _Kevin Christensen_
Name: KEVIN CHRISTENSEN
Title: 1ST V P


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00051

CONFIDENTIAL

# EXHIBIT D

February 13, 2002

<u>VIA FACSIMILE (419) 443-2380</u>
<u>AND CERTIFIED MAIL</u>

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Re:    <u>Senior Indebtedness</u>

Gentlemen:

Reference is made to the indebtedness of The National Machinery Company (the "<u>Senior Indebtedness</u>") arising under that certain Credit Agreement dated as of November 6, 1998 by and among The National Machinery Company, the institutions from time to time party thereto as lenders (the "<u>Lenders</u>") and Bank One, NA (formerly known as The First National Bank of Chicago), as the contractual representative of the Lenders, as its has been amended, supplemented or modified from time to time and in effect (the "<u>Credit Agreement</u>").

PLEASE TAKE NOTICE that the undersigned has acquired all right, title and interest of the Lenders in and to the Senior Indebtedness, including all rights to the collateral securing the repayment of the Senior Indebtedness and all rights against any guarantors of the Senior Indebtedness.  A copy of a Notice of Assignment dated as of February 12, 2002 is attached hereto.

All payments of the Senior Indebtedness must hereafter be made to:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Ave.
Suite 1700
Chicago, Illinois 60603

**NMLLC 00059**

2787.1 049579-13175

**CONFIDENTIAL**

This notification is being sent to you pursuant to Section 13.3(B) of the Credit Agreement. Future payments made by you to any persons other than NMC Acquisition LLC will not be effective to discharge the Senior Indebtedness.

Very truly yours,

NMC ACQUISITION LLC

By: _____
One of its attorneys

cc.    James J. Greenberger, Esq.
       Andrew H. Kalnow
       Persons on the attached
              Distribution list

NMLLC 00060

CONFIDENTIAL

2787.1 049579-13175

## DISTRIBUTION LIST

National Machinery – Europe, Inc.
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

NMC Holding Company
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn:  Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre
153 East 53rd Street
New York, New York 10022
Attn:   Kirk A. Radke
        Eunu Chun
        Andrew Lindholm
Telephone (212) 446-4800
Fax (212) 446-4900

NMLLC 00061

**CONFIDENTIAL**

APPENDIX I

to Assignment Agreement

NOTICE

OF ASSIGNMENT

February 12, 2002

To:    Bank One, NA (formerly known as the First National Bank of Chicago), as Agent
One Bank One Plaza
Chicago, Illinois 60670
Attention: Kevin Christensen

THE NATIONAL MACHINERY COMPANY
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attention: Chief Financial Officer

From:   BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO)
("Bank One"), THE CIT GROUP/BUSINESS CREDIT, INC. ("CIT"), FLEET
NATIONAL BANK ("Fleet"), THE HUNTINGTON NATIONAL BANK
("Huntington"), NATIONAL CITY BANK ("National City"), FIRSTAR BANK, N.A.
("Firstar"), and FIFTH THIRD BANK, NORTHWESTERN OHIO, N.A. ("Fifth
Third") (collectively, the "Assignors")

NMC ACQUISITION LLC (the "Assignee")

1.        We refer to that Credit Agreement (the "Credit Agreement") described in
Item 1 of Schedule 1 attached hereto ("Schedule 1"). Capitalized terms used herein and not
otherwise defined herein shall have the meanings attributed to them in the Credit Agreement.

2.        This Notice of Assignment (this "Notice") is given and delivered to the
Agent pursuant to Section 13.3(B) of the Credit Agreement.

3.        The Assignors and the Assignee have entered into an Assignment
Agreement, dated as of February 12, 2002 (the "Assignment"), pursuant to which, among other
things, each Assignor has sold, assigned, delegated and transferred to the Assignee, and the
Assignee has purchased, accepted and assumed from the Assignors all of the Assignors'
respective outstanding rights and obligations under the Credit Agreement and all of the other
Loan Documents relating to the facilities listed in Item 3 of Schedule 1. The Effective Date of
the Assignment shall be February 12, 2002, provided that payment is made by the Assignee
pursuant to Section 4 of the Assignment Agreement on or prior to 5:00 p.m. (Chicago time) on
such date.

NMLLC 00062

CONFIDENTIAL

Received Feb 11 01:45PM (01:06) on SLA line (10) for *BLEWIS'   WORKSRV3 printed 0PE3C67C86844ID on Feb 11 01:54PM 2002 * Pg 4/5
MANAGED ASSETS        312 732 1775        02/11 '02 13:19 NO.822  04/05

4.   The Assignors and the Assignee hereby give to the Borrower and the Agent notice of the assignment and delegation referred to herein.

5.   The processing fee of $3,500 required by Section 13.3(B) of the Credit Agreement has been waived.

6.   The Assignee may request and direct that the Agent prepare and cause the Borrower to execute and deliver new notes or, as appropriate, replacement notes, to the Assignee. The Assignors and the Assignee, as applicable, each agree to deliver to the Agent the original note received by it from the Borrower upon its receipt of a new note in the appropriate amount.

7.   The Assignee hereby represents and warrants that none of the funds, monies, assets or other consideration being used to make the purchase pursuant to the Assignment are "plan assets" as defined under ERISA and that its rights, benefits, and interests in and under the Loan Documents will not be "plan assets" under ERISA.

8.   The Assignee authorizes the Agent to act as its contractual representative under the Loan Documents in accordance with the terms thereof. The Assignee acknowledges that the Agent has no duty to supply information with respect to the Borrower or the Loan Documents to the Assignee until the Assignee becomes a party to the Credit Agreement.

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK OF CHICAGO), as an Assignor

By: _____
Name:  KEVIN CHRISTENSEN
Title:  1ST VP

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00063

CONFIDENTIAL

Received Feb 12 12:47PM (00:52) on SEA line [3] for 'RLEVIS'   WORKSRV3 printed OPE3C690F34513E on Feb 12 01:01PM 2002 * Pg 2/4
02/12/02  13:43 FAX 3122239019          CIT BUSINESS CREDIT                                                        @002

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _Jerome P. Sapich_
Name:   Jerome P. Sapich
Title:   Vice President

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:

NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00064

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _Jeffrey W Robinson_
Name: Jeffrey H Robinson
Title: Senior Vice President


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00065

**CONFIDENTIAL**

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor


By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: *David A. Kirkley* (signature)
Name: David A. Kirkley
Title: Vice President


NATIONAL CITY BANK, as an Assignor


By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor


By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00066

**CONFIDENTIAL**

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:

FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:

THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:

NATIONAL CITY BANK, as an Assignor

By: _Michael P McKimm_____
Name: MICHAEL P. MCDERMOY
Title: ASSISTANT VICE PRESIDENT

FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:
Title:

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00067

CONFIDENTIAL

THE CIT GROUP/BUSINESS CREDIT, INC.,
as an Assignor

By: _____
Name:
Title:


FLEET NATIONAL BANK, as an Assignor

By: _____
Name:
Title:


THE HUNTINGTON NATIONAL BANK, as
an Assignor

By: _____
Name:
Title:


NATIONAL CITY BANK, as an Assignor

By: _____
Name:
Title:


FIRSTAR BANK, N.A., as an Assignor

By: _____
Name:    Stephen J. Jones
Title:        Vice President


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT


NMLLC 00068

CONFIDENTIAL

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name: William A. Behe
Title:  Senior Vice President


NMC ACQUISITION LLC, as the Assignee


By: _____
Name:
Title:


ACKNOWLEDGED AND CONSENTED TO:

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
   OF CHICAGO), as Agent

By: _____
   Name:
   Title:

SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00069

**CONFIDENTIAL**

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee

By: _____
Name:    Andrew H. Kalnow
Title:    Chairman (Mile Davis)


ACKNOWLEDGED AND CONSENTED TO:


BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
    OF CHICAGO), as Agent

By: _____
Name:
Title:


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT

NMLLC 00070

CONFIDENTIAL

Received Feb 11 01:45PM (01:06) on S&A line (10) for 'RLEVIS'    WORKSRV3 printed OPE3C67C8684410 on Feb 11 01:54PM 2002 • Pg 5/5
MANAGED ASSETS              312 732 1775          02/11 '02 13:19 NO.822  05/05

FIFTH THIRD BANK, NORTHWESTERN
OHIO, N.A., as an Assignor

By: _____
Name:
Title:


NMC ACQUISITION LLC, as the Assignee


By: _____
Name:
Title:


ACKNOWLEDGED AND CONSENTED TO:

BANK ONE, NA (formerly known as THE FIRST NATIONAL BANK
OF CHICAGO), as Agent

By: _Kevin Christensen_
Name: KEVIN CHRISTENSEN
Title: 1ST VP


SIGNATURE PAGE TO NOTICE TO ASSIGNMENT AGREEMENT


NMLLC 00071

CONFIDENTIAL

# EXHIBIT E

February 13, 2002

<u>**VIA FACSIMILE (419) 443-2380**</u>
<u>**AND CERTIFIED MAIL**</u>

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

   Re:  <u>Demand for Payment/Notice of Default</u>

Gentlemen:

   PLEASE TAKE NOTICE that demand is hereby made for immediate payment in full of all indebtedness owed by The National Machinery Company to NMC Acquisition LLC ("<u>Secured Party</u>") including, without limitation, all indebtedness of The National Machinery Company arising under or related to that certain Credit Agreement dated as of November 6, 1998 by and among The National Machinery Company, the institutions from time to time party thereto as lenders and Bank One, NA (formerly known as The First National Bank of Chicago), as the contractual representative of the lenders, as its has been amended, supplemented or modified from time to time and in effect (the "<u>Credit Agreement</u>"), which indebtedness has been acquired by Secured Party.

   Secured Party believes that the amount of indebtedness owed by The National Machinery Company is currently in excess of $33,500,000 and will include additional costs incurred by Secured Party and interest that it may be entitled to recover after the date of this notice in accordance with applicable law. All of the indebtedness owed by The National Machinery Company to Secured Party is secured by a first lien on all assets of The National Machinery Company, which lien was granted by The National Machinery Company in the Credit Agreement and recently acquired by Secured Party.

   Please also take notice that all indebtedness owed by The National Machinery Company to Secured Party is in default and, pursuant to the terms of the Credit Agreement, Secured Party terminates the Commitment (as defined in the Credit Agreement) and demands immediate repayment of all Loans. Please note that following a default, the Credit Agreement and applicable Ohio law permits Secured Party to proceed against The National Machinery Company and its property in any manner permitted by Ohio Revised Code §1309.601 et seq. in order to recover the indebtedness

NMLLC 00072

**CONFIDENTIAL**

owed to it. Secured Party reserves the right to exercise all such rights and remedies at any time and from time to time without further notice to you, all to the extent permitted by applicable law. No delay or forbearance by Secured Party in exercising any of its rights or remedies should be considered by you or by any secondary obligor to be a waiver or modification of Secured Party's rights.

Very truly yours,

NMC ACQUISITION LLC

By: _____
One of its attorneys

cc.    James J. Greenberger, Esq.
       Andrew H. Kalnow
       Persons on the attached
              Distribution list

2737.1 049579-13175

NMLLC 00073

**CONFIDENTIAL**

## DISTRIBUTION LIST

National Machinery – Europe, Inc.
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

NMC Holding Company
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn:  Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre
153 East 53rd Street
New York, New York 10022
Attn:   Kirk A. Radke
        Eunu Chun
        Andrew Lindholm
Telephone (212) 446-4800
Fax (212) 446-4900

NMLLC 00074

**CONFIDENTIAL**

2737.1 049579-13175

# EXHIBIT F

# NOTIFICATION OF DISPOSITION OF COLLATERAL

Date of
Notice:  February 13, 2002

To:   Persons on Attached Distribution List

From:   NMC Acquisition LLC
    c/o Alpha Capital Partners, Ltd.
    122 South Michigan Ave.
    Suite 1700
    Chicago, Illinois 60603
    Facsimile: (312) 322-9808

Name
of Debtor:  The National Machinery Company

PLEASE TAKE NOTICE that we will sell the following Property of the Debtor to the highest qualified bidder in public as follows:

  Day and Date:  Tuesday, February 26, 2002

  Time:    10:00 a.m. (Eastern Time)

  Place:   Supance & Howard
      84-88 South Washington Street
      Tiffin, Ohio 44883

The Property of the Debtor to be sold is all of the Debtor's accounts, machinery, equipment, fixtures, inventory, investment property, goods, chattel paper, deposit accounts, tax refunds, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing.

You are entitled to an accounting of the unpaid indebtedness secured by the Property that we intend to sell. You may request an accounting by calling our attorney, James J. Greenberger, Esq., at (312) 845-5439.

We intend to bid all or part of the indebtedness owed to us by the Debtor at the sale. All other bids must be for cash, must be for all of the Property to be sold in bulk and must be qualified by the delivery to us at or before the time of the sale of a cashier's

NMLLC 00075

CONFIDENTIAL

check or certified check payable to NMC Acquisition LLC in an amount equal at least 20% of the bid. A winning cash bidder will be required at the conclusion of the bidding to make a non-refundable cash deposit with NMC Acquisition equal to 20% of the purchase price and to close its purchase of the Property on the next business day by delivering the balance of the purchase price in immediately available funds.

NMC ACQUISITION LLC

By: _____
    One of its attorneys

NMLLC 00076

CONFIDENTIAL

Office of Chief Counsel
Ohio Department of Taxation
30 E. Broad Street
23rd Floor
Columbus, OH  43215

NMLLC 00077

CONFIDENTIAL

# NOTIFICATION OF DISPOSITION OF COLLATERAL

Date of
Notice:         February 13, 2002

To:             Persons on Attached Distribution List

From:           NMC Acquisition LLC
                c/o Alpha Capital Partners, Ltd.
                122 South Michigan Ave.
                Suite 1700
                Chicago, Illinois 60603
                Facsimile: (312) 322-9808

Name
of Debtor:      National Machinery Company – Europe, Inc.

PLEASE TAKE NOTICE that we will sell the following Property of the Debtor
to the highest qualified bidder in public as follows:

Day and Date:   Tuesday, February 26, 2002

Time:           10:00 a.m. (Eastern Time)

Place:          Supance & Howard
                84-88 South Washington Street
                Tiffin, Ohio 44883

The Property of the Debtor to be sold is all of the Debtor's accounts, machinery,
equipment, fixtures, inventory, investment property, goods, chattel paper, deposit
accounts, tax refunds, furniture, fixtures, general intangibles (including, without
limitation, all patents, trademarks and copyrights), contract rights, instruments,
documents and all other personal property or interests in personal property; whether any
of the foregoing is owned now or acquired later; all accessions to, substitutions for, and
all replacements, products and proceeds of the foregoing; all books and records
pertaining to any of the foregoing; and all insurance policies insuring any of the
foregoing.

You are entitled to an accounting of the unpaid indebtedness secured by the
Property that we intend to sell. You may request an accounting by calling our attorney,
James J. Greenberger, Esq., at (312) 845-5439.

We intend to bid all or part of the indebtedness owed to us by the Debtor at the
sale. All other bids must be for cash, must be for all of the Property to be sold (along

**NMLLC 00078**

**CONFIDENTIAL**

with all of the property of Debtor's affiliates which shall be sold at the same time), and must be qualified by the delivery to us at or before the time of the sale of a cashier's check or certified check payable to NMC Acquisition LLC in an amount equal at least 20% of the bid. A winning cash bidder will be required at the conclusion of the bidding to make a non-refundable cash deposit with NMC Acquisition equal to 20% of the purchase price and to close its purchase of the Property on the next business day by delivering the balance of the purchase price in immediately available funds.

NMC ACQUISITION LLC

By:_____
     One of its attorneys

NMLLC 00079

CONFIDENTIAL

## DISTRIBUTION LIST

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

National Machinery – Europe, Inc.
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

NMC Holding Company
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn:  Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre
153 East 53rd Street
New York, New York 10022
Attn:   Kirk A. Radke
        Eunu Chun
        Andrew Lindholm
Telephone (212) 446-4800
Fax (212) 446-4900

Ohio Department of Taxation
P.O. 1090
Columbus, Ohio 43216-1090

Tax Commissioner's Office
30 E. Broad Street, 22nd Floor
Columbus, Ohio 43215

Office of Chief Counsel
Ohio Department of Taxation
30 E. Broad Street
23rd Floor
Columbus, OH  43215

**NMLLC 00080**

**CONFIDENTIAL**

2971.1 049579-13175

# NOTIFICATION OF DISPOSITION OF COLLATERAL

Date of
Notice:        February 13, 2002

To:            Persons on Attached Distribution List

From:          NMC Acquisition LLC
               c/o Alpha Capital Partners, Ltd.
               122 South Michigan Ave.
               Suite 1700
               Chicago, Illinois 60603
               Facsimile: (312) 322-9808

Name
of Debtor:     The National Machinery Company – Michigan


PLEASE TAKE NOTICE that we will sell the following Property of the Debtor to the highest qualified bidder in public as follows:

Day and Date:        Tuesday, February 26, 2002

Time:                10:00 a.m. (Eastern Time)

Place:               Supance & Howard
                     84-88 South Washington Street
                     Tiffin, Ohio 44883

The Property of the Debtor to be sold is all of the Debtor's accounts, machinery, equipment, fixtures, inventory, investment property, goods, chattel paper, deposit accounts, tax refunds, furniture, fixtures, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing.

You are entitled to an accounting of the unpaid indebtedness secured by the Property that we intend to sell. You may request an accounting by calling our attorney, James J. Greenberger, Esq., at (312) 845-5439.

We intend to bid all or part of the indebtedness owed to us by the Debtor at the sale. All other bids must be for cash, must be for all of the Property to be sold (along

2971.1 049579-13175

NMLLC 00081

CONFIDENTIAL

with all of the property of Debtor's affiliates which shall be sold at the same time), and must be qualified by the delivery to us at or before the time of the sale of a cashier's check or certified check payable to NMC Acquisition LLC in an amount equal at least 20% of the bid.  A winning cash bidder will be required at the conclusion of the bidding to make a non-refundable cash deposit with NMC Acquisition equal to 20% of the purchase price and to close its purchase of the Property on the next business day by delivering the balance of the purchase price in immediately available funds.

NMC ACQUISITION LLC

By: _____
        One of its attorneys

NMLLC 00082

CONFIDENTIAL

## DISTRIBUTION LIST

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

National Machinery – Europe, Inc.
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

NMC Holding Company
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn: Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre
153 East 53rd Street
New York, New York 10022
Attn:   Kirk A. Radke
        Eunu Chun
        Andrew Lindholm
Telephone (212) 446-4800
Fax (212) 446-4900

Ohio Department of Taxation
P.O. 1090
Columbus, Ohio 43216-1090

Tax Commissioner's Office
30 E. Broad Street, 22nd Floor
Columbus, Ohio 43215

Office of Chief Counsel
Ohio Department of Taxation
30 E. Broad Street
23rd Floor
Columbus, OH  43215

NMLLC 00083

CONFIDENTIAL

# NOTIFICATION OF DISPOSITION OF COLLATERAL

Date of
Notice:          February 13, 2002

To:              Persons on Attached Distribution List

From:            NMC Acquisition LLC
                 c/o Alpha Capital Partners, Ltd.
                 122 South Michigan Ave.
                 Suite 1700
                 Chicago, Illinois 60603
                 Facsimile: (312) 322-9808

Name
of Debtor:       NMC Holding Company


   PLEASE TAKE NOTICE that we will sell the following Property of the Debtor
to the highest qualified bidder in public as follows:

          Day and Date:      Tuesday, February 26, 2002

          Time:              10:00 a.m. (Eastern Time)

          Place:             Supance & Howard
                             84-88 South Washington Street
                             Tiffin, Ohio 44883

   The Property of the Debtor to be sold is all of the Debtor's pledged collateral,
accounts, machinery, equipment, fixtures, inventory, investment property, goods, chattel
paper, deposit accounts, tax refunds, furniture, fixtures, general intangibles (including,
without limitation, all patents, trademarks and copyrights), contract rights, instruments,
documents and all other personal property or interests in personal property; whether any
of the foregoing is owned now or acquired later; all accessions to, substitutions for, and
all replacements, products and proceeds of the foregoing; all books and records
pertaining to any of the foregoing; and all insurance policies insuring any of the
foregoing.

   You are entitled to an accounting of the unpaid indebtedness secured by the
Property that we intend to sell. You may request an accounting by calling our attorney,
James J. Greenberger, Esq., at (312) 845-5439.

   We intend to bid all or part of the indebtedness owed to us by the Debtor at the
sale. All other bids must be for cash, must be for all of the Property to be sold (along

2971.1 049579-13175

NMLLC 00084

CONFIDENTIAL

with all of the property of Debtor's affiliates which shall be sold at the same time), and must be qualified by the delivery to us at or before the time of the sale of a cashier's check or certified check payable to NMC Acquisition LLC in an amount equal at least 20% of the bid. A winning cash bidder will be required at the conclusion of the bidding to make a non-refundable cash deposit with NMC Acquisition equal to 20% of the purchase price and to close its purchase of the Property on the next business day by delivering the balance of the purchase price in immediately available funds.

NMC ACQUISITION LLC

By: _____

One of its attorneys

NMLLC 00085

CONFIDENTIAL

## DISTRIBUTION LIST

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:    Chief Financial Officer

National Machinery – Europe, Inc.
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:    Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:    Chief Financial Officer

NMC Holding Company
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:    Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn: Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre
153 East 53rd Street
New York, New York 10022
Attn:    Kirk A. Radke
         Eunu Chun
         Andrew Lindholm
Telephone (212) 446-4800
Fax (212) 446-4900

Ohio Department of Taxation
P.O. 1090
Columbus, Ohio 43216-1090

Tax Commissioner's Office
30 E. Broad Street, 22nd Floor
Columbus, Ohio 43215

Office of Chief Counsel
Ohio Department of Taxation
30 E. Broad Street
23rd Floor
Columbus, OH  43215

NMLLC 00086

CONFIDENTIAL

2971.1 049579-13175

## DISTRIBUTION LIST

The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

National Machinery – Europe, Inc.
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

The National Machinery Company - Michigan
c\o The National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

NMC Holding Company
c\oThe National Machinery Company
161 Greenfield Street
P.O. Box 47
Tiffin, Ohio 44883
Attn:   Chief Financial Officer

Citicorp Venture Capital, Ltd.
399 Park Avenue
14th Floor – Zone 4
New York, New York 10043
Attn:  Charles Corpening
Telephone (212) 599-0965
Fax (212) 888-2940

Citicorp Mezzanine Partners, L.P.
399 Park Avenue
14th Floor
New York, New York 10043
Attn:  Byron L. Knief
Fax (212) 888-2940

Kirkland & Ellis
Citicorp Centre

153 East 53rd Street
New York, New York 10022
Attn:   Kirk A. Radke
        Eunu Chun
Telephone (212) 446-4800
Fax (212) 446-4900

Kirkland & Ellis
153 East 53rd Street
New York, New York 10022
Attn:   Adrian van Schie
        Andrew Lindholm
Fax (212) 446-4900

Bank One, NA
Mail Code IL1-0631
1 Bank One Plaza
Chicago, Illinois 60670
Fax:  (312) 732-1755

Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603
Attn:  Jim Clark
Fax:  312-853-7036

Heller Financial Leasing Inc.
201 West Big Beaver Road
Suite 800
Troy, Michigan 48084

IBM Credit Corporation
1 North Castle Drive
Armonk, New York 10504-2575

Ohio Department of Taxation
P.O. 1090
Columbus, Ohio 43216-1090

Tax Commissioner's Office
30 E. Broad Street, 22nd Floor
Columbus, Ohio 43215

**NMLLC 00087**

**CONFIDENTIAL**

# EXHIBIT G

SALE OF THE ASSETS OF
THE NATIONAL MACHINERY COMPANY
THE NATIONAL MACHINERY COMPANY – MICHIGAN
THE NATIONAL MACHINERY COMPANY – EUROPE, INC.

## TERMS OF SALE

### February 26, 2002

1.   This is a public foreclosure sale conducted pursuant to Section 1309.610 of the Ohio Revised Code.

2.   The assets to be sold are all of the following assets of each of The National Machinery Company, The National Machinery Company – Michigan, and The National Machinery Company – Europe, Inc.: all accounts, machinery, equipment, fixtures, inventory, goods, chattel paper, deposit accounts, tax refunds, furniture, fixtures, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing.

3.   The assets to be sold expressly do NOT include any assets of NMC Holding Company (including any stock of The National Machinery Company) or any equity securities or similar financial assets (e.g., partnership interests, interests in limited liability companies, etc.) that are owned by The National Machinery Company, The National Machinery Company – Michigan, or The National Machinery Company – Europe, Inc.

4.   No liabilities of any of The National Machinery Company, The National Machinery Company – Michigan, or The National Machinery Company – Europe, Inc. are intended to be conveyed by this sale. No person, by bidding or purchasing any assets sold in this sale, agrees to assume, expressly or by implication, any liabilities or obligations of The National Machinery Company, The National Machinery Company – Michigan, or The National Machinery Company – Europe, Inc.

5.   All assets will be sold "AS IS". All warranties are expressly disclaimed. There is no warranty relating to title, possession, quiet enjoyment, or the like in this disposition. ALL WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.

6.   All assets to be sold will be sold in bulk to the highest bidder.

NMLLC 00088

CONFIDENTIAL

7.  This sale is being conducted to satisfy unpaid indebtedness owed to NMC Acquisition LLC in the approximate amount of $34,653,448.44. NMC Acquisition LLC reserves the right to bid at the sale and may bid any or all of the unpaid indebtedness in lieu of cash.

8.  All bids other than bids from NMC Acquisition LLC must be for cash. Bids must be pre-qualified by the deposit of a certified or cashiers' check payable to NMC Acquisition LLC equal to at least 20% of the bid.

9.  A winning cash bidder must deposit 20% of the winning bid with NMC Acquisition LLC at the conclusion of the auction. The balance of the purchase price must be paid to NMC Acquisition LLC in immediately available funds by 10:00 a.m., Eastern Time, on February 27, 2002. In the event that the winning bidder fails to pay the balance of the purchase price to NMC Acquisition LLC by 10:00 a.m., Eastern Time, on February 27, 2002, the sale shall be canceled and NMC Acquisition LLC shall retain the winning bidder's 20% deposit as liquidated damages for breach. Time is of the essence to the contract of sale.

10. NMC Acquisition LLC will issue a bill of sale and transfer statement for the assets sold to the winning bidder upon its payment in full of the purchase price.

74699.1 049579-13175

NMLLC 00089

CONFIDENTIAL

# EXHIBIT H

1

```
 1   IN RE:   The National Machinery Company

 2            The National Machinery Company-Michigan

 3            The National Machinery Company-Europe, Inc.

 4                  Auction of Assets

 5                      - - -

 6   DATE:     February 26, 2002 at 10:07 a.m.

 7

 8   PLACE:    Law offices of

 9             Supance and Howard

10             84-88 South Washington Street

11             Tiffin, Ohio  44883

12

13   REPORTER:  Patricia L. Davis, RPR

14             Notary Public

15

16                      - - -

17

18

19

20

21

22

23

24
```

NMLLC 00090

CONFIDENTIAL

2

```
 1     APPEARANCES:

 2              SUPANCE & HOWARD

 3              James Supance

 4              Brent Howard

 5              84-88 South Washington Street

 6              Tiffin, Ohio  44883

 7              (419) 447-2521

 8                        - - -

 9

10     ALSO PRESENT:

11     Chris Klepper

12     Mike Klepper

13     Shayne Thomas

14     VIA SPEAKERPHONE:

15     James J. Greenberger, Esq.
       On behalf of Andrew Kalnow
16                        - - -

17

18

19

20

21

22

23

24
```

**NMLLC 00091**

**CONFIDENTIAL**

3

1          MR. HOWARD:   Good morning

2     everyone.  My name is Brent Howard and I'm an

3     attorney for NMC Acquisition LLC.  Welcome to the

4     public sale of the assets of The National Machinery

5     Company and its affiliates.  This sale is being

6     conducted by NMC Acquisition LLC which holds a

7     first priority security interest in the assets that

8     will be sold today.  The security interest secures

9     indebtedness of approximately $34,653,448.44 that

10     is owed as of today by The National Machinery

11     Company to NMC Acquisition LLC and is in default.

12     The National Machinery Company-Michigan and The

13     National Machinery Company-Europe, Inc. have each

14     guaranteed payment of the defaulted indebtedness.

15          This is a public foreclosure sale and is being

16     conducted pursuant to section 1309.610 of the Ohio

17     Revised Code.  The sale has been duly noticed to

18     all debtors, secondary obligors, and other persons

19     that have notified NMC Acquisition LLC of a claim

20     in the collateral to be sold or who perfected a

21     lien in the collateral by filing a financing

22     statement in the proper filing office not less than

23     10 days prior to the date of notice.  This sale has

24     been advertised in newspapers of general

CONFIDENTIAL

4

1    circulation in Tiffin and Toledo, Ohio.

2        All persons attending this sale must sign in

3    on the sign-in sheet located at the end of the

4    table.  If you have not done so already, I would

5    ask that you do so now.

6        And for the record I note that everyone has

7    signed in.

8        I would ask at this time that all persons who

9    expect to bid at the sale and wish to qualify their

10   bids come forward and present me with a certified

11   or cashier's check payable to NMC Acquisition LLC.

12   As indicated in the notices and advertisements of

13   this sale, no bid will be accepted unless a

14   certified or cashier's check equal to at least 20

15   percent of the bid is deposited with NMC

16   Acquisition LLC in advance.

17       In the event that your bid is successful, the

18   20 percent deposit will be non-refundable and will

19   be applied towards the purchase of the assets which

20   must close by no later than 10:00 o'clock a.m.

21   tomorrow.  In the event that a winning bidder

22   cannot deliver the balance of the purchase price by

23   tomorrow, its 20 percent deposit will be forfeited

24   as liquidated damages.

NMLLC 00093

CONFIDENTIAL

5

1   All other checks will be returned to bidders

2   at the end of the auction.  If you do not deposit a

3   check with me at this time, you will not be

4   permitted to bid.  Your highest bid will be limited

5   to five times the amount of the check that you give

6   to me now.

7   Before we begin the auction, I need to make an

8   important announcement about the assets to be

9   sold.  NMC Acquisition LLC has decided to exclude

10  from this sale the assets of NMC Holding Company

11  and all equity securities and similar financial

12  assets that are owned by The National Machinery

13  Company, The National Machinery Company-Michigan

14  and The National Machinery Company-Europe, Inc.

15  With respect to the assets excluded from the sale,

16  NMC Acquisition LLC's lien will continue in full

17  force and effect and NMC Acquisition LLC reserves

18  all of its rights against NMC Holding Company and

19  the other debtors.

20  (Michael Klepper entered the room.)

21  MR. HOWARD:  For the record, I

22  note that a person has arrived and I'll ask him to

23  sign in and I know him to be Michael Klepper.

24  MR. KLEPPER:  Are you sure you

NMLLC 00094

CONFIDENTIAL

1    know that?

2                    MR. HOWARD:    And I'll continue.

3    The assets to be sold today consist entirely of all

4    personal property assets of The National Machinery

5    Company, The National Machinery Company-Michigan,

6    and The National Machinery Company-Europe, Inc.,

7    other than equity securities and similar financial

8    assets that may be owned by them.  As indicated in

9    the notice, the assets to be sold will be sold in

10   bulk.

11       I refer everyone in attendance to a handout

12   that has been available to everyone entitled terms

13   of sale.  I ask now does anyone have any questions

14   about the terms of sale before we begin the

15   auction?

16       Seeing no questions, we will now begin the

17   auction and I note that by my watch the time is

18   10:15 a.m. Eastern Standard Time, and we are at the

19   law offices of Supance and Howard, 84-88 South

20   Washington Street, Tiffin, Ohio.

21       NMC Acquisition LLC bids 16 million dollars

22   for the assets to be sold.

23       Are there any other bidders?

24       Seeing no other bidders and seeing that no one

CONFIDENTIAL

7

1    has signed in and indicated that they would be a

2    bidder at today's auction, I declare the auction

3    now closed and thank everyone for their attendance.

4         We can go off the record.

5              (Concluded at 10:16 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

NMLLC 00096

CONFIDENTIAL

CERTIFICATE

1

2    I, Patricia L. Davis, Registered Professional

3    Reporter, do hereby certify that the foregoing,

4    consisting of seven pages, is a true and complete

5    transcript as transcribed by me on a computer of

6    the proceedings conducted at the time and place

7    specified, and I do further certify that I was

8    personally present during all of the said

9    proceedings.

10    Subscribed this 10th  day of March, 2002.

11

12

13    PATRICIA L. DAVIS,
      Registered Professional Reporter
14    One Wellington Place
      Tiffin, Ohio  44883
15    419-447-3245

16

17

18

19

20

21

22

23

24

NMLLC 00097

CONFIDENTIAL

February 26, 2002

10:00 a.m. e.s.t.

Location: Supance & Howard, 84-88 S. Washington Street, Tiffin, OH

Sale of Personal Property of National Machinery Company, National Machinery-Europe Inc. and National Machinery-Michigan

## Sign-in-Sheet

| Name (Please sign and print) | Address | Telephone No. | Party Representing | Will you be a bidder? |
|---|---|---|---|---|
| 1. Gregory F. Dupuis PATRICIA L. DAVIS | 1 Washington Off. Tiffin. | 419-447-3045 — | | No |
| 2. Kim A. Klopp | P.O. Box 107 Fostoria | Superior Dist Co. 435-1428 | | No |
| 3. Shayne E. Thomas | 2759 S. TR 159 Tiffin | 419 447-1613 | OldFort Bank | NO |
| 4. James Q Supance | P.O.B. 767 Tiffin | 419-447-2521 | NMC Atty | NO |
| 5. Michael Klopp | P.O. Box 107 Fostoria | (419) 435-1438 | Superior Dist. | No |
| 6. Brett T. Howard | P.O. Box 767 Tiffin OH | 419.447.0501 | NMc Atty. | Yes |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |

NMLLC 00098

CONFIDENTIAL

# EXHIBIT I

## FORECLOSURE BILL OF SALE AND
## TRANSFER STATEMENT

FOR VALUE RECEIVED, NMC Acquisition LLC, a Delaware limited liability company (the "Secured Party"), does hereby sell to NMC Acquisition LLC, a Delaware limited liability company (the "Buyer"), all of the rights of The National Machinery Company, an Ohio corporation (the "Debtor"), in the following collateral:   All of the Debtor's accounts, machinery, equipment, fixtures, inventory, goods, chattel paper, deposit accounts, tax refunds, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing; provided, however, that this Foreclosure Bill of Sale and Transfer Statement specifically excludes and does not convey to the Buyer any equity securities or similar financial assets (e.g., interests in any corporations, partnerships or limited liability companies) owned or held by the Debtor;

TO HAVE AND TO HOLD unto the Buyer and its assigns forever.

This Foreclosure Bill of Sale and Transfer Statement has been issued following a public disposition held pursuant to Ohio Revised Code § 1309.610 and is intended to constitute a Transfer Statement within the meaning of Ohio Revised Code § 1309.619.  The Debtor has defaulted in connection with an obligation secured by the above-referenced collateral, the Secured Party has exercised its post-default remedies with respect to the collateral, and, by reason of the exercise, the Buyer has acquired the rights of the Debtor in the collateral.

The name and address of the Secured Party is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois  60603

The name and address of the Debtor is:

The National Machinery Company
161 Greenfield Street
Tiffin, Ohio  44883

The name and address of the Buyer is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois  60603

This Foreclosure Bill of Sale and Transfer Statement is made without any warranties whatsoever.  Without limiting the generality of the foregoing THE SECURED PARTY (1)

NMLLC 00099

CONFIDENTIAL

EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTIBILITY OR FITNESS FOR PARTICULAR PURPOSE, AND (2) MAKES NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION.

This Foreclosure Bill of Sale and Transfer Statement does not convey, and the Buyer shall not assume, directly or indirectly, any liabilities or obligations of the Debtor of any kind whatsoever and all of such liabilities and obligations are hereby disclaimed by the Buyer absolutely.

Dated: February 26, 2002

NMC ACQUISITION LLC

By _____
Name _ANDREW H. KALNOW_
Its _MANAGING MEMBER_

NMLLC 00100

CONFIDENTIAL

74491.3 049579-13175

## FORECLOSURE BILL OF SALE AND
## TRANSFER STATEMENT

FOR VALUE RECEIVED, NMC Acquisition LLC, a Delaware limited liability company (the "Secured Party"), does hereby sell to NMC Acquisition LLC, a Delaware limited liability company (the "Buyer"), all of the rights of The National Machinery Company – Michigan, a Michigan corporation (the "Debtor"), in the following collateral: All of the Debtor's accounts, machinery, equipment, fixtures, inventory, goods, chattel paper, deposit accounts, tax refunds, furniture, fixtures, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing; provided, however, that this Foreclosure Bill of Sale and Transfer Statement specifically excludes and does not convey to the Buyer any equity securities or similar financial assets (e.g., interests in any corporations, partnerships or limited liability companies) owned or held by the Debtor;

TO HAVE AND TO HOLD unto the Buyer and its assigns forever.

This Foreclosure Bill of Sale and Transfer Statement has been issued following a public disposition held pursuant to Ohio Revised Code § 1309.610 and is intended to constitute a Transfer Statement within the meaning of Ohio Revised Code § 1309.619. The Debtor has defaulted in connection with an obligation secured by the above-referenced collateral, the Secured Party has exercised its post-default remedies with respect to the collateral, and, by reason of the exercise, the Buyer has acquired the rights of the Debtor in the collateral.

The name and address of the Secured Party is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois 60603

The name and address of the Debtor is:

The National Machinery Company – Michigan
161 Greenfield Street
Tiffin, Ohio 44883

The name and address of the Buyer is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois 60603

**NMLLC 00101**

**CONFIDENTIAL**

74560.3 049579-13175

This Foreclosure Bill of Sale and Transfer Statement is made without any warranties whatsoever. Without limiting the generality of the foregoing THE SECURED PARTY (1) EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTIBILITY OR FITNESS FOR PARTICULAR PURPOSE, AND (2) MAKES NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION.

This Foreclosure Bill of Sale and Transfer Statement does not convey, and the Buyer shall not assume, directly or indirectly, any liabilities or obligations of the Debtor of any kind whatsoever and all of such liabilities and obligations are hereby disclaimed by the Buyer absolutely.

Dated: February 26, 2002

NMC ACQUISITION LLC

By _____

Name  ANDREW H. KALNOW

Its  MANAGING MEMBER

**NMLLC 00102**

**CONFIDENTIAL**

74560.3 049579-13175

## FORECLOSURE BILL OF SALE AND
## TRANSFER STATEMENT

FOR VALUE RECEIVED, NMC Acquisition LLC, a Delaware limited liability company (the "Secured Party"), does hereby sell to NMC Acquisition LLC, a Delaware limited liability company (the "Buyer"), all of the rights of National Machinery – Europe, Inc., an Ohio corporation (the "Debtor"), in the following collateral:   All of the Debtor's accounts, machinery, equipment, fixtures, inventory, goods, chattel paper, deposit accounts, tax refunds, furniture, fixtures, general intangibles (including, without limitation, all patents, trademarks and copyrights), contract rights, instruments, documents and all other personal property or interests in personal property; whether any of the foregoing is owned now or acquired later; all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing; provided, however, that this Foreclosure Bill of Sale and Transfer Statement specifically excludes and does not convey to the Buyer any equity securities or similar financial assets (e.g., interests in any corporations, partnerships or limited liability companies) owned or held by the Debtor;

TO HAVE AND TO HOLD unto the Buyer and its assigns forever.

This Foreclosure Bill of Sale and Transfer Statement has been issued following a public disposition held pursuant to Ohio Revised Code § 1309.610 and is intended to constitute a Transfer Statement within the meaning of Ohio Revised Code § 1309.619.  The Debtor has defaulted in connection with an obligation secured by the above-referenced collateral, the Secured Party has exercised its post-default remedies with respect to the collateral, and, by reason of the exercise, the Buyer has acquired the rights of the Debtor in the collateral.

The name and address of the Secured Party is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois  60603

The name and address of the Debtor is:

National Machinery – Europe, Inc.
161 Greenfield Street
Tiffin, Ohio  44883

The name and address of the Buyer is:

NMC Acquisition LLC
c/o Alpha Capital Partners, Ltd.
122 South Michigan Avenue, Suite 1700
Chicago, Illinois  60603

**NMLLC 00103**

**CONFIDENTIAL**

This Foreclosure Bill of Sale and Transfer Statement is made without any warranties whatsoever. Without limiting the generality of the foregoing THE SECURED PARTY (1) EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTIBILITY OR FITNESS FOR PARTICULAR PURPOSE, AND (2) MAKES NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION.

This Foreclosure Bill of Sale and Transfer Statement does not convey, and the Buyer shall not assume, directly or indirectly, any liabilities or obligations of the Debtor of any kind whatsoever and all of such liabilities and obligations are hereby disclaimed by the Buyer absolutely.

Dated: February 26, 2002

NMC ACQUISITION LLC

By _____

Name ANDREW H. KRINOW

Its MANAGING MEMBER

NMLLC 00104

CONFIDENTIAL

74557.3 049579-13175

# EXHIBIT J

[EXECUTION COPY]

SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

OF

NMC ACQUISITION LLC

A Delaware Limited Liability Company

Dated April 15, 2002

Effective as of February 11, 2002

110734.6 049579-13175

NMLLC 00107

CONFIDENTIAL

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| Section 1.1 | Definitions | 2 |
| ARTICLE II | GENERAL PROVISIONS | 15 |
| Section 2.1 | Formation and Prior Activities | 15 |
| Section 2.2 | Company Name | 15 |
| Section 2.3 | Registered Office; Registered Agent | 15 |
| Section 2.4 | Place of Business | 16 |
| Section 2.5 | Purpose; Nature of Business Permitted, Powers | 16 |
| Section 2.6 | Business Transactions of a Member or Director with the Company | 16 |
| Section 2.7 | Company Property | 16 |
| Section 2.8 | Term | 17 |
| Section 2.9 | No State Law Partnership | 17 |
| Section 2.10 | No Liability of Members | 17 |
| ARTICLE III | MEMBERS; CAPITAL STRUCTURE AND MEETINGS | 17 |
| Section 3.1 | Initial Contributions | 17 |
| Section 3.2 | Capital Structure | 17 |
| Section 3.3 | Certificates | 18 |
| Section 3.4 | Changes to Capital Structure | 20 |
| Section 3.5 | Preemptive Rights | 20 |
| Section 3.6 | Sponsor Fees | 22 |
| Section 3.7 | Annual Meetings of Members | 22 |
| Section 3.8 | Special Meetings of Members | 22 |
| Section 3.9 | Place of Meetings of Members | 22 |
| Section 3.10 | Notice of Meetings of Members | 22 |
| Section 3.11 | Quorum | 23 |
| Section 3.12 | Fixing of Record Date | 23 |
| Section 3.13 | Voting | 23 |
| Section 3.14 | Proxies | 23 |
| Section 3.15 | Ratification of Acts of Directors and Officers | 24 |

NMLLC 00108

CONFIDENTIAL

Section 3.16    Informal Action of Members ........................................................ 24

Section 3.17    Organization............................................................................... 24

Section 3.18    Power to Bind the Company ....................................................... 24

Section 3.19    Representations and Warranties, Indemnification ...................... 24

Section 3.20    Liability of Members ................................................................. 26

ARTICLE IV     CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS, AND
                ALLOCATIONS.......................................................................... 26

Section 4.1     Capital Contributions ................................................................. 26

Section 4.2     Additional Capital Contributions .............................................. 26

Section 4.3     Capital Accounts........................................................................ 26

Section 4.4     Allocations to Capital Accounts ................................................ 27

Section 4.5     Negative Capital Accounts ........................................................ 30

Section 4.6     Tax Allocations.......................................................................... 30

Section 4.7     Determinations by Tax Matters Partner ..................................... 31

ARTICLE V      DISTRIBUTIONS ..................................................................... 32

Section 5.1     Withdrawals and Distributions in General.................................. 32

Section 5.2     Tax Distributions ....................................................................... 32

Section 5.3     Mandatory Distributions of Available Cash ............................... 32

Section 5.4     Optional Distributions................................................................ 32

Section 5.5     In-Kind Distributions ................................................................ 32

Section 5.6     Limitations on Distributions ...................................................... 33

Section 5.7     Withholding ............................................................................... 33

Section 5.8     Interest........................................................................................ 33

ARTICLE VI     MANAGEMENT........................................................................ 33

Section 6.1     Management of the Company...................................................... 33

Section 6.2     Election, Term of Office, Resignation, Removal, Vacancies............ 34

Section 6.3     Annual and Regular Meetings .................................................... 34

Section 6.4     Observation Rights of Members ................................................. 34

Section 6.5     Special Meetings........................................................................ 35

Section 6.6     Waiver of Notice of Meetings of the Board................................. 35

Section 6.7     Quorum ...................................................................................... 35

Section 6.8     Voting ........................................................................................ 35

Section 6.9     Removal; Resignations ............................................................... 35

NMLLC 00109

CONFIDENTIAL

Section 6.10    Informal Action of Directors .................................................... 35
Section 6.11    Participation by Conference Telephone .................................... 35
Section 6.12    Compensation of Directors ...................................................... 36
Section 6.13    Committees ............................................................................... 36
Section 6.14    Committee Rules ...................................................................... 36
Section 6.15    Power to Bind Company ........................................................... 36
Section 6.16    Liability of the Directors .......................................................... 37
Section 6.17    Reliance by Third Parties ......................................................... 37
Section 6.18    Board of Directors and Sub Boards Compositions .................. 37
Section 6.19    Member Consent Rights ........................................................... 37
ARTICLE VII    EXECUTIVE OFFICERS .......................................................... 38
Section 7.1     General Provisions .................................................................... 38
Section 7.2     Election and Term of Office ..................................................... 38
Section 7.3     Removal of Officers .................................................................. 38
Section 7.4     The Chief Executive Officer .................................................... 38
Section 7.5     The President ............................................................................. 39
Section 7.6     The Chairman of the Board ....................................................... 39
Section 7.7     Vice Chairman of the Board ..................................................... 39
Section 7.8     The Vice President ..................................................................... 40
Section 7.9     The Secretary ............................................................................ 40
Section 7.10    The Assistant Secretary ............................................................ 40
Section 7.11    The Chief Financial Officer ...................................................... 40
Section 7.12    The Treasurer ............................................................................ 41
Section 7.13    The Assistant Treasurer ............................................................ 41
Section 7.14    Duties of Officers May be Delegated ....................................... 41
Section 7.15    Compensation ........................................................................... 41
ARTICLE VIII   BOOKS AND RECORDS; TAX MATTERS; AND REPORTS TO
                MEMBERS ................................................................................ 41
Section 8.1     Books and Records .................................................................... 41
Section 8.2     Accounting; Tax Year ............................................................... 41
Section 8.3     Filing of Tax Returns ................................................................ 42
Section 8.4     Tax Matters Partner ................................................................... 42
Section 8.5     Financial Statements and Other Information ............................. 42

110734.6.049579-13175

NMLLC 00110

CONFIDENTIAL

Section 8.6    Tax Information for Current and Former Members........................ 44
Section 8.7    Confidentiality Provisions and Limitations on Access..................... 44
ARTICLE IX    TRANSFER OF INTERESTS AND LIQUIDITY EVENTS ...................... 44
Section 9.1    Prohibition.................................................................. 44
Section 9.2    Conditions to Transfers.................................................... 44
Section 9.3    Effect of Transfers ........................................................ 45
Section 9.4    Right of First Offer ....................................................... 45
Section 9.5    Approved Sale............................................................. 47
Section 9.6    Incorporation of the Company ........................................... 48
Section 9.7    Tag-Along Rights.......................................................... 48
Section 9.8    Taxes, etc ................................................................. 49
ARTICLE X    ADDITIONAL MEMBERS ................................................... 49
Section 10.1    Admissions................................................................ 49
Section 10.2    Admission of Additional Members........................................ 49
Section 10.3    Admission of Assignees as Substitute Members .......................... 50
ARTICLE XI    DISSOLUTION OF THE COMPANY ....................................... 51
Section 11.1    Dissolution ................................................................ 51
Section 11.2    Winding-Up ............................................................... 51
ARTICLE XII    INDEMNIFICATION......................................................... 52
Section 12.1    Right to Indemnity ........................................................ 52
Section 12.2    Insurance .................................................................. 54
Section 12.3    Contract with the Company ............................................... 54
ARTICLE XIII    AMENDMENTS ............................................................. 55
Section 13.1    Amendments .............................................................. 55
ARTICLE XIV    MISCELLANEOUS ......................................................... 55
Section 14.1    Expenses .................................................................. 55
Section 14.2    Successors, Counterparts ................................................. 56
Section 14.3    Governing Law; Severability.............................................. 56
Section 14.4    Filings .................................................................... 56
Section 14.5    Headings .................................................................. 56
Section 14.6    Additional Documents .................................................... 56
Section 14.7    Notices ................................................................... 57
Section 14.8    Waiver of Partition........................................................ 57

NMLLC 00111

CONFIDENTIAL

Section 14.9      Interpretation...................................................................................... 57

Section 14.10     Entire Agreement, etc .......................................................................... 58

Section 14.11     No Third-Party Beneficiary ................................................................ 58

Section 14.12     Survival................................................................................................ 58

EXHIBIT A

Terms of Interests ............................................................................................................ A-1

EXHIBIT B

Initial Directors ...............................................................................................................B-1

EXHIBIT C

Schedule of Investors......................................................................................................C-1

EXHIBIT D

Addresses For Notice...................................................................................................... D-1

NMLLC 00112

CONFIDENTIAL

SECOND AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

Dated April 15, 2002

Effective as of February 11, 2002

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement"), dated as of April 15, 2002, and effective as of February 11, 2002, of NMC Acquisition LLC, a Delaware limited liability company (the "Company"), by and among Alpha Capital Fund III, L.P., a Delaware limited partnership ("Alpha"), Superior Distributing Company, Inc., an Ohio corporation ("Superior"), Andrew H. Kalnow, an individual ("A. Kalnow"), Carl F. Kalnow, an individual ("C. Kalnow"), Loretta K. Kaplan, as trustee of the Loretta K. Kaplan Qualified Annuity Trust, an Illinois trust ("Kaplan"), and Gertrude K. Chisholm, an individual ("Chisholm"; together with Alpha, Superior, A. Kalnow, C. Kalnow and Kaplan, being the "Initial Members"), and each Person subsequently admitted as a member of the Company pursuant to this Agreement.

The Company was formed on December 27, 2001, as a limited liability company under the provisions of the Delaware Act. The original limited liability agreement of the Company was entered into as of the same date between the Company and A. Kalnow, as the sole member.

On February 11, 2002, the Company and the Initial Members entered into an Amended and Restated Limited Liability Company Agreement, pursuant to which, among other things, the Initial Members were admitted as Members of the Company and A. Kalnow was appointed its sole manager.

The Initial Members, by entering into this Agreement, now wish further to amend and restate the Limited Liability Company Agreement of the Company, in order to revise the rights and privileges of its Members. The Initial Members desire that the rights and privileges described in this Agreement be effective as of February 11, 2002, as if the Amended and Restated Limited Liability Company Agreement, dated February 11, 2002, had never been executed; provided that all actions taken by A. Kalnow in his capacity as sole manager of the Company from February 11, 2002, to and including the date of this Agreement are approved and ratified.

Subject to the terms of this Agreement, the Members intend that A. Kalnow will continue to exercise ultimate control over the management of the Company through his ownership of a majority of the Voting Interests. This Agreement is intended primarily to provide for the participation of other Members in the management of the Company in accordance with good governance practice and to provide certain protections for minority investors in the Company.

NOW THEREFORE, the Members, intending to be legally bound, agree as follows:

110734.6 049579-13175

NMLLC 00113

CONFIDENTIAL

ARTICLE I
DEFINITIONS

Section 1.1    Definitions.    The singular shall include the plural and the masculine gender shall include the feminine, the neuter and vice versa, as the context requires. Certain capitalized terms used in this Agreement are defined elsewhere in this Agreement or in the schedules or exhibits hereto, which schedules and exhibits shall for all purposes constitute an essential portion of this Agreement. The following defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

"A. Kalnow Disability Event" means the death or disability of A. Kalnow. For purposes of this definition, A. Kalnow shall be considered disabled if (a) a mental or physical condition prevents A. Kalnow from effectively discharging his duties as a member of the Board, (b) A. Kalnow's personal physician certifies that such incapacity is likely to continue for more than 60 days, and (c) a physician selected by Holders representing a majority of the Senior Common Interests determines that A. Kalnow is unable to perform the material responsibilities of a chairman of the board of a significant, operating business corporation.

"A. Kalnow Employment Agreement" means an employment agreement that will be entered into between A. Kalnow and the Company, which will require the Company to pay A. Kalnow an annual salary of $50,000 in 2002 and an annual salary of $100,000 in 2003, which will be increased by $10,000 per year each year thereafter through 2017; provided that payment of the salary for 2002 will be deferred until not sooner than June 30, 2004, and provided further that A. Kalnow may, at his option, defer his salary payable for any year indefinitely, and that any deferred salary will bear interest at the greater of rate of 6% per annum or the prime rate charged from time to time by Fifth Third Bank. Mr. Kalnow will also be entitled to a car allowance and reimbursement of annual membership expenses at the Mohawk Country Club.

"Accountants" means such firm of independent certified public accountants as shall be engaged from time to time by the Board on behalf of the Company to audit the books and records of the Company.

"Additional Capital Contribution" shall mean any Capital Contributions made to the Company by Members in excess of any initial Capital Contributions.

"Additional Member" means any Person other than an Initial Member admitted to the Company as a Member of the Company pursuant to Section 10.2 and shown as a Member of the Company on the books and records of the Company and on the Schedule of Investors.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (a) credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to the Treasury Regulations under Section 704 of the Code and (b) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the

110734.6 049579-13175

2

NMLLC 00114

CONFIDENTIAL

provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Alpha Consulting Agreement" means a consulting agreement that will be entered into between Alpha or its Affiliate and the Company, which will require the Company to pay Alpha or its Affiliate, for so long as Alpha owns not less than 5% of the outstanding Common Interests and continues to provide services deemed adequate by the Board, an annual consulting fee of $50,000 in 2002 and $100,000 in 2003, which will be increased by $10,000 per year each year thereafter through 2017; provided that payment of the consulting fee for 2002 may be deferred until not sooner than June 30, 2004, at the election of either Alpha or the chief executive officer of the Company, and provided further that Alpha may, at its option, defer its fee payable for any year indefinitely, and that any deferred fee will bear interest at the greater of rate of 6% per annum or the prime rate charged from time to time by Fifth Third Bank.

"Alpha Contemplated Transfer" means a Transfer by A. Kalnow to Alpha of a pro rata strip of up to $550,000 of A. Kalnow's Membership Interests, Subordinated Notes, Bridge Notes and loan commitments to the Company, including up to 37,500 Common Interests and up to 212,500 Preferred Interests, occurring on or prior to February 1, 2004.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person, and with respect to any individual, such individual's spouse and family members (including natural and adopted descendants) and any trust, family limited partnership or similar estate planning entity solely for the benefit of such individual or such individual's spouse and/or family.

"Affiliate Transaction" shall have the meaning set forth in Section 2.6(b) of this Agreement

"Agreement" means this Second Amended and Restated Limited Liability Agreement of the Company, including any schedules and exhibits hereto, as amended, modified, supplemented or restated from time to time, as the context requires.

"Another Enterprise" shall have the meaning set forth in Section 12.1(d) of this Agreement.

"Approved Sale" shall have the meaning set forth in Section 9.5(a) of this Agreement.

"Assignee" shall mean a transferee of Interests in accordance with Article IX hereof who has not been admitted as a Substitute Member.

"Authorization Date" shall have the meaning set forth in Section 9.4(a) of this Agreement.

"Available Cash" means the Consolidated EBITDA of the Company for the Fiscal Year then ended less (a) the Hypothetical Tax Amount distributed pursuant to Section 5.2 of this Agreement with respect to such Fiscal Year, (b) all non-cash items of income and gain, (c)

NMLLC 00115

CONFIDENTIAL

interest expense to the extent paid in cash, (d) Deductible Capital Expenditures, and (e) a reasonable reserve for working capital, expansion and other expenditures, in each case as determined by the Board.

"Bankruptcy" shall mean, with respect to any Person, the occurrence of any of the following events: (a) the filing by such Person of a petition in bankruptcy or for relief under applicable bankruptcy laws; (b) the filing against such Person of any such petition (unless such petition is dismissed within ninety (90) days from the date of filing thereof); (c) entry against such Person of an order for relief under applicable bankruptcy laws; (d) written admission by such Person of its inability to pay its debts as they mature, or an assignment by such Person for the benefit of creditors; or (e) appointment of a trustee, conservator or receiver for the property or affairs of such Person.

"Board" shall mean the Board of Directors as provided for in Section 6.1 of this Agreement.

"Book Value" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g); provided that the Book Value of any asset contributed to the Company shall be equal to the fair market value of the contributed asset on the date of the contribution.

"Bridge Notes" means those certain Bridge Notes issued pursuant to the Loan Agreement between the Company and the Initial Members, dated February 11, 2002, as the same may be amended from time to time.

"Business Day" means a day other than a Saturday, a Sunday or a day on which banks in Tiffin, Ohio are permitted or required by law to close.

"Call" has the meaning set forth in Part C, Section 6(a) of Exhibit A.

"Call Closing" has the meaning set forth in Part C, Section 6(b) of Exhibit A.

"Call Multiple" means the indicated multiple applicable the Fiscal Year in which the Call Notice was delivered:

| Fiscal Year | Call Multiple |
| --- | --- |
| 2004 | 6.0x |
| 2005 | 5.75x |
| 2006 | 5.5x |
| 2007 and thereafter | 5.25x |

"Call Notice" has the meaning set forth in Part C, Section 6(a) of Exhibit A.

110734.6 049579-13175                                      4

NMLLC 00116

CONFIDENTIAL

"Call Price" has the meaning set forth in Part C, Section 6(d) of **Exhibit A**.

"Callable Amount" means the following number of Class A Common Interests (as adjusted for splits and consolidations of Class A Common Interests) in the indicated Fiscal Years:

| Fiscal Year | Callable Class A Interests |
|---|---|
| 2004 | 63,931 |
| 2005 | 127,862 |
| 2006 | 191,793 |
| 2007 and thereafter | All remaining Class A Common Interests |

*provided that* if the Alpha Contemplated Transfer occurs the Callable Amount shall increase, cumulatively, by an additional 9,375 Class A Common Interests in each of Fiscal Years 2004, 2005 and 2006.

"Capital Account" has the meaning given in Section 4.3 of this Agreement.

"Capital Contribution" means, at any specified time with respect to any Member, the total amount of money or other property contributed to the capital of the Company by such Member pursuant to this Agreement.

"Certificate of Formation" shall have the meaning set forth in Section 2.1 of this Agreement.

"Change of Control" shall mean any sale, transfer, issuance or redemption or series of sales, transfers, issuances or redemptions (or any combination thereof) of Interests of the Company by the holders thereof or the Company which results in any person or entity or group of affiliated persons or entities (other than the Holders of Interests in the Company (on a fully diluted basis) immediately prior to any such transaction or series of transactions) owning Interests in the Company possessing the voting power under ordinary circumstances to elect a majority of the Board and constituting a majority of the Common Interests.

"Class A Common Interests" has the meaning set forth in Section 3.2(a) of this Operating Agreement.

"Class B Common Interests" has the meaning set forth in Section 3.2(a) of this Operating Agreement.

"Class C Common Interests" has the meaning set forth in Section 3.2(a) of this Operating Agreement.

110734.6 049579-13175                    5

NMLLC 00117

CONFIDENTIAL

"Class D Common Interests" has the meaning set forth in Section 3.2(a) of this Operating Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provision of succeeding law).

"Committee" shall have the meaning set forth in Section 6.9 of this Agreement.

"Common Interests" shall mean the common limited liability company membership interests of the Company, including the Class A, Class B, Class C and Class D Common Interests.

"Common Members" shall mean the Members who hold Common Interests.

"Company" means NMC Acquisition LLC, a limited liability company formed and constituted and governed under and pursuant to the Delaware Act, the Certificate of Formation and this Agreement.

"Company Book Value" shall mean, with respect to the Interests, the aggregate book value of the Capital Accounts attributable to the Interests determined in accordance with Article IV of this Agreement.

"Company Fair Market Value" shall mean the fair market value of the Company as a going concern (without discounts for minority interests or lack of liquidity), net of the liabilities of the Company, as of a specific date and as determined in good faith by the Board. In determining such fair market value, the Board may consider the assets of the Company, the current and projected Net Profit or Net Loss of the Company, any existing contracts that may generate revenues, goodwill, and any other issue the Board deems appropriate in determining such value. If Disputing Members dispute the accuracy of the Board's determination of the Company Fair Market Value, the Disputing Members may, at such Disputing Members' joint expense, have an independent financial expert selected by the Disputing Members (the "Member's Expert") prepare an evaluation of the fair market value of the Company and, in such event, the Board shall make available the books and records of the Company to the Member's Expert, subject to such conditions of confidentiality as the Board shall reasonably impose. In the event the difference between the fair market value of the Company as determined by the Board and the fair market value of the Company as determined by the Member's Expert is less than 10%, the Company Fair Market Value shall be the arithmetic average of such fair market values. In the event the difference between the fair market value of the Company as determined by the Board and the fair market value of the Company as determined by the Member's Expert is 10% or greater, the Company shall retain an independent financial expert other than the Member's Expert (the "Independent Expert"), that is reasonably acceptable to both the Company and the Disputing Members, to determine the fair market value of the Company. The Independent Expert shall consider only those items of disagreement between the Company and the Member's Expert and shall deliver to the Company and the Disputing Members a finding on the issues of disagreement and a final appraisal, which shall be binding upon the Disputing Members and the Company. The cost of the Member's Expert shall be borne equally by each of the Disputing

110734.6 049579-13175                                      6

NMLLC 00118

CONFIDENTIAL

Members and the cost of the Independent Expert shall be borne 50% by the Company and 50% by the Disputing Members.

"Company Items" shall have the meaning set forth in Section 4.4(c) of this Agreement.

"Consolidated EBITDA" means, for any period, all as determined in accordance with generally accepted accounting principles, the consolidated net income (or net loss) of the Company and its Subsidiaries for such period plus (i) the sum of (a) depreciation expense, (b) amortization expense, (c) other non-cash expenses, (d) net total federal, state and local income tax expense, and (e) gross interest expense for such period less gross interest income for such period, plus or minus (ii) the amount of cash received or expended in such period in respect of any amount that, under clauses (c) and (e) above, was taken into account in determining Consolidated EBITDA for such or any prior period.

"Deductible Capital Expenditures" means an annual reserve for capital expenditures equal to (a) $750,000 for each of Fiscal Years 2002 through 2007, and (b) $1,000,000 for each subsequent Fiscal Year.

"Deficiency Amount" shall have the meaning set forth in Section 4.4(b) of this Agreement.

"Delaware Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as it may be amended from time to time and any successor to such statute.

"Directors" shall have the meaning set forth in Section 6.1 of this Agreement.

"Disposing Member" shall have the meaning set forth in Section 9.4 of this Agreement.

"Disposition" shall have the meaning set forth in Section 9.4 of this Agreement.

"Disputing Members" means (a) in the case of a put or call of the Class A Common Interests, Members holding a majority of the outstanding Class A Common Interests put or called for repurchase, and (b) in all other cases, Members holding in excess of 10% of the Voting Interests.

"EBITDA Measurement Period" means in whichever of the following periods the average 12-month Consolidated EBITDA was the highest: (a) the 12-month period ending on the last Business Day of the month preceding the month in which the applicable Put Notice or Call Notice was delivered, or (b) the 36-month period ending on the last Business Day of the month preceding the month in which the applicable Put Notice or Call Notice was delivered.

"Effective Date" means February 11, 2002.

"Electing Member" shall have the meaning set forth in Section 9.4(b) of this Agreement.

"Election Period" shall have the meaning set forth in Section 9.4 of this Agreement.

NMLLC 00119

CONFIDENTIAL

"Employee Option" means any warrant, option or other similar right to subscribe for or purchase an Interest where such warrant, option or right is issued or granted, pursuant to a compensation plan or other similar arrangement approved by the Board, to an employee of the Company or its Subsidiaries or other service provider to the Company or its Subsidiaries in such person's capacity as an employee or service provider.

"Event of Noncompliance" shall have the meanings set forth in Section 7 of Part A and Section 7 of Part C of **Exhibit A**.

"Event of Termination" shall have the meaning set forth in Section 11.1 of this Agreement.

"Excess Amount" shall have the meaning set forth in Section 4.4(b) of this Agreement.

"Fiscal Period" shall mean the period commencing on February 11, 2002, and thereafter each period commencing on the day immediately following the last day of the preceding Fiscal Period, and ending at the close of business on the first to occur of the following dates:

(i)     December 31 of such period; and

(ii)    any other day as determined by the Tax Matters Partner.

"Fiscal Year" shall mean the calendar year period ending on December 31 of each year.

"Fully-Diluted Common Interests" means all Common Interests of the Company that would be outstanding if, immediately prior to such determination, all outstanding warrants, options and other rights to acquire Common Interests were exercised.

"Fundamental Change" shall mean a reorganization, consolidation or merger in which the Company is a party (except any reorganization, consolidation or merger where, after giving effect thereto, the holders of the Company's outstanding membership interests (on a fully diluted basis) immediately prior to such reorganization, consolidation or merger will, immediately following such reorganization, consolidation or merger, own the outstanding Interests of the Company (on a fully diluted basis) possessing the voting power under ordinary circumstances to elect a majority of the Board), or a sale or other transfer of all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis in any transaction or series of related transactions (other than sales in the ordinary course of business).

"Funded Debt" means, without duplication, (a) indebtedness for borrowed money, (b) indebtedness which by its terms matures in more than one year, or can be extended by the obligor for more than one year, following the date of its creation or incurrence, (c) obligations arising under leases that generally accepted accounting principles require the obligor to capitalize on its balance sheet, and (d) guarantees of indebtedness of any other Person of the character described in subparts (a), (b) or (c) of this definition.

NMLLC 00120

CONFIDENTIAL

"Hypothetical Tax Amount" means, with respect to each Member, that percentage of the Company's income, gain, loss, deductions and expenses allocated for tax purposes to such Member that is determined by the Tax Matters Member, acting in good faith, to be the highest combined rate of United States federal and state income taxation applicable to any Member of the Company for the applicable tax year.

"Individual Member" means any Member that is a natural individual and Loretta K. Kaplan.

"Independent Expert" shall have the meaning set forth in the definition of "Company Fair Market Value" of this Agreement.

"Initial Members" means Alpha, Superior, A. Kalnow, C. Kalnow, Kaplan and Chisholm.

"Institutional Member" means Alpha, Superior and any other Member that is not a natural individual, other than Kaplan.

"Intended Characterization" shall have the meaning set forth in Section 4.4(e) of this Agreement.

"Interest" means a membership interest in the Company.

"Interest Consideration" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"Interest Distribution" shall have the meaning set forth in Part C, Section 1.2, of **Exhibit A** of this Agreement.

"Interest Percentage" means, with respect to any class, group or series of Interests, the proportion of Interests of such class, group or series held by one or more specified holders of such Interests over the total number of Interests of such class, group or series.

"Issuance Items" shall have the meaning set forth in Section 4.4(c) of this Agreement.

"Junior Securities" shall have the meaning set forth in Part A, Section 1(b), of **Exhibit A** of this Agreement.

"Liquidation Value" means the Series A Preferred Liquidation Amount and/or the Series B Preferred Liquidation Amount, as applicable.

"Liquidity Event" means a Fundamental Change, a Change in Control or a Qualified Public Offering.

"Lunn Contemplated Transfer" means a Transfer by A. Kalnow to Lunn Partners LLC or its nominees of a pro rata strip of up to $1,500,000 of A. Kalnow's Membership Interests, Subordinated Notes, Bridge Notes and loan commitments to the Company, including up to

NMLLC 00121

CONFIDENTIAL

102,273 Common Interests and up to 579,545 Series B Preferred Interests, occurring on or prior to June 30, 2002.

"Member" means any Person admitted to the Company as a member of the Company pursuant to the provisions of this Agreement and named as a member of the Company in the books and records of the Company and on the Schedule of Investors, including any Person admitted as an Initial Member, Additional Member or a Substitute Member, in such Person's capacity as a member of the Company and excluding any Persons who cease to be Members, pursuant to Article X of this Agreement.

"Member's Expert" shall have the meaning set forth in the definition of "Company Fair Market Value" of this Agreement.

"Net Loss" means the net loss of the Company with respect to a Fiscal Period, as determined for federal income tax purposes; provided that such loss shall be decreased by the amount of all income during such period that is exempt from federal income tax and increased by the amount of all expenditures during such period that are not deductible for federal income tax purposes and that do not constitute capital expenditures.

"Net Profit" means the net income of the Company with respect to a Fiscal Period, as determined for federal income tax purposes; provided that such income shall be increased by the amount of all income during such period that is exempt from federal income tax and decreased by the amount of all expenditures during such period that are not deductible for federal income tax purposes and that do not constitute capital expenditures.

"New Interests" means any authorized but unissued membership interests of the Company and all rights, options or warrants to purchase membership interests, and securities of any type whatsoever that are, or may become, convertible into membership interests; provided, however, that the term "New Interests" does not include:

NMLLC 00122

CONFIDENTIAL

(i)    Preferred Interests and Common Interests issued pursuant to Sections 3.4(b) and (c) of this Agreement;

(ii)    equity securities issued pursuant to or related to the acquisition of all or a part of another corporation or entity by the Company or any Subsidiary by merger, purchase of all or substantially all of the assets or other reorganization;

(iii)    equity securities issued to financial institutions as consideration for or in connection with any credit facilities obtained by the Company from such financial institution;

(iv)    equity securities issued pursuant to a public offering registered under the Securities Act;

(v)    equity securities issued in connection with any split, distribution or reclassification of Common Interests distributable on a pro rata basis to all holders of Common Interests; and

(vi)    up to 80,000 Class D Common Interests, comprising not more than 5% of the outstanding Common Interests, issued to employees and Directors of the Company or its Subsidiaries after the date hereof by direct sale, grant or the exercise of Employee Options.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"Offered Securities" shall have the meaning set forth in Section 9.4 of this Agreement.

"Option Interest" means an Interest issued by the Company on exercise by a Person of a conversion feature, warrant, option or other similar right (other than an Employee Option).

"Other Senior Common Members" shall have the meaning set forth in Section 9.4(a) of this Agreement.

"Partnership Minimum Gain" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(2).

"Partner Nonrecourse Debt" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"Partner Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(i).

"Pass-Thru Member" shall have the meaning set forth in Section 8.4 of this Agreement.

NMLLC 00123

CONFIDENTIAL

"Permitted Transfers" means (a) any Transfer of Interests to a Permitted Transferee or to the Company, or (b) in the case of A. Kalnow, the Alpha Contemplated Transfer and the Lunn Contemplated Transfer.

"Permitted Transferee" means, as applicable, (i) an Individual Member's spouse and family members (including natural or adopted descendants), (ii) any trust solely for the benefit of such Individual Member and/or such Individual Member's spouse and/or family, (iii) a family limited partnership or similar estate planning entity benefiting the family members of any Individual Member, (iv) with respect to an Institutional Member, any Principal or any Permitted Transferee or Affiliate of a Principal, and (v) other Members and Loretta K. Kaplan.

"Person" means any individual, partnership, joint venture, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof in their capacity as such), government (or agency or political subdivision thereof) or other entity.

"Preemptive Pro Rata Share" shall have the meaning set forth in Section 3.5 of this Agreement.

"Preferred Interests" shall mean, in the aggregate, all preferred limited liability membership interests of the Company which shall be issuable in one or more series (each, a "Series"), including, without limitation, the Series A and Series B Preferred Interests, the relative rights, powers, preferences, duties, liabilities and obligations of which are set forth in on **Exhibit A** hereto.

"Principals" means Andrew H. Kalnow, David DeVore, Richard M. Goff, Kris Klepper, Michael Klepper and Robert Lunn.

"Put" has the meaning set forth in Part C, Section 5(a) of **Exhibit A**.

"Put Closing" has the meaning set forth in Part C, Section 5(b) of **Exhibit A**.

"Put Notice" has the meaning set forth in Part C, Section 5(a) of **Exhibit A**.

"Put Price" has the meaning set forth in Part C, Section 5(d) of **Exhibit A**.

"Qualified Public Offering" shall mean the closing of a public offering pursuant to a registration statement declared effective under the Securities Act covering the offer and sale of Common Interests (or any similar common equity securities of the Company if the Company is incorporated pursuant to Section 9.6 of this Agreement prior to any such public offering) that is designated as a Qualified Public Offering by the Board.

"Redemption Notice" shall have the meaning set forth in Part A, Section 4(a), of **Exhibit A** of this Agreement.

"Regulatory Allocations" shall have the meaning set forth in Section 4.4(g) of this Agreement.

NMLLC 00124

CONFIDENTIAL

"Relevant Member" shall have the meaning set forth in Section 4.4(c) of this Agreement.

"Required Common Holders" means the affirmative vote of Persons holding not less than 66.67% of the then outstanding Senior Common Interests voting together as a single class.

"Required Preferred Holders" means the affirmative vote of Persons holding not less than 66.67% of each of the then outstanding Series of Preferred Interests, voting as separate classes.

"Required Series A Holders" means the affirmative vote of Person holding not less than 66.7% of the Series A Preferred Interests.

"Required Series B Holders" means the affirmative vote of Person holding not less than 66.7% of the Series B Preferred Interests.

"Sale Notice" shall have the meaning set forth in Section 9.4 of this Agreement.

"Schedule of Investors" shall mean **Exhibit C** attached hereto, setting forth each Member's respective Capital Contributions and the Interest Percentage which shall be filed with the records of the Company.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Senior Common Interests" means the Class A, the Class B, and the Class C Common Interests.

"Senior Common Members" means Members holding Class A, Class B and Class C Common Interests.

"Senior Credit Facility Closing" means the Company's closing a transaction with a financial institution pursuant to which the financial institution lends or commits to lend the Company not less than $5,000,000.

"Series" shall have the meaning set forth in the definition of "Preferred Interest" of this Agreement.

"Series A Preferred Interests" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"Series A Preferred Liquidation Amount" shall have the meaning set forth in Part A, Section 2(a), of **Exhibit A** of this Agreement.

"Series B Preferred Interests" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"Series B Preferred Liquidation Amount" shall have the meaning set forth in Part A, Section 2(a), of **Exhibit A** of this Agreement.

110734.6 049579-13175                                    13

**NMLLC 00125**

**CONFIDENTIAL**

"Spread Amount" shall have the meaning set forth in Section 4.4(e) of this Agreement.

"State" means the State of Delaware.

"Stated Value" shall have the meaning set forth in the Section 2(b) of Part A to **Exhibit A** of this Agreement.

"Sub Board" shall have the meaning set forth in Section 6.18(b) of this Agreement.

"Subordinated Notes" means those certain Subordinated Notes issued pursuant to the Loan Agreement between the Company and the Initial Members, dated February 11, 2002, as the same may be amended from time to time.

"Subsidiary" shall mean any person or entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or equity interests of such person or entity are at the time owned or controlled, directly or indirectly, by the Company.

"Substitute Member" means any Person admitted to the Company as a member of the Company pursuant to the provisions of Section 10.3 of this Agreement and shown as a Member in the books and records and the Company and on the Schedule of Investors.

"Tax Matters Partner" has the meaning given in Section 8.4 of this Agreement.

"Total Redemption Interests" shall have the meaning set forth in Part A, Section 4(b), of **Exhibit A** to this Agreement.

"Transfer" shall mean, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge, encumbrance or other disposition; and, as a verb, voluntarily or involuntarily to sell, assign, transfer, grant, give away, hypothecate, pledge, encumber or otherwise dispose of, and shall include any transfer by will, gift or intestate succession.

"Transferring Member" shall mean, collectively, the Initial Members and their Permitted Transferees.

"Treasury Regulations" mean the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding income tax regulations).

"United States" or "U.S." means the United States of America.

"Voting Interests" means the Class A Common Interests and the Class B Common Interests; provided that following the occurrence of an A. Kalnow Disability Event, the Class A, Class B and Class C Common Interests shall all be Voting Interests. It is intended that initially, and after giving effect to the Alpha Contemplated Transfer and the Lunn Contemplated Transfer, A. Kalnow will own a majority of the Voting Interests.

"$" means United States dollars.

110734.6 049579-13175

14

NMLLC 00126

CONFIDENTIAL

ARTICLE II
GENERAL PROVISIONS

Section 2.1    Formation and Prior Activities.

(a)    James J. Greenberger, an authorized person, formed the Company as a limited liability company on December 27, 2001, by filing a Certificate of Formation (the "Certificate of Formation") with the Secretary of State of the State of Delaware in conformity with Section 18-201 of the Delaware Act. All actions previously taken by James J. Greenberger in forming the Company are hereby ratified and approved by the Members. The Company and, if required, each of the Members, shall execute or cause to be executed from time to time all other instruments, certificates, notices and documents and shall do or cause to be done all such acts and things (including keeping books and records and making publications or periodic filings) as may now or hereafter be required for the formation, valid existence and, when appropriate, termination of the Company as a limited liability company under the laws of the State of Delaware.

(b)    The Initial Members affirm, approve and ratify all acts taken by A. Kalnow in his capacity as sole director and Chief Executive Officer of the Company prior to the date of this Agreement.

(c)    The Initial Members affirm, approve and ratify the Company's contribution of substantially all of the Company's assets to National Machinery LLC, an Ohio limited liability company, in exchange for all of the membership interests of National Machinery LLC. The Company shall not permit National Machinery LLC to issue membership interests or any other equity securities to any Person other than the Company without the prior consent of the Required Common Holders and the Required Preferred Holders

Section 2.2    Company Name. The name of the Company shall be "NMC Acquisition LLC" or such other name or names as may be selected by the Board from time to time, and its business shall be carried on in such name with such variations and changes as the Board deems necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted. Without limiting the generality of the foregoing, the Board may change the Company's name to "NMC LLC" or some variation of such name, without the necessity of amending this Agreement.

Section 2.3    Registered Office; Registered Agent. The Company shall maintain a registered office in the State of Delaware at, and the name and address of the Company's registered agent in the State of Delaware is, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, 19801. The Board may, from time to time, change the Company's registered office and/or registered agent and shall forthwith amend the Certificate of Formation to reflect such change(s).

Section 2.4    Place of Business. The business address of the Company shall be determined by the Board. The Company may from time to time have such other place or places of business within or without the State of Delaware as the Board may deem advisable.

110734.6 049579-13175                                    15

NMLLC 00127

CONFIDENTIAL

Section 2.5    <u>Purpose; Nature of Business Permitted, Powers</u>.  The purpose of the Company is to engage in any and all lawful business or activity which limited liability companies are permitted to carry on under the Delaware Act including, without limitation, the manufacture, refurbishment, sale and servicing of industrial machinery and the ownership of equity securities and interests in other companies engaged in or facilitating the engagement in such activities.  The Company shall possess and may exercise all the powers and privileges granted by the Delaware Act or by any other law or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary, appropriate, advisable, incidental or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

Section 2.6    <u>Business Transactions of a Member or Director with the Company</u>.

(a)    Subject to paragraph (b) below, in accordance with Section 18-107 of the Delaware Act, a Member or Director may lend money to, borrow money from, act as surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with, the Company and, subject to applicable law, shall have the same rights and obligations with respect to any such matter as a Person who is not a Member or Director, as applicable.

(b)    Except as otherwise set forth in this Agreement, the Company shall not, and shall not permit any of its Subsidiaries to, sell, lease, transfer or otherwise dispose of any of their respective properties or assets to, or purchase any property or assets from, or enter into any contract, agreement, understanding, loan, advance or guaranty with, or for the benefit of, an Affiliate ("<u>Affiliate Transaction</u>") unless (i) such Affiliate Transaction is on terms that are not less favorable to the Company or such Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Subsidiary from an unrelated Person, and (ii) a majority of the disinterested directors of the Board approves such Affiliate Transaction.  For the avoidance of doubt, for purposes of this Section 2.6(b), the term "<u>Affiliate</u>" shall include, without limitation, each of the Initial Members and the Principals.

(c)    The Alpha Consulting Agreement and A. Kalnow., Employment Agreement, and the Company's performance thereunder, are affirmed, authorized and approved by the Initial Members.

Section 2.7    <u>Company Property</u>.  No real or other property of the Company shall be deemed to be owned by any Member individually, but shall be owned by and title shall be vested solely in the Company.  Without limiting the foregoing, all trade secrets, intellectual property and other business assets used or developed by the Company are owned and controlled by the Company only.  The interests of the Members in the Company shall constitute personal property.

Section 2.8    <u>Term</u>.  The existence of the Company commenced on the date of the filing of the Certificate of Formation in the office of the Secretary of State of the State of Delaware in accordance with the Delaware Act, and, subject to the provisions of Article XI hereof, the Company shall have a perpetual life.

NMLLC 00128

CONFIDENTIAL

Section 2.9    <u>No State Law Partnership</u>.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture and that no Member or Director be a partner or joint venturer of any other Member or Director for any purposes other than applicable tax laws.    This Agreement may not be construed to suggest otherwise. Notwithstanding the foregoing, the Members intend that the Company shall be treated as a partnership for tax purposes, and no Member shall take any position in any tax return, audit, litigation or other proceeding that is inconsistent with the characterization of the Company as a partnership for tax purposes.

Section 2.10    <u>No Liability of Members</u>.  All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

<div align="center">

ARTICLE III
MEMBERS; CAPITAL STRUCTURE AND MEETINGS

</div>

Section 3.1    <u>Initial Contributions</u>.   The name, initial Capital Contribution, Interest Percentage, and number of Interests of each Initial Member is set forth on the Schedule of Investors attached as **Exhibit C**.  Each Initial Member has purchased and been issued on the Effective Date the number of Interests set forth opposite the Initial Member's name for the price of $1.00 per Interest.  The books and records of the Company shall thereafter reflect the name, address and Additional Capital Contribution of each Initial Member and the name, address and Capital Contribution of each Additional Member or Substitute Member who is admitted or becomes a Member pursuant to the transfer of Interests, each as permitted by this Agreement.

Section 3.2    <u>Capital Structure</u>.

(a)    Capitalization.  Subject to the terms of this Agreement, the Company is authorized to issue equity interests in the Company designated as Interests. The total number of Interests which the Company shall initially have authority to issue is 12,000,000.  Other than as set forth in this Agreement, each Interest shall be identical in all respects with each other Interest. The capital structure of the Company shall initially consist of six classes of membership interests: Series A preferred membership interests (the "<u>Series A Preferred Interests</u>"), Series B preferred membership interests (the "<u>Series B Preferred Interests</u>"), Class A common membership interests (the "<u>Class A Common Interests</u>"), Class B common membership interests (the "<u>Class B Common Interests</u>"), Class C common membership interests (the "<u>Class C Common Interests</u>"), and Class D common membership interests (the "<u>Class D Common Interests</u>").  The Company shall initially have the authority to issue 1,700,000 Series A Preferred Interests, 7,100,000 Series B Preferred Interests, 300,000 Class A Common Interests, 580,000 Class B Common Interests, 780,000 Class C Common Interests, and 1,540,000 Class D Common Interests.  The relative rights, powers, preferences, duties, liabilities and obligations of holders of the Series A Preferred Interests, Additional Preferred Interests, Class A Common Interests, Class B Common Interests, Class C Common Interests, and Class D Common Interests shall be as set forth herein and on **Exhibit A** hereto.   Subject to the terms and conditions of this Agreement,

110734.6 049579-13175                                  17

NMLLC 00129

CONFIDENTIAL

the Board may establish, authorize and issue additional Interests and new classes and series of Interests to the extent the Board deems desirable and in the best interests of the Company and its Members.

(b)     Membership Interests.  Subject to the terms of Sections 3.3, 3.4, 3.5 and Article X, the Company is authorized to issue Interests to any Person at such prices per Interest as may be determined by the Board or a duly authorized committee thereof and in exchange for either capital contributions or the provision of services (together, "Interest Consideration"), as may be determined by the Board.  The number of Interests issued to Members shall be listed in the membership records of the Company and on **Exhibit C** hereto, which shall be amended from time to time by the Company as required to reflect issuances of Interests to new Members, changes in the number of Interests held by Members and to reflect the addition or cessation of Members.  Except as otherwise provided in this Agreement, the number of Interests held by each Member shall not be affected by any (i) issuance by the Company of Interests to other Members or (ii) change in the Capital Account of such Member (other than such changes to reflect additional Capital Contributions or Interest Consideration from such Member in exchange for new Interests or distributions to a Member in redemption of or exchange for Interests).  Except as set forth in this Agreement, the Company is authorized to issue options or warrants to purchase Interests, restricted Interests, Interest appreciation rights, phantom Interests, and other securities convertible, exchangeable or exercisable for Interests, on such terms as may be determined by the Board or a duly authorized committee thereof.

(c)     No Redemption.  The Company shall not redeem or repurchase any Member's Interests and no Member shall have the right to withdraw from the Company or receive any return of any Capital Contribution, except upon dissolution of the Company pursuant to Article XI or pursuant to the terms of **Exhibit A.**

Section 3.3     Certificates.

(a)     Right to Issue Certificates.  If at any time the Board determines that it is in the interest of the Company to issue certificates attesting to the ownership of Interests in the Company by Members of the Company, the provisions of this Section 3.3 shall thereafter apply (and prior to such determination by the Board, if any, this Section 3.3 shall have no force or effect).

(b)     Form of Certificates.  Certificates attesting to the ownership of Interests in the Company shall be in such form as shall be approved by the Board and shall state that the Company is a limited liability company formed under the laws of the State of Delaware, the name of the Member to whom such certificate is issued, that the certificates represent limited liability company interests within the meaning of Section 18-702(c) of the Act and that the certificates are securities governed by Article 8 of the Uniform Commercial Code.  Each such certificate shall be signed by the Chief Executive Officer and the Secretary, or any Assistant Secretary, of the Company.

110734.6 049579-13175

18

NMLLC 00130

CONFIDENTIAL

(c)    Register.    The transfer register or transfer books and blank share certificates shall be kept by the Secretary of the Company or by any transfer agent or registrar designated by the Board for that purpose.

(d)    Issuance.    The certificates of the Company shall be numbered and registered in the share register or transfer books of the Company as they are issued.

(e)    Transfer.  Subject to all provisions hereof relating to Transfers of Interests, if the Company shall issue certificates in accordance with the provisions of this Section, Transfers of Interests shall be made on the register or transfer books of the Company upon surrender of the certificate therefor, endorsed by the Person named in the certificate or by an attorney lawfully constituted in writing.

(f)    Record Holder.  Except to the extent that the Company shall have received written notice of an assignment of an Interest in the Company, the Company shall be entitled to treat the Person in whose name any certificates issued by the Company stand on the books of the Company as the absolute owner thereof, and shall not be bound to recognize any equitable or other claim to, or interest in, such Interest on the part of any other Person.

(g)    Lost Destroyed or Mutilated Certificates.  The holder of any certificates issued by the Company shall immediately notify the Company of any loss, destruction or mutilation of such certificates, and the Secretary may cause a new certificate or certificates to be issued to such holder, in case of mutilation of the certificate, upon the surrender of the mutilated certificate or, in case of loss or destruction of the certificate, upon satisfactory proof of such loss or destruction and, if the Board shall so determine, the granting of an indemnity and/or the deposit of a bond in such form and in such sum, and with such surety or sureties, as the Board may direct.

(h)    Legends.  In addition to any other legend required with respect to a particular class, group or series of Interests, each such certificate, if any, shall bear the following legend:

> "THE INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, ENCUMBERED, HYPOTHECATED OR OTHERWISE DISPOSED OF WITHOUT COMPLYING WITH THE PROVISIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT BY AND AMONG THE MEMBERS OF NMC ACQUISITION LLC, AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE WITH THE COMPANY.  THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF THE AFORESAID AGREEMENT."

NMLLC 00131

CONFIDENTIAL

Section 3.4    Changes to Capital Structure.

(a)    Additional Members.    Subject to Section 3.5, the Board may admit Additional Persons as Members, and create and issue Interests to those Persons and to existing Members, in accordance with Article X.  Subject to such approvals as may be required pursuant to Article X, the terms of admission or issuance may provide for the creation of different classes, groups or series of membership interests having different rights, powers and duties, which rights, powers and duties may be senior, pari passu or junior to the rights, powers and duties of the Common Interests and/or the Series A Preferred Interests, as determined by the Board.  Any creation of any new class, group or series of Interests shall be reflected in a supplemental exhibit to this Agreement indicating such rights, powers and duties.

(b)    Special Employee Interests.    Upon the approval of the Board, the Company may sell or grant to employees or Directors of or consultants to the Company or its Subsidiaries Common Interests or Employee Options for up to 80,000 Class D Common Interests (which sales may be for prices that are below fair market value); provided that the number of such issuances to employees and Directors maybe increased with the approval of the Required Common Holders.

Section 3.5    Preemptive Rights.  The Company hereby grants to each Member holding Common Interests (or if such Member designates, its Affiliate), the right, on the terms (including, without limitation, the limitations contained in paragraph (d) below) set forth below, to purchase such Member's Preemptive Pro Rata Share of New Interests which the Company may, after the date hereof, from time to time, propose to sell and issue for cash or other consideration.  "Preemptive Pro Rata Share" means a percentage equal to the total Common Interests owned by such Member divided by all of the issued and outstanding Common Interests, respectively, owned by all Members requesting or exercising the right to which such Preemptive Pro Rata Share relates.

(a)    In the event the Company proposes to undertake an issuance of New Interests, it shall give each Member written notice of its intention, describing the type of New Interests, the consideration and the general terms upon which the Company proposes to issue the same.  Each Member shall have 30 days from the date of receipt of any such notice to agree to purchase its Preemptive Pro Rata Share of such New Interests for the cash or cash equivalent consideration (as determined in good faith by the Board) and upon the general terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Interests to be purchased.  In the event that any Member or its Affiliate elects to purchase less than its Preemptive Pro Rata Share of the New Interests so offered, the Company shall promptly so notify all other Members holding Common Interests and, for a period of five (5) days following such notice, the Member's Preemptive Pro Rata Share (or portion thereof not purchased by such Member or its Affiliates) may be purchased by other Members holding Common Interests or their Affiliates within such period in such proportion as such Members agree or, failing agreement, in proportion to the outstanding Common Interests held by each Member desiring to purchase such New Interests.

NMLLC 00132

CONFIDENTIAL

(b)    In the event a Member fails to exercise the above rights within the original thirty (30) day period, and the other Members holding Common Interests fail to purchase such Member's Preemptive Pro Rata Share within the following five (5) day period, the Company shall have one hundred twenty (120) days thereafter to sell the New Interests respecting which any such Person's preemptive right under this Section 3.5 was not exercised, at a cash or cash equivalent price (as determined in good faith by the Board) and upon general terms no more favorable to the purchasers thereof than as specified in the Company's notice. In the event the Company has not sold the New Interests within said one hundred twenty (120) day period, the Company shall not thereafter issue or sell any New Interests, without first offering a portion of such securities to the Members, their successors and Affiliates as provided above.

(c)    The purchase rights granted under this Section 3.5 shall be exercisable only by a Member if such Member holds Common Interests representing at least one percent (1%) of the number of Common Interests then issued and outstanding.

(d)    The rights granted pursuant to this Section 3.5 may be waived by the Required Holders, provided that no consenting Holder or its Affiliate is purchasing or otherwise receiving any of the New Interests being offered.

Section 3.6    Sponsor Fees.  In consideration for services rendered to the Company by Alpha and A. Kalnow in organizing and capitalizing the Company, the Company shall pay $200,000 to each of Alpha and A. Kalnow as a sponsor fee.  The sponsor fee shall be payable in two equal installments: the first installment shall be paid concurrently with the Senior Credit Facility Closing and the second installment shall be paid on February 1, 2003.

Section 3.7    Annual Meetings of Members.  An annual meeting of the Members shall be held on such date and at such time as may be determined by resolution of the Board.  Subject to the provisions of this Agreement, at each annual meeting the Members shall elect Directors to hold office until his or her successor is elected and qualified, or until the effective date of his or her resignation or removal.  Any other proper business may be transacted at the annual meeting of Members.

Section 3.8    Special Meetings of Members.  A special meeting of the Members may be called by the Chief Executive Officer, the Board or by the holders of ten percent or more of the Common Interests.

Section 3.9    Place of Meetings of Members.   The Board may designate any place, either within or outside of the State of Delaware, as the place of meeting for any annual meeting or for any special meeting.  If no such place is designated by the Board, the place of meeting will be the principal office of the Company.

Section 3.10    Notice of Meetings of Members.   Unless waived as herein provided, written notice of each annual or special meeting, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than five (5) days nor more than sixty (60) days before the date of the meeting, unless otherwise required by law, either personally or by mail, by or at the direction of

110734.6 049579-13175                                    21

NMLLC 00133

CONFIDENTIAL

the Chief Executive Officer or the Secretary, or the persons calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Member at his or her address as it appears on the records of the Company, with postage thereon prepaid. Attendance at any meeting in person or by proxy shall constitute waiver of notice thereof unless the person or proxy at the meeting objects to the holding of the meeting because notice was not given. A waiver of notice of a meeting in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. When a meeting is adjourned to another time or place in accordance with Section 3.11, notice need not be given of the adjourned meeting if the time and place of the adjourned meeting is announced at the meeting at which the adjournment is taken.

Section 3.11    Quorum. Unless otherwise provided in this Agreement, the Holders of a majority of the outstanding Voting Interests, represented either in person or by proxy, shall constitute a quorum for consideration of such matter at a meeting of Members. If Interests of the Company consisting of less than a majority of the Voting Interests are represented at such meeting, a majority of the Interests so represented may adjourn the meeting from time to time without further notice. At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the original meeting. The Members present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal of such number of Members as may leave less than a quorum.

Section 3.12    Fixing of Record Date. For purposes of determining the Members entitled to notice of or to vote at any meeting of Members, or to express consent to limited liability company action in writing without a meeting, or to receive payment of any distribution or in order to make a determination of Members for any proper purpose, the Board may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than sixty (60) days and, for a meeting of Members, not less than five (5) days immediately preceding such meeting. If no record date is fixed pursuant to the foregoing, the day on which notice of the meeting is mailed or the date on which the resolution of the Board declaring the payment of any distribution is adopted, as the case may be, shall be the record date for such determination of Members. A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting.

Section 3.13    Voting. Unless otherwise provided by this Agreement, including, without limitation, the Exhibits, each outstanding Voting Interest shall be entitled to one (1) vote at a meeting of Members. A Member may vote either in person or by proxy. All questions, unless otherwise provided by law or in this Agreement, shall be decided by a majority of the votes eligible to vote on the matter.

Section 3.14    Proxies. A Member may appoint a proxy to vote or otherwise act for him or her, with or without a meeting, by signing an appointment form and delivering it to the person so appointed. All proxies shall expire eleven months from the date of execution thereof, unless otherwise provided in the proxy. Every proxy shall be revocable at the will of the Member executing it, except as otherwise provided by law, by a writing delivered to the Company stating

NMLLC 00134

CONFIDENTIAL

that the proxy is so revoked or by a subsequent proxy executed by, or by attendance at the meeting and voting in person by, the person executing the proxy.

Section 3.15  Ratification of Acts of Directors and Officers.  Except as otherwise provided by law or by this Agreement, any transaction or contract or act of the Company or of the Directors or the officers of the Company may be ratified by the affirmative vote of the holders of the number of Interests which would have been necessary to approve such transaction, contract or act at a meeting of Members, or by the written consent of Members in lieu of a meeting.

Section 3.16  Informal Action of Members.  Any action required to be taken at a meeting of the Members, or any action which may be taken at a meeting of the Members, may be taken without a meeting and without a vote, if a consent in writing, setting forth the action so taken, shall be signed (i) by all of the outstanding Members entitled to vote with respect to the subject matter thereof, or (ii) by the holders of outstanding Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Interests entitled to vote thereon were present and voting, if such consent is signed by less than all of the Members entitled to vote with respect to the subject matter thereof.

Section 3.17  Organization.  The Chairman of the Board shall preside at all meetings of the Members, or in his absence, the Members attending the meeting shall elect their own chairman of the meeting.  The Secretary of the Company shall act as secretary of all meetings of the Members and keep the minutes.  In the absence of the Secretary, the chairman of the meeting may appoint any person to act as the secretary of the meeting.

Section 3.18  Power to Bind the Company.  No Member (acting in its capacity as such) shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board by the affirmative vote required for such matter pursuant to this Agreement or pursuant to a written authorization signed by the Company's Chief Executive Officer.

Section 3.19  Representations and Warranties, Indemnification.

(a)  As of the date hereof in the case of Initial Members or as of the date of admission or substitution in the case of any other Member, each Member hereby represents and warrants to the Company and each other Member as follows:

(i)  In each case to the extent applicable, such Member is duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  All requisite actions necessary for the due authorization, execution, delivery and performance of this Agreement by such Member have been duly taken.

(ii)  Such Member has duly executed and delivered this Agreement. This Agreement constitutes a valid and binding obligation of such Member enforceable

NMLLC 00135

CONFIDENTIAL

against such Member in accordance with its terms (except as may be limited by bankruptcy, insolvency, or similar laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity).

(iii)    Such Member's authorization, execution, delivery and performance of this Agreement does not and will not (i) conflict with, or result in a breach, default or violation of (A) to the extent applicable, the certificate or articles of incorporation, by-laws or other organizational documents of such Member, (B) any material contract or agreement to which that Member is a party or is otherwise subject, or (C) any law, order, judgment, decree, writ, injunction, or arbitration award to which that Member is subject; or (ii) require any consent, approval, or authorization from filing, or registration with, or notice to, any governmental authority or other Person, other than those that have already been obtained.

(iv)    Such Member is familiar with the proposed business, financial condition, properties, operations, and prospects of the Company, and has asked such questions and conducted such due diligence concerning such matters and concerning its acquisition of any membership interests as it has desired to ask and conduct, and all such questions have been answered to its full satisfaction. Such Member has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company. Such Member understands that owning membership interests involves various risks, including the restrictions on transferability set forth in this Agreement, lack of any public market for such membership interests, the risk of owning its membership interests for an indefinite period of time, and the risk of losing its entire investment in the Company. Such Member is able to bear the economic risk of such investment; is acquiring its membership interests for investment and solely for its own beneficial account and not with a view to or any present intention of directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution, or otherwise disposing of all or a portion of its membership interests; and such Member acknowledges that the membership interests have not been registered under the Securities Act or any other applicable federal or state securities laws, and that the Company has no intention, and except as set forth in the registration rights agreement executed by the Initial Members and the Company on the date of this Agreement, shall not have any obligation, to register or to obtain an exemption from registration for the membership interests or to take action so as to permit sales pursuant to the Securities Act (including, without limitation, Rules 144 and 144A thereunder).

(b)    Each Member hereby indemnifies the Company from and against and agrees to hold the Company free and harmless from any and all claims, losses, damages, liabilities, judgments, fines, settlements, compromises, awards, costs, expenses or other amounts (including without limitation any attorney fees, expert witness fees or related costs) arising out of or otherwise related to a breach of any of the representations and warranties of such Member as set forth in this Section 3.19.

110734.6 049579-13175

24

NMLLC 00136

CONFIDENTIAL

Section 3.20   Liability of Members.  Except to the extent provided for in Section 18-607 of the Delaware Act, no Member shall be: (i) personally liable for the debts, obligations or liabilities of the Company, including any such debts, obligations or liabilities arising under a judgment, decree or order of a court; (ii) obligated to cure any deficit in any Capital Account; (iii) required to return all or any portion of any capital contribution; or (iv) required to lend any funds to the Company.

<div align="center">

ARTICLE IV
CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS, AND ALLOCATIONS

</div>

Section 4.1   Capital Contributions.  Each Member has made one or more Capital Contributions to the Company as specified in the Schedule of Investors or otherwise on the books and records of the Company.

Section 4.2   Additional Capital Contributions.  No Member shall be required to make any Additional Capital Contribution to the Company in respect of any deficit in such Member's Capital Account or otherwise.

Section 4.3   Capital Accounts.  A capital account (a "Capital Account") shall be established and maintained on the Company's books with respect to each Member, in accordance with the provisions of Treasury Regulations Section 1.704-1(b), including the following:

(a)   Each Member's Capital Account shall be increased by: (i) the fair market value of such Member's Capital Contributions (net of any liabilities that the Company is considered to assume or take subject to in connection with any such Capital Contribution); (ii) the amount of Net Profit (or items thereof) allocated to such Member; and (iii) any other increases required by the Treasury Regulations.

(b)   Each Member's Capital Account shall be decreased by:  (i) the amount of Net Loss (or items thereof) allocated to such Member; (ii) all amounts paid or distributed to such Member pursuant to this Agreement, other than any amount required to be treated as a payment for property or services for federal income tax purposes; (iii) the fair market value of any property distributed in kind to such Member (net of any liabilities that such Member is considered to assume or take subject to for purposes of Section 752 of the Code in connection with any such distribution); and (iv) any other decreases required by the Treasury Regulations.

(c)   All provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Code and Treasury Regulations thereunder and shall be interpreted and applied in a manner consistent with such law.  The Tax Matters Partner shall make any necessary modifications to this Section 4.3 in the event unanticipated events occur that might otherwise cause this Agreement not to comply with such law or any changes thereto.

Section 4.4   Allocations to Capital Accounts.

(a)   General Rule.  Except as otherwise provided in this Section 4.4, Net Profit (and items thereof) and Net Loss (and items thereof) for any Fiscal Period shall be allocated

110734.6 049579-13175                                    25

NMLLC 00137

CONFIDENTIAL

among the Members in a manner such that, as of the end of such Fiscal Period, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof pursuant to Section 5.2 hereof, minus (b) the sum of (i) such Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Period.

(b)    Special Allocations Relating to Preferred Interests.  Notwithstanding any other provision of this Article IV (other than Section 4.4(f)), if any Preferred Interests are redeemed by the Company, (i) Net Profit (and items of income and gain thereof) shall be allocated to each Preferred Interest so redeemed to the extent that the designated liquidation preference (if any) with respect to such Preferred Interest exceeds the Capital Account balance with respect to such Preferred Interest (such excess being a "Deficiency Amount") (such allocation being pro rata to all such Preferred Interests redeemed in accordance with each such Interest's respective Deficiency Amount if there is insufficient Net Profit (and items of income and gain thereof) to eliminate all Deficiency Amounts) and (ii) Net Loss (and items of loss, deduction and expense thereof) shall be allocated to each Preferred Interest so redeemed to the extent that the Capital Account balance with respect to such Preferred Interest exceeds the designated liquidation preference (if any) with respect to such Interest (such excess being an "Excess Amount") (such allocation being pro rata to all such Interests redeemed in accordance with each such Preferred Interest's respective Excess Amount if there is insufficient Net Loss (and items of loss, deduction and expense thereof) to eliminate all Excess Amounts).

(c)    Special Allocations Relating to Certain Issuances of Option Interests.  If, as a direct or indirect result of the issuance by the Company of an Option Interest, any Member (such a Member, the "Relevant Member") other than the Person to whom such Option Interest is issued or the Company realizes any items of income, gain, loss deduction or expense (such items, the "Issuance Items"), then notwithstanding any other provision of this Article IV (other than Section 4.4(f)), the Issuance Items shall be taken into account in allocating Company items of income, gain, loss, deduction and expense as a result (the "Company Items") so that, to the extent possible, the net amount of such Issuance Items, together with allocations of Company Items, to each Relevant Member shall be equal to the net amount that would have been allocated to each Relevant Member pursuant to Section 4.4 if the Issuance Items had not been realized.

(d)    Option Interests.  In the event that the Company issues an Option Interest, the Person acquiring such Option Interest, each Member and the Company each agrees to treat such issuance as a tax-free transaction under Section 721(a) of the Code.  The Tax Matters Partner is authorized to make adjustments and/or allocations to Capital Accounts in a manner that the Tax Matters Partner deems necessary or appropriate in order to effectuate the intended economic sharing arrangement with respect to an Option Interest.

(e)    Employee Options.  In the event that a person exercises an Employee Option, such person, each Member and the Company each agrees to treat the transaction for all

NMLLC 00138

CONFIDENTIAL

purposes (including, without limitation, tax reporting) as: (i) a payment by the Company to such person of cash compensation equal in amount to the excess, if any, of, (A) the fair market value (as determined in the sole and absolute discretion of the Board) of the Interest acquired on exercise of the Employee Option on the date of exercise of the corresponding Employee Option over (B) the exercise price, if any, of such Employee Option (such excess, if any, of clause (A) over clause (B) being the "Spread Amount"), and (ii) a tax-free Capital Contribution under Section 721(a) of the Code by such person to the Company of cash equal in amount to the sum of the Spread Amount and the exercise price, if any, made in exchange for such Interest acquired on exercise of the Employee Option (which amount shall be credited to such person's Capital Account under Section 4.3(a)) (the "Intended Characterization"). The parties agree to execute any documents and to take any other action in support of the Intended Characterization and further agree not to take any action that would be inconsistent with the Intended Characterization. The Tax Matters Partner is authorized to make adjustments and/or allocations to Capital Accounts in order to effectuate the Intended Characterization.

        (f)     Regulatory and Related Allocations. Notwithstanding any other provision in this Agreement to the contrary, the following special allocations shall be made in the following order:

        (i)     Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2, if there is a net decrease in Partnership Minimum Gain during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share of the net decrease in such Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2. This Section 4.4(f)(i) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

        (ii)     Member Minimum Gain Chargeback. If there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to Partner Nonrecourse Debt during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share, if any, of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Member's Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2. This Section 4.4(f)(ii) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

NMLLC 00139

CONFIDENTIAL

(iii)    Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member's Capital Account, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, that an allocation pursuant to this Section 4.4(f)(iii) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.4(f)(iii) were not in this Agreement.  This Section 4.4(f)(iii) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(ii)(d) and shall be interpreted consistently therewith.

(iv)    Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Member's Adjusted Capital Account Deficit as quickly as possible; provided, however, that an allocation pursuant to this Section 4.4(f)(iv) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4.4 (other than Section 4.4(f)(iii)) have been tentatively made as if this Section 4.4(f)(iv) were not in this Agreement.

(v)    Partner Nonrecourse Deductions.   Any Partner Nonrecourse Deductions for any Fiscal Period shall be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2.

(vi)    Nonrecourse Deductions.  Any Nonrecourse Deductions for any Fiscal Period shall be allocated to the Members in accordance with their respective Capital Contributions.

(vii)    Loss Allocation Limitation.  No allocation of Net Loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase an Adjusted Capital Account Deficit with respect to such Member.

(g)    Curative Allocations.  The allocations set forth in Section 4.4(f) (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations under Section 704 of the Code.  Notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Company items of income, gain, loss, deduction and expense among the Members so that, to the extent possible, the net amount of such allocations of other Company items and the Regulatory Allocations shall be equal to the net amount that would have been allocated to the Members pursuant to Section 4.4 if the Regulatory Allocations had not occurred.

110734.6 049579-13175

28

NMLLC 00140

CONFIDENTIAL

(h)    Section 754 Adjustments.    Pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to the extent an adjustment to the adjusted tax basis of any Company asset under Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Treasury Regulations.

(i)    Transfer of or Change in Interests.    The Tax Matters Partner is authorized to adopt any convention or combination of conventions which he reasonably believes would be upheld for federal income tax purposes regarding the allocation and/or special allocation of items of Company income, gain, loss, deduction and expense with respect to a newly issued Interest, a transferred Interest and a redeemed Interest.    Upon admission as a Substitute Member, a transferee of an Interest shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Interest.

(j)    Syndication, Organization and Operating Expenses.    Syndication and organization expenses as defined in Section 709 of the Code and Operating Expenses shall be allocated to the Capital Accounts of the class(es), series or group(s) of Interests based upon the relative Capital Contributions of the class(es), series or group(s) of Interests or in any other manner deemed equitable by the Tax Matters Partner.

(k)    Allocation Periods and Unrealized Items.    Subject to applicable Treasury Regulations and notwithstanding anything expressed or implied to the contrary in this Agreement, the Tax Matters Partner may, in its reasonable discretion, determine allocations to Capital Accounts based on an annual, quarterly or other period and/or on realized and unrealized net increases or net decreases (as the case may be) in the fair market value of Company property.

Section 4.5    Negative Capital Accounts.    No Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.    A Member who has more than one interest in the Company shall have a single Capital Account that reflects all such interests regardless of the class of interest owned and regardless of the time or manner in which the interest were acquired.

Section 4.6    Tax Allocations.

(a)    Items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the Net Profit (and items thereof) and Net Loss (and items thereof) of which such items are components were allocated pursuant to Section 4.4; provided, however, that solely for federal, state and local income tax purposes, allocations shall be made in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, to the extent so required thereby.    Such allocations shall be made in such manner and utilizing such permissible tax elections as determined in the reasonable discretion of the Tax Matters Partner.

NMLLC 00141

CONFIDENTIAL

(b)     Allocations pursuant to this Section 4.6 are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit (and items thereof) or Net Loss (and items thereof).

(c)     The Members are aware of the tax consequences of the allocations made by this Section 4.6 and hereby agree to be bound by the provisions of this Section 4.6 in reporting their shares of items of Company income, gain, loss, deduction and expense.

Section 4.7     <u>Determinations by Tax Matters Partner</u>.     All matters concerning the computation of Capital Accounts, the allocation of Net Profit (and items thereof) and Net Loss (and items thereof), the allocation of items of Company income, gain, loss, deduction and expense for tax purposes and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Tax Matters Partner in its reasonable discretion. Such determination shall be final and conclusive as to all the Members. Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the Tax Matters Partner shall determine, in its reasonable discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Members as reflected in Article V, the Tax Matters Partner may make such modification.

NMLLC 00142

CONFIDENTIAL

## ARTICLE V
## DISTRIBUTIONS

Section 5.1    Withdrawals and Distributions in General.  No Member shall have the right to withdraw or demand distributions of any amount in its Capital Account, except as expressly provided in this Article V.  All distributions of cash and other property shall be made in accordance with the rights of each class, series or group of Interests as reflected in **Exhibit A** and the Schedule of Investors and any amendments from time to time thereto.

Section 5.2    Tax Distributions.  Subject to the limitations set forth in Section 5.6, as soon after the close of each Fiscal Year as is practicable, the Company shall make a cash distribution to each Member in an amount equal to the Hypothetical Tax Amount with respect to such Fiscal Year.

Section 5.3    Mandatory Distributions of Available Cash.  Subject to the limitations set forth in Section 5.6, as soon as practicable after the close of Fiscal Year 2004 and the close of each Fiscal Year thereafter, and after taking into account any distributions made pursuant to Section 5.2, the Company will make a cash distribution to the holders of the Common Interests equal to 20% of the Company's Available Cash as of the last day of the previous Fiscal Year.

Section 5.4    Optional Distributions.  Subject to the limitations set forth in this Article V and to the rights of each class, series or group of Interests reflect in **Exhibit A**, the Company may make additional, optional distributions to the Members at such times and in such amounts as the Board may decide in its absolute discretion, provided that for so long as any Preferred Interests remain outstanding, the Company will not during any Fiscal Year distribute to holders of Common Interests more than 40% of the Company's Available Cash as of the last day of its previous Fiscal Year without the consent of the Required Preferred Holders.

Section 5.5    In-Kind Distributions.  The Board may make distributions in kind if, in its sole and absolute discretion, a disposition of the assets at the time of distribution would be in the best interests of the Members.  Any distributions in kind shall be made on a pro rata basis to the Members, unless otherwise approved by the Required Holders.  For all purposes of this Agreement, (i) any property (other than United States dollars) that is distributed in kind to one or more Members with respect to a Fiscal Year (including any in-kind distribution upon the dissolution and winding-up of the Company) shall be deemed to have been sold for cash (in United States dollars) equal to its fair market value as determined in good faith by the Board, (ii) the unrealized gain or loss inherent in such property shall be treated as recognized gain or loss for purposes of determining Net Profit or Net Loss, (iii) such gain or loss shall be allocated to the Members' Capital Accounts pursuant to Article IV for such Fiscal Period, and (iv) such in-kind distribution shall be made after giving effect to such allocation pursuant to Article IV.  For purposes of clause (i) of the preceding sentence, if there is an initial public offering involving the Company and stock of the public entity is distributed in-kind to the Members in connection therewith, such stock shall be deemed to have been sold for cash (in United States dollars) equal to the Company Fair Market Value.

NMLLC 00143

CONFIDENTIAL

Section 5.6    Limitations on Distributions.  Notwithstanding anything expressed or implied to the contrary in this Agreement, the Company shall not be required to make a distribution to any Member on account of such Member's Interest if (a) such distribution would violate Section 18-607 of the Delaware Act or other applicable law, (b) such distribution would violate any law, rule, regulation, order or directive of any governmental authority then applicable to the Company, (c) such distribution would violate any contract or agreement to which the Company is then a party, which has been approved by the Required Common Holders, or (d) to the extent that the Required Common Holders, in their sole and absolute discretion, determine that the cash available to the Company is insufficient to permit such distribution.

Section 5.7    Withholding.  Notwithstanding anything expressed or implied to the contrary in this Agreement, the Tax Matters Partner is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any federal, state, local and foreign withholding requirement with respect to any payment, allocation or distribution by the Company to any Member or other Person.  All amounts so withheld, and, in the manner determined by the Tax Matters Partner, in its reasonable discretion, amounts withheld with respect to any payment, allocation or distribution by any Person to the Company, shall be treated as distributions to the Members under the applicable provisions of this Agreement.  If any such withholding requirement with respect to any Member exceeds the amount distributable to such Member under this Agreement, or if any such withholding requirement was not satisfied with respect to any item previously allocated, paid or distributed to such Member, such Member or any successor or assignee with respect to such Member's Interest hereby indemnifies and agrees to hold harmless the Tax Matters Partner, the other Members and the Company for such excess amount or such amount required to be withheld, as the case may be, together with any applicable interest, additions or penalties thereon.

Section 5.8    Interest.  No interest shall be paid or credited to the Members with respect to their Capital Contributions or Capital Accounts or upon any undistributed funds left on deposit with the Company except as otherwise may be expressly provided by this Agreement, including, without limitation, **Exhibit A**, or in the designation of rights and preferences of any class(es), series or group(s) of Interests.

<div align="center">ARTICLE VI<br>MANAGEMENT</div>

Section 6.1    Management of the Company.  Subject to such matters which are expressly reserved hereunder to the Members for decision, the business and affairs of the Company shall be managed by a Board of Directors (the "Board"), which shall constitute the Company's sole manager.  Other than rights and powers expressly reserved herein to the Members and authority delegated to officers of the Company in accordance with Article VII hereof, the Board shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein.  In addition to the powers and authority expressly conferred upon them by statute or by this Agreement, the Directors are hereby empowered to

NMLLC 00144

CONFIDENTIAL

exercise all such powers and do all such acts and things as may be exercised or done by the Company, subject, nevertheless, to the provisions of the Delaware Act and this Agreement. Subject to the special rights of the holders of the Series A Preferred Interests and the Class A Common Interests following an Event of Noncompliance, the Board shall consist of between five and seven members (the "Directors") as the Board may from time to time determine.

Section 6.2     Election, Term of Office, Resignation, Removal, Vacancies. Directors shall be elected at the annual meeting of the Members or at such other times as the Members entitled to elect Directors may decide. Each Director shall hold office until his successor is elected and qualified or until his earlier resignation or removal. Directors shall be elected and may be removed without cause by the holders of the various classes of Interests entitled to elect and remove them in accordance with **Exhibit A**. Where Directors are to be elected, removed or consented to by a type, class or sub-class of Interests, such election, removal or consent shall be effected by the vote of a majority of the type, class or sub-class entitled to make such election, removal or consent. Following the occurrence of an A. Kalnow Disability Event, where the election of a Director or Directors is reserved to the holders of all Voting Interests, the holders of the Voting Interests shall elect such Director or Directors by cumulative vote, with each holder of Voting Interests entitled to vote the number of Voting Interests owned by him or her for as many persons as there are Directors to be elected, or to cumulate the votes by giving one candidate as many votes as the number of such Directors multiplied by the aggregate number of votes shall equal, or by distributing such votes on the same principle among any number of such candidates. Any Director elected by cumulative vote may be removed without cause by Persons holding a sufficient number of Voting Interests to insure that the Director could not be re-elected if all the Directors elected by cumulative vote were removed and simultaneously stood for re-election. Whenever the holders of any class or classes of Interests or series thereof are entitled to elect one or more Directors by the provisions of this Agreement, vacancies and newly created directorships of such class or classes or series thereof may be filled by the vote of a majority of the Directors elected by such class or classes or series thereof then in office, or by the vote of the sole remaining Director so elected. A Director need not be a Member.

Section 6.3     Annual and Regular Meetings. The annual meeting of the Board shall be held without other notice than this Section 6.3 on the same day and at the same place as the annual meeting of Members and immediately following such annual meeting of Members, or as soon thereafter as is practicable. Additional regular meetings of the Board shall be held at such times and places, within or without the State of Delaware, as the Board may determine, by resolution, from time to time, provide that the Board will use its best efforts to meet not less than four times per year. The Secretary shall give notice of each such resolution to any Director who was not present at the time the same was adopted, but no further notice of such regular meeting need be given.

Section 6.4     Observation Rights of Members. Every Member that owns 5% or more of the outstanding Common Interests shall have the right to attend each meeting of the Board as a non-voting observer, provided that the Board may exclude such Member from deliberations concerning any matter in which the Member has a personal financial interest and any matter that the Board deems confidential and requests that observers be excluded.

110734.6 049579-13175                                    33

NMLLC 00145

CONFIDENTIAL

Section 6.5    Special Meetings.  Special meetings of the Board may be called by the Chairman of the Board, if there be one, the President or by any Director.  Notice thereof stating the place, date and hour of the meeting shall be given to each Director either by mail not less than forty-eight (48) hours before the date of the meeting, by telephone or telegram on twenty-four (24) hours' notice, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

Section 6.6    Waiver of Notice of Meetings of the Board.  Attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, a regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 6.7    Quorum.  Unless otherwise required by law, at each meeting of the Board, the presence of a majority of the total number of Directors shall constitute a quorum for the transaction of business.  If a quorum shall not be present at any meeting of the Board, then the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 6.8    Voting.  The act of a majority of the votes of the Directors present at a meeting at which a quorum is present shall be the act of the Board, unless the act of a greater number is required by law or by this Agreement.

Section 6.9    Removal; Resignations.  Any Director of the Company may resign at any time by giving written notice to the Board or the Secretary of the Company.  Such resignation shall take effect at the time specified therein and, unless tendered to take effect upon acceptance thereof, the acceptance of such resignation shall not be necessary to make it effective.

Section 6.10    Informal Action of Directors.  Unless specifically prohibited by this Agreement, any action which may be taken by the Board or any committee thereof appointed pursuant to Section 6.13 (a "Committee") at a meeting may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Directors entitled to vote with respect to the subject matter thereof, and such writing or writings are filed with the minutes of the proceedings of the Board or Committee thereof.

Section 6.11    Participation by Conference Telephone.  Unless otherwise restricted by this Agreement, members of the Board, or any Committee designated by such Board, may participate in a meeting of such Board, or Committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

Section 6.12    Compensation of Directors.  The Board shall have the sole authority to fix the compensation of Directors, each of whom shall be treated the same for compensation purposes regardless of whether such Director is also an employee of the Company; provided that

110734.6 049579-13175                                34

NMLLC 00146

CONFIDENTIAL

no Member shall be entitled to receive compensation for his or her service as Director other than the right to participate in any option or equity purchase plan that may be adopted by the Board for employees and Directors of the Company. Upon submission of reasonable documentation, a Director shall be paid his or her reasonable out-of-pocket expenses, if any, for attendance at each meeting of the Board, and Directors may be paid a stated salary or other compensation for attendance at each meeting of the Board or a stated annual salary as a Director. No such payment shall preclude any director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing Committees may be allowed like compensation for attending Committee meetings.

Section 6.13 <u>Committees</u>.

(a)     The Board shall create an Audit Committee and a Compensation Committee, which will each consist of not less than three Directors. As long as Alpha holds at least 20% of the Class A Common Interests, the Director elected by the holders of the Class A Common Interests shall serve on both the Audit Committee and the Compensation Committee. The Compensation Committee will be consulted in advance concerning any proposed changes in the senior management of the Company or its Subsidiaries.

(b)     The Board may from time to time create one or more other Committees and appoint members of the Board to serve on such Committee or Committees. Except as otherwise set forth herein, each Committee shall have two or more members, who shall, subject to Section 6.18(c) below, serve at the pleasure of the Board. Except as otherwise set forth herein, each Committee shall have such authority as the Board may from time to time direct.

(c)     The designation of such Committee and the delegation thereto of authority shall not operate to relieve the Board, or any member thereof, of any responsibility imposed upon it or him by law.

Section 6.14 <u>Committee Rules</u>. Unless the Board otherwise provides, each Committee designated by the Board may adopt, amend and repeal rules for the conduct of its business. In the absence of a resolution by the Board or a provision in the rules of such Committee to the contrary, the presence of a majority of the total number of members of such Committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members present at a meeting at which a quorum is present shall be the act of such Committee.

Section 6.15 <u>Power to Bind Company</u>. Unless the Board consists of one Director, no Director (acting in his capacity as such) shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board by the affirmative vote required for such matter pursuant to the terms of this Agreement.

Section 6.16 <u>Liability of the Directors</u>. The personal liability of the Directors of the Company is hereby eliminated to the fullest extent permitted by the Delaware Act, as the same may be amended and supplemented. A Director of the Company shall not be personally liable to the Company or its Members for monetary damages for breach of fiduciary duty as a Director,

110734.6 049579-13175                         35

NMLLC 00147

CONFIDENTIAL

except as to liability to the extent such exemption from liability or limitation thereof is not permitted under the Delaware Act, as the same exists or may hereafter be amended. If the Delaware Act hereafter is amended to further eliminate or limit the liability of a Director, then a Director of the Company, in addition to the circumstances in which a Director is not personally liable as set forth in the preceding sentence, shall not be liable to the fullest extent permitted by the amended Delaware Act. In furtherance of, and without limiting the generality of the foregoing, no Director shall be: (i) personally liable for the debts, obligations or liabilities of the Company, including any such debts, obligations or liabilities arising under a judgment, decree or order of a court; (ii) obligated to cure any deficit in any Capital Account; (iii) required to return all or any portion of any capital contribution; or (iv) required to lend any funds to the Company. Any repeal or modification of this Section 6.16 by the Members of the Company shall not adversely affect any right or protection of a Director of the Company existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

Section 6.17    <u>Reliance by Third Parties</u>. Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Board and the officers of the Company herein set forth.

Section 6.18    <u>Board of Directors and Sub Boards Compositions</u>.

(a)    Subject to Section 6.1, the size and composition of the Board shall be determined by the Board.

(b)    The composition of the board of directors (a "<u>Sub Board</u>") of each of the Company's Subsidiaries shall be the same as that of the Board.

(c)    The removal from the Board or a Sub Board (with or without cause) of any director or member thereof shall be made only upon the written request of the person or persons entitled to designate such director or member. In addition, in the event that any representative designated hereunder for any reason ceases to serve as a member of the Board, or a Sub Board during his term of office, the resulting vacancy on the Board or the Sub Board, as the case may be, shall be filled by a representative designated by the person or persons entitled to designate such director or member pursuant to **Exhibit A**.

(d)    The initial members of the Board are identified on Exhibit B hereto.

Section 6.19    <u>Member Consent Rights</u>. Notwithstanding anything in this Agreement to the contrary, the Company will not take any of the following actions, or suffer any of the following events to occur, without the consent of the Required Common Holders:

(a)    a Change of Control;

(b)    a Fundamental Change;

NMLLC 00148

CONFIDENTIAL

(c)    a Transfer by A. Kalnow of Common Interests that would result in more than 50% of the Common Interests originally issued to A. Kalnow having been Transferred other than pursuant to Permitted Transfers; and

(d)    transactions between the Company and A. Kalnow and his Affiliates other than (i) transactions and contracts expressly contemplated in this Agreement, and (ii) transactions involving payments by the Company of not more than $25,000 during 2002, and thereafter a cumulative amount equal to $25,000 plus $1,000 per Fiscal Year (which payments are expected to defray the cost of office space and personnel allocated to the business of the Company by Alpha and its Affiliates), and (iii) re-imbursement of other out-of-pocket expenses reasonably incurred by A. Kalnow and his Affiliates to the benefit of the Company and its Subsidiaries.

<div align="center">

ARTICLE VII
EXECUTIVE OFFICERS

</div>

Section 7.1    General Provisions.  The Board shall elect a Chief Executive Officer and a Secretary of the Company.  The Board may also elect a Chairman of the Board, one or more Vice Chairman of the Board, a President, one or more Vice Presidents, a chief operating officer, a Chief Financial Officer, a Treasurer, one or more Assistant Secretaries and Assistant Treasurers and such additional officers as the Board may deem necessary or appropriate from time to time.  Any two or more offices may be held by the same person.  The officers elected by the Board shall have such duties as are hereafter described and such additional duties as the Board may from time to time prescribe.

Section 7.2    Election and Term of Office.  The officers of the Company shall be elected annually by the Board at the regular meeting of the Board held after each annual meeting of the Members.  If the election of officers is not held at such meeting, such election shall be held as soon thereafter as may be convenient.  New offices of the Company may be created and filled and vacancies in offices may be filled at any time, at a meeting or by the written consent of the Board.  Unless removed pursuant to Section 7.3, each officer shall hold office until his successor has been duly elected and qualified, or until his earlier death or resignation.  Election or appointment of an officer or agent shall not of itself create contract rights.

Section 7.3    Removal of Officers.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever, in its judgment, the best interests of the Company would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person(s) so removed.

Section 7.4    The Chief Executive Officer.  The Board shall designate whether the Chairman of the Board, if one shall have been chosen, or the President shall be the Chief Executive Officer of the Company.  If a Chairman of the Board has not been chosen, or if one has been chosen but not designated Chief Executive Officer, then the President shall be the Chief Executive Officer of the Company.  The Chief Executive Officer shall be the principal executive officer of the Company and shall in general supervise and control all of the business and affairs of the Company, subject to the direction and control of the Board.  The Chief Executive Officer

110734.6 049579-13175                          37

NMLLC 00149


CONFIDENTIAL

shall preside at all meetings of the Members and of the Board and shall see that orders and resolutions of the Board are carried into effect. The Chief Executive Officer may sign bonds, mortgages, certificates for shares and all other contracts and documents, except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board or by this Agreement to some other officer or agent of the Company. Except to the extent expressly limited by the Board or by this Agreement, the Chief Executive Officer shall have the power and authority to cause the Company to borrow money, to make investments, to enter into contracts, leases, licenses and guarantees, to hire and fire employees, to set budgets and strategic plans, to make acquisitions and dispositions of assets, to appoint and remove officers of Subsidiaries and designate their powers, and to engage in any and all other lawful acts on behalf of the Company consistent with Section 2.5 of this Agreement. The Chief Executive Officer shall have general powers of supervision and shall be the final arbiter of all differences between officers of the Company and his decision as to any matter affecting the Company shall be final and binding as between the officers of the Company subject only to the Board. The initial President and Chief Executive Officer of the Company shall be Andrew H. Kalnow.

Section 7.5    The President.    In the absence of the Chief Executive Officer or in the event of his inability or refusal to act, if the Chairman of the Board has not been designated Chief Executive Officer, the President shall perform the duties of the Chief Executive Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. At all other times the President shall have the active management of the business of the Company under the general supervision of the Chief Executive Officer. The President shall have concurrent power with the Chief Executive Officer to sign bonds, mortgages, certificates for shares and other contracts and documents, except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board or by this Agreement to some other officer or agent of the Company. In general, the President shall perform all duties incident to the office of president and such other duties as the Chief Executive Officer or the Board may from time to time prescribe.

Section 7.6    The Chairman of the Board.    The Chairman of the Board, if one is chosen, shall be chosen from among the members of the Board. If the Chairman of the Board has not been designated Chief Executive Officer, the Chairman of the Board shall report to, and perform such duties as may be assigned to the Chairman of the Board by, the Board. The initial Chairman of the Board shall be A. Kalnow.

Section 7.7    Vice Chairman of the Board.    In the absence of the Chief Executive Officer or in the event of his inability or refusal to act, if the Chairman of the Board has been designated Chief Executive Officer and the Chairman is unable or refuses to act, the Vice-Chairman, or if there be more than one, the Vice-Chairmen, in the order determined by the Board (or if there be no such determination, then in the order of their election), shall perform the duties of the Chief Executive Officer, and when so acting shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. At all other times, the Vice-Chairman or Vice-Chairmen shall perform such duties and have such powers as the Board may from time to time prescribe.

NMLLC 00150

CONFIDENTIAL

Section 7.8    The Vice President.    In the absence of the President or in the event of his inability or refusal to act, the Vice-President (or in the event there be more than one Vice-President, the Executive Vice-President and then the other Vice-President or Vice-Presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.    The Vice-Presidents shall perform such other duties and have such other powers as the Chief Executive Officer or the Board may from time to time prescribe.

Section 7.9    The Secretary.    The Secretary shall attend all meetings of the Board and all meetings of the Members and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing Committees when required.    The Secretary shall give, or cause to be given, notice of all meetings of the Members and special meetings of the Board, and shall perform such other duties as may be prescribed by the Board or the Chief Executive Officer, under whose supervision the Secretary shall be.    The Board may give general authority to any other officer to affix the seal of the Company and to attest the affixing by his signature.

Section 7.10    The Assistant Secretary.    The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Chief Executive Officer or the Board may from time to time prescribe.

Section 7.11    The Chief Financial Officer.    The Chief Financial Officer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board or Chief Executive Officer.    The Chief Financial Officer shall disburse the funds of the Company as may be ordered by the Board or Chief Executive Officer, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer, or the Board at its regular meetings, or when the Board or Chief Executive Officer so requires, an account of all his transactions as Chief Financial Officer and of the financial condition of the Company.    If required by the Board or the Chief Executive Officer, the Chief Financial Officer shall give the Company a bond (which shall be renewed every six (6) years) in such sum and with such surety or sureties as shall be satisfactory to the Board or the Chief Executive Officer for the faithful performance of the duties of his office and for the restoration to the Company, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Company.    The Chief Financial Officer shall report to, and perform such duties as may be assigned to him by, the Board or the Chief Executive Officer.

Section 7.12    The Treasurer.    The Treasurer, if one is elected, shall report to and be subordinate to the Chief Financial Officer, and shall, in the absence of the Chief Financial

NMLLC 00151

CONFIDENTIAL

Officer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the Chief Financial Officer and shall perform such other duties and have such other powers as the Chief Executive Officer, the Chief Financial Officer or the Board may from time to time prescribe.

Section 7.13    <u>The Assistant Treasurer</u>.  The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Chief Executive Officer or the Board may from time to time prescribe.

Section 7.14    <u>Duties of Officers May be Delegated</u>.  In the absence of any officer of the Company, or for any other reason the Board may deem sufficient, the Board may delegate the powers or duties, or any of such powers or duties, of any officers or officer to any other officer or to any Director.

Section 7.15    <u>Compensation</u>.  The Board shall have the authority to establish reasonable compensation of all officers for services to the Company.

<div align="center">ARTICLE VIII<br>BOOKS AND RECORDS; TAX MATTERS; AND REPORTS TO MEMBERS</div>

Section 8.1    <u>Books and Records</u>.  The books and records of the Company, and a list of the names and residence, business or mailing addresses and Interests of all Members, shall be maintained at the principal executive offices of the Company.  Each Member shall have the right to obtain from the Company from time to time, upon reasonable demand for any purpose reasonably related to the Member's interest as a Member of the Company, and upon paying the costs of collection, duplication and mailing, the documents and other information to which such Member is entitled under the Delaware Act.  Any demand by a Member pursuant to this section shall be in writing and shall state the purpose of such demand.  The Company may maintain such other books and records and may provide such financial or other statements as the Board in its discretion deems advisable.

Section 8.2    <u>Accounting; Tax Year</u>.

(a)    The books and records of the Company shall be kept on the cash basis or accrual basis as determined by the Tax Matters Partner in its reasonable discretion.  The Company may report its operations for tax purposes on the cash or accrual method as determined by the Tax Matters Partner in its reasonable discretion.  The taxable year of the Company shall be its Fiscal Year.

(b)    The books and records of the Company shall be audited by the Accountants as of the end of each Fiscal Year, commencing with the first partial Fiscal Year, of the Company.

NMLLC 00152

CONFIDENTIAL

Section 8.3 · Filing of Tax Returns. The Tax Matters Partner shall prepare and file, or cause the Accountants to prepare and file, a federal information tax return and any required state and local income tax and information returns for each taxable year of the Company. The Tax Matters Partner shall exercise reasonable discretion as to whether or not to prepare and file (or cause the Accountants to prepare and file) composite, group or similar state, local and foreign tax returns on behalf of the Members where and to the extent permissible under applicable law. Each Member hereby agrees to execute any relevant documents (including a power of attorney authorizing such a filing), to furnish any relevant information and otherwise to do anything necessary in order to facilitate any such composite, group or similar filing. Any taxes paid by the Company in connection with any such composite, group or similar filing shall be treated as an advance to the relevant Members (with interest being charged thereon) and shall be recouped by the Company out of any distributions subsequently made to such relevant Members. Such advances may be funded by Company borrowings. Both the deduction for interest payable by the Company with respect to any such borrowings, and the corresponding income from interest received by the Company from the relevant Members, shall be specifically allocated to such Members.

Section 8.4    Tax Matters Partner. A. Kalnow shall be designated as the tax matters partner of the Company (the "Tax Matters Partner") as provided in Section 6231(a)(7) of the Code. Each Person (for purposes of this provision a "Pass-Thru Member") that holds or controls an Interest on behalf of, or for the benefit of another Person or Persons, or which Pass-Thru Member is beneficially owned (directly or indirectly) by another Person or Persons shall, within 30 days following receipt from the Tax Matters Partner of a notice or document, convey such notice or other document in writing to all holders of beneficial interests in the Company holding such interest through such Pass-Thru Member. Subject to Section 4.6 above, in the event the Company shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Company is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and its decision shall be final and binding upon, the Company and each Member. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company.

Section 8.5    Financial Statements and Other Information. The Company shall deliver to any Member that, together with its Affiliates, holds 3.0% or more of the Common Interests, and any other Person approved by the Board:

(a)        as soon as available but in any event within 60 days after the end of each fiscal quarter in each fiscal year, (i) unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the fiscal year to the end of such fiscal quarter, and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal quarter, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments showing comparisons to the applicable annual budget and to the Company's performance during the corresponding period of the prior year, (ii) a management discussion and analysis describing briefly any material developments in the

110734.6 049579-13175                                            41

NMLLC 00153

CONFIDENTIAL

Company's business during the preceding fiscal quarter, as well as a summary analysis of financial performance and condition;

(b)    within 90 days after the end of each fiscal year, consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by an opinion containing no exceptions or qualifications (except for qualifications regarding specified contingent liabilities) of an independent accounting firm of recognized national standing, and a copy of such firm's annual management letter to the Board;

(c)    promptly upon receipt thereof, any additional reports, management letters or other detailed information concerning significant aspects of the Company's operations or financial affairs given to the Company by its independent accountants (and not otherwise contained in other materials provided hereunder);

(d)    at the beginning of each fiscal year, annual budgets prepared on a quarterly basis for the Company and each of its Subsidiaries (or regions) for such fiscal year (displaying anticipated statements of income and cash flows); and

(e)    with reasonable promptness, such other information and financial data concerning the Company and its Subsidiaries as any Person entitled to receive information under this Section 8.5 may reasonably request.

Except as may be permitted by the Board or otherwise required by law or judicial order or decree or by any governmental agency or authority, any Member receiving information hereunder shall use its best efforts to maintain the confidentiality of all nonpublic information obtained hereunder; provided that such Member may disclose such information (i) to other Members (who shall be bound by this provision), (ii) to its advisors who shall be informed of this provision and hold such information confidential, (iii) in connection with the sale or transfer or proposed sale or transfer of any Interests, if the transferee or proposed transferee agrees in writing to keep such information confidential or (iv) with respect to disclosures by Alpha and Superior, to their respective partners and shareholders in such amount as is reasonably required to provide updates of the status of the Company; provided that all such persons shall be informed of the confidential nature of the information and be required to maintain the confidentiality of such information.

Section 8.6    Tax Information for Current and Former Members.    To the extent reasonably practicable, within 60 days after the end of each Fiscal Year, the Company shall prepare and mail to each Member and, to the extent necessary, to each former Member (or such Member's legal representatives), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representatives) to prepare its respective federal, state and local income tax returns in accordance with the laws, rules and regulations then prevailing.  The Company shall also provide Form K-1s to Members as soon as practicable after the end of each Fiscal Year.

110734.6 049579-13175                    42

NMLLC 00154

CONFIDENTIAL

Section 8.7    <u>Confidentiality Provisions and Limitations on Access</u>.    Notwithstanding any other provision of this Agreement, the Company may, to the maximum extent permitted by applicable law, keep confidential from the Members any information the disclosure of which the Company reasonably believes is not in the best interest of the Company or is adverse to the interest of the Company or which the Company is required by law or by an agreement with any Person to keep confidential.

<div align="center">

ARTICLE IX
TRANSFER OF INTERESTS AND LIQUIDITY EVENTS

</div>

Section 9.1    <u>Prohibition</u>.    Transferring Members may Transfer all or any portion of their Interests only (a) pursuant to a Permitted Transfer, (b) in compliance with Article IX, (c) pursuant to Section 9.4(b), or (d) pursuant to Section 9.5.    Members other than Transferring Members may Transfer all or any portion of their Interests only (x) pursuant to Section 9.4(b) or (y) pursuant to Section 9.5.    Any attempted Transfer of Interests, other than in strict accordance with this Article IX, shall be null and void and of no force or effect whatsoever, and the purported transferee shall have no rights as a Member.

Section 9.2    <u>Conditions to Transfers</u>.    Subject to Section 9.1, a Member shall be entitled to Transfer of all or any portion of its Interests only upon satisfying the Board that each of the following conditions has been met; <u>provided</u> <u>that</u> the Board shall not unreasonably withhold its consent to a Permitted Transfer:

(a)    such Transfer does not cause the Company to lose its status as a partnership for federal or state income tax purposes;

(b)    the Tax Matters Partner determines, in its reasonable discretion, that such Transfer, itself or together with any other Transfers, would not likely result in the Company being classified as a publicly traded partnership within the meaning of Section 7704(b) of the Code.

(c)    such Transfer does not require the registration or qualification of such Interests pursuant to any applicable federal or state securities laws;

(d)    such Transfer does not result in a violation of applicable laws;

(e)    the Board receives written instruments that are in form and substance satisfactory to the Board, as determined in its sole and absolute discretion (including, without limitation, (i) copies of any instruments of Transfer, (ii) the transferee's consent to be bound by this Agreement as a Member and assume the rights, obligations and liabilities of the transferor and (iii) if requested by the Board, an opinion of counsel to such transferee, in form and substance satisfactory to the Board, to the effect that the conditions set forth in subsections (a), (c) and (d) above have been satisfied);

(f)    the transferor shall have represented that such Transfer (A) was effected through a broker-dealer or matching agent whose procedures with respect to the transfer of

NMLLC 00155

CONFIDENTIAL

Interest have been approved by the Tax Matters Partner as not being incident to a public trading market and not through any other broker-dealer or matching agent or (B) otherwise was not effected through a broker-dealer or matching agent which makes a market in Interests or which provides a readily available, regular and ongoing opportunity to Members to sell or exchange their Interests; and

(g)    no purported Transfer of an Interest will be recognized if, after giving effect to such Transfer, the Company would not satisfy at least one of the safe harbors contained in Treasury Regulations Section 1.7704-1.

The Tax Matters Partner may reasonably interpret, and is hereby authorized to take such action as it deems necessary or desirable to effect, the foregoing provisions of this Section 9.2. The Tax Matters Partner may, in its reasonable discretion, amend the provisions of Section 9.2(a), (b), (f) or (g) in such manner as may be necessary or desirable (or eliminate or amend such provisions to the extent they are no longer necessary or desirable) to preserve the tax status of the Company.

Notwithstanding the foregoing, no Transfer of a Preferred Interest, other than a Permitted Transfer, shall be made without the consent of the Board, which consent may be given, withheld or conditioned in its absolute discretion.

Section 9.3    Effect of Transfers.    Upon any Transfer permitted by the terms of this Agreement, the transferee of the Interests transferred shall be entitled to receive the distributions and allocations of income, gain, loss, deduction, credit or similar items to which the transferring Member would be entitled with respect to such Interests, but shall not be entitled to exercise any of the other rights of a Member with respect to such Interests, including, without limitation, the right to vote, unless and until such transferee is admitted to the Company as a Member pursuant to Article X hereof.

Section 9.4    Right of First Offer.

(a)    Notice of Sale.    Prior to the consummation of any sale, assignment, transfer or exchange of any Common Interest (a "Disposition"), a Member (the "Disposing Member") shall deliver written notice (the "Sale Notice") to the Company and the Members holding Senior Common Interests (such Members, excluding the Disposing Member, being hereafter referred to as the "Other Senior Common Members"). The Sale Notice shall disclose in reasonable detail the type and number of Common Interests (the "Offered Securities") proposed to be Disposed of and the terms and conditions of the proposed Disposition. A Disposing Member shall not consummate any Disposition until twenty (20) days after the Sale Notice has been delivered to the Company and each Other Senior Common Member (the "Election Period"), unless the parties to the Disposition have been finally determined pursuant to this Section 9.4 prior to the expiration of the Election Period. The date of the first to occur of such events is referred to herein as the "Authorization Date." Permitted Transfers shall not be subject to this Section 9.4.

NMLLC 00156

CONFIDENTIAL

(b)    <u>Right of First Offer</u>. The Company may elect to purchase all, but not less than all, of the Offered Securities which are the subject of the Sale Notice delivered by any Disposing Member upon the same terms and conditions as described in the Sale Notice by delivering a written notice of such election to such Disposing Member within ten (10) days after the Sale Notice has been delivered to the Company. If the Company has not elected to purchase all of the Offered Securities which are the subject of such Sale Notice within such ten (10) day period, the Other Senor Common Members may, in the aggregate, elect to purchase all, but not less than all, of the Offered Securities which are the subject of such Sale Notice delivered by any Disposing Member upon the same terms and conditions as described in the Sale Notice by delivering a written notice of such election to the Disposing Member within ten (10) days after the time for the Company to elect to purchase the Offered Securities has expired. If more than one of the Other Senior Common Members elects to purchase the Offered Securities, the Offered Securities shall be allocated among the Other Senior Common Members so electing on a pro rata basis based on the relative amount of such Offered Securities desired to be purchased by the other Members in the aggregate. If neither the Company nor the Other Senior Common Members elects to purchase all of the Offered Securities specified in the Sale Notice, the Disposing Member will have (y) sixty (60) days after the Authorization Date to draft, execute and deliver definitive documentation to Dispose of such Offered Securities, subject to the provisions of Section 9.4, on terms and conditions no more favorable to the transferee than those proposed in the Sale Notice and (z) if such documentation is so drafted, executed and delivered, thirty (30) days thereafter to consummate the Disposition. Any such Offered Securities not so Disposed of by the Disposing Member during such 90-day period will again be subject to the provisions of this Section 9.4 upon subsequent Disposition. If the Company or any Other Senior Common Member has elected to purchase Offered Securities hereunder, the Disposition of such Offered Securities shall be consummated as soon as practical after the delivery of the election notice(s) to the Disposing Member, but in any event within thirty (30) days after the expiration of the Election Period. The Company or the Other Senior Common Members shall pay for such Offered Securities by delivery of a check or wire transfer of funds in the aggregate amount of the purchase price for such Offered Securities. The purchasers of Offered Securities under this Section 9.4 shall be entitled to receive customary representations and warranties from the Disposing Member regarding the ownership and title of such Offered Securities. The right of first offer granted pursuant to this Section 9.4 and the requirements of this Section 9.4 shall terminate upon a Liquidity Event.

Section 9.5    <u>Approved Sale</u>.

(a)    <u>Approved Sale</u>. Notwithstanding any other provisions of this Agreement, if the Board and the Required Common Holders approve the sale of 50% or more of the Company to a third party (whether by merger, consolidation, sale of all or substantially all of its assets or sale of outstanding and/or newly issued equity securities of the Company) (an "<u>Approved Sale</u>"), the Board shall notify the Members in writing of that election; provided, however that the foregoing provision shall apply to an Approved Sale with an Affiliate of any Member only upon the approval of the holders of all the outstanding Senior Common Interests. Upon request by the Board, each Member will consent to and raise no objections to the Approved Sale, waive any appraisal or dissenters rights in respect of such Approved Sale, and

NMLLC 00157

CONFIDENTIAL

take all other actions necessary or desirable to cause the consummation, of such Approved Sale on the terms proposed by the Board, including, without limitation, (i) if the Approved Sale is structured as a sale of Interests, each Member will sell its Common Interests and Preferred Interests and any other equity securities of the Company and rights to acquire any Common Interests, Preferred Interests or other equity securities on the terms and conditions approved by the Board, (ii) if the Approved Sale is structured as a merger or consolidation, each Member will vote in favor thereof and will not exercise any dissenters' rights of appraisal it may have under any applicable law, and (iii) if the Approved Sale is structured as a sale of all or substantially all of the assets of the Company, each Member will vote in favor thereof and, if applicable, will vote in favor of the subsequent dissolution and liquidation of the Company.  Each Member shall be severally obligated to join (on a basis not to exceed such Member's pro rata share of the proceeds from such Approved Sale) in any indemnification or other obligations to which the Board agrees in connection with such Approved Sale (other than any such obligations that relate specifically to a particular Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Preferred Interests and Common Interests, as to which obligations each such Member shall be solely liable).

(b)    Consideration.  The obligations of the Members with respect to an Approved Sale are subject to the requirement that upon the consummation of the Approved Sale, all of the holders of a particular class or series of equity securities of the Company shall receive the same form and amount of consideration per membership interest, or if any holders of a particular type, class or series of equity securities of the Company are given an option as to the form and amount of consideration to be received, all holders of such type, class or series will be given the same option.

(c)    Rule 506.  If the Company enters into any negotiation or transaction for which Rule 506 of the Securities Act (or any similar rule then in effect) may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each holder that is not an "accredited investor" (within the meaning of Rule 501 (a) of the Securities Act) will, at the request of the Board, appoint a member representative (as such term is defined in Rule 501 of the Securities Act) approved by the Board, and the Company will pay the fees of such member representative.  If any such holder declines to appoint the member representative approved by the Board, such holder will appoint another member representative, and such holder will be responsible for the fees of the member representative so appointed.

(d)    Costs.  Each Member will bear its pro rata share of the costs of any sale of equity securities of the Company pursuant to an Approved Sale (but only if such Approved Sale is actually consummated) to the extent such costs are incurred for the benefit of all holders and are not otherwise paid by the Company or the acquiring party.  Costs incurred by or on behalf of a holder for its sole benefit will not be considered costs of the transaction hereunder.

Section 9.6    Incorporation of the Company.  The Board may, in advance of and in order to facilitate a public offering of securities of the Company, or for other reasons which the

NMLLC 00158

CONFIDENTIAL

Board deems to be in the best interests of the Company, cause the Company to incorporate its business, or any portion thereof, including, without limitation, by way of: (i) the transfer of all of the assets of the Company, subject to the liabilities of the Company, or the transfer of any portion of such assets and liabilities, to one or more corporations in exchange for equity interests of said corporation(s), and the subsequent distribution of such equity interests, at such time as the Board may determine, to the Members in accordance with this Agreement, (ii) the transfer by each of the Members of Interests held by such Member to one or more corporations in exchange for equity interests of said corporation(s), and, in connection therewith, each Member hereby agrees to the transfer of its Interests in accordance with the terms of exchange as provided by the Board and further agrees that, as of the effective date of such exchange, any Interests outstanding thereafter which shall not have been tendered for exchange shall represent only the right to receive a certificate representing the number of equity interests of said corporation(s) as provided in the terms of the exchange, (iii) the merger of the Company with and into a corporation as a result of which Members receive as merger consideration equity interests of such corporation, as the surviving entity to the merger, which merger shall not be required to be approved by the Members, or (iv) the conversion of the Company to a corporation or other entity pursuant to applicable law, which conversion shall not be required to be approved by Members.  The Members hereby agree that the organizational documents of any such new corporation or entity and/or a shareholders' or other agreement, as appropriate, will provide that the material rights and obligations of the Members hereunder will continue to apply to the extent reasonably practicable.

Section 9.7    Tag-Along Rights.    In the event of a Transfer, other than a Permitted Transfer, by a Member (a "Transferring Major Member"), involving 50% or more of the outstanding Class A or Class B Common Interests, at least 30 days prior to such Transfer, the Transferring Major Member making such Transfer will deliver a written notice (a "Sale Notice") to the Company and the other Common Members (the "Other Common Members"), specifying in reasonable detail the identity of the prospective transferee(s) and the terms and conditions of the Transfer.    The Other Common Members may elect to participate in the contemplated Transfer by delivering written notice to the Transferring Major Member within 30 days after delivery of the Sale Notice.  If any Other Common Member has elected to participate in such Transfer, the Transferring Major Member and such Other Common Members will be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a number of Common Interests, regardless of class, equal to the product of (i) the quotient determined by dividing the percentage of Common Interests held by such person by the aggregate percentage of Common Interests owned by the Transferring Major Member and the Other Common Members participating in such sale and (ii) the number of Common Interests to be sold in the contemplated Transfer.

For example, if the Sale Notice contemplated a sale of 100 Class B Common Interests by the Transferring Major Member, and if the Transferring Major Member at such time owns 30% of all Common Interests, regardless of class, and if one Other Common Member elects to participate and owns 20% of all Common Interests, regardless of class, the Transferring Major Member would be entitled to sell 60 Common Interests (30% ÷ 50% x 100 Common Interests) and the Other

NMLLC 00159

CONFIDENTIAL

Common Member would be entitled to sell 40 Common Interests (20% ÷ 50% x 100 Common Interests).

Each Transferring Major Member shall use best efforts to obtain the agreement of the prospective transferee(s) to the participation of the Other Common Members in any contemplated Transfer and to the inclusion of a transfer of the class of Common Interest held by the Other Common Members in the contemplated Transfer, and each Transferring Major Member shall not transfer any of its Common Interests to the prospective transferee(s) if the prospective transferee(s) declines to allow the participation of the Other Common Members or the inclusion of their Common Interests in the sale.

Section 9.8    Taxes, etc.  Each Member hereby agrees to indemnify and hold harmless the Company and each other Member from and against all loss, damage or expense, including, without limitation, tax liabilities or loss of tax benefits, arising directly or indirectly as a result of any Transfer or purported Transfer in contravention of the provisions of this Agreement.

<div align="center">

ARTICLE X
ADDITIONAL MEMBERS

</div>

Section 10.1    Admissions.  No Person shall be admitted to the Company as a Member (other than the Initial Members) except in accordance with Section 10.2 or 10.3 hereof.  Any purported admission which is not in accordance with this Article X shall be null and void.  Upon admission of any Additional or Substitute Member, or upon any Member ceasing to be a Member, the books and records of the Company shall be revised accordingly to reflect such admission or cessation.

Section 10.2    Admission of Additional Members.  A Person shall become an Additional Member pursuant to the terms of this Agreement only if and when each of the following conditions is satisfied:

(a)    the issuance of the relevant Interests has been authorized by the Board pursuant to Section 3.4(a);

(b)    the admission of such Person as an Additional Member shall be approved by the Board;

(c)    the Board, in its sole and absolute discretion, determines the nature and amount of the Interest Consideration to be contributed by such Person;

(d)    the Board has received, on behalf of the Company, such Person's Interest Consideration as so determined;

(e)    the Company receives written instruments (including, without limitation, such Person's consent to be bound by this Agreement as a Member) that are in form and substance satisfactory to the Company, as determined in its sole and absolute discretion and such representations and warranties as shall be reasonably requested by the Board;

110734.6 049579-13175                                         48

NMLLC 00160

CONFIDENTIAL

(f)    if required by the Company in its sole and absolute discretion, such Person shall execute and swear to an instrument by the terms of which such Person acknowledges that the relevant Interests have not been registered under the Securities Act, or any applicable state securities laws, and covenants, represents and warrants that such Person is acquiring the relevant Interests for investment only and not with a view to the resale or distribution thereof; and

(g)    such Person shall furnish the Company with such other similar information or documentation as the Board may request.

Section 10.3    <u>Admission of Assignees as Substitute Members</u>.  An Assignee of all or any portion of a Member's Interests shall become a Substitute Member of the Company only if and when each of the following conditions is satisfied:

(a)    the Company receives written instruments (including, without limitation, such Assignee's consent to be bound by this Agreement as a Member) that are in form and substance satisfactory to the Board, as determined in its sole and absolute discretion; provided that with respect to Permitted Transfers the Board shall exercise reasonable discretion;

(b)    such Assignee shall have paid to the Company the amount determined by the Board to be equal to the costs and expenses incurred in connection with such assignment, including, without limitation, costs incurred in preparing and filing such amendments to this Agreement as may be required;

(c)    if required by the Company in its sole and absolute discretion, such Assignee shall execute and swear to an instrument by the terms of which such Assignee acknowledges that the relevant Interests have not been registered under the Securities Act, or any applicable state securities laws, and covenants, represents and warrants that such Assignee acquired the relevant Interests for investment only and not with a view to the resale or distribution thereof; and

(d)    such Assignee shall furnish the Company with such other similar information or documentation as the Board may reasonably request.

<div align="center">

ARTICLE XI
DISSOLUTION OF THE COMPANY

</div>

Section 11.1    <u>Dissolution</u>.  The Company shall be dissolved upon the occurrence of either of the following events (an "<u>Event of Termination</u>"):

(a)    a determination by the Required Holders to dissolve the Company; or

(b)    the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

NMLLC 00161

CONFIDENTIAL

No other event, including the retirement, insolvency, liquidation, dissolution, insanity, expulsion, Bankruptcy, death, incapacity or adjudication of incompetency of a Member, shall cause the existence of the Company to terminate.

Section 11.2    <u>Winding-Up</u>.

(a)    Upon dissolution of the Company, the Board, or if there is none, the Person or Persons approved by the Required Holders, shall carry out the winding up of the Company's affairs and shall, within no more than 30 days after completion of a final audit of the Company's books and records (which shall be performed within 90 days of such termination), make distributions, out of Company assets, in the following manner and order:

(i)    to payment and discharge of claims of all creditors of the Company who are not Members;

(ii)    to payment and discharge of the claims of all creditors of the Company who are Members; and

(iii)    subject to the distribution requirements contained in Exhibit A with respect to any classes, group or series of Interests, to the Members or their legal representatives in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all adjustments to Capital Accounts for all periods.

(b)    Upon the completion of the distribution of the Company's assets, the Company shall be terminated and the Members shall cause the Company to execute and file a Certificate of Cancellation in accordance with Section 18-203 of the Delaware Act.

<div align="center">ARTICLE XII<br>INDEMNIFICATION</div>

Section 12.1    <u>Right to Indemnity</u>.

(a)    Subject to Section 12.1(c) below, the Company shall, to the fullest extent to which it is empowered to do so by the Delaware Act, or any other applicable laws as may from time to time be in effect, indemnify any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that he or she is or was a Director or officer of the Company, or who is or was a Director or officer of the Company serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise, against all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, if such person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no

NMLLC 00162

CONFIDENTIAL

reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)     Subject to Section 12.1(c) below, the Company shall, to the fullest extent to which it is empowered to do so by the Delaware Act or any other applicable laws as may from time to time be in effect, indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action or suit by or in a right of the Company to procure judgment in its favor by reason of the fact that such person is or was a Director or officer of the Corporation, or is or was a Director or officer of the Company serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the prosecution, defense or settlement of such action or suit, if such person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to the best interests of the Company; provided that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Company, unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

(c)     Any indemnification under Sections 12.1(a) and (b) (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification of the Director or officer is proper in the circumstances because he or she has met the applicable standard of conduct set forth in Sections 12.1(a) or (b). Such determination shall be made (1) by the Board by a majority vote of a quorum consisting of Directors who were not parties to such action, suit or proceeding, or (2) if such quorum is not obtainable, or even if obtainable, if a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion, or (3) by the Members. To the extent, however, that a Director or officer of the Company has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in Sections 12.1(a) and (b), or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of authorization in the specific case.

(d)     For purposes of any determination under Section 12.1(c), a person shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of account of the Company or Another Enterprise (as hereinafter defined), or on information supplied to such person by the officers of

110734.6 049579-13175                                          51

NMLLC 00163

CONFIDENTIAL

the Company or Another Enterprise in the course of their duties, or on the advice of legal counsel for the Company or Another Enterprise or on information or records given or reports made to the Company or Another Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Company or Another Enterprise. The term "Another Enterprise" as used in this Section 12.1(d) shall mean any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Company as a director, officer, employee or agent. The provisions of this Section 12.1(d) shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 12.1(a) or (b), as the case may be.

(e)    Notwithstanding any contrary determination in the specific case under Section 12.1(c), and notwithstanding the absence of any determination thereunder, any Director or officer may apply to the Court of Chancery in the State of Delaware for indemnification to the extent otherwise permissible under Sections 12.1(a) or (b). The basis of such indemnification by a court shall be a determination by such court that indemnification of the Director or officer is proper in the circumstances because such person has met the applicable standards of conduct set forth in Sections 12.1(a) and (b), as the case may be. Neither a contrary determination in the specific case under Section 12.1(c) nor the absence of any determination thereunder shall be a defense to such application or create a presumption that the Director or officer seeking indemnification has not met any applicable standard of conduct. Notice of any application for indemnification pursuant to this Section 12.1(e) shall be given to the Company promptly upon the filing of such application. If successful, in whole or in part, the Director or officer seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

(f)    Expenses incurred by a Director or officer in defending a civil, criminal administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Director or officer to repay such amount, unless it shall ultimately be determined that he or she is entitled to be indemnified by the Company as authorized in this Article XII.

(g)    The indemnification provided by this Article XII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under this Agreement, any agreement, vote of Members or disinterested Directors, or otherwise, it being the policy of the Company that indemnification pursuant to this Article XII shall be to the fullest extent permitted by law, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director or officer, and shall inure to the benefit of the heirs, executors and administrators of such a person. The provisions of this Article XII shall not be deemed to preclude the indemnification of any person who is not specified in Sections 12.1 (a) and (b) but whom the Company has the power or obligation to indemnify under the provisions of the Delaware Act, or otherwise.

110734.6 049579-13175

52

NMLLC 00164

CONFIDENTIAL

(h)    If the Company has paid indemnity or has advanced expenses to a Director or officer, the Company shall report the indemnification or advance in writing to the Members with or before the notice of the next Members' meeting.

(i)    The Company may, to the extent authorized from time to time by the Board, provide rights of indemnification and the advancement of expenses to employees and agents of the Company similar to those conferred in this Article XII to Directors and officers of the Company.

(j)    Notwithstanding anything contained in this Article XII to the contrary, except for proceedings to enforce rights to indemnification (which shall be governed by Section 12.1(e) hereof), the Company shall not be obligated to indemnify any Director or officer in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board.

Section 12.2    Insurance.  The Company may purchase and maintain insurance on behalf of any person who is or was a Director or officer of the Company, or is or was a Director or officer of the Company serving at the request of the Company as a director, officer, employee or agent of another Company, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such, whether or not the Company would have the power or the obligation to indemnify him against such liability under this Article XII.

Section 12.3    Contract with the Company.  The provisions of this Article XII shall be deemed to be a contract between the Company and each Director, officer, employee or agent who serves in any such capacity at any time while this Article XII and the relevant provisions of the Delaware Act or other applicable law, if any, are in effect, and any repeal or modification of any such law or of this Article XII shall not affect any rights or obligations then existing with respect to any state of facts then or heretofore existing or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

<div align="center">

ARTICLE XIII
AMENDMENTS

</div>

Section 13.1    Amendments.  Except as otherwise set forth herein, the Company reserves the right to amend, alter, change, repeal or waive any provision contained in this Agreement, and all rights conferred upon Members herein are granted subject to this reservation; provided, however that no such amendment, alteration, change, repeal or waiver shall be effective without the approval of the Required Holders and, in the case of alterations, changes, repeals or waivers of Section 2.6(b), Section 4.3, Section 4.5, Section 5.2, or Section 8.5, the approval of the holders of not less than 95% of the outstanding Senior Common Interests; provided further, however, that, without the approval of any Members, the Board:

(i)    may amend this Agreement as may be required to implement any admission of Members or issuance or Transfer of Interests pursuant to the terms of this Agreement;

110734.6 049579-13175

<div align="center">53</div>

NMLLC 00165

CONFIDENTIAL

(ii)    may amend this Agreement to reflect changes validly made pursuant to this Agreement in the membership of the Company and the Capital Accounts of the Members;

(iii)    may amend this Agreement to prevent the Company (A) from in any manner being deemed an "investment company" subject to the provisions of the Investment Company Act of 1940, as amended, or (B) from being treated as an association taxable as a corporation or as a "publicly traded partnership" for purposes of Section 7704 of the Code; and

(iv)    may amend this Agreement to cure any technical or clerical errors herein or to cure any non-compliance by it with the Delaware Act or the Code, as such laws may be amended and modified from time to time.

An amendment shall become effective as of the date specified in the Required Holders' approval, or, if none is specified, as of the date of such approval.

### ARTICLE XIV
### MISCELLANEOUS

Section 14.1    Expenses.    All start-up and organization costs of the Company, including the costs of the Company (including payment of key man life insurance premiums) and the reasonable out-of-pocket costs of the Initial Members in the negotiation, documentation and consummation of the transactions contemplated hereby (including the prepayment of any Company expenses by the Initial Members), shall be borne by the Company, either directly or through reimbursement.    Reimbursement shall occur promptly upon the submission of reasonable documentation to the Company.

Section 14.2    Successors, Counterparts.    Subject to Articles IX and X, this Agreement (a) shall be binding as to the executors, administrators, estates, heirs and legal successors, or nominees or representatives, of the Members and (b) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 14.3    Governing Law; Severability.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law.    In particular, this Agreement shall be construed to the maximum extent possible to comply with all the terms and conditions of the Delaware Act.    If it shall be determined by a court of competent jurisdiction that any provisions or wording of this Agreement shall be invalid or unenforceable under the Delaware Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement.    In that case, this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provisions cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable terms or provisions.    If it shall be determined by a court of competent jurisdiction that any provision relating to the distributions and allocations of the Company or to any expenses payable by the

110734.6 049579-13175                                        54

NMLLC 00166

CONFIDENTIAL

Company is invalid or unenforceable, this Agreement shall be construed or interpreted so as (a) to make it enforceable or valid and (b) to make the distributions and allocations as closely equivalent to those set forth in this Agreement as is permissible under applicable law.

Section 14.4    Filings.    Following the execution and delivery of this Agreement, the Company and the Members shall promptly prepare any documents required to be filed and recorded under the Delaware Act, and the Company and the Members shall promptly cause each such document to be filed and recorded in accordance with the Delaware Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. The Company and the Members shall also promptly cause to be filed, recorded and published such statements of fictitious business name and any other notices, certificates, statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

Section 14.5    Headings.    Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

Section 14.6    Additional Documents.    Each Member agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary to carry out the provisions or intentions of this Agreement,

Section 14.7    Notices.    Except as otherwise provided in this Agreement, all notices, requests and other communications to any Member shall be in writing (including telecopier, electronic mail or similar writing) and shall be given to such Member (and any other Person designated by such Member) at its postal or electronic mail address or telecopier number set forth on **Exhibit D** or, if not so set forth on **Exhibit D**, in the records of the Company, or such other postal or electronic mail address or telecopier number as such Member may hereafter specify for the purpose by notice. Notices to the Company shall be at the address indicated below. Each such notice, request or other communication shall be effective (a) if given by telecopier or electronic mail, when transmitted to the number specified pursuant to this Section 14.7 and the appropriate confirmation is received, (b) if given by postal mail, when deposited in the United States mail, addressed to the Member, with postage prepaid, or (c) if given by any other means, when delivered at the address specified pursuant to this Section 14.7.

>           To the Company:    NMC Acquisition LLC
>                              c/o National Machinery LLC
>                              161 Greenfield Street
>                              Tiffin, Ohio 44883-2471
>                              Attn: President
>                              Facsimile: (419) 443-2379

>           with copies to: Alpha Capital Partners, Ltd.

>                              122 South Michigan Avenue

NMLLC 00167

CONFIDENTIAL

Suite 1700
Chicago, Illinois 60603
Attn: Andrew H. Kalnow
Facsimile: (312) 322-9808

and

Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 North LaSalle Street
Suite 2700
Chicago, Illinois  60601
Attn: James J. Greenberger, Esq.
Facsimile: (312) 782-8416

Section 14.8   Waiver of Partition.  Each of the Members hereby irrevocably waives any and all rights that such Member may have to maintain any action for partition of any of the Company's property, including pursuant to Article XI hereof.

Section 14.9   Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine, or the neuter gender shall include the masculine, feminine and neuter.  In the event of any conflict between the terms of this Agreement and the terms of **Exhibit A** hereto or of any designation of rights and preferences of any Series, the terms of such Exhibit or designation, as applicable, shall control.

Section 14.10   Entire Agreement, etc.  This Agreement and the Exhibits attached hereto constitute the entire agreement among the Members party hereto relating to the subject matter hereof and supersede all prior contracts, agreements and understandings among them.  No course of prior dealings among the Members shall be relevant to supplement or explain any term used in this Agreement.  No provisions of this Agreement may be waived, amended or modified orally, but only by an instrument in writing executed by the waiving party.  No waiver of any terms or conditions of this Agreement in one instance shall operate as a waiver of any other term or condition or as a waiver in any other instance.

Section 14.11   No Third-Party Beneficiary.  Except for the provisions of Article XII hereof, this Agreement is made solely for the benefit of the parties hereto and no other person shall have any rights, interest, or claims hereunder or otherwise be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

Section 14.12   Survival.  All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until the expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

110734.6 049579-13175

56

NMLLC 00168

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement as of the date first above written.

ALPHA CAPITAL FUND III, L.P.

By:    Alpha III Partners, LLC
Its:    Manager


By:_____
        Name:  David A. DeVore
        Title:   Vice President and Principal


SUPERIOR DISTRIBUTING COMPANY, INC.

By:_____
        Name:  Kris Klepper
        Title:   President


_____
        Andrew H. Kalnow


_____
        Carl F. Kalnow


_____
        Loretta K. Kaplan, as trustee of the Loretta
        K. Kaplan  Qualified Annuity Trust


_____
        Gertrude K. Chisholm


110734.6 049579-13175            57

NMLLC 00169

CONFIDENTIAL

ALPHA CAPITAL FUND III, L.P.

By:    Alpha III Partners, LLC
Its:    Manager

By:    _David A. DeVore_____
        Name:  David A. DeVore
        Title:   Vice President and Principal


SUPERIOR DISTRIBUTING COMPANY, INC.

By: _____
        Name:  Kris Klepper
        Title:   President


_____
          Andrew H. Kalnow


_____
          Carl F. Kalnow


_____
    Loretta K. Kaplan, as trustee of the Loretta
    K. Kaplan  Qualified Annuity Trust


_____
          Gertrude K. Chisholm


110734.6 049579-13175

**NMLLC 00170**

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement as of the date first above written.

ALPHA CAPITAL FUND III, L.P.

By:   Alpha III Partners, LLC
Its:   Manager

By:_____
       Name:  David A. DeVore
       Title:   Vice President and Principal

SUPERIOR DISTRIBUTING COMPANY, INC.

By:_____
       Name:  Kris Klepper
       Title:   President

_____
Andrew H. Kalnow

_____
Carl F. Kalnow

_____
Loretta K. Kaplan, as trustee of the Loretta
K. Kaplan  Qualified Annuity Trust

_____
Gertrude K. Chisholm

NMLLC 00171

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement as of the date first above written.

ALPHA CAPITAL FUND III, L.P.

By:    Alpha III Partners, LLC
Its:    Manager

By:_____
        Name:  David A. DeVore
        Title:   Vice President and Principal


SUPERIOR DISTRIBUTING COMPANY, INC.

By:_____
        Name:  Kris Klepper
        Title:    President


_____
        Andrew H. Kalnow

_____
        Carl F. Kalnow


_____
        Loretta K. Kaplan, as trustee of the Loretta
        K. Kaplan  Qualified Annuity Trust


_____
        Gertrude K. Chisholm


110734.6 049579-13175                            57                        **NMLLC 00172**

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement as of the date first above written.

ALPHA CAPITAL FUND III, L.P.

By:    Alpha III Partners, LLC
Its:    Manager

By:_____
      Name:  David A. DeVore
      Title:    Vice President and Principal

SUPERIOR DISTRIBUTING COMPANY, INC.

By:_____
      Name:  Kris Klepper
      Title:    President

_____
          Andrew H. Kalnow

_____
          Carl F. Kalnow

_____
    Loretta K. Kaplan, as trustee of the Loretta
    K. Kaplan  Qualified Annuity Trust

_____
          Gertrude K. Chisholm

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement as of the date first above written.

ALPHA CAPITAL FUND III, L.P.

By:    Alpha III Partners, LLC
Its:    Manager

By:_____
        Name:  David A. DeVore
        Title:   Vice President and Principal

SUPERIOR DISTRIBUTING COMPANY, INC.

By:_____
        Name:  Kris Klepper
        Title:   President

_____
Andrew H. Kalnow

_____
Carl F. Kalnow

_____
Loretta K. Kaplan, as trustee of the Loretta
K. Kaplan  Qualified Annuity Trust

_____
Gertrude K. Chisholm

110734.6 049579-13175                    57

**NMLLC 00174**

**CONFIDENTIAL**

**EXHIBIT A**

**Terms of Interests**

The other preferences, qualifications, limitations, restrictions and special or relative rights of each class of membership interest are set forth below. All capitalized terms not defined herein have the same meanings as in the body of the Second Amended and Restated Limited Liability Company Agreement to which this is an Exhibit.

**Part A. Series A Preferred Interests**

Section 1.    Distributions.    Except as provided in this Part A and in Section 5.2 of the Agreement, the holders of Series A Preferred Interests shall have no right to receive any dividends or other distributions on account of their Series A Preferred Interests.

Section 2.    Liquidation.

(a)    Liquidation, Dissolution.    Upon any liquidation, dissolution or winding up of the Company, each holder of Series A Preferred Interests shall be entitled to be paid, before any distribution or payment is made upon any Junior Securities, an amount in cash equal to the Stated Value of the Series A Preferred Interests held by each such holder plus interest thereon from the Effective Date at the rate of 4.5% per annum, compounded annually (the "Series A Preferred Liquidation Amount"), and the holders of Series A Preferred Interests shall not be entitled to any further payment. If upon any such liquidation, dissolution or winding up of the Company, the Company's assets available for distribution to its Members are insufficient to permit payment to the holders of Series A Preferred Interests in full, then the entire assets available for distribution to holders of Series A Preferred Interests shall be distributed ratably among holders of the Series A Preferred Interests based upon the Series A Preferred Liquidation Amount of the Series A Preferred Interests held by such holders.

(b)    Definitions.

(i)    The "Stated Value of the Series A Preferred Interests" is $1.00 per Interest.

(ii)    As used in this Part A, the term "Junior Securities" means all Membership Interests of the Company, including the Series B Preferred Interests and the Common Interests, other than Membership Interests that are expressly made senior to or pari passu with the Series A Preferred Interests.

(c)    No Deemed Liquidations.    A Fundamental Change or Change of Control shall not be a deemed liquidation within the meaning of Section 2(a) of this Part A.

(d)    Noncash Distributions.    If any of the assets of the Company are to be distributed other than in cash pursuant to this Section 2, the value of such assets shall be determined by the Board, provided that the value of any security which is listed on any securities

NMLLC 00175

CONFIDENTIAL

exchange or quoted in the NASDAQ System or the over-the-counter market shall be deemed to be its Market Price. The term "Market Price" when used with respect to any security means the average of the closing prices of such security's sales on all securities exchanges on which such security may at the time be listed, or, if there has been no sale on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so listed, the average of the closing prices quoted in the NASDAQ System as of 4:00 P.M., New York time, or, if on any day such security is not quoted in the NASDAQ System, the average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by the National Quotation Bureau, Incorporated, or any similar successor organization, in each such case averaged over a period of 21 Business Days consisting of the day as of which "Market Price" is being determined and the 20 consecutive Business Days prior to such day.

      (e)    Cancellation of Interests. Upon payment or distribution of all amounts to be paid to the holders of the Series A Preferred Interests under this Section 2, the Series A Preferred Interests shall be deemed to be automatically canceled and the rights and preferences contained herein shall be null and void.

Section 3.    Voting Rights. Except as expressly provided in the Agreement and in this Part A, the holders of record of the Series A Preferred Interests shall have no right to vote on any matter submitted to the Members of the Company for vote, consent or approval, and Series A Preferred Interests shall not be included in determining the number of Interests voting or entitled to vote on any matter.

Section 4.    Redemption of Series A Preferred Interests. The rights of redemption with respect to the Series A Preferred Interests are as follows:

      (a)    Scheduled Redemption. The Company shall redeem for cash all outstanding Series A Preferred Interests on February 1, 2012, for a price equal to the Series A Preferred Liquidation Amount of such Interests.

      (b)    Optional Redemption by the Holder. At any time after February 1, 2007, any holder of Series A Preferred Interests may, by sending written notice (each a "Redemption Notice") to the Company, require the Company to redeem for cash all or any portion of the outstanding Series A Preferred Interests held by such Member for a price equal to the Series A Preferred Liquidation Amount of such interests; provided that no holder may deliver a Redemption Notice during any fiscal quarter of the Company with respect to more than 1/12 of the number of Series A Preferred originally issued to the holder on the date of the Agreement. Within 10 days of its receipt of any Redemption Notice, the Company shall give written notice to the remaining holders of the Series A Preferred Interests of such redemption. The Company shall be obligated to redeem for cash the aggregate number of Series A Preferred Interests specified in the original Redemption Notice and any subsequent Redemption Notice received by the Company within 30 days of the original Redemption Notice ("Total Redemption Interests") within 90 days after the expiration of the 30 day period; provided, however, that if the Company does not, in the reasonable discretion of the Board, have sufficient cash to redeem the Total

NMLLC 00176

CONFIDENTIAL

Redemption Interests, the Series A Preferred Interests shall be redeemed pro rata based on the Total Redemption Interests. In addition, with respect to any Series A Preferred Interests acquired by Alpha in the Alpha Contemplated Transfer, Alpha shall have the right to redeem 1/12 of such Series A Preferred Interests during each fiscal quarter of the Company beginning after the fifth anniversary of the Alpha Contemplated Transfer pursuant to the terms of this Section 4(b) and on the same basis as its other Series A Preferred Interests.

(c)    Optional Redemption by the Company. The Company may at any time redeem for cash all or any part of the outstanding Series A Preferred Interests for a price equal to the Series A Preferred Liquidation Amount of such Interests; provided that any optional redemption by the Company shall be made pro rata among all holders of the Series A Preferred Interests.

(d)    Special Event Redemptions.

(i)    If a Fundamental Change or Change of Control is to occur, the Company will notify each holder of Series A Preferred Interests in writing of such pending Fundamental Change or Change of Control no less than 20 days prior to the consummation thereof. Such notice will describe the material terms and conditions of the Fundamental Change or Change of Control (including, but not limited to, the amount and nature of the total consideration to be paid in connection therewith) and the Company will thereafter give each such holder prompt notice of any material changes in such terms. Upon consummation of a Fundamental Change or Change of Control, the Company shall, at the election of the Required Series A Preferred Holders made in writing to the Company not less than 10 days after receipt by such Required Series A Holders of the notice of the pending Fundamental Change or Change of Control from the Company, redeem all or any portion (to be allocated pro rata among all holders of Series A Preferred Interests) of the then outstanding Series A Preferred Interests designated by the Required Series A Holders at a price per share equal to the Series A Preferred Liquidation Amount thereof within 10 days after receipt of notice. Any redemption hereunder shall be paid by the Company in (x) securities from an acquiring person or entity (if applicable in connection with the Fundamental Change or Change of Control, as the case may be), (y) a combination of such securities (if applicable in connection with the Fundamental Change or Change of Control) and cash, or (z) all cash, at the election of the Preferred Required Holders in the notice sent by the Required Series A Holders electing redemption hereunder. Any securities to be delivered to the holders of the Series A Preferred Interests hereunder will be valued at the price provided therefor in the Fundamental Change or Change of Control. If in any case a proposed Fundamental Change or Change of Control does not occur, no redemption of the Series A Preferred Interests pursuant to this Section 4(d) in connection with such Fundamental Change or Change of Control shall be required or effected.

(ii)    If and to the extent that applicable law or any other restriction prohibits the payment by the Company to the holders of Series A Preferred Interests of all or any portion of the amounts required to be paid under Section 4(d)(i) of this Part A,

NMLLC 00177

CONFIDENTIAL

such unpaid amounts will be paid to the holders of Series A Preferred Interests by the person or entity (other than the Company) who is a party to the Fundamental Change or Change of Control on the closing thereof (or on such other date determined by agreement of such party and the Preferred Required Holders) by purchase of such Series A Preferred Interests under an agreement which will provide that such purchased Interests will be canceled effective upon such purchase. In the event the full amount of any payment hereunder is not lawfully permitted to be paid to the holders of Series A Preferred Interests by such party on or prior to the closing (or other date determined in accordance herewith), then the Fundamental Change or Change of Control may not be consummated.

(iii)    The rights under Section 4(d) of this Part A shall be in addition to any rights any holder of Series A Preferred Interests may have under Sections 4(a) and 4(b) of this Part A.

(e)    <u>Surrender of Certificates</u>.    On or before the date of redemption, each holder of any Series A Preferred Interests being redeemed shall surrender the certificate or certificates, if any, representing such Interests to the Company, duly endorsed, at the office of the Company or any transfer agent of the Company for the Series A Preferred Interests. At the time required for redemption, the Series A Preferred Liquidation Amount shall be paid and each such surrendered certificate, if any, shall be canceled and retired. If a certificate is surrendered and all of the interests evidenced thereby are not being redeemed, the Company shall, at the option of the Board if certificates are to be issued, cause certificates for the Series A Preferred Interests not being redeemed to be issued and delivered to the holder of the Series A Preferred Interests whose name appears as the owner on the surrendered certificate. In any such event, the Company shall cause its membership records to be modified appropriately to reflect any such redemption and cancellation of Series A Preferred Interests.

(f)    <u>Payment of Redemption Price</u>.    If the funds of the Company legally available therefor shall be insufficient to discharge any redemption required pursuant to this Section 4 in full, the maximum number of full Series A Preferred Interests that can be redeemed with such funds shall be redeemed ratably among the holders of the Series A Preferred Interests in proportion to the aggregate redemption price to be paid to each holder and to the extent such obligation is not met in full, such obligation shall continue to be discharged as promptly as funds legally available therefor become available until the obligation is discharged in full.

Section 5.    <u>Protective Provisions</u>.    So long as any Series A Preferred Interests remain outstanding, the Company shall not, without the prior consent of the Required Series A Holders, make any distributions, repurchases or redemptions of or on account of any Junior Securities other than:

(a)    Distributions of the Hypothetical Tax Amount pursuant to Section 5.2 of the Agreement;

(b)    Distributions of 40% or less of the Company's Available Cash to the holders of the Common Interests in any Fiscal Year;

NMLLC 00178

CONFIDENTIAL

(c)    Repurchases of Class A Common Interests pursuant to the put and call provisions set forth in Part C of this **Exhibit A** below; and

(d)    Repurchases of Class D Common Interests from employees of the Company or its Subsidiaries in connection with the termination of such employees' employment.

Section 6.    Events of Noncompliance.    An "Event of Noncompliance" will be deemed to occur under this Part A if:

(a)    the Company fails to make any redemption payment with respect to the Series A Preferred Interests which it is obligated to make hereunder, whether or not such payment is legally permissible or is prohibited by any agreement to which the Company is subject, and such failure shall not be cured within three (3) Business Days; or

(b)    the Company breaches or otherwise fails to perform or observe any other covenant or agreement in favor or for the benefit of the holders of the Series A Preferred Interests set forth in the Agreement or in this Part A, and such failure shall not be cured within three (3) Business Days; or

(c)    the Company or any Subsidiary makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating the Company or any Subsidiary bankrupt or insolvent; or any order for relief with respect to the Company or any Subsidiary is entered under the Federal Bankruptcy Code.

Section 7.    Consequences of Events of Noncompliance.    If any Event of Noncompliance described in this Part A occurs:

(a)    The interest rate used to calculate the Series A Preferred Liquidation Amount shall increase to 6.5% per annum for so long as the Event of Noncompliance continues uncured; and

(b)    The number of Directors constituting the Company's Board shall, at the request of the holders of a majority of the Series A Preferred Interests then outstanding, be increased by such number which shall constitute a minimum majority of the Board, and the holders of the Series A Preferred Interests shall have the special right, voting separately as a single class (with each Series A Preferred Interest being entitled to one vote) and to the exclusion of all other classes of the Company's Membership Interests, to elect individuals to fill such newly created directorships, to remove any individuals elected to such directorships and to fill any vacancies in such directorships. The special right of the holders of Series A Preferred Interests to elect members of the Board may be exercised at the special meeting called pursuant to this subparagraph (b), at any annual or other special meeting of the Members and, to the extent and in the manner permitted by the Agreement, pursuant to a written consent in lieu of a meeting. Such special right shall continue until such time as there is no longer any Event of Noncompliance in existence, at which time such special right shall terminate subject to revesting

NMLLC 00179

CONFIDENTIAL

upon the occurrence and continuation of any Event of Noncompliance which gives rise to such special right hereunder.

The right of the holders of the Series A Preferred Interests to elect a majority of the Board following the occurrence of an Event of Noncompliance shall be senior and exclusive to the special right of any other class of Membership Interests to elect a majority of the Board following the occurrence of an Event of Noncompliance. No such special right shall be exercisable by the holders of any other class of Interest unless and until the earlier of (i) no Series A Preferred Interests remain outstanding, or (ii) the Event of Noncompliance giving rise to the right described in this Section 7(b) is cured or waived; and

      (c)    Each holder of Preferred Stock shall also have any other rights which such holder is entitled to under any contract or agreement at any time and any other rights which such holder may have pursuant to applicable law.

Section 8.    <u>Amendment and Waiver</u>.  No amendment, modification or waiver shall be binding or effective with respect to any provision of this Part A without the prior written consent of the Required Series A Holders.

## Part B. Series B Preferred Interests

Section 1.    <u>Distributions</u>.  Except as provided in this Part B and in Section 5.2 of the Agreement, the holders of Series B Preferred Interests shall have no right to receive any dividends or other distributions on account of their Series B Preferred Interests.

Section 2.    <u>Liquidation</u>.

      (a)    <u>Liquidation, Dissolution</u>.  Upon any liquidation, dissolution or winding up of the Company, each holder of Series B Preferred Interests shall be entitled to be paid, before any distribution or payment is made upon any Junior Securities, an amount in cash equal to the Stated Value of the Series B Preferred Interests held by each such holder plus interest thereon from the Effective Date at the rate of 8.0% per annum, compounded annually (the "<u>Series B Preferred Liquidation Amount</u>"), and the holders of Series B Preferred Interests shall not be entitled to any further payment. If upon any such liquidation, dissolution or winding up of the Company, the Company's assets available for distribution to its Members are insufficient to permit payment to the holders of Series B Preferred Interests in full, then the entire assets available for distribution to holders of Series B Preferred Interests, after the payment in full of the Series A Preferred Interests, shall be distributed ratably among holders of the Series B Preferred Interests based upon the Series B Preferred Liquidation Amount of the Series B Preferred Interests held by such holders.

      (b)    <u>Definitions</u>.

          (i)    The "Stated Value of the Series B Preferred Interests" is $1.00 per Interest.

NMLLC 00180

CONFIDENTIAL

(ii)      As used in this Part B, the term "Junior Securities" means all Common Interests of the Company and shall not include Membership Interests, such as the Series A Preferred Interests, that are expressly senior to or pari passu with the Series B Preferred Interests.

(c)      <u>No Deemed Liquidations</u>.  A Fundamental Change or Change of Control shall not be a deemed liquidation within the meaning of Section 2(a) of this Part B.

(d)      <u>Noncash Distributions</u>.  If any of the assets of the Company are to be distributed other than in cash pursuant to this Section 2, the value of such assets shall be determined by the Board, <u>provided</u> that the value of any security which is listed on any securities exchange or quoted in the NASDAQ System or the over-the-counter market shall be deemed to be its Market Price.  The term "<u>Market Price</u>" when used with respect to any security means the average of the closing prices of such security's sales on all securities exchanges on which such security may at the time be listed, or, if there has been no sale on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so listed, the average of the closing prices quoted in the NASDAQ System as of 4:00 P.M., New York time, or, if on any day such security is not quoted in the NASDAQ System, the average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by the National Quotation Bureau, Incorporated, or any similar successor organization, in each such case averaged over a period of 21 Business Days consisting of the day as of which "Market Price" is being determined and the 20 consecutive Business Days prior to such day.

(e)      <u>Cancellation of Interests</u>.  Upon payment or distribution of all amounts to be paid to the holders of the Series B Preferred Interests under this Section 2, the Series B Preferred Interests shall be deemed to be automatically canceled and the rights and preferences contained herein shall be null and void.

Section 3.      <u>Voting Rights</u>.  Except as expressly provided in the Agreement and in this Part B, the holders of record of the Series B Preferred Interests shall have no right to vote on any matter submitted to the Members of the Company for vote, consent or approval, and Series B Preferred Interests shall not be included in determining the number of Interests voting or entitled to vote on any matter.

Section 4.      <u>Redemption of Series B Preferred Interests</u>.  The rights of redemption with respect to the Series B Preferred Interests are as follows:

(a)      <u>Optional Redemption by the Company</u>.  The Company may at any time redeem for cash all or any part of the outstanding Series B Preferred Interests for a price equal to the Series B Preferred Liquidation Amount of such Interests; <u>provided that</u> any optional redemption by the Company shall be made pro rata among all holders of the Series B Preferred Interests and, <u>provided further</u>, that at the time of such redemption no Series A Preferred Interests remain outstanding.

(b)      <u>Special Event Redemptions</u>.

110734.6 049579-13175                                              A-7

NMLLC 00181

CONFIDENTIAL

(i)    If a Fundamental Change or Change of Control is to occur, the Company will notify each holder of Series B Preferred Interests in writing of such pending Fundamental Change or Change of Control no less than 20 days prior to the consummation thereof. Such notice will describe the material terms and conditions of the Fundamental Change or Change of Control (including, but not limited to, the amount and nature of the total consideration to be paid in connection therewith) and the Company will thereafter give each such holder prompt notice of any material changes in such terms. Upon consummation of a Fundamental Change or Change of Control, the Company shall, at the election of the Required Series B Preferred Holders made in writing to the Company not less than 10 days after receipt by such Required Series B Holders of the notice of the pending Fundamental Change or Change of Control from the Company, redeem all or any portion (to be allocated pro rata among all holders of Series B Preferred Interests) of the then outstanding Series B Preferred Interests designated by the Required Series B Holders at a price per share equal to the Series B Preferred Liquidation Amount thereof within 10 days after receipt of notice. Any redemption hereunder shall be paid by the Company in (x) securities from an acquiring person or entity (if applicable in connection with the Fundamental Change or Change of Control, as the case may be), (y) a combination of such securities (if applicable in connection with the Fundamental Change or Change of Control) and cash, or (z) all cash, at the election of the Preferred Required Holders in the notice sent by the Required Series B Holders electing redemption hereunder. Any securities to be delivered to the holders of the Series B Preferred Interests hereunder will be valued at the price provided therefor in the Fundamental Change or Change of Control. If in any case a proposed Fundamental Change or Change of Control does not occur, no redemption of the Series B Preferred Interests pursuant to this Section 4(b) in connection with such Fundamental Change or Change of Control shall be required or effected.

(ii)    If and to the extent that applicable law or any other restriction prohibits the payment by the Company to the holders of Series B Preferred Interests of all or any portion of the amounts required to be paid under Section 4(b)(i) of this Part B, such unpaid amounts will be paid to the holders of Series B Preferred Interests by the person or entity (other than the Company) who is a party to the Fundamental Change or Change of Control on the closing thereof (or on such other date determined by agreement of such party and the Preferred Required Holders) by purchase of such Series B Preferred Interests under an agreement which will provide that such purchased Interests will be canceled effective upon such purchase. In the event the full amount of any payment hereunder is not lawfully permitted to be paid to the holders of Series B Preferred Interests by such party on or prior to the closing (or other date determined in accordance herewith), then the Fundamental Change or Change of Control may not be consummated.

(c)    Surrender of Certificates. On or before the date of redemption, each holder of any Series B Preferred Interests being redeemed shall surrender the certificate or certificates, if any, representing such Interests to the Company, duly endorsed, at the office of the Company or any transfer agent of the Company for the Series B Preferred Interests. At the time required for redemption, the Series B Preferred Liquidation Amount shall be paid and each such

NMLLC 00182

CONFIDENTIAL

surrendered certificate, if any, shall be canceled and retired. If a certificate is surrendered and all of the interests evidenced thereby are not being redeemed, the Company shall, at the option of the Board if certificates are to issued, cause certificates for the Series B Preferred Interests not being redeemed to be issued and delivered to the holder of the Series B Preferred Interests whose name appears as the owner on the surrendered certificate. In any such event, the Company shall cause its membership records to be modified appropriately to reflect any such redemption and cancellation of Series B Preferred Interests.

(d)    Payment of Redemption Price.    If the funds of the Company legally available therefor shall be insufficient to discharge any redemption required pursuant to this Section 4 in full, the maximum number of full Series B Preferred Interests that can be redeemed with such funds shall be redeemed ratably among the holders of the Series B Preferred Interests in proportion to the aggregate redemption price to be paid to each holder and to the extent such obligation is not met in full, such obligation shall continue to be discharged as promptly as funds legally available therefor become available until the obligation is discharged in full.

Section 5.    Protective Provisions.    So long as any Series B Preferred Interests remain outstanding, the Company shall not, without the prior consent of the Required Series B Holders, make any distributions, repurchases or redemptions of or on account of any Junior Securities other than:

(a)    Distributions of the Hypothetical Tax Amount pursuant to Section 5.2 of the Agreement;

(b)    Distributions of 40% or less of the Company's Available Cash to the holders of the Common Interests in any Fiscal Year;

(c)    Repurchases of Class A Common Interests pursuant to the put and call provisions set forth in Part C of this Exhibit A below; and

(d)    Repurchases of Class D Common Interests from employees of the Company or its Subsidiaries in connection with the termination of such employees' employment.

Section 6.    Conversion Feature.    In the event that the Alpha Contemplated Transfer is consummated, the Series B Preferred Interests transferred by A. Kalnow to Alpha shall, immediately upon such transfer and without the necessity of any further action, be converted into the same number of Series A Preferred Interests, and such Series A Preferred Interests shall have the same rights, privileges and Series A Preferred Liquidation Amount as Series A Preferred Interests that were issued as of the Effective Date, provided that for purpose of calculating the Series A Preferred Liquidation Amount with respect to such shares, interest shall accrue from the date of the Alpha Contemplated Transfer rather than from the Effective Date.

Section 7.    Amendment and Waiver.    No amendment, modification or waiver shall be binding or effective with respect to any provision of this Part B without the prior written consent of the Required Series B Holders.

NMLLC 00183

CONFIDENTIAL

## Part C. Common Interests

Except as otherwise provided in the Agreement or as otherwise required by applicable law, all shares of Class A Common Interests, Class B Common Interests, Class C Common Interests, and Class D Common Interests shall be identical in all respects and shall entitle holders thereof to the same rights and privileges, subject to the same qualifications, limitations and restrictions.

Section 1.    Distributions; Conversion, Issuance.

1.1    General Obligation.  Subject to the rights of the holders of the Preferred Interests set forth in Parts A and B of this **Exhibit A** and any other provisions in the Agreement, holders of Common Interests shall be entitled to receive, equally on a per Interest basis, such distributions in cash, Interests or property of the Company as may be declared thereon by the Board from time to time, out of assets or funds of the Company legally available therefor. Distributions shall be declared and paid to holders of any of the Class A Common Interests, Class B Common Interests, Class C Common Interests, and Class D Common Interests only if such Distributions are declared and paid to all holders of Interests of such classes in the same amount per Interest.

1.2    Distributions of Interests.  If at any time a distribution of Common Interests, or any other securities of the Company, is to be made to holders of Common Interests (hereinafter referred to as an "Interest Distribution"), such Interest Distribution may be declared and paid only as follows:

(a)    an Interest Distribution consisting of Class A Common Interests to holders of Class A Common Interests; provided that there shall be a simultaneous Interest Distribution consisting of Class B Common Interests to holders of Class B Common Interests, Class B Common Interests to holders of Class C Common Interests, and Class D Common Interests to holders of Class D Common Interests in the same amount per Interest;

(b)    an Interest Distribution consisting of Class B Common Interests to holders of Class B Common Interests; provided that there shall be a simultaneous Interest Distribution consisting of Class A Common Interests to holders of Class A Common Interests, Class C Common Interests to holders of Class C Common Interests in the same amount per Interest and Class D Common Interests to holders of Class D Common Interests in the same amount per Interest;

(c)    an Interest Distribution consisting of Class C Common Interests to holders of Class C Common Interests; provided that there shall be a simultaneous Interest Distribution consisting of Class A Common Interests to holders of Class A Common Interests, Class B Common Interests to holders of Class B Common Interests in the same amount per Interest and Class D Common Interests to holders of Class D Common Interests in the same amount per Interest;

CONFIDENTIAL

(d)    an Interest Distribution consisting of Class D Common Interests to holders of Class D Common Interests; provided that there shall be a simultaneous Interest Distribution consisting of Class A Common Interests to holders of Class A Common Interests, Class B Common Interests to holders of Class B Common Interests in the same amount per Interest and Class C Common Interests to holders of Class C Common Interests in the same amount per Interest; or

(e)    an Interest Distribution consisting of any other class of securities of the Company to holders of Class A Common Interests, Class B Common Interests, Class C Common Interests and Class D Common Interests in the same amount per Interest.

Section 2.    <u>Voting</u>.

(a)    <u>General Voting Rights</u>.    Except as otherwise required by statute or specifically provided in the Agreement or in paragraph (b) below, holders of the Voting Interests shall have the sole right and power to vote on all matters on which a vote of Members is to be taken. At every meeting of the Members:

(i)    each holder of Voting Interests shall be entitled to cast one (1) vote, in person or by proxy, for each Voting Interest standing in his, her or its name on the membership records of the Company; and

(ii)    holders of Common Interests other than Voting Interests shall have no right to vote on any matter submitted to the Members of the Company for vote, consent or approval, and Common Interests other than Voting Interests shall not be included in determining the number of Interests voting or entitled to vote on any such matter.

(b)    <u>Election of Directors</u>.    The Board of the Company will consist of between five (5) and seven (7) Directors, as determined by the Board, who will be elected as follows:

(i)    So long as the Class A Common Interests comprise (A) 3% or more of the outstanding Common Interests, the holders of a majority of the Class A Common Interests will be entitled to elect one Director, and (B) 10% or more of the outstanding Common Interests, the holders of a majority of the Class A Common Interests will be entitled to approve of one Director elected pursuant to subparagraph 2(b)(iii) below at any time that the Board consists of seven (7) Directors;

(ii)    So long as the Class C Common Interests comprise 20% or more of the outstanding Common Interests, the holders of a majority of the Class C Common Interests will be entitled to elect one Director; provided that as long as C. Kalnow, Kaplan and Chisholm collectively hold at least 25% of the Class C Common Interests, the Director to be elected by the Class C Common Interest will be elected by the vote of a majority of the Class C Common Interests held by C. Kalnow, Kaplan and Chisholm;

NMLLC 00185

CONFIDENTIAL

(iii)    Provided that no A. Kalnow Disability Event has occurred, the balance of the Directors comprising the Board will be elected by the vote of a majority of the Voting Interests; and

(iv)    Following the occurrence of an A. Kalnow Disability Event,

(A)    provided that the Class B Common Interests comprise not less than 20% of the outstanding Common Interests, a majority of the Class B Common Interests, voting as a separate class, will be entitled to elect two Directors; provided further that if Andrew Frost (Drew) Kalnow is a holder of Class B Common Interests, one of the two Directors will be selected by Andrew Frost (Drew) Kalnow, and

(B)    the holders of the Voting Interests shall, acting as a single class, elect the balance of the Directors comprising the Board on a cumulative basis with each Voting Interest entitled to one vote for each Director to be elected.

Section 3.    Reclassification, Etc.    Neither the Class A Common Interests nor Class B Common Interests nor the Class C Common Interests nor the Class D Common Interests maybe subdivided, consolidated, reclassified or otherwise changed unless contemporaneously therewith the other classes of Common Interests are subdivided, consolidated, reclassified or otherwise changed in the same proportion and in the same manner.

Section 4.    Conversion Rights.    The Common Interests shall have the following conversion privileges:

(a)    Holders of Class B Common Interests and Class C Common Interests may at any time, by notice to the Company, elect to convert any or all of their Class B Common Interests and Class C Common Interests into the same number of Class D Common Interests.

(b)    Upon the consummation of the Alpha Contemplated Transfer, the Class B Common Interests Transferred by A. Kalnow to Alpha shall be automatically converted into the same number of Class A Common Interests.

(c)    Upon the consummation of the Lunn Contemplated Transfer, the Class B Common Interests Transferred by A. Kalnow to Lunn Partners LLC or its nominees shall be automatically converted into the same number of Class C Common Interests.

(d)    Except as expressly provided in this Section 4, no Common Interests shall have any conversion rights or re-conversion rights.

Section 5.    Put Rights of Class A Common Interests.

(a)    At any time and from time to time after February 1, 2007, each holder of Class A Common Interests shall have the right to require the Company to repurchase all or any portion of the Class A Common Interests held by the holder at the Put Price (the "Put") by

NMLLC 00186

CONFIDENTIAL

delivering a written notice to the Company specifying the number of Class A Common Interests to be purchased (the "Put Notice"). The right to exercise the Put will inure to the benefit of all transferees of the holder's Class A Common Interests. Notwithstanding the foregoing, none of the Class A Common Interests acquired by Alpha pursuant to the Alpha Contemplated Transfer may be Put to the Company for repurchase by Alpha or its transferees prior to the fifth anniversary of the Alpha Contemplated Transfer.

(b)     Upon the delivery of the Put Notice, the Company and the exercising holder of Class A Common Interests will in good faith promptly determine the Put Price as provided hereunder, and subject to the provisions hereof within ten days after the determination of the Put Price, the Company will purchase and the holder will sell the number of the holder's Class A Common Interests specified in the Put Notice at a mutually agreeable time and place (the "Put Closing").

(c)     At the Put Closing, the exercising holder will deliver to the Company certificates representing the holder's Class A Common Interests (to the extent certificated) to be repurchased by the Company and the Company will deliver to the Investor a subordinated promissory note in the original principal amount of the Put Price in form and substance satisfactory to the holder with the principal amount payable in twelve equal quarterly installments beginning on the last Business Day of the first quarter beginning after the date of the Put Notice, bearing interest at a floating rate per annum equal to the interest rate per annum announced from time to time by Fifth Third Bank as its prime rate plus 500 basis points. The subordinated notes issued hereunder shall be subordinated to all other Funded Debt of the Company on such terms as may be required by the Company's lenders.

(d)     The "Put Price" of the Class A Common Interests to be repurchased shall mean the greater of:

(i)     the product of (A) the sum of (w) 4.75 multiplied by the Consolidated EBITDA for the applicable EBITDA Measurement Period as reflected on the Company's consolidated income statement(s) for such period(s), plus (x) the amount of unrestricted cash and cash equivalents stated on the Company's consolidated balance sheet as of the last Business Day of the month in which the Put Notice is delivered, less (y) the Liquidation Value of all outstanding Preferred Interests as of the last Business Day of the month in which the Put Notice is delivered, less (z) the outstanding principal amount of the Company's Funded Debt as of the last Business Day of the month in which the Put Notice is delivered, multiplied by (B) a fraction (the "Put Fraction"), the numerator of which will be the Class A Common Interests to be repurchased and the denominator of which will be the total number of all Common Interests outstanding on the date of the Put Notice; or

(ii)     the product of (A) the Company Fair Market Value, multiplied by (B) the Put Fraction.

In calculating the Put Price, all accounting determinations will be made in accordance with generally accepted accounting principles consistently applied.

110734.6 049579-13175                          A-13

NMLLC 00187

CONFIDENTIAL

     (e)    The right of any holder of Class A Common Interests to exercise the Put hereunder shall terminate upon the first to occur of (i) the tenth anniversary of the date of this Agreement and (ii) the consummation of a Qualified Public Offering.

Section 6.    <u>Call Obligations of the Class A Common Interests</u>.

     (a)    At any time and from time to time after February 1, 2004, the Company will have the right to purchase up to the Callable Amount of the Class A Common Interests at the Call Price (the "<u>Call</u>") by delivering written notice to any holder of Class A Common Interests (the "<u>Call Notice</u>").  Notwithstanding the foregoing, the Company may not Call for repurchase any of the Class A Common Interests acquired by Alpha in the Alpha Contemplated Transfer prior to the second anniversary of the Alpha Contemplated Transfer.

     (b)    Upon delivery of the Call Notice, the Company and the applicable holders will in good faith promptly determine the Call Price hereunder, and within 30 days after the Call Price has been determined, the Company will purchase and the holders will sell the Class A Common Interests as set forth in the Call Notice at a mutually agreeable time and place (the "<u>Call Closing</u>").

     (c)    At the Call Closing, the holders of the Class A Common Interests being repurchased will deliver to the Company duly executed instruments  transferring the Class A Common Interests to the Company, against payment of the appropriate Call Price.  If the Call Notice is delivered prior to February 1, 2007, the Call Price will be payable entirely in cash.  If the Call Notice is delivered on or after February 1, 2007, 40% of the Call Price will be payable in cash and 60% of the Call Price will be payable by the Company's delivery of a subordinated promissory note in the original principal amount of 60% of the Call Price in form and substance satisfactory to the holders with the principal amount payable in eight equal quarterly installments beginning on the last Business Day of the first quarter beginning after the date of the Call Notice, bearing interest at a floating rate per annum equal to the interest rate per annum announced from time to time by Fifth Third Bank as its prime rate plus 400 basis points.  The subordinated notes issued hereunder shall be subordinated to all other Funded Debt of the Company on such terms as may be required by the Company's lenders.

     (d)    "<u>Call Price</u>" of the Class A Common Interests being repurchased means the greater of:

     (i)    the product of (A) the sum of (x) the applicable Call Multiple multiplied by the Consolidated EBITDA for the applicable EBITDA Measurement Period as reflected on the Company's consolidated income statement(s) for such period(s), plus (x) the amount of unrestricted cash and cash equivalents stated on the Company's consolidated balance sheet as of the last Business Day of the month in which the Call Notice is delivered, less (y) the Liquidation Value of all outstanding Preferred Interests as of the last Business Day of the month in which the Call Notice is delivered, less (z) the outstanding principal amount of the Company's Funded Debt as of the last Business Day of the month in which the Call Notice is delivered, multiplied by (B) a fraction (the "<u>Call Fraction</u>"), the numerator of which will be the Class A Common Interests to be

110734.6 049579-13175            A-14

NMLLC 00188

CONFIDENTIAL

repurchased and the denominator of which will be the total number of all Common Interests outstanding on the date of the Call Notice, or

(ii)     the product of (A) the Company Fair Market Value, multiplied by (B) the Call Fraction.

In calculating the Call Price, all accounting determinations will be made in accordance with generally accepted accounting principles consistently applied.

(e)     Concurrently with its repurchase of Class A Common Interests from any holder pursuant to this Section 6, and as a condition thereof, the Company shall repurchase and redeem from such holder the Applicable Percentage of all Preferred Interests, Bridge Notes and Subordinated Notes owned by such holder and such holder's commitment to purchase any additional Bridge Notes and Subordinated Notes will be reduced by the Applicable Percentage of such commitment. The purchase price for the other Interests and notes to be repurchased in connection with the Company's exercise of a call will be the Liquidation Value of the applicable Preferred Interests and the par value of all indebtedness owed under any repurchased note. The purchase price will be payable in cash at closing; provided that if the applicable Call Notice is delivered on or after February 1, 2007, 40% of the purchase price will be payable in cash and 60% of the purchase price will be payable by the Company's delivery of a subordinated promissory note containing the same terms and conditions as subordinated promissory notes described in paragraph (c) of this Section 6. "Applicable Percentage" means that percentage obtained by dividing the number of Class A Common Interests of the applicable holder being called by the Company by the total number of Class A Common Interest owned by that holder.

(f)     The Company's right to exercise the Call hereunder shall terminate upon the first to occur of (i) the tenth anniversary of the date of this Agreement and (ii) the consummation of a Qualified Public Offering.

Section 7.     An "Event of Noncompliance" will be deemed to occur under this Part C if:

(a)     the Company fails to repurchase any Class A Common Interests which it is obligated to repurchase pursuant to Sections 5 or 6 of this Part C, whether or not such payment is legally permissible or is prohibited by any agreement to which the Company is subject, and such failure shall not be cured within three (3) Business Days; or

(b)     the Company defaults on the payment of any principal or interest due under any of the subordinated notes delivered by the Company pursuant to Sections 5 or 6 of this Part C, and such failure shall not be cured within three (3) Business Days.

Section 8.     Consequences of Events of Noncompliance.   If any Event of Noncompliance described in this Part C occurs:

(a)     The interest rates on all subordinated notes issued by the Company pursuant to Sections 5 and 6 of this Part C shall increase by 200 basis points per annum for so long as the Event of Noncompliance continues uncured; and

110734.6 049579-13175                          A-15

NMLLC 00189

CONFIDENTIAL

(b)     The number of Directors constituting the Company's Board shall, at the request of the holders of a majority of the Class A Common Interests then outstanding, be increased by such number which shall constitute a minimum majority of the Board, and the holders of the Class A Common Interests shall have the special right, voting separately as a single class (with each Class A Common Interest being entitled to one vote) and to the exclusion of all other classes of the Company's Membership Interests, to elect individuals to fill such newly created directorships, to remove any individuals elected to such directorships and to fill any vacancies in such directorships. The special right of the holders of the Class A Common Interests to elect members of the Board may be exercised at the special meeting called pursuant to this subparagraph (b), at any annual or other special meeting of the Members and, to the extent and in the manner permitted by the Agreement, pursuant to a written consent in lieu of a meeting. Such special right shall continue until such time as there is no longer any Event of Noncompliance in existence, at which time such special right shall terminate subject to revesting upon the occurrence and continuation of any Event of Noncompliance which gives rise to such special right hereunder.

The right of the holders of the Class A Common Interests to elect a majority of the Board following the occurrence of an Event of Noncompliance shall be junior and subordinate to the special right of the holders of the Series A Preferred Interests to elect a majority of the Board following the occurrence of an Event of Noncompliance described in Part A of this **Exhibit A.** Accordingly, the right of the holders of the Class A Common Interests described in this Section 8(b) shall not be exercisable unless (i) no Series A Preferred Interests remain outstanding, or (ii) no Event of Noncompliance described in Section 7 of Part A has occurred and is continuing.

(c)     Each holder of Class A Common Interests shall also have any other rights which such holder is entitled to under any contract or agreement at any time and any other rights which such holder may have pursuant to applicable law.

Section 9.     <u>Amendment and Waiver</u>.  No amendment, modification or waiver shall be binding or effective with respect to any provision of this Part C without the prior written consent of the holders of 66.7% of each class of Common Interests effected by such amendment, modification or waiver.

NMLLC 00190

CONFIDENTIAL

**EXHIBIT B**

**Initial Directors**

Andrew H. Kalnow
David DeVore
Carl F. Kalnow
Michael R. Klepper
Amy Coleman

NMLLC 00191

CONFIDENTIAL

**EXHIBIT C**

### Schedule of Investors

The following Schedule of Investors is effective as of February 11, 2002, and shall be amended from time to time to reflect additional capital contributions, exercises of Option Interests and Employee Options, Transfers of Interests (including the Alpha Contemplated Transfer and the Lunn Contemplated Transfer), the admission of Additional Members and the withdrawal of existing Members, as the case may be.

### Series A Preferred Interests

| Investor | Capital Contribution | Interest Percentage in Class | Number of Series A Preferred Interests |
|---|---|---|---|
| Alpha Capital Fund III, L.P. | $1,449,105 | 100% | 1,449,105 |

### Series B Preferred Interests

| Investor | Capital Contribution | Interest Percentage in Class | Number of Series B Preferred Interests |
|---|---|---|---|
| Superior Distributing Company, Inc. | $579,642 | 8.21% | 579,642 |
| Andrew H. Kalnow | $3,284,072 | 46.58% | 3,284,072 |
| Carl F. Kalnow | $1,062,394 | 15.07% | 1,062,394 |
| Loretta K. Kaplan Qualified Annuity Trust | $1,062,394 | 15.07% | 1,062,394 |
| Gertrude K. Chisholm | $1,062,394 | 15.07% | 1,062,394 |

**NMLLC 00192**

**CONFIDENTIAL**

## Class A Common Interests

| Investor | Capital Contribution | Interest Percentage in Class | Number of Class A Common Interests |
|---|---|---|---|
| Alpha Capital Fund III, L.P. | $255,724 | 100% | 255,724 |

## Class B Common Interests

| Investor | Capital Contribution | Interest Percentage in Class | Number of Class B Common Interests |
|---|---|---|---|
| Andrew H. Kalnow | $579,542 | 100% | 579,542 |

## Class C Common Interests

| Investor | Capital Contribution | Interest Percentage in Class | Number of Class C Common Interests |
|---|---|---|---|
| Superior Distributing Company, Inc. | $102,290 | 15.37% | 102,290 |
| Carl F. Kalnow | $187,481 | 28.21% | 187,481 |
| Loretta K. Kaplan Qualified Annuity Trust | $187,481 | 28.21% | 187,481 |
| Gertrude K. Chisholm | $187,481 | 28.21% | 187,481 |

## Class D Common

None

NMLLC 00193

CONFIDENTIAL

EXHIBIT D

**Addresses for Notice**

Alpha Capital Fund III, L.P.
c/o Alpha Capital Partners, Ltd.
122 South Michigan Ave.
Suite 1700
Chicago, Illinois 60603
Attn: Andrew H. Kalnow
Facsimile: (312) 322-9808

Superior Distributing Company, Inc.
22116 Washington Township Road 218
P.O. Box 107
Fostoria, Ohio 44830
Attn: Kris Klepper
Facsimile: (419) 435-5231

Andrew H. Kalnow
658 West Willow St.
Chicago, IL 60614
Facsimile: (312) 322-9808

Carl F. Kalnow
2386 Grandin Road
Cincinnati, OH 45208
Facsimile: (513) 621-5259

Loretta K. Kaplan Qualified
    Annuity Trust
c/o Loretta K. Kaplan
586 Somerset Lane
Northfield, IL 60093
Facsimile: (847) 446-8071

Getrude K. Chisholm
20926 Brantley
Shaker Heights, OH 44122
Facsimile: (216) 932-9091

NMLLC 00194

110734.6 049579-13175                    D-1                    CONFIDENTIAL

# EXHIBIT K

# OPERATING AGREEMENT

## OF

## NATIONAL MACHINERY LLC

**THIS OPERATING AGREEMENT** (this "Agreement") of National Machinery LLC, an Ohio limited liability company (the "Company"), is entered into and effective as of March 5, 2002, by NMC Acquisition LLC, a Delaware limited liability company, as the sole member (the "Member") of the Company.

**WHEREAS**, the Member desires to enter into this Agreement and form and operate a limited liability company under the laws of the State of Ohio on the terms and conditions described herein;

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member agrees as follows:

1.     **Organizational Matters**.

(a)     Formation.  The Member was organized as a limited liability company pursuant to the Ohio Limited Liability Company Act, Ohio Rev. Code Ann. Sections 1705.01, et seq., as the same may be amended from time to time (the "Act").  The Member shall operate the Company as an Ohio limited liability company under and pursuant to the Act.  An Articles of Organization ("Articles") of the Company was filed on March 5, 2002 with the Office of the Secretary of State of Ohio by the organizer of the Company acting as agent for the Member.  The Member shall be the member of the Company within the meaning of the Act, and except as expressly provided herein to the contrary, the rights and obligations of the Member shall be as provided in the Act.  The Member agrees to execute such certificates or documents and do such filings and recordings and all other acts as may be required in order to comply with all applicable laws.

(b)     Name.  The business of the Company shall be conducted under the name "National Machinery LLC"

(c)     Operating Agreement.  This Agreement shall constitute the operating agreement of the Company within the meaning of the Act.

(d)     Certificates of Ownership.  Except as authorized by the Board of the Company pursuant to Section 6 of this Agreement, no certificates or other evidence of ownership shall be issued in respect of the interests in the Company (the "Member Interests").

2.     Purposes.  The purpose of the Company shall be to transact any and all lawful business for which limited liability companies may be organized under the Act, including, without limitation, the manufacture, refurbishment, sale and servicing of industrial machinery.

NMLLC 00198

CONFIDENTIAL

The Company shall have the power to do all acts and things necessary or useful in connection with the foregoing.

3.    **Principal Place of Business; Registered Agent and Registered Office.**

(a)    Place of Business.  The principal place of business of the Company shall be located at 161 Greenfield Street, Tiffin, Ohio, or at such other place as the Member may determine from time to time.

(b)    Registered Agent and Office.  The registered agent and registered office of the Company in Ohio is CT Corporation System, 441 Vine Street, Cincinnati, Ohio 45202. The Member may designate, from time to time, such other registered agent and registered office in Ohio or in any other jurisdiction in which the Company may register or qualify to do business.

4.    **Term and Fiscal Year.**

(a)    Term.  The term of the Company commenced as of the date of filing of the Articles with the Office of the Secretary of State of Ohio and shall continue until terminated in accordance with the terms of this Agreement or as otherwise provided by law.

(b)    Fiscal Year.  The fiscal year of the Company shall be the calendar year.

5.    **Capital.**

(a)    Capital Contributions.  The Member has heretofore contributed cash to the capital of the Company in the amount of One Hundred and No/100 Dollars ($100.00), and in exchange for such capital contribution, the Member shall be the owner of one hundred percent (100%) of the Membership Interests in the Company.

(b)    Limited Liability.    Anything in this Agreement to the contrary notwithstanding, the personal liability of the Member arising out of or in any manner relating to the Company shall be limited to and shall not exceed the Member's capital contribution and obligations to contribute capital as provided herein.

(c)    Capital Accounts.  A separate capital account shall be determined and maintained for the Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended from time to time ("Code"), and the Treasury Regulations ("Regulations") promulgated thereunder.  No interest or additional share of profits shall be paid or credited to the Member on its capital account or on any undistributed profits or funds left on deposit with the Company except as provided herein.

6.    **Certificates.**

(a)    Right to Issue Certificates.  If at any time the Board (as defined herein) determines that it is in the interest of the Company to issue certificates attesting to the ownership of Membership Interests in the Company by the Member of the Company, the provisions of this Section 6 shall thereafter apply (and prior to such determination by the Board, if any, this Section 6 shall have no force or effect).

NMLLC 00199

CONFIDENTIAL

(b)    Form of Certificates.    Certificates attesting to the ownership of Membership Interests in the Company shall be in such form as shall be approved by the Board and shall state that the Company is a limited liability company formed under the laws of the State of Ohio, the name of the Member to whom such certificate is issued, that the certificates represent such Membership Interests and that the certificates are securities governed by Article 8 of the Uniform Commercial Code.    Each such certificate shall be signed by the President or Chief Executive Officer and the Secretary or any Assistant Secretary of the Company.

(c)    Register.    The transfer register or transfer books and blank share certificates shall be kept by the Secretary of the Company or by any transfer agent or registrar designated by the Board for that purpose.

(d)    Issuance.    The certificates of the Company shall be numbered and registered in the share register or transfer books of the Company as they are issued.

(e)    Transfer.    If the Company shall issue certificates in accordance with the provisions of this Section, any transfers of interests shall be made on the register or transfer books of the Company upon surrender of the certificate therefor, endorsed by the person named in the certificate or by an attorney lawfully constituted in writing.

(f)    Record Holder.    Except to the extent that the Company shall have received written notice of an assignment of a Membership Interest in the Company, the Company shall be entitled to treat the person in whose name any certificates issued by the Company stand on the books of the Company as the absolute owner thereof, and shall not be bound to recognize any equitable or other claim to, or interest in, such Membership Interest on the part of any other person.

(g)    Lost Destroyed or Mutilated Certificates.    The holder of any certificates issued by the Company shall immediately notify the Company of any loss, destruction or mutilation of such certificates, and the Secretary may cause a new certificate or certificates to be issued to such holder, in case of mutilation of the certificate, upon the surrender of the mutilated certificate or, in case of loss or destruction of the certificate, upon satisfactory proof of such loss or destruction and, if the Board shall so determine, the granting of an indemnity and/or the deposit of a bond in such form and in such sum, and with such surety or sureties, as the Board may direct.

(h)    Legends.    In addition to any other legend required with respect to a particular class, group or series of Interests, each such certificate, if any, shall bear the following legend:

"THE INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND MAY NOT BE TRANSFERRED, SOLD,    ASSIGNED,    PLEDGED,    ENCUMBERED, HYPOTHECATED    OR    OTHERWISE    DISPOSED    OF WITHOUT COMPLYING WITH THE PROVISIONS OF THE OPERATING    AGREEMENT    BY    AND    AMONG    THE MEMBERS OF NATIONAL MACHINERY LLC, AS SUCH

NMLLC 00200

CONFIDENTIAL

AGREEMENT MAY BE AMENDED FROM TIME TO TIME, A
COPY OF WHICH IS ON FILE WITH THE COMPANY. THE
HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF
THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF
THE PROVISIONS OF THE AFORESAID AGREEMENT."

7.    **Distributions**. Distributions shall be made to the Member at the times and in the amounts as determined by the Board.

8.    **Allocation of Profits and Losses**. Each item of the Company's income, gain, loss, deduction or credit shall be allocated to the Member; provided, however, that such allocations shall be made in accordance with Section 704 of the Code and applicable Regulations.

9.    **Management**.

(a)    <u>General</u>. The exclusive, complete and full power of management and control of the conduct and operation of the Company business shall be vested in a board of managers (the "<u>Board</u>") consisting of between five (5) and seven (7) members (each a "<u>Manager</u>"), as determined by the Board. The Board will act by majority vote, except that the Member may from time to time grant super-voting rights to any Manager or Managers. The Managers shall have all of the rights, powers and authority generally conferred under the Act or other applicable law. Except as other provided in this Agreement, no Manager shall, except following majority approval of the Board, in the name of or on behalf of the Company, sign or execute any contract, instrument or document, perform any other act, engage in any transaction, commit or bind the Company to any act, contract, instrument or document, or incur any debt. The Managers shall serve at the pleasure of the Member. Each Manager may resign at any time. Each Manager is subject to removal and replacement at any time by the Member. Any vacancy created by the death, resignation or removal of any Manager shall be filled by the Member.

(b)    <u>Fiduciary Relationship</u>. At all times the Board will have a fiduciary relationship to the Company and to the Member. In performing its duties under this Agreement, the Board shall act in good faith and on a fair basis with the Company and the Member.

(c)    <u>Meetings of the Board</u>. Any Manager may call a meeting of the Board upon ten (10) days' notice in writing (which may be by facsimile), which notice shall specify the date, time and purpose or purposes of the meeting. Meetings of the Board shall be held at the Company's principal executive offices, unless a majority of the Managers agree to meet at another location. Managers may be present at any meeting of the Board by telephone, provided that each Manager can hear all other present Managers. The presence, in person or by telephone, of all Managers, is required to constitute a quorum of the Board for any meeting; provided, however, that less than all Managers (but not less than a majority of all Managers then in office) may constitute a quorum if the Managers not present at a meeting waive in writing their right to attend such meeting of the Board.

(d)    <u>Actions of the Board of Directors Without a Meeting</u>. Any action which may be taken by the Board at a meeting may be taken by the unanimous written consent of the

NMLLC 00201

CONFIDENTIAL

Board taken without a meeting or by the written consent of a majority of the Board taken without a meeting, provided that all Managers receive prior notice of any action of the Board to be taken by the written consent of less than all of the Managers.

(e)     Officers.  The Company shall have a President and such other officers as the Board from time to time may appoint.  The officers shall be appointed annually at a meeting of the Board, shall serve without compensation (unless approved by the Board or by any compensation committee established by the Board) and may be removed at any time, with or without cause, by the Board.  Subject at all times to the authority of the Board, the day-to-day operations of the Company shall be carried out by individuals appointed by the Board as provided in this Agreement to act on behalf of the Company (each, an "officer"), having such power, authority and duties as may be provided by or pursuant to resolutions of the Board or as is otherwise specifically provided for in this Agreement, and having such titles as may be assigned to them by the Board.  The initial President and chief executive officer of the Company shall be Andrew H. Kalnow.

(f)     Third Party Reliance.  Any third party shall be fully protected in relying upon the authority of the President of the Company, and upon the authority of any officer of the Company, to the extent that the actions of the officer are consistent with such officer's authority as established by resolution of the Board, and upon any resolution adopted by a majority of the Board.

10.     **Members**.

(a)     General.  In dealing with third parties with respect to the Company's business or on behalf of the Company, the Member shall act in accordance with policies established by the Board.  The Member shall not, in the name of or on behalf of the Company, sign or execute any contract, instrument or document, perform any other act, engage in any transaction, commit or bind the Company to any act, contract, instrument or document, or incur any debt, except as expressly permitted by this Agreement.

(b)     Decisions.  Except as otherwise expressly so required in this Agreement, all decisions shall be made by the Board.

11.     **Books and Records**.  Accurate books, records and accounts shall be maintained by the Company showing its assets, liabilities, operations, transactions and financial condition. The Company books, records and reports and a copy of the Articles and any amendments thereto or restatements thereof, shall be maintained at the principal office of the Company and the Member (and the designated representative of the Member) shall, at all reasonable times and during regular business hours, have the right to inspect and copy same.

12.     **Withdrawal, Insolvency or Dissolution of the Member**.  The Member shall not have the right to withdraw, retire or resign from the Company and any withdrawal, retirement or resignation shall be wrongful.  No Member shall be entitled to receive any payment from the Company or to have its Membership Interests repurchased on account of the Member's withdrawal or dissociation from the Company.  The insolvency or dissolution of the Member shall not terminate the Company, except as otherwise provided by the Act.

NMLLC 00202

CONFIDENTIAL

13.    **Transferees and Successors**.  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which such person's predecessor in interest was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby.

14.    **Termination**.  The company shall terminate if the Member determines to dissolve the Company or as otherwise provided by the Act.  Upon termination of the Company, the affairs of the Company shall be wound up by the Member or by a liquidating trustee selected by the Board.

15.    **Indemnification**.  The Company shall indemnify, defend, and hold the Managers, Member, their agents, and their respective successors, executors, administrators or personal representatives, officers, managers and members harmless from and against any loss, liability, damage, cost, or expense (including reasonable attorney's fees) sustained or incurred as a result of any act, decision or omission concerning the business or activities of the Company provided that the Manager, Member, agent, or other person, or any of them are not guilty of gross negligence or willful misconduct and were acting in good faith within what such person reasonably believed to be the scope of such person's authority for a purpose which such person reasonably believed to be not opposed to the interests of the Company.

16.    **Amendment**.  If at any time during the term of the Company, the Board shall deem it necessary or desirable to make any change in any of the provisions hereof, or any additions hereto, for the advantageous or satisfactory management of Company business or to comply with any applicable law, it may be done only by unanimous agreement of all the Managers.

17.    **Governing Law**.  This Agreement shall be regarded for all purposes as an Ohio document, and the validity and construction thereof shall be determined and governed by the laws of the State of Ohio.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held illegal, invalid or unenforceable or in conflict with the Act or other applicable law, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held illegal, invalid, unenforceable or in conflict shall not be affected thereby.

18.    **Notices**.  All notices, requests and demands herein required or permitted to be given or made shall be deemed to be effectively served and delivered when delivered personally, or if given by telephone facsimile, when the facsimile is delivered to the recipient or when the sending machine properly issues a time-stamped confirmation that the transmission was sent to the proper recipient, or if sent by mail, three (3) days after being deposited in the United States mail in a sealed envelope, postage prepaid, and

    if intended for the Company, addressed to the Company at the principal office of the Company,

    if intended for a Manager, addressed to the Manager in care of the Company at the principal office of the Company, and

CONFIDENTIAL

if intended for the Member, addressed to the Member at the Member's address appearing below the Member's name on the signature page hereof,

or to such other person and/or at such other address designated by written notice given to the Company, all Managers and the Member in accordance herewith.

19.    **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall be deemed one Agreement.

20.    **Interpretation**.  The use of the masculine, feminine or neuter gender and the use of the singular and plural shall not be given the effect of any exclusion or limitation herein; and the use of the word "person" or "party" shall mean and include any individual, trust, corporation, partnership, limited liability company or other entity.   The words "hereof," "herein," "hereunder," and similar words refer to this Agreement as a whole. References to Sections refer to Sections of this Agreement, except for references to Sections of the Code or as except as the context otherwise provides.  All Section titles and captions contained herein are for convenient reference only and shall not be construed as confining or limiting in any way the scope or intent of the provisions of this Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date written above.

NMC ACQUISITION LLC, a Delaware limited liability company

By: _____

Name: ANDREW H. KAZNOW

Its: MANAGING MEMBER

Address:    161 Greenfield Street
            Tiffin, Ohio  44883

NMLLC 00204

111997.1 049579-13175                            - 7 -

**CONFIDENTIAL**

# EXHIBIT L

## BILL OF SALE

FOR VALUE RECEIVED, NMC Acquisition LLC, a Delaware limited liability company (the "Seller"), does hereby assign, transfer, sell and convey to National Machinery LLC, an Ohio limited liability company (the "Buyer"), all of the Seller's rights, assets and properties, including, without limitation, all of its accounts, machinery, equipment, fixtures, inventory, goods, chattel paper, deposit accounts, tax refunds, general intangibles, contract rights, instruments, documents and all other personal property or interests in personal property; all books and records pertaining to any of the foregoing; and all insurance policies insuring any of the foregoing; provided, however, that this Bill of Sale specifically excludes and does not convey to the Buyer any of the Seller's liens, claims, mortgages, security interests, credits, notes, loans, and causes of action that Seller may have against The National Machinery Company, an Ohio corporation, or any of its subsidiaries arising under that certain Credit Agreement, dated as of November 6, 1998, among The National Machinery Company, as Borrower, The First National Bank of Chicago, as agent, and certain other financial institutions named therein, as lenders, as the same was amended, supplemented or modified from time to time, or arising under any other agreement, mortgage, pledge, guaranty or document executed in connection with such Credit Agreement;

TO HAVE AND TO HOLD unto the Buyer and its assigns forever.

This Bill of Sale has been delivered in exchange for the Seller receiving one hundred percent (100%) of the membership interests of the Buyer.

This Bill of Sale does not convey, and the Buyer shall not assume, directly or indirectly, any liabilities or obligations of the Seller of any kind whatsoever and all of such liabilities and obligations are hereby disclaimed by the Buyer absolutely.

Dated: March 5, 2002

NMC ACQUISITION LLC

By: _____
Name: ANDREW H. KALNOW
Its: MANAGING MEMBER

NMLLC 00205

**CONFIDENTIAL**

110522.2 049579-13175

# EXHIBIT M

# GLOBAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Global Settlement Agreement and Mutual Release (hereinafter referred to as the "Agreement") is made and entered into as of the 4th day of October 2002, by and among Andrew H. Kalnow ("A.Kalnow"), Carl F. Kalnow ("C.Kalnow"), Gertrude K. Chisholm ("Chisholm"), Loretta K. Kaplan ("Kaplan"), National Machinery LLC, an Ohio limited liability company ("NM LLC"), and NMC Acquisition LLC, a Delaware limited liability company ("Acquisition"; together with A.Kalnow, C.Kalnow, Chisholm, Kaplan and NM LLC, the "Kalnow Parties"), and Citicorp Venture Capital, Ltd, a New York corporation ("CVC"), CCT Partners V, L.P., a Delaware limited partnership ("CCT"), Charles E. Corpening ("Corpening"), and David F. Thomas ("Thomas"; together with CVC, CCT, and Corpening, the "CVC Parties"), Steven A. Anderson ("Anderson"), NMC Holding Company, a Delaware corporation ("Holding"), and The National Machinery Company, an Ohio corporation ("NMC"; together with Holding, the "NMC Parties"). The Kalnow Parties, the CVC Parties, Anderson and the NMC Parties are sometimes referred to collectively as the "Parties" or individually as a "Party."

## R E C I T A L S:

A.    On January 23, 2002, certain of the Kalnow Parties filed a shareholders' derivative action and other common law claims against the CVC Parties and NMC Parties in the Court of Common Pleas of Seneca County, Ohio. The NMC Parties were subsequently dismissed as defendants, and the action was removed to the United States District Court for the Northern District of Ohio, Western Division, where it continues to be pending as Andrew H. Kalnow et al. v. Citicorp Venture Capital, Ltd., et al., Case No. 3:02CV7272 (the "Federal Action"). The CVC Parties have filed counterclaims and a third-party complaint in the Federal Action against certain of the Kalnow Parties.

B.    On February 26, 2002, pursuant to a Notice of Disposition of Collateral dated February 13, 2002, Acquisition conducted a public foreclosure sale (the "Public Sale") of all personal property assets of NMC and certain of its subsidiaries, other than equity securities and other financial assets (the "NMC Personal Property"). Acquisition purchased the NMC Personal Property for $16 million at the Public Sale and subsequently contributed the NMC Personal Property to its subsidiary, NM LLC.

C.    On March 20, 2002, Acquisition filed a complaint against NMC and Marguerite Bernard, the Seneca County Treasurer, in the Court of Common Pleas of Seneca County, Ohio, alleging breach of the Credit Agreement and seeking to foreclose upon a certain Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases (the "Mortgage") held by Acquisition on real property owned by NMC in Tiffin, Ohio (the "Real Property"). The litigation initiated by Acquisition's complaint is pending as NMC Acquisition LLC v. The National Machinery Company and Marguerite Bernard, Case No. 54337 (the "Foreclosure Action"). As used herein, "Credit Agreement" means that certain Credit Agreement, dated as of November 6, 1998, by and among NMC, as Borrower, the institutions from time to time party thereto as lenders (the "Lenders"), and Bank One, NA (formerly known

142467.8 049579-21124

**CONFIDENTIAL**

**NMLLC 01239**

as The First National Bank of Chicago), as contractual representative of the Lenders, as amended.

D.    On May 20, 2002, Acquisition filed a Petition For Appointment of a Receiver with respect to Holding in the Court of Chancery of the State of Delaware in and for New Castle County. That action is pending as In re NMC Holding Company, C.A. No. 19634 (the "Delaware Action").

E.    On May 20, 2002, Acquisition filed a Verified Complaint at Law against Holding in the Circuit Court of Cook County, Illinois seeking to recover from Holding based on an alleged breach of a guaranty. That action is pending as NMC Acquisition LLC v. NMC Holding Company, Case No. 02 L 6398 (the "Illinois Action").

F.    The CVC Parties and Anderson have disputed all of the claims brought by Kalnow Parties in the Federal Action. The NMC Parties have disputed Acquisition's right to the relief sought in the Foreclosure Action, the Delaware Action and the Illinois Action. The applicable Kalnow Parties have disputed the counterclaims and third-party claims brought by the CVC Parties in the Federal Action.

G.    The Parties desire to settle and compromise all disputes, controversies, claims and actions that exist between them on the terms and conditions herein provided, without any admission of wrongdoing by any Party, in order to avoid the burdens, uncertainty, inconvenience and expense of further litigation.

NOW, THEREFORE, the Parties, intending to be legally bound, agree as follows:

1.    Recitals. The recitals set forth hereinabove are adopted and incorporated herein as a part of the Parties' agreement.

2.    Dismissal of the Federal Action. Based in part on the accuracy of the representations contained in Sections 12, 13 and 14, the CVC Parties, Anderson and the Kalnow Parties shall, on or before October 15, 2002, secure the dismissal with prejudice of the Federal Action; provided, however, that in connection with said dismissal, neither this Agreement nor any other document shall be filed with the Court in which the terms of the Parties' agreement to settle, other than the fact that the Parties have agreed to dismiss the Federal Action, is made public or of record, unless such a filing is ordered by the Court, in which case the document required to be filed shall be filed under seal. The Parties agree to bear their own court costs and attorney's fees incurred in the Federal Action. Notwithstanding the foregoing, the Parties agree that the Court presiding over the Federal Action shall retain jurisdiction solely for the purposes of enforcing the terms of this Agreement.

3.    Dismissal of the Delaware Action. Based in part on the accuracy of the representations contained in Sections 12, 13 and 14, the Parties shall, on or before October 15, 2002, secure the dismissal with prejudice of the Delaware Action; provided, however, that in connection with said dismissal, neither this Agreement nor any other document shall be filed with the Court in which the terms of the Parties' agreement to settle, other than the fact that the Parties have agreed to dismiss the Delaware Action, is made public or of record, unless such a

CONFIDENTIAL

NMLLC 01240

filing is ordered by the Court, in which case the document required to be filed shall be filed under seal. The Parties agree to bear their own court costs and attorney's fees incurred in the Delaware Action.

4. <u>Consent to Judgment in Foreclosure Action</u>. Based in part on the representations and warranties set forth in Section 12, NMC consents to the entry of a judgment against it in the Foreclosure Action, which judgment will hold that the indebtedness described on **Schedule 1** is immediately due and payable by NMC to Acquisition, that the Mortgage is owned by Acquisition and constitutes a valid first mortgage on the Real Property, and that Acquisition has an immediate right to foreclosure upon the Mortgage. The Parties will cause the judgment to be entered by the Court by not later than October 15, 2002. NMC agrees to cooperate with Acquisition in any post-judgment proceedings that Acquisition may undertake to foreclose the Mortgage on the Real Property.

5. <u>Consent to Judgment in Illinois Action</u>. Based in part on the representations and warranties set forth in Section 12, Holding consents to the entry of a judgment against it in the Illinois Action, which judgment will hold that that Holding is a payment guarantor of the indebtedness described on **Schedule 1** and that the payment of that indebtedness is immediately due and owing by Holding to Acquisition without condition. The Parties will cause the judgment to be entered by the Court by not later than October 15, 2002. Subject to the terms of Section 18(d) of this Agreement, Holding agrees to cooperate with Acquisition in any post-judgment proceedings that Acquisition may undertake to attach any assets of Holding or otherwise to enforce its judgment against Holding and its assets.

6. <u>Sale of Assets by Holding</u>.

(a) In partial satisfaction of the judgment to be entered against it in the Illinois Action, and in furtherance of Holding's obligations pursuant to the Guaranty Agreement (as defined in the Credit Agreement), Holding hereby sells, conveys, assigns, transfers and sets over unto Acquisition all right, title and interest of Holding in and to any property, whether real or personal, tangible or intangible, payment entitlements, dividends and contract rights, other than (i) the capital stock of NMC and (ii) any liability insurance policies providing coverage (including litigation expenses) for product liability, environmental and other claims asserted against NMC, Holding and/or their present and former officers, directors, employees, agents and/or predecessors in interest. Without limiting the generality of the foregoing, the assigned properties shall include all Holding's right, title and interest in any and all federal, state and local tax refunds ("Tax Refunds") that may be due to Holding or to the members of any affiliated group for which Holding acts or has acted as the common parent. Holding does not convey, and Acquisition does not assume, any liabilities or obligations associated with the assigned properties and rights or otherwise.

(b) In the event that the sale or assignment of any asset by Holding provided for in Section 6(a) requires the consent of a third party that has not been obtained or is prohibited by law, the sale or conveyance shall not be deemed to occur until the consent of the third party has been obtained or applicable law permits the sale or conveyance. Subject to the terms of Section 9, Holding will take all actions reasonably requested by Acquisition to obtain any required third party consents. In the event that applicable law prohibits the assignment of any Tax Refund or

**CONFIDENTIAL**

**NMLLC 01240A**

other right or property, Holding will take all actions reasonably requested by Acquisition to place such Tax Refund, right or property into the possession, control and ownership of Acquisition in a manner consistent with applicable law in order to effect fully the intent of Section 6(a).

(c)  Without limiting the generality of Section 6(b), and subject to the terms of Section 9 and Section 6(d), concurrently with the execution of this Agreement Holding will

(i)     appoint Robert J. Foster ("Foster") the Executive Vice President of Holding and authorize Mr. Foster to sign and file by, for and in the name of Holding (1) a 2001 Consolidated U.S. Corporation Income Tax Return on Form 1120 for Holding and the affiliated group for which Holding is the common parent (the "2001 Tax Return"), (2) a 2001 Corporation Application for Tentative Refund on Form 1139, (3) a Power of Attorney and Declaration of Representative on Form 2848 appointing Deloitte & Touche, and such other persons as may be designated by Acquisition as Holding's attorney in fact for tax matters, and (4) the Application on Form 8302 referenced in subpart (iv) below;

(ii)    take such actions and sign and deliver to Acquisition all documents that Acquisition requests in order for Holding to open a deposit account at Fifth Third Bank (the "Refund Account");

(iii)   enter into a Blocked Account Agreement, in the form of **Exhibit A**, with respect to the Refund Account, granting Acquisition a security interest in the Refund Account and giving Acquisition the right, without further notice to or the consent of Holding, to sweep, collect and retain all funds deposited into the Refund Account; and

(iv)    sign and deliver to Acquisition for filing an Electronic Funds Transfer of Tax Refund of $1 Million or More on Form 8302 designating the Refund Account as the account into which all tax refunds will be transferred.

(d)  Holding's obligations under Section 6(c) of this Agreement shall be conditioned on and subject to Deloitte & Touche's signing of the 2001 Tax Return as income tax preparer.

7.   Sale of Real Property by NMC.  In partial satisfaction of the judgment to be entered against it in the Foreclosure Action, and subject to the terms of Section 9, concurrently with its execution of this Agreement, NMC will execute and deliver to Acquisition an undated Deed In Lieu of Foreclosure Agreement, in the form of **Exhibit B**, pursuant to which NMC will convey the Real Property to Acquisition's affiliate, NMC Real Estate LLC, an Ohio limited liability company.

8.   Sale of Subsidiary Stock and Other Assets by NMC.

(a)  In partial satisfaction of the judgment to be entered against it in the Foreclosure Action, NMC hereby sells, conveys, assigns, transfers and sets over unto Acquisition all right, title and interest of NMC in and to all of its remaining assets, other than the Real Property, including, without limitation, all capital stock of and other equity interests in The National Machinery Company – Michigan, The National Machinery Company – Europe, Inc., NME National Machinery Europe GmbH, NMC International, Inc., Nationwide Machinery U.K. Limited, and National Machinery Asia Company, Ltd., (collectively, the "Subsidiary Stock").

CONFIDENTIAL          NMLLC 01241

(b) To the extent that the conveyance of any assets or Subsidiary Stock requires the consent of any third party or would trigger a right of first refusal, right of dissociation or other similar right in favor of any third party, the conveyance of such asset or Subsidiary Stock will not be effective unless and until such third party consent or waiver of rights has been obtained. NMC will, subject to the terms of Section 9, take all actions reasonably requested by Acquisition in order to obtain any such consents and waivers. Prior to such consents and waivers being obtained, and subject to the terms of Section 9, NMC will take all action reasonably requested by Acquisition (including the liquidation of subsidiaries and the granting to Acquisition of proxies to vote the Subsidiary Stock) to place such assets and Subsidiary Stock, and any proceeds or other economic benefit thereof, into the possession, control and ownership of Acquisition in a manner consistent with applicable law in order to effect fully the intent of Section 8(a).

9.  Professional Services.  All professional services required to effectuate the transfer of the NMC Parties' assets pursuant to Sections 6, 7 and 8 of this Agreement shall be performed by professionals retained by the Kalnow Parties at the Kalnow Parties' expense. Notwithstanding the foregoing, the NMC Parties, Anderson and the CVC Parties will be solely responsible for the fees and expenses of their own attorneys incurred in the negotiation and preparation of this Agreement and the documents contemplated to be executed concurrently with this Agreement.

10. Releases.

(a) The Kalnow Parties, and each of them, for themselves and on behalf of their past and present stockholders, directors, officers, partners, employees, agents, representatives, attorneys; and their past and present direct and indirect parents, subsidiaries (whether or not wholly-owned), divisions and affiliates; and their predecessors, successors and assigns; and the participants and beneficiaries on whose behalf they act (the "Kalnow Releasing Parties"), irrevocably and unconditionally and generally remise, release and forever discharge the CVC Parties and Anderson, and each of them, and each of their respective past and present stockholders, directors, officers, partners, employees, agents, representatives, attorneys; and each of their respective past and present direct and indirect parents, subsidiaries (whether or not wholly-owned), divisions and affiliates; and their predecessors, successors and assigns (the "CVC and Anderson Released Parties"), from any and all manner of agreements, promises, complaints, grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the Kalnow Parties, or any of them, ever had, now have or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations which are the subject matter of, or which could have been asserted in, the Federal Action and which relates in any way to NMC or Holding. It is expressly understood and agreed that this Agreement shall act as a complete bar to any such claim, demand, grievance or action of any kind or nature whatsoever brought, or which could have been brought, by the Kalnow Releasing Parties against the CVC and Anderson Released Parties; provided, however, that this Agreement shall not prohibit the Kalnow Releasing Parties from bringing an action in good faith to enforce the terms of this Agreement.

(b) The Kalnow Releasing Parties, and each of them, irrevocably and unconditionally and generally remise, release and forever discharge each of the respective past and present

CONFIDENTIAL

NMLLC 01242

stockholders (other than Holding), directors, officers, partners, employees, agents, representatives, and attorneys of the NMC Parties from any and all manner of agreements, promises, complaints, grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the Kalnow Parties, or any of them, ever had, now have or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations which are the subject matter of, or which could have been asserted in, the Federal Action and which relates in any way to NMC or Holding. It is expressly understood and agreed that this Agreement shall act as a complete bar to any such claim, demand, grievance or action of any kind or nature whatsoever brought, or which could have been brought, by the Kalnow Releasing Parties against the respective past and present stockholders (other than Holding), directors, officers, partners, employees, agents, representatives, and attorneys of the NMC Parties, including any claim, demand, grievance or action based on indebtedness owed to Acquisition or NM LLC by NMC or Holding or their respective subsidiaries; provided, however, that this Agreement shall not prohibit the Kalnow Releasing Parties from bringing an action in good faith to enforce the terms of this Agreement. Notwithstanding the foregoing, nothing in this Section shall release or discharge NMC or Holding from any indebtedness related to borrowed money or other financial accommodations that it may owe directly or on account of a guaranty to Acquisition or NM LLC or release any lien, mortgage or security interest relating thereto.

(c) The Kalnow Releasing Parties, and each of them, irrevocably and unconditionally and generally remise, release and forever discharge each of the NMC Parties from any and all manner of agreements, promises, complaints, grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the Kalnow Parties, or any of them, ever had, now have or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations that relates in any way to NMC or Holding, except that the Kalnow Releasing Parties shall not release or discharge NMC or Holding from any indebtedness related to borrowed money or other financial accommodations that it may owe directly or on account of a guaranty to Acquisition or NM LLC or release any lien, mortgage or security interest relating thereto. This Agreement shall not prohibit the Kalnow Releasing Parties from bringing an action in good faith to enforce the terms of this Agreement.

(d) The CVC Parties and Anderson, and each of them, for themselves and on behalf of each of their past and present stockholders, directors, officers, partners, employees, agents, representatives, attorneys; and their past and present direct and indirect parents, subsidiaries (whether or not wholly-owned), divisions and affiliates; and their predecessors, successors and assigns (the "CVC and Anderson Releasing Parties"), irrevocably and unconditionally and generally remise, release and forever discharge, the Kalnow Parties, and each of them, on behalf of their past and present stockholders, directors, officers, partners, employees, agents, trusts, representatives, attorneys; and their past and present direct and indirect parents, subsidiaries (whether or not wholly-owned), divisions and affiliates; and their predecessors, successors and assigns; and the participants and beneficiaries on whose behalf the Kalnow Parties act (the "Kalnow Released Parties"), from any and all manner of agreements, promises, complaints,

142467.8 049579-21124

6

CONFIDENTIAL    NMLLC 01243

grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the CVC Parties and Anderson, or any of them, ever had, now has or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations which are the subject matter of, or which could have been asserted in, the Federal Action and which relate in any way to NMC or Holding. It is expressly understood, and agreed that this Agreement shall act as a complete bar to any such claim, demand, grievance or action of any kind or nature whatsoever brought, or which could have been brought, by the CVC and Anderson Releasing Parties against the Kalnow Released Parties; provided, however, that this Agreement shall not prohibit the CVC and Anderson Releasing Parties from bringing an action in good faith to enforce the terms of this Agreement.

(e) The CVC Parties, Anderson and NMC Parties covenant and agree, on behalf of themselves and each of the CVC, Anderson and NMC Releasing Parties, to execute and deliver a Mutual General Release, in the form of **Exhibit C** hereto, in favor of the stockholders of NMC or Holding listed on **Schedule 2**, or any of them, upon such stockholder's execution and delivery of the same Mutual General Release to the CVC Parties, Anderson and NMC Parties.

(f) The NMC Parties, and each of them, for themselves and on behalf of each of their past and present stockholders, directors, officers, partners, employees, agents, representatives, and attorneys; and their past and present direct and indirect subsidiaries (whether or not wholly-owned) and divisions; and their predecessors, successors and assigns (the "NMC Releasing Parties"), irrevocably and unconditionally and generally remise, release and forever discharge, the Kalnow Released Parties and the CVC and Anderson Released Parties from any and all manner of agreements, promises, complaints, grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the NMC Releasing Parties, or any of them, ever had, now has or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations which relate in any way to NMC or Holding. It is expressly understood and agreed that this Agreement shall act as a complete bar to any such claim, demand, grievance or action of any kind or nature whatsoever brought, or which could have been brought, by the NMC Releasing Parties against the CVC Released Parties or the Kalnow Released Parties or Anderson; provided, however, that this Agreement shall not prohibit the NMC Releasing Parties from bringing an action in good faith to enforce the terms of this Agreement.

(g) The NMC Releasing Parties and the CVC and Anderson Releasing Parties hereby irrevocably and unconditionally and generally remise, release and forever discharge Foster from any and all manner of agreements, promises, complaints, grievances, liabilities, obligations, damages, claims and demands of any kind or nature whatsoever, in law or equity, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, which the NMC Releasing Parties and the CVC and Anderson Releasing Parties, or any of them, ever had, now has or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever, from the beginning of the world until the date of this Agreement, arising from or related to any matters or allegations which relate in any way to Foster's conduct and actions in

**CONFIDENTIAL**

NMLLC 01244

the course of his appointment as an Executive Vice President of Holding pursuant to Section 6(c)(i) of this Agreement, including, without limitation, his execution, delivery and filing on behalf of Holding the documents referenced in Section 6(c)(i) and (c)(iv) of this Agreement.

11. Closing Deliveries.  Concurrently with their execution and delivery of this Agreement, the Parties will execute and deliver, or cause to be executed and delivered, the documents, affidavits and agreements described on **Schedule 3**.

12. Representations and Warranties of the Kalnow Parties.  The Kalnow Parties, jointly and severally, hereby represent and warrant to the CVC Parties and NMC Parties as of the date hereof as follows:

(a) The Kalnow Parties have not assigned, or in any way transferred, in whole or in part, any claim which they, or any of them, may have or have had against the CVC Parties, Anderson or the NMC Parties, or any of them, except among the Kalnow Parties.

(b) The Kalnow Parties have read fully and understand the provisions set forth in this Agreement; and they have discussed the provisions contained in, and the transactions contemplated by, this Agreement with their professional advisors.

(c) The Kalnow Parties, and any individual(s) executing this Agreement on behalf of the Kalnow Parties, or any of them, have full power and authority to execute and deliver this Agreement on their behalf and on behalf of all other parties on whose behalf they purport to act. The Kalnow Parties have full power and authority to perform the covenants on their part herein contained and to consummate the transactions contemplated hereby. When fully executed and delivered, this Agreement and the other agreements contemplated herein to be delivered by the Kalnow Parties, or any of them, will constitute valid and binding obligations of the Kalnow Parties that are signatory thereto, enforceable against them in accordance with its respective terms.

(d) The execution and delivery of this Agreement and the performance of or compliance with the terms and provisions of this Agreement will not violate, conflict with, or result in a breach of any of the terms, conditions or provisions of any law, statute, regulation or order, or any agreement or any other restriction of any kind or character, to which the Kalnow Parties, or any of them, are a party or by which they, or any of them, may be bound.

(e) No statement, promise, representation or other inducement for this Agreement has been made to the Kalnow Parties by anyone except as specifically set forth in this Agreement. The Kalnow Parties have executed this Agreement freely and voluntarily, and without reliance upon any statement or representation by anyone except as specifically set forth herein.

(f) To the knowledge and belief of Acquisition, the Public Sale was conducted in compliance in all respects with the requirements of all applicable laws.

(g) To the knowledge and belief of Acquisition, based in part upon its examination of records acquired from NMC, the calculation and explanation of the indebtedness owed by NMC and Holding to Acquisition as of August 31, 2002, and set forth on **Schedule 1** hereto (the "Current Indebtedness") is accurate, true, correct, and complete.  No Kalnow Party has received

CONFIDENTIAL

NMLLC 01245

any payment with respect to, or agreed to compromise any portion of, the Current Indebtedness subsequent to August 31, 2002, except as provided in this Agreement.

(h) Based on its review of the records of NMC and Holding, Acquisition believes that the aggregate fair value of the Subsidiary Stock, Tax Refunds, Real Property, and any and all other assets of the NMC Parties and their subsidiaries sold, conveyed, assigned, transferred or set over to the Kalnow Parties, or any of them, under Sections 6, 7 and 8 of this Agreement (the "NMC Parties Transferred Assets") does not exceed the value of the Current Indebtedness. Based on its review of the records of NMC and Holding, Acquisition believes that the aggregate fair value of the NMC Personal Property plus the fair value of the NMC Transferred Assets does not exceed the value of the Current Indebtedness plus sixteen million dollars ($16,000,000).

(i) A proposal of settlement or an amended proposal of settlement to dental care providers, substantially in one of the forms attached as **Schedule 4-A** hereto, has been sent by NM LLC to the health care providers indicated on **Schedule 4-B**. Based on its review of the records of NMC and Holding in its possession, NM LLC believes that the health care providers listed on **Schedule 4-B** constitute substantially all of the unreimbursed health care providers that provided services to NMC employees during 2001 that were reimbursable under NMC's health care plan. NM LLC believes that the health care providers indicated as "Settled" on **Schedule 4-B** have accepted NM LLC's proposal of settlement and NM LLC has received executed settlement agreements substantially in the form of **Schedule 4-A** from each of them. Based on its review of the records of NMC and Holding in its possession, NM LLC believes that the aggregate amount of the unreimbursed claims that were reimbursable by NMC under NMC's health care plan and have not been settled by NM LLC, including but not limited to claims of health care providers and individual NMC employees, does not exceed four hundred fifty thousand dollars ($450,000).

(j) Subject to the truth and accuracy of the representation made by the NMC Parties in Section 14(j), NM LLC represents that it has taken action to become the sponsoring employer of both The National Machinery Company Revised Retirement Plan and Trust and the National Machinery Employee Savings and Protection Plan (collectively, the "Plans"); that it is now the plan sponsor of each of those Plans for purposes of Titles I and IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and that under Title IV of ERISA, NM LLC has assumed liability for any underfunding of The National Machinery Company Revised Retirement Plan and Trust. No Kalnow Party makes any representation or warranty with respect to the existence or nonexistence of any other person's liability under the Plans.

(k) To the knowledge of NM LLC, the 2001 Tax Return was prepared by Deloitte & Touche, based upon books and records of Holding and NMC supplied to Deloitte & Touche by NM LLC, Holding and NMC. Based upon its review of the records of Holding and NMC in its possession, NM LLC believes that the 2001 Tax Return is correct and complete.

(l) None of the Kalnow Parties is aware of any information contrary to the representations and warranties contained in Sections 12(f) through 12(k) or that would render any of the representations and warranties contained in Sections 12(f) through 12(k) inaccurate.

**CONFIDENTIAL**

**NMLLC 01246**

13. <u>Representations and Warranties of the CVC Parties to the Kalnow Parties</u>. The CVC Parties jointly and severally, hereby represent and warrant to the Kalnow Parties as of the date hereof as follows:

(a)  The CVC Parties have not assigned, or in any way transferred, in whole or in part, any claim which they, or any of them, may have or have had against the Kalnow Parties, or any of them.

(b)  The CVC Parties have read fully and understand the provisions set forth in this Agreement; and they have discussed the provisions contained in, and the transactions contemplated by, this Agreement with their professional advisors.

(c)  The CVC Parties and any individual(s) executing this Agreement on behalf of such Parties, or any of them, have full power and authority to execute and deliver this Agreement on their behalf and on behalf of all other parties on whose behalf they purport to act.  The CVC Parties have full power and authority to perform the covenants on their part herein contained and to consummate the transactions contemplated hereby.  When fully executed and delivered, this Agreement and the other agreements contemplated herein to be delivered by the CVC Parties, or any of them, will constitute valid and binding obligations of the CVC Parties that are signatory thereto, enforceable against them in accordance with its respective terms.

(d)  The execution and delivery of this Agreement and the performance of or compliance with the terms and provisions of this Agreement will not violate, conflict with, or result in a breach of any of the terms, conditions or provisions of any law, statute, regulation or order, or any agreement or any other restriction of any kind or character, to which the CVC Parties, or any of them, are a party or by which they, or any of them, may be bound.

(e)  No statement, promise, representation or other inducement for this Agreement has been made to the CVC Parties by anyone except as specifically set forth in this Agreement.  The CVC Parties have each executed this Agreement freely and voluntarily, and without reliance upon any statement or representation by anyone except as specifically set forth herein.

(f)  To the actual knowledge of the CVC Parties, since December 31, 2001, none of the CVC Parties, Anderson or the NMC Parties has taken any action or been a party to any communication with a taxing authority that could reasonably be expected to affect the tax liability of Holding and its consolidated group for 2001 or for any prior tax year.  Since December 31, 2001, Holding has not, to the actual knowledge of any CVC Party, received any communications from the Internal Revenue Service concerning the liability of any NMC Party for taxes with respect to 2001 or any prior tax year.

(g)  To the knowledge of any CVC Party, since December 23, 2001, Holding has not sold, assigned, transferred, encumbered, granted a security interest in, or otherwise granted a third party an interest in or rights with respect to any property, assets or rights of Holding.

(h)  To the knowledge of any CVC Party, NMC has not granted any mortgage or encumbrance with respect to the Real Property or any portion thereof other than the Mortgage.  Since December 23, 2001, NMC has not entered into any lease with respect to the Real Property or otherwise granted any third party rights in the Real Property.

**CONFIDENTIAL**

**NMLLC 01247**

(i) To the knowledge of any CVC Party, since December 23, 2001, NMC has not sold, conveyed, transferred, pledged, encumbered or otherwise assigned any of the Subsidiary Stock. To the knowledge of any CVC Party, since December 23, 2001, NMC has not entered into or amended any shareholders agreement or similar agreement relating in any way to any of the Subsidiary Stock. To the knowledge of any CVC Party, since December 23,2001, NMC has not granted any third party a right of first refusal, a preemptive right, an option, warrant or similar right of purchase or other substantive right with respect to any of the Subsidiary Stock or with respect to the capital stock of any direct or indirect subsidiary of NMC. Since December 23, 2001, to the actual knowledge of any CVC Party, no NMC Party has received communications from any third party other than the Kalnow Parties with respect, to the Subsidiary Stock.

(j) To the knowledge of the CVC Parties, all persons who were at any time both an affiliate of the Kalnow Parties and a stockholder of Holdings are listed on **Schedule 2**.

14. <u>Representations and Warranties of Anderson and the NMC Parties to the Kalnow Parties</u>. Anderson and the NMC Parties, jointly and severally, hereby represent and warrant to the Kalnow Parties as of the date hereof as follows:

. (a) Anderson and the NMC Parties have not assigned, or in any way transferred, in whole or in part, any claim which they, or any of them, may have or have had against the Kalnow Parties, or any of them.

(b) Anderson and the NMC Parties have read fully and understand the provisions set forth in this Agreement; and they have discussed the provisions contained in, and the transactions contemplated by, this Agreement with their professional advisors.

(c) Anderson and the NMC Parties, and any individual(s) executing this Agreement on behalf of such Parties, or any of them, have full power and authority to execute and deliver this Agreement on their behalf and on behalf of all other parties on whose behalf they purport to act. Anderson and the NMC Parties have full power and authority to perform the covenants on their part herein contained and to consummate the transactions contemplated hereby. When fully executed and delivered, this Agreement and the other agreements contemplated herein to be delivered by Anderson and the NMC Parties, or any of them, will constitute valid and binding obligations of Anderson and the NMC Parties that are signatory thereto, enforceable against them in accordance with its respective terms.

(d) The execution and delivery of this Agreement and the performance of or compliance with the terms and provisions of this Agreement will not violate, conflict with, or result in a breach of any of the terms, conditions or provisions of any law, statute, regulation or order, or any agreement or any other restriction of any kind or character, to which Anderson or the NMC Parties, or any of them, are a party or by which they, or any of them, may be bound.

(e) No statement, promise, representation or other inducement for this Agreement has been made to Anderson or the NMC Parties by anyone except as specifically set forth in this Agreement. Anderson and the NMC Parties have each executed this Agreement freely and voluntarily, and without reliance upon any statement or representation by anyone except as specifically set forth herein.

**CONFIDENTIAL**

**NMLLC 01248**

(f) To the knowledge of Anderson and the NMC Parties, since December 31, 2001, none of the CVC Parties, Anderson or the NMC Parties has taken any action or been a party to any communication with a taxing authority that could reasonably be expected to affect the tax liability of Holding and its consolidated group for 2001 or for any prior tax year. Since December 31, 2001, Holding has not, to the knowledge of Anderson or any NMC Party, received any communications from the Internal Revenue Service concerning the liability of any NMC Party for taxes with respect to 2001 or any prior tax year.

(g) To the knowledge of Anderson and the NMC Parties, since December 23, 2001, Holding has not sold, assigned, transferred, encumbered, granted a security interest in, or otherwise granted a third party an interest in or rights with respect to any property, assets or rights of Holding.

(h) To the knowledge of Anderson and the NMC Parties, NMC has not granted any mortgage or encumbrance with respect to the Real Property or any portion thereof other than the Mortgage. To the knowledge of Anderson and the NMC Parties, since December 23, 2001, NMC has not entered into any lease with respect to the Real Property or otherwise granted any third party rights in the Real Property.

(i) To the knowledge of Anderson and the NMC Parties, since December 23, 2001, NMC has not sold, conveyed, transferred, pledged, encumbered or otherwise assigned any of the Subsidiary Stock. To the knowledge of Anderson and the NMC Parties, since December 23, 2001, NMC has not entered into or amended any shareholders agreement or similar agreement relating in any way to any of the Subsidiary Stock. To the knowledge of Anderson and the NMC Parties, since December 23, 2001, NMC has not granted any third party a right of first refusal, a preemptive right, an option, warrant or similar right of purchase or other substantive right with respect to any of the Subsidiary Stock or with respect to the capital stock of any direct or indirect subsidiary of NMC. Since December 23, 2001, to the actual knowledge of Anderson or any NMC Party, no NMC Party has received communications from any third party other than the Kalnow Parties with respect, to the Subsidiary Stock.

(j) Foster has been duly appointed as an Executive Vice President of Holding and has the corporate power and authority to execute, deliver and file with all applicable taxing authorities on behalf of Holding the documents referenced in Section 6(c)(i) above. NM LLC's election to become a sponsoring employer of the Plans has been approved, authorized and ratified by the board of directors of NMC.

(k) To the best knowledge of the Anderson and the NMC Parties, all persons who were at any time both an affiliate of the Kalnow Parties and a stockholder of Holdings are listed on **Schedule 2**.

15. <u>Dishonored Checks</u>.  Concurrently with the execution and delivery of this Agreement by the Kalnow Parties, the Kalnow Parties will cause Foster, the former chief financial officer of NMC, and Patrick A. Bowers, the former controller of NMC, to deliver to the CVC Parties an affidavit substantially in the form of **Exhibit D**. No Kalnow Party shall issue any checks, drafts, notes or other financial instruments in the name of NMC or Holding. The Kalnow Parties shall

CONFIDENTIAL

NMLLC 01249

use their best efforts to ensure that any pre-printed checks or other financial instruments of NMC or Holding in their possession or control are destroyed or delivered to the NMC Parties.

16. <u>Liability Denied</u>. The Parties acknowledge and agree that they have entered into this Agreement solely as a compromise of disputed claims and to avoid the further burdens, uncertainty, inconvenience and expense of continued litigation. Nothing in this Agreement constitutes, or shall operate or be construed as, an admission of wrongdoing by any Party in connection with the Federal Action, the Foreclosure Action, the Delaware Action or the Illinois Action, or in any other proceeding or matter of any kind. This Agreement shall not be admissible for any purpose in the Federal Action, the Foreclosure Action, the Delaware Action or the Illinois Action or in any other proceeding of any kind, except to the extent necessary to enforce this Agreement or as otherwise required by law.

17. <u>Confidentiality</u>. Each Party acknowledges and agrees that the terms of this Agreement are confidential and shall not be disclosed to any person or entity except as provided in this Section 17. Notwithstanding the foregoing: (a) the terms of this Agreement may be disclosed to a Party's shareholders, directors, officers, employees, accountants, attorneys or advisors, but only to the extent reasonably required to conduct the business affairs of the Party; (b) this provision does not prohibit or restrict any of the Parties (or their attorneys) from responding to any inquiry about this settlement or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the National Association of Securities Dealers, Inc. (NASD) or other governmental or self-regulatory organization; and (c) disclosure may be made as otherwise required by law. No Party shall issue or make, or permit any agent or affiliate to issue or make, any press release or public statement (including, but not limited to, any statement in response to an inquiry of a member of the press) with respect to the terms of the settlement.

18. <u>Post-Execution Cooperation</u>.

(a) The Parties shall each, without additional consideration, execute such further documents and do such further acts as may be reasonably requested to confirm or effect the transactions provided for herein. Without limiting the generality of the foregoing, following the date of this Agreement, the NMC Parties and each of the CVC Parties (solely in its capacity as a past or present officer, director, stockholder or agent of an NMC Party) and Anderson (solely in his capacity as a past or present officer, director, stockholder or agent of an NMC Party) will promptly execute such documents and do such further acts as the Kalnow Parties, or any of them, may request in order to better vest in the Kalnow Parties, or their designees, good, marketable and clear title to the assets of NMC and Holding including, without limitation, all Internet domain names, Tax Refunds, Subsidiary Stock and the Real Property, and all proceeds thereof.

(b) The CVC Parties, Anderson and NMC Parties shall reasonably cooperate with the Kalnow Parties in defending any actions brought by creditors of NMC or Holding against any Kalnow Party and in defending the validity and priority of the liens of Acquisition against, and the unencumbered title of its affiliates to, the assets of NMC.

(c) The Kalnow Parties shall reasonably cooperate with the CVC Parties and Anderson in defending any action brought against any CVC Party or Anderson relating to NMC or Holding, including but not limited to claims by creditors of NMC or Holding and the lawsuit entitled

**CONFIDENTIAL**

**NMLLC 01250**

*Baker v. The National Machinery Company, et al.*, No. 8:02CV7444, pending in the United States District Court for the Northern District of Ohio (the "Baker Lawsuit"). Without limiting the foregoing, in order to facilitate any such defense, the Kalnow Parties shall (i) provide the CVC Parties and Anderson with reasonable access to the books and records of NMC and Holding and (ii) provide the CVC Parties and Anderson with reasonable access to witnesses or potential witnesses who are currently employed by or affiliated with NM LLC or Acquisition. The Kalnow Parties shall provide access to witnesses under this Section 18(c) upon reasonable notice and at mutually convenient locations and times.

(d) In the event that any Party is obligated to provide cooperation to another Party pursuant to this Section 18, the reasonable out-of-pocket expenses incurred by the cooperating Party in rendering such assistance will be paid by the requesting Party. Upon the reasonable request of the cooperating Party, the requesting Party will provide and pay for the cost of legal counsel for the cooperating Party. The cooperating Party may alternatively elect to employ counsel of its own choice in connection with its required cooperation, provided that the expenses of such counsel shall be borne solely by the cooperating Party.

(e) No Party shall take any action, or suffer any Party within its control to take any action, which directly or indirectly impairs or delays the objects of this Agreement, including the Kalnow Parties' acquisition of good and clear title to all remaining assets of NMC and Acquisition, without the prior written consent of each other Party that would be adversely effected thereby.

(f) No Party shall knowingly take any affirmative action to cancel any insurance policy that belongs, or previously belonged, to NMC which provides coverage to any of the Kalnow Parties, the NMC Parties or to their respective past and present directors, officers, employees, subsidiaries and affiliates ("Potential Insureds") against product liability, environmental, and other liability claims relating to occurrences, claims arising or claims made prior to February 26, 2002, to the extent that such policies are in force on the date of this Agreement, and no Party shall knowingly assign or release the rights of any of the Potential Insureds with respect to such policies. Each Party represents and warrants to the other Parties that it has not knowingly taken any such actions since December 23, 2001. The Parties shall reasonably cooperate in pursuing and perfecting claims on behalf of the Potential Insureds. Notwithstanding the foregoing, nothing in this subsection shall compel any Party to expend any money, to forego any business opportunities, or to change the nature of its business practices in any way.

(g) NM LLC and Acquisition will provide the NMC Parties and the officers and directors of NMC and Holding with reasonable access to the books and records of NMC and Holding in its possession or control for purposes of responding to inquiries by government authorities or preparing filings or submissions that are reasonably required for judicial proceedings or by government authorities. All such books and records shall remain the sole property of NM LLC. NM LLC shall have no obligation to permit any person access to documents that NM LLC reasonably believes to be sensitive or confidential or to permit examinations for purposes that NM LLC reasonably believes to be adverse to its interests. The CVC Parties will reimburse NM LLC for all reasonable out-of-pocket costs incurred by NM LLC in connection with an examination of books and records pursuant to this subsection.

CONFIDENTIAL

NMLLC 01251

(h) To the extent reasonably required for the NMC Parties to defend the *Baker* Lawsuit and other legal proceedings, NM LLC and Acquisition will provide the NMC Parties and the officers and directors of NMC and Holding with access to witnesses or potential witnesses who are currently employed by or affiliated with NM LLC or Acquisition. NM LLC and Acquisition shall provide access to witnesses under this Section 18(h) upon reasonable notice and at mutually convenient locations and times.

19. Creditor and Claimant Inquiries. Each Party shall direct all inquiries and demands received by it, including, but not limited to, inquiries and demands from government agencies and creditors of NMC and Holding and/or any other claimants who assert claims against NMC, Holding or directors, officers or employees of NMC or Holding exclusively to: The National Machinery Company, P.O. Box 648, Tiffin, Ohio 44883. No Party shall suggest or intimate that any Party other than NMC or Holding is responsible for their debts or for any claims against NMC or Holding; in particular, and without limitation, (a) the Kalnow Parties shall not suggest or intimate to anyone that any CVC Party is responsible for the payment of debts of NMC or Holding or claims asserted against NMC or Holding, and (b) none of the CVC Parties, Anderson or the NMC Parties shall suggest or intimate to anyone that any Kalnow Party is responsible for the payment of debts of NMC or Holding or claims asserted against NMC or Holding.

20. Consolidated Balance Sheet. Within thirty (30) days following the execution of this Agreement, NM LLC shall prepare and deliver to the NMC Parties an unaudited consolidated balance sheet of Holding and its subsidiaries as of the date of this Agreement ("Unaudited Balance Sheet"). The Unaudited Balanced Sheet shall to the knowledge of NM LLC present fairly the consolidated financial position of Holding and its subsidiaries as of the date of this Agreement after giving effect to the Public Sale of the NMC Personal Property and the transactions contemplated in this Agreement. The CVC Parties shall promptly reimburse NM LLC upon its request for any reasonable out-of-pocket expenses and employee overtime expenses reasonably incurred by NM LLC in preparing the Unaudited Balance Sheet.

21. Resignation of Robert Foster. Concurrently with the execution of this Agreement, the Kalnow Parties shall deliver to the NMC Parties a resignation by Foster as Executive Vice President of Holding effective as of the close of business on the second business day following the date of this Agreement.

22. Indemnification for Liabilities Related to 2001 Tax Return. Acquisition and NM LLC shall jointly and severally indemnify and hold each of the CVC Parties and Anderson harmless from and against any and all losses, damages (other than consequential damages), injuries, expenses and other liabilities incurred by any of them solely on account of any errors in the 2001 Tax Return for which any Kalnow Party was responsible.

23. Effect of Representations and Warranties. The representations and warranties made by the Parties in this Agreement are made for the purpose of providing information to other Parties and inducing other Parties to enter into this Agreement. No party shall have any right to indemnification or damages on account of any breach of a representation or warranty made in this Agreement, provided that nothing in this Section shall bar a Party from bringing an action for fraud or to rescind this Agreement in the event of such a breach.

**CONFIDENTIAL**

**NMLLC 01252**

24. <u>Entirety of Agreement; Amendments</u>.  This Agreement contains the entire understanding and agreement among the Parties with respect to the transactions contemplated hereby.  This Agreement may not be amended, modified, or altered except by an instrument in writing signed by the Party sought to be charged.  No waiver of, or changes to, any of the terms and conditions of this Agreement shall be valid or binding unless in writing and signed by the Party sought to be charged.

25. <u>Binding Agreement</u>.  This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and assigns.

26. <u>Construction of Agreement</u>.  The Parties acknowledge and agree that this Agreement was the product of mutual negotiation; and, for purposes of construing this Agreement, no individual Party shall be deemed to have drafted the Agreement.

27. <u>Headings</u>.  The headings in this Agreement are for purposes of reference only, and such headings shall not limit or define the meaning herein.

28. <u>Survival</u>.  All covenants, agreements, representations and warranties made herein shall survive the consummation of the transaction contemplated hereunder and shall be deemed to be material and to have been relied upon by each Party, notwithstanding any investigation heretofore or hereafter made by, or on behalf of, any Party.

29. <u>Governing Law; Disputes</u>.  This Agreement shall be deemed to have been made in the State of Ohio and shall be governed by and construed in accordance with the laws of the State of Ohio excluding its choice of law rules.  Any disputes concerning this Agreement or any Party's performance hereunder shall be heard exclusively in the United States District Court for the Northern District of Ohio, Western Division.

30. <u>Counterparts/Effectiveness</u>.  This Agreement, and any amendments, waivers, consents or supplements hereto, may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one and the same instrument.  This Agreement shall only become effective upon the execution and delivery of at least one counterpart hereof by each of the Parties hereto.

31. <u>Facsimile Signatures</u>.  Each Party is hereby authorized to rely upon and accept as an original any communication which is sent to it by facsimile, telegraphic or other electronic transmission including, but not limited to, executed copies of this Agreement, which such Party in good faith believes has been signed by any other Party and has been delivered to any Party by a properly authorized representative of such Party, whether or not that is in fact the case.

*[The next page is the signature page]*

**CONFIDENTIAL**

**NMLLC 01253**

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.          NATIONAL MACHINERY LLC

By: _____     By: _____
Title:                                   Title:

CCT PARTNERS V, L.P.                      NMC ACQUISITION LLC

By: _____     By: _____
Title:                                   Title:

_____          _____
Charles E. Corpening                      Andrew H. Kalnow

_____          _____
David F. Thomas                           Carl F. Kalnow

_____          _____
Steven A. Anderson                        Gertrude K. Chisholm

THE NATIONAL MACHINERY COMPANY            _____
                                          Loretta K. Kaplan

By: _____
Title:

NMC HOLDING COMPANY

By: _____
Title:

CONFIDENTIAL

NMLLC 01254

142467.6 049579-21124

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.    NATIONAL MACHINERY LLC

By: _____    By: _____
Title:    Title:

CCT PARTNERS V, L.P.    NMC ACQUISITION LLC

By: _____    By: _____
Title:    Title:

_____    _____
Charles E. Corpening    Andrew H. Kalnow

_____    _____
David F. Thomas    Carl F. Kalnow

_____    _____
Steven A. Anderson    Gertrude K. Chisholm

THE NATIONAL MACHINERY COMPANY    _____
Loretta K. Kaplan

By: _____
Title:

NMC HOLDING COMPANY

By: _____
Title:

CONFIDENTIAL

NMLLC 01255

142467.6 049579-21124

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.

By: _____
Title:

NATIONAL MACHINERY LLC

By: _____
Title:

CCT PARTNERS V, L.P.

By: _____
Title:

NMC ACQUISITION LLC

By: _____
Title:

_____
Charles E. Corpening

_____
Andrew H. Kalnow

_____
David F. Thomas

_____
Carl F. Kalnow

_____
Steven A. Anderson

_____
Gertrude K. Chisholm

THE NATIONAL MACHINERY COMPANY

_____
Loretta K. Kaplan

By: _____
Title:

NMC HOLDING COMPANY

By: _____
Title:

**CONFIDENTIAL**

**NMLLC 01256**

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.

By: _____
Title:

CCT PARTNERS V, L.P.

By: _____
Title:

_____
Charles E. Corpening

_____
David F. Thomas

_____
Steven A. Anderson

THE NATIONAL MACHINERY COMPANY

By: _____
Title:

NMC HOLDING COMPANY

By: _____
Title:

NATIONAL MACHINERY LLC

By: _____
Title:

NMC ACQUISITION LLC

By: _____
Title:

_____
Andrew H. Kalnow

_____
Carl F. Kalnow

_____
Gertrude K. Chisholm

_____
Loretta K. Kaplan

**CONFIDENTIAL**

**NMLLC 01257**

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.

By: *Charles E Corpening*
Title: *Vice President*

NATIONAL MACHINERY LLC

By: _____
Title: _____

CCT PARTNERS V, L.P.

By: *Charles E Corpening*
Title: *Vice President*

NMC ACQUISITION LLC

By: _____
Title: _____

_____
Charles E. Corpening

_____
Andrew H. Kalnow

_____
David F. Thomas

_____
Carl F. Kalnow

_____
Steven A. Anderson

_____
Gertrude K. Chisholm

THE NATIONAL MACHINERY COMPANY

_____
Loretta K. Kaplan

By: _____
Title: _____

NMC HOLDING COMPANY

By: _____
Title: _____

**CONFIDENTIAL**

**NMLLC 01258**

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Global Settlement Agreement and Mutual Release as of the dates indicated below.

CITICORP VENTURE CAPITAL, LTD.

By: _____
Title:

NATIONAL MACHINERY LLC

By: _____
Title:

CCT PARTNERS V, L.P.

By: _____
Title:

NMC ACQUISITION LLC

By: _____
Title:

_____
Charles E. Corpening

_____
Andrew H. Kalnow

_____
David F. Thomas

_____
Carl F. Kalnow

_____
Steven A. Anderson

_____
Gertrude K. Chisholm

THE NATIONAL MACHINERY COMPANY

By: _____
Title:

_____
Loretta K. Kaplan

NMC HOLDING COMPANY

By: _____
Title:

**CONFIDENTIAL**

NMLLC 01259

Schedules

| | | |
|---|---|---|
| Schedule 1 | - | Calculation and Description of NMC Indebtedness |
| Schedule 2 | - | List of Stockholders To Be Released |
| Schedule 3 | - | List of Documents, Affidavits and Agreements to be Delivered Upon Execution |
| Schedule 4A | - | Form of Settlement Proposal Letter to Health Care Providers |
| Schedule 4B | - | List of Known Health Care Providers |

Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Blocked Account Agreement |
| Exhibit B | - | Deed In Lieu of Foreclosure |
| Exhibit C | - | Mutual General Release |
| Exhibit D | - | Forms of Affidavit Regarding Dishonored Checks |

**CONFIDENTIAL**

**NMLLC 01260**

The following are the Schedules and Exhibits to the
Global Settlement Agreement and Mutual Release
made and entered into by and among
Andrew H. Kalnow, Carl F. Kalnow, Gertrude K. Chisholm, Loretta K. Kaplan, National
Machinery LLC, an Ohio limited liability company, and NMC Acquisition LLC, a
Delaware limited liability company, and Citicorp Venture Capital, Ltd, a New York
corporation, CCT Partners V, L.P., a Delaware limited partnership, Charles E. Corpening,
and David F. Thomas, Steven A. Anderson, NMC Holding Company, a Delaware
corporation, and The National Machinery Company, an Ohio corporation.

CONFIDENTIAL

NMLLC 01261

**Schedule 1**

**Calculation and Description of NMC Indebtedness**

1. As of July 31, 2002, the outstanding principal amount of the indebtedness owed by NMC to Acquisition plus accrued interest was $19,866,230.70. **Attachment I** to this Schedule 1 sets forth the calculation of that indebtedness. Interest continues to accrue on the outstanding principal amount of the indebtedness at the rate of $4,303.22 per day. The balance of this Schedule describes the calculation of that indebtedness.

2. Immediately prior to the UCC foreclosure sale of NMC's personal property assets conducted by Acquisition on February 26, 2002, the indebtedness of NMC to Acquisition was $35,143,562.54.

3. The principal amount of the NMC indebtedness was reduced on February 26, 2002, by Acquisition's credit bid of $16,000,000 for all personal property assets of NMC at the UCC foreclosure sale.

4. Acquisition believes that its credit bid of $16,000,000 reflected an amount greater than the fair value of NMC's personal property on that date. Acquisition's belief is based upon the arms' length, negotiated value of the Bank One, N.A. liens on that property and upon appraisals of the real property conducted by agents of Bank One, N.A. prior to the sale.

5. Bank One, N.A., as agent for a group of lenders, held a first lien on substantially all personal property, and a first mortgage on all real property, owned by NMC on February 12, 2002. Acquisition acquired NMC's debt and Bank One, N.A.'s lien on February 12, 2002, for the cash sum of $19,000,000. On information and belief, Bank One N.A. accepted Acquisition's $19,000,000 purchase offer on February 6, 2002, in preference to a competing offer made for the same debt and liens by Park Industries, Inc., an unaffiliated third party that had an opportunity to conduct due diligence and was knowledgeable about the industry in which NMC operated. Acquisition does not believe that there was any material change in the value of NMC's assets between February 6, and February 26, 2002. Based on the amount of its successful bid, Acquisition believes that the aggregate fair value of the real property and personal property on which Bank One, N.A. held a lien was not more than $19,000,000.

6. Bank One, N.A. (f/k/a First Chicago NBD) obtained an appraisal of the real property owned by NMC from U.S. Realty Consultants, Inc. ("USRC") as of October 22, 1998. USRC appraised the market value of the real property, as then occupied, as $2,900,000. USRC appraised the value of the real property, assumed vacant, as $210,000. The real property was, as of February 12, 2002, subject to Bank One, N.A.'s mortgage. Acquisition believes that there was no material change in the value of the real property between October 22, 1998, and February 12, 2002.

**CONFIDENTIAL**

**NMLLC 01262**

7.    The only material assets of NMC upon which Bank One, N.A. did not have a lien were (a) a 100% ownership interest in NME National Machinery Europe GmbH ("NMC-Germany"), and (b) 420 shares (out of 2,000 shares outstanding) of National Machinery Asia Company, Ltd. ("NMC-Japan"). Bank One, N.A.'s lien also did not extend to a portion of NMC's interests in two other immaterial subsidiaries (NMC International, Inc. and Nationwide Machinery U.K. Limited).

8.    Acquisition believes that neither NMC-Germany nor NMC-Japan has any going concern value, as both entities distribute products exclusively for Acquisition. The aggregate net book value of the assets of NMC-Germany as of July 31, 2002, is $1,326,725. The aggregate net book value of NMC-Japan as of July 31, 2002, multiplied by 39% (constituting the 35% unpledged portion of NMC's 60% interest in NMC-Japan) is $830,877. Receivables due from NMC have been ignored for purposes of calculating the foregoing net book values.

9.    Acquisition anticipates that NMC is due a federal income tax refund of approximately $3,114,971, which is expected to become payable following the filing of a consolidated tax return by Holding for 2001. Since NMC generated all of the taxable income with respect to which any refund may be owing, Acquisition believes that it acquired a first priority security interest in the proceeds of that refund from Bank One, N.A. However, because the refund will be payable to Holding, NMC's common parent, on whose assets Bank One, N.A. had no lien, for abundance of caution this Schedule will treat the refund receivable as not being included in the $19,000,000 already paid by Acquisition for the Bank One, N.A. lien.

10.   Based upon the foregoing analysis, Acquisition believes that, after consummation of the transactions contemplated in the Global Settlement Agreement and Mutual Release, the amount of the deficiency that will be owed by NMC to Acquisition (exclusive of interest and legal fees accrued after July 31, 2002) will be $14,593,658, calculated as follows:

CONFIDENTIAL

NMLLC 01263

140748.1 049579-21124

| | |
|---|---|
| Debt as of July 31, 2002 (after deduction of $19 million paid for personal and real property interests on February 26, 2002) | $19,866,231 |
| *Less* 100% of book value of NMC-Germany | $ 1,326,725 |
| *Less* 39% of book value of NMC-Japan | $  830,877 |
| *Less* expected tax refund[1] | $  3,114,971 |
| REMAINING DEFICIENCY | $14,593,658 |

---

[1]  If Acquisition has a valid security interest in the tax refund (and it believes it does), the amount of the refund should not be deducted from the remaining deficiency, as Acquisition would have acquired its rights to the refund, together with the other encumbered assets, at the UCC foreclosure sale.  This deduction is shown out of abundance of caution only.  Acquisition believes that the true deficiency will be in excess of $17,708,629.

**CONFIDENTIAL**

140748.1 049579-21124

**NMLLC 01264**

**Schedule 2**

**Shareholders To Be Released**

Calg Corporation

Carjan Corporation

Carl F. Kalnow, Andrew H. Kalnow, Loretta K. Kaplan
and Gertrude K. Chisholm as Co-Trustees for Trust Est.
12/28/72 FBO Gertrude K. Chisholm

Gertrude Kalnow Chisholm, Successor Trustee for
Gertrude Kalnow U/A of August 20, 1958

Gertrude K. Chisholm as Trustee of the
Gertrude K. Chisholm 1997 Qualified Annuity Trust

Carl F. Kalnow, Andrew H. Kalnow, Loretta K. Kaplan
and Gertrude K. Chisholm as Co-Trustees for Trust Est.
12/28/72 FBO Andrew H. Kalnow

Andrew H. Kalnow Successor Trustee for
Andrew J. Kalnow U/A of August 20, 1958

Carl F. Kalnow, Andrew H. Kalnow, Loretta K. Kaplan
and Gertrude K. Chisholm as Co-Trustees for Trust Est.
12/28/72 FBO Carl F. Kalnow

Carl F. Kalnow Successor Trustee for
Carl F. Kalnow U/A of August 20, 1958

Trust U/W Jane Frost Kalnow F/B/O Andrew H. Kalnow

Trust U/W Jane Frost Kalnow F/B/O Carl F. Kalnow

Trust U/W Jane Frost Kalnow F/B/O Gertrude K. Chisholm

Trust U/W Jane Frost Kalnow F/B/O Loretta K. Kaplan

Loretta K. Kaplan and Allan M. Kaplan as Trustees of the
Andrew H. Kalnow 1990 Generation Skipping Trust
Dated 12/19/90

Kelsey Goebel Kalnow Trust, Kristin G. Kalnow, Trustee

**CONFIDENTIAL**

140593.2 049579-21124

**NMLLC 01265**

Caroline Jane Kalnow Trust, Kristin G. Kalnow, Trustee

Carl F. Kalnow, Jr. Trust, Kristin G. Kalnow, Trustee

Carl F. Kalnow, Andrew H. Kalnow, Loretta K. Kaplan
and Gertrude K. Chisholm as Co-Trustees for Trust Est.
12/28/72 FBO Loretta K. Kaplan

Loretta Kalnow Kaplan Successor, Trustee for
Loretta Kalnow U/A of August 20, 1958

Allan M. Kaplan as Trustee of the Loretta K. Kaplan
1990 Irrevocable Trust Agreement Dated August 21, 1990

Pruina Corporation

Paul N. Aley

Larry F. Baker

John H. Bolte III

John H. Bolte or Geraldine M. Bolte, trustees or their successors in trust under the John H. Bolte
Living Trust dated December 27, 1999

Kurt Eckstein

Robert J. Foster

Thomas E. Hay

J & K Investments L.P.

**CONFIDENTIAL**

**NMLLC 01266**

140593.2 049579-21124

**Schedule 3**

**List of Documents, Affidavits and Agreements to be Delivered Upon Execution**

To be Delivered by the CVC Parties

1. Agreed Motion to Dismiss the Federal Action

2. Stipulation of Dismissal With Prejudice of the Delaware Action

3. Consent to Judgment in the Foreclosure Action

4. Consent to Judgment in the Illinois Action

5. Bill of Sale to be signed by Holding

6. 2001 Consolidated U.S. Corporation Income Tax Return on Form 1120

7. 2001 Corporation Application for Tentative Refund on Form 1139

8. Power of Attorney and Declaration of Representative on Form 2848

9. Deposit Account Resolution for Refund Account at Fifth Third Bank

10. Signature Card for Refund Account at Fifth Third Bank

11. Blocked Account Agreement

12. Deed in Lieu of Foreclosure Agreement

13. Limited Warranty Deed

14. Owner's Affidavit to Title Company

15. Bill of Sale for remaining assets of NMC

16. Stock Powers for

    (a) The National Machinery Company – Michigan

    (b) The National Machinery Company – Europe, Inc.

    (c) NME National Machinery Europe GmbH

    (d) NMC International, Inc.

    (e) Nationwide Machinery U.K. Limited

**CONFIDENTIAL**

**NMLLC 01267**

       (f)      National Machinery Asia Company, Ltd.

17.    Irrevocable Proxy to Vote All Shares of National Machinery Asia Company, Ltd.

18.    Mutual General Release with each of the persons specified on **Schedule 2** who delivers a concurrent Mutual General Release to the CVC Parties

19.    Secretary's Certificate of Holding certifying adoption of resolution appointing Robert J. Foster as Executive Vice President of Holding and authorizing him to sign and file the 2001 Tax Returns and other documents contemplated in the Agreement to be delivered by Holding on its behalf

20.    Incumbency Certificate signed by the President of Holding certifying the incumbency of the Secretary of Holding

21.    Registrant Name Change Agreement with respect to domain name "nationalmachinery.com"


<u>Documents to be Delivered by the Kalnow Parties</u>

1.    Agreed Motion to Dismiss the Federal Action

2.    Stipulation of Dismissal With Prejudice of the Delaware Action

3.    Blocked Account Agreement

4.    Deed in Lieu of Foreclosure Agreement

5.    Affidavit of Andrew H. Kalnow concerning transfer tax exemption[1]

6.    Statement of Reason for Exemption from Real Estate Conveyance Fee[2]

7.    Affidavit of Patrick A. Bowers concerning unpaid checks of NMC

8.    Affidavit of Robert J. Foster concerning unpaid checks of NMC

9.    Mutual General Release to be delivered by all or some of the persons specified on **Schedule 2**

10.    Registrant Name Change Agreement with respect to domain name "nationalmachinery.com"

---

[1]  This document will not be delivered to the CVC Parties and is listed here merely for convenience.

[2]  This document will not be delivered to the CVC Parties and is listed here merely for convenience.  **CONFIDENTIAL**

**NMLLC 01268**

**SCHEDULE 4A**

# National Machinery LLC                Tiffin

September 30, 2002

Attn: Cheryl                                                  **CONFIDENTIAL**
Consult in Lab Med
3142 W. Central Ave
Toledo, OH 43606                                             **NMLLC 01269**

Dear Dental Health Care Provider:

   In August 2002, National Machinery LLC ("NM LLC") made an offer to health care providers in the Tiffin area to settle at a discount unpaid bills owed to such providers by participants in the NMC Health Care Plan administered by EBNM (the "Plan"). The Plan was terminated in December 2001, as a consequence of the insolvency of The National Machinery Company ("NMC"). The termination of the Plan left many health care providers unpaid and many former Plan participants financially unable to settle their unexpected accounts.

   After consultation with several dental care providers, NM LLC has determined that the general settlement it offered to health care providers in August 2002, may not be appropriate for many dental care providers. Accordingly, NM LLC is transmitting to you this offer of settlement to dental care providers, which will, upon your acceptance, replace and supercede the August 2002 offer previously sent to you by NM LLC. The principal difference between this offer and the August 2002 offer is that this offer will allow you to hold the patient responsible for the co-payment that he or she would have had to pay had he or she been covered under the terms of the Plan.

   Accordingly, NM LLC would like to offer to you a global settlement of all claims that you may have against former employees of NMC and their families to the extent that such claims would have been covered by Plan. NM LLC would propose two options:

   Plan A—to pay you 50 percent of the face value of such claims in cash in five equal annual installments beginning on July 30, 2003, in accord and full satisfaction of those claims or:

   Plan B—to pay you 30 percent of the face value of such claims in cash by not later than September 20, 2002, in accord and full satisfaction of those claims.

   We have obtained records from NMC which indicate that the outstanding claims you have under the Plan total $1,418.60. A summary of those claims (the "Claims"), listed by employee, is attached to this letter. Based upon our calculations the amount payable to

SCHEDULE 4A

# National Machinery LLC          Tiffin

September 30, 2002

Attn: Cheryl                                          **CONFIDENTIAL**
Consult in Lab Med
3142 W. Central Ave
Toledo, OH 43606                                      . NMLLC 01270

Dear Dental Health Care Provider:

In August 2002, National Machinery LLC ("NM LLC") made an offer to health care providers in the Tiffin area to settle at a discount unpaid bills owed to such providers by participants in the NMC Health Care Plan administered by EBNM (the "Plan"). The Plan was terminated in December 2001, as a consequence of the insolvency of The National Machinery Company ("NMC"). The termination of the Plan left many health care providers unpaid and many former Plan participants financially unable to settle their unexpected accounts.

After consultation with several dental care providers, NM LLC has determined that the general settlement it offered to health care providers in August 2002, may not be appropriate for many dental care providers. Accordingly, NM LLC is transmitting to you this offer of settlement to dental care providers, which will, upon your acceptance, replace and supercede the August 2002 offer previously sent to you by NM LLC. The principal difference between this offer and the August 2002 offer is that this offer will allow you to hold the patient responsible for the co-payment that he or she would have had to pay had he or she been covered under the terms of the Plan.

Accordingly, NM LLC would like to offer to you a global settlement of all claims that you may have against former employees of NMC and their families to the extent that such claims would have been covered by Plan. NM LLC would propose two options:

Plan A—to pay you 50 percent of the face value of such claims in cash in five equal annual installments beginning on July 30, 2003, in accord and full satisfaction of those claims or:

Plan B—to pay you 30 percent of the face value of such claims in cash by not later than September 20, 2002, in accord and full satisfaction of those claims.

We have obtained records from NMC which indicate that the outstanding claims you have under the Plan total $1,418.60. A summary of those claims (the "Claims"), listed by employee, is attached to this letter. Based upon our calculations the amount payable to

CONFIDENTIAL

NMLLC 01271

you under the proposed global settlement for Plan A would be annual payments of $141.86 over the next five years with the first payment due on July 30, 2003 or a single payment of $425.58 for Plan B payable on or before September 22, 2002.

For and in consideration of NM LLC's payment to you of the settlement amount referenced in the preceding paragraph, and by your signature below, you hereby agree to release, acquit and forever discharge all persons who are or who may be liable to you or to any other person with respect to any Claims, including all former NMC employees, their family members, guarantors, co-obligors, NM LLC, and each of their respective officers, members, directors, agents and employees (collectively, the "Releasees"), from and against any and all claims, bills, charges, causes of action, suits, debts, accounts, covenants, bonds, agreements, judgments, demands and other obligations that you or any of your affiliates may have or ever have had against the Releasees, or against any of them, arising out of or in relation to any of the Claims. Notwithstanding the foregoing, it is understood and agreed that this release shall not extend to, and that you shall continue to be entitled to collect amounts owed to you from, patients to whom you have provided dental services or their family members to the extent--but only to the extent--that such patients or their family members would have been directly responsible to you for any co-payment under the terms of the Plan.

By your signature below, you represent and warrant to NM LLC that: (1) you have not assigned your rights under any of the Claims to a collection agency or to any other person, (2) you have the power and authority to execute this release on behalf of all persons entitled to receive payment on account of the Claims, (3) the attached schedule of Claims is a complete and correct list of all amounts owed to you under the Plan, and (4) you have read and understood the release contained in the preceding paragraph and have had opportunity to discuss the legal effect of this release with a lawyer of your choosing before signing this letter.

Our offer of global settlement will remain open for 30 days following the date of this letter. Time is of the essence to this offer. You may accept our offer by signing this letter where indicated below, initialing the attached schedule of Claims, and returning both the letter and the schedule to me within the 30-day period. NM LLC's offer is contingent upon the accuracy of your representations and warranties contained in the preceding paragraph. If you believe that the attached schedule of Claims is not correct, please do not sign this letter and call me immediately at (419) 443-2306.

A global settlement of all outstanding Claims is clearly in the best interests of all concerned. A global settlement will avoid time consuming and costly collection actions against individuals who are under severe financial stress. At best, if you choose to pursue individual collection actions, you may be able to obtain a few judgments that will be paid out over a long period of time. We have already had reports of a former NMC employee filing for bankruptcy on account of unpaid medical bills. We would like to resolve these issues within the next few weeks to minimize the number of other former employees who may be forced to take similar actions.

CONFIDENTIAL

NMLLC 01272

you under the proposed global settlement for Plan A would be annual payments of $141.86 over the next five years with the first payment due on July 30, 2003 or a single payment of $425.58 for Plan B payable on or before September 22, 2002.

For and in consideration of NM LLC's payment to you of the settlement amount referenced in the preceding paragraph, and by your signature below, you hereby agree to release, acquit and forever discharge all persons who are or who may be liable to you or to any other person with respect to any Claims, including all former NMC employees, their family members, guarantors, co-obligors, NM LLC, and each of their respective officers, members, directors, agents and employees (collectively, the "Releasees"), from and against any and all claims, bills, charges, causes of action, suits, debts, accounts, covenants, bonds, agreements, judgments, demands and other obligations that you or any of your affiliates may have or ever have had against the Releasees, or against any of them, arising out of or in relation to any of the Claims. Notwithstanding the foregoing, it is understood and agreed that this release shall not extend to, and that you shall continue to be entitled to collect amounts owed to you from, patients to whom you have provided dental services or their family members to the extent--but only to the extent--that such patients or their family members would have been directly responsible to you for any co-payment under the terms of the Plan.

By your signature below, you represent and warrant to NM LLC that: (1) you have not assigned your rights under any of the Claims to a collection agency or to any other person, (2) you have the power and authority to execute this release on behalf of all persons entitled to receive payment on account of the Claims, (3) the attached schedule of Claims is a complete and correct list of all amounts owed to you under the Plan, and (4) you have read and understood the release contained in the preceding paragraph and have had opportunity to discuss the legal effect of this release with a lawyer of your choosing before signing this letter.

Our offer of global settlement will remain open for 30 days following the date of this letter. Time is of the essence to this offer. You may accept our offer by signing this letter where indicated below, initialing the attached schedule of Claims, and returning both the letter and the schedule to me within the 30-day period. NM LLC's offer is contingent upon the accuracy of your representations and warranties contained in the preceding paragraph. If you believe that the attached schedule of Claims is not correct, please do not sign this letter and call me immediately at (419) 443-2306.

A global settlement of all outstanding Claims is clearly in the best interests of all concerned. A global settlement will avoid time consuming and costly collection actions against individuals who are under severe financial stress. At best, if you choose to pursue individual collection actions, you may be able to obtain a few judgments that will be paid out over a long period of time. We have already had reports of a former NMC employee filing for bankruptcy on account of unpaid medical bills. We would like to resolve these issues within the next few weeks to minimize the number of other former employees who may be forced to take similar actions.

Please call me at (419) 443-2306 if you have any questions about this letter and the offer it contains.  You may accept NM LLC's offer by returning this letter and the attached schedule, appropriately signed and initialed, to me by mail or fax at (419) 443-2184.

We appreciate your patience and cooperation during this very difficult time for the former employees of NMC, the medical providers and for the Tiffin community as a whole.

Sincerely,

*Larry Baker*

Larry Baker

THE UNDERSIGNED ACCEPTS AND AGREES TO THE TERMS
OF THE GLOBAL SETTLEMENT FOR DENTAL CLAIMS, INCLUDING THE
RELEASE OF CLAIMS, DESCRIBED ABOVE.
MY CHOICE OF PAYMENT TERMS IS:

(Please initial your choice)    PLAN A _____       PLAN B _____

Name of Dental Care Provider (please print): _____

Signed: _____       Date: _____

Title: _____

**CONFIDENTIAL**

**NMLLC 01273**

Please call me at (419) 443-2306 if you have any questions about this letter and the offer it contains. You may accept NM LLC's offer by returning this letter and the attached schedule, appropriately signed and initialed, to me by mail or fax at (419) 443-2184.

We appreciate your patience and cooperation during this very difficult time for the former employees of NMC, the medical providers and for the Tiffin community as a whole.

Sincerely,

Larry Baker

THE UNDERSIGNED ACCEPTS AND AGREES TO THE TERMS
OF THE GLOBAL SETTLEMENT FOR DENTAL CLAIMS, INCLUDING THE
RELEASE OF CLAIMS, DESCRIBED ABOVE.
MY CHOICE OF PAYMENT TERMS IS:

(Please initial your choice)   PLAN A _____    PLAN B _____

Name of Dental Care Provider (please print): _____

Signed: _____   Date: _____

Title: _____

CONFIDENTIAL

NMLLC 01274

**Exhibit 4A**

# National Machinery LLC                 Tiffin

August 14, 2002

Pediatric Ophthalmology
Attn: Melissa
555 South 18th St. Suite 4C
Columbus, OH  43205

Dear Health Care Provider:

Last December The National Machinery Company ("NMC") closed its doors after more than 125 years of operations in Tiffin.  At the time of its closing, NMC was insolvent; it did not have enough money to pay the claims of its creditors.  NMC had previously pledged all of its assets to Bank One, N.A. as security for its debt.

Among the many creditors that remain unpaid following NMC's failure are health care providers who, like yourself, provided medical services to former employees of NMC under NMC's health care plan which ended at midnight on December 31, 2001.  Many of those employees are not unemployed and suffering serious financial difficulties as a consequence of their loss of employment.  Moreover, because the NMC plan was entirely self-funded, there is no third party insurer liable for the unpaid bills.

As you may know, last February, a group of investors led by the Kalnow family bought the assets of NMC from Bank One in a foreclosure sale.  The new group, now operating under the name National Machinery LLC, acquired only the assets of NMC and expressly did not assume any of the liabilities of NMC, including any unpaid liabilities to health care providers.

However, the new owners of National Machinery LLC are not strangers to Tiffin. The Kalnow family and investors in National Machinery LLC have a long-standing commitment to the Tiffin community.  The families of many former NMC employees have been working for NMC for four generations or more.  National Machinery LLC wants to do something to help the former employees of NMC and the local health care providers, all of whom have been badly hurt by the failure of NMC.

Accordingly, National Machinery LLC would like to offer to you a global settlement of all claims that you may have against former employees of NMC and their families to the extent that such claims would have been covered by the old NMC health care plan.  National Machinery LLC would propose two options:

**CONFIDENTIAL**                 NMLLC 01275

Plan A—to pay you 50 percent of the face value of such claims in cash in five equal annual installments beginning on July 30, 2003, in accord and full satisfaction of those claims or:

Plan B—to pay you 30 percent of the face value of such claims in cash by not later than July 30, 2002, in accord and full satisfaction of those claims.

We have obtained records from NMC which indicate that the outstanding claims you have under the old NMC health care plan total $315.00. A summary of those claims (the "Claims"), listed by employee, is attached to this letter. Based upon our calculations the amount payable to you under the proposed global settlement for Plan A would be annual payments of $31.50 over the next five years with the first payment due on July 30, 2003 or a single payment of $94.50 for Plan B payable on July 30, 2002.

For and in consideration of National Machinery LLC's payment to you of the settlement amount referenced in the preceding paragraph, and by your signature below, you hereby agree to release, acquit and forever discharge all persons who are or who may be liable to you or to any other person with respect to any Claims, including all former NMC employees, their family members, guarantors, co-obligors, National Machinery LLC, and each of their respective officers, members, directors, agents and employees (collectively, the "Releasees"), from and against any and all claims, bills, charges, causes of action, suits, debts, accounts, covenants, bonds, agreements, judgments, demands and other obligations that you or any of your affiliates may have or ever have had against the Releasees, or against any of them, arising out of or in relation to any of the Claims.

By your signature below, you represent and warrant to National Machinery LLC that: (1) you have not assigned your rights under any of the Claims to a collection agency or to any other person, (2) you have the power and authority to execute this release on behalf of all persons entitled to receive payment on account of the Claims, (3) the attached schedule of Claims is a complete and correct list of all amounts owed to you under the NMC health care plan, and (4) you have read and understood the release contained in the preceding paragraph and have had opportunity to discuss the legal effect of this release with a lawyer of your choosing before signing this letter.

Our offer of global settlement will remain open for 30 days following the date of this letter. Time is of the essence to this offer. You may accept our offer by signing this letter where indicated below, initialing the attached schedule of Claims, and returning both the letter and the schedule to me within the 30-day period. National Machinery LLC's offer is contingent upon the accuracy of your representations and warranties contained in the preceding paragraph. If you believe that the attached schedule of Claims is not correct, please do not sign this letter and call me immediately at (419) 443-2306.

A global settlement of all outstanding NMC health care plan claims is clearly in the best interests of all concerned. A global settlement will avoid time consuming and costly

CONFIDENTIAL

NMLLC 01276

collection actions against individuals who are under severe financial stress. At best, if you choose to pursue individual collection actions, you may be able to obtain a few judgments that will be paid out over a long period of time. We have already had reports of a former NMC employee filing for bankruptcy on account of unpaid medical bills. We would like to resolve these issues within the next few weeks to minimize the number of other former employees who may be forced to take similar actions.

Please call me at (419) 443-2306 if you have any questions about this letter and the offer it contains. You may accept National Machinery LLC's offer by returning this letter and the attached schedule, appropriately signed and initialed, to me by mail or fax at (419) 443-2184.

We appreciate your patience and cooperation during this very difficult time for the former employees of NMC, the medical providers and for the Tiffin community as a whole.

Sincerely,

Larry Baker

THE UNDERSIGNED ACCEPTS AND AGREES TO THE TERMS
OF THE GLOBAL SETTLEMENT FOR MEDICAL CLAIMS, INCLUDING THE
RELEASE OF CLAIMS, DESCRIBED ABOVE.
MY CHOICE OF PAYMENT TERMS IS:

(Please initial your choice)   PLAN A _____      PLAN B _____

Name of Health Care Provider (please print): _____

Signed: _____   Date: _____

Title: _____

**CONFIDENTIAL**

**NMLLC 01277**

SCHEDULE 4B

## *Exhibit A - Provider settled*

30-Sep-02

*Providers who have agreed to accept offer and not balance bill participants.*

| | |
|---|---|
| ADVANCED CHIRO | FOSTORIA COMMUNITY HOSP |
| ALLERGY AND ASTHMA CENTER | FOX DDS, STEVEN C |
| ALPAY MD, ILHAN | FREDRICK C SMITH CLINIC |
| ALPHA THERAPEUTIC | FREMONT WALK IN MED CTR |
| AMIN MD, DIAKKUMAR | GARLAPATI MD, KRISHNAIAH |
| ANESTHESIA SERVICE ASSOCIATES | GEROSKI IV DDS, STEVEN P |
| ANESTHESIOLOGY CONSULTANTS | GOODMAN DDS, DAVID L |
| APRIA HEALTHCARE | GRIFFIN DC, ERIC |
| ARLINGTON ORTHOPAEDIC | GRIFFIN DC, LYNN |
| ARNOLD OD, ANTHONY | HASHIM MD, M |
| ASSOC ANESTH OF TOLEDO | HOFFMAN BIRMINGHAM & ASSOC |
| ASSOC PHYSICIANS | IMPATH |
| AUBERLE MD, J | KAKARALA MD, PRASAD |
| BELLEVUE HOSPITAL | KAOSOL MD, SERI |
| BERCKMUELLER MD, DAVID | KATZ MD, STEPHEN E |
| BETTY JANE MEMORIAL REHAB | KISTLER DPM, TIMOTHY D. |
| BK HOME MEDICAL SERV | LINCOLN COUNTY PRIMARY |
| BLANCHARD VALLEY REGIONAL HEALTH CENTER | MCCOMB FAMILY DENTISTRY INC |
| BOSSE DO, JAMES | MCDONNELL MD, JESSOP |
| BREMYER DPM INC, JOHN H | MED-TEL DBA WIDE OPEN MRI |
| BUCKEYE DERMATOLOGY | MEMORIAL HOSPITAL |
| BUCYRUS COMMUNITY HOSP | MERCY HOSPITAL |
| BUCYRUS FAMILY MEDICINE | MERCY HOSPITAL - WILLARD |
| BV NEUROSURGICAL | MERCY TIFFIN MCAULEY |
| BV PATHOLOGY & LAB | MERCY TIFFIN WOUND SERV |
| CARDIOTHORACIC & VASCULAR | MEYER D.O., CHRISTOPHER |
| CC HOME CARE SERVICES | MICHIGAN EAR INSTITUTE |
| CEPEDA MD, JORGE | MID OHIO CARDIOLOGY |
| CHRISTIAN MD, SAMUEL | MIDWEST NEUROSCIENCE (AKA SWANSON) |
| CITY OF TIFFIN | MIDWEST PAIN TREATMENT CENTER |
| CLARK MD, PAUL | MIDWEST PHYSICIAN ANESTH |
| CLEVELAND ANESTHESIA GRP. INC. | MONTESCLAROS, ADOLBEN |
| CLEVELAND CLINIC FOUNDATION | MOTLEY OD, MARK |
| CONSOLO DPM, JOEL | NAT MED SEV III INC DBA |
| CONSULT IN LAB MED | NCOAST |
| CONSULTING PATHOLOGISTS | NEW BEGINNINGS PED |
| CONSULTING RADIOLOGISTS | NIELSEN MD, ERIK |
| DALAL, BANKIM | NORTH CENTRAL RADIOLOGY |
| DERAN, BARRY | NORTH CENTRAL WOMENS HEALTH |
| DESAI MD, AJITKUMAR | NORTHCOAST RADIATION |
| EBI | NORTHLAND ANES ASSOC |
| ENT PHYSICIANS | NORTHWEST EYE SURGEONS |
| ESTRADA MD, EDDIE | NORTHWEST OHIO ORTHOPEDICS |
| FABRIZIO CHIRO | NW OHIO CARDIOLOGY CONSUL |
| FAMILY HEALTH PARTNERS | O E MEYER CO |
| FASTAR | O'BLENESS HOSPITAL |
| FELTON DDS, JOHN C | OPTIMA REHABILITATION |
| FELTON MD, JAMES | ORTHOFIX |
| FIDLER DPM, ROBERT | PATHOLOGY LABS |
| FINDLAY ORTHOPEDIC ASSOC | PEDIATRIC OPHTHALMOLOGY |
| FINDLAY RADIOLOGY ASSOC | PEDIATRIC PULMONARY ASSO |
| FINDLAY SURGERY CTR | PERSONAL TOUCH DELIVERIES |
| FIRELANDS REG MED CTR | PODIATRIC ASSOC OF NW OHIO |
| FLETCHER DDS INC, RICHARD L | PROFESSIONAL HEARING CARE |
| FLOWER HOSPITAL | PROMEDICA CENTRAL |

**CONFIDENTIAL**

NMLLC 01278

# Exhibit A - Provider settled

*Providers who have agreed to accept offer and not balance bill participants.*

PROVIDENCE HOSPITAL
PULMONARY & CRITICAL CARE
QUEST DIAGNOSTICS
RADIOLOGY ASSOC
RANDALL, KELLY
RECONSTRUCTIVE SURGEONS
RESER DC, RICHARD
RESPIRATORY SPEC
RESTAT
RHEE, SHANG Y.
RIVERSIDE METHODIST HOSP
SCHERER, DR MICHAEL
SENECA COUNTY DIALYSIS CENT
SENECA COUNTY EMS
SENECA DERMATOLOGY
SHAWBERRY, JEFFREY D
SOLAIMAN, A R
SONI, DR. RENU
ST LUKES HOSPITAL
ST VINCENT MEDICAL CENTER
SURGERY & CRITICAL CARE
SURGICOR, INC.
SYCAMORE AMBULANCE SERVICE
TEMPLE DDS, R J
THEKDI MD, DINESH
TIFFIN ANESTHESIA ASSOC
TIFFIN EMERGENCY SERVICES
TIFFIN OB-GYN CENTER
TOLEDO CARDIOLOGY
TOLEDO CLINIC
TOLEDO HOSPITAL
TOLEDO ORTHOPAEDIC SURG
TOLEDO RADIOLOGICAL ASSOC
UNIVERSITY HOSPITAL
UNIVERSITY OF MICHIGAN HEALTH SYSTEM
UPPER ARLINGTON SURGERY
UPPER SANDUSKY MEDICAL
VELA, DR RUDOLPH
VELA, DR. JOHN
VETERANS AFFAIRS
VIVRA ASTHMA & ALLERGY
W W KNIGHT
WILDWOOD SURGICAL CENTER
WILSON DDS, JAMES C
WOLF, GARY R.
WOOD COUNTY HOSPITAL
WYANDOT CHIROPRACTIC & FITNESS
WYANDOT MEMORIAL HOSPITAL
YAGER DDS, ROBERT M
YOUNG MD, WADE
ZIRRM PATHOLOGY

161

CONFIDENTIAL

NMLLC 01279

## *Exhibit D - No settlement*

30-Sep-02

### *Providers who have not negotiated*

AKERS MD, MARK
BLANCHARD VALLEY MED ASSO
CHAMBERS OD, THOMAS
CHIMERA ANESTHESIA
CURASCRIPT PHARMACY
DORNAUER DDS INC, ROBERT J
ELLINGER DDS, RICHARD
FOSTORIA FAMILY PRACTICE
GRILLIS DO INC, MICHAEL
HHCSI HEPAS PHYSICIAN SERVICE
MEDICAL COLLEGE HOSPITAL
ROSS OD, ROBERT E.
SHREINER OD, ROBERT
SYCAMORE MEDICAL ASSOC
UNIV SURGEONS
UNIVERSITY ANESTHESIOLOGY
UNIVERSITY OSTEOPATHIC MEDICAL CENTER
VAIL, DR THOMAS F
VICEK DDS MS, ROBYN E
WILLARD EMERGENCY SERVICE
WYNKOOP, TIMOTHY

21

CONFIDENTIAL

NMLLC 01280

## *Exhibit B - Pending settlement*

30-Sep-02

### *Providers who are still negotiating*

BENOIT DO, SHARIE
GANESAN MD, MAHAMUNI
HOYDA DDS, JEFFREY A
KENTRIS DC, WILLIAM
LABCORP
N OHIO MEDICAL SPECIALIST
RAO, DR. LALITHA
SCHAFER, CARL W

8

CONFIDENTIAL

NMLLC 01281

EXHIBIT A

## BLOCKED ACCOUNT AGREEMENT

THIS BLOCKED ACCOUNT AGREEMENT ("Agreement") is made and entered into as of October __, 2002, by and among FIFTH THIRD BANK (the "Bank"), NMC HOLDING COMPANY, a Delaware corporation (the "Company"), and NMC ACQUISITION LLC, a Delaware limited liability company (together with any successors and assigns, "Secured Party").

Recitals:

A.     The Company has established Account No. 731-80137 with Bank (such account and all other of the Company's accounts with the Bank are collectively, the "Blocked Account").

B.     The parties hereto desire to enter into this Agreement in order to set forth their relative rights and duties with respect to the Blocked Account and all funds on deposit therein from time to time.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.     **Effectiveness.**  This Agreement shall take effect immediately upon its execution by all parties hereto and shall supersede any blocked account or similar agreement in effect with respect to the Blocked Account.

2.     **Security Interest; Agency.**  As collateral security for the Company's obligations to Secured Party and pursuant to that certain Global Settlement Agreement and Mutual Release dated as of September __, 2002 by and among the Company, Secured Party and various other parties, the Company hereby grants to Secured Party, a present and continuing security interest in (a) the Blocked Account, (b) all contract rights and privileges in respect of the Blocked Account, and (c) all cash, checks, money orders and other items of value of the Company now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of, or in transit to, the Bank or any agent, bailee or custodian thereof (collectively, "Receipts"), and all proceeds of the foregoing, and the Bank acknowledges that this Agreement constitutes notice, in accordance with the Uniform Commercial Code of the State of Ohio, of Secured Party's security interest in such collateral.  Secured Party hereby appoints the Bank as Secured Party's bailee and pledgee-in-possession for the Blocked Account and all Receipts, and the Bank hereby accepts such appointment and agrees to be bound by the terms of this Agreement.  The Company hereby agrees to such appointment and further agrees that the Bank, on behalf of Secured Party, shall be entitled to exercise, upon the written instructions of Secured Party, any and all rights which Secured Party may have under applicable law with respect to the Blocked Account, all Receipts and all other collateral described in this paragraph 2.

3.     **Control of Blocked Account.**  The Blocked Account shall be under the sole dominion and control of Secured Party and shall be maintained by the Bank in the name of the Company.  Notwithstanding anything set forth herein to the contrary, neither the Company nor any other person or entity, through or under the Company, shall have any control over the use of, or any right to withdraw any amount from, the Blocked Account.  The Bank shall exercise the

A - 1

**CONFIDENTIAL**                    NMLLC 01282

same degree of care toward the Receipts held in the Blocked Account as it exercises toward similar funds of its own and shall not be held to any higher standard of care under this Agreement, nor deemed to owe any fiduciary duty to the Company or to the Secured Party.

4.    **Procedures for Blocked Account.**    The Bank shall follow the following procedures with respect to the Blocked Account:

(a)    Secured Party shall have the exclusive right to direct and provide instructions to the Bank as to the disposition of all amounts then or thereafter deposited in the Blocked Account, and the Bank shall not comply with any instruction from the Company in connection with the Blocked Account unless consented to in writing by Secured Party and received by the Bank;

(b)    The Bank will transfer on each banking day all immediately available funds on deposit in the Blocked Account by wire transfer, or other method of transfer mutually agreeable to the Bank and Secured Party, to such account (the "Concentration Account") as Secured Party may from time to time direct the Bank in accordance with the Bank's usual and customary procedures for funds transfers; and

(c)    The Company agrees it shall not make any attempt, without the prior written authorization of Secured Party, to access the Blocked Account or funds therein.

5.    **Statements and Other Information.**    The Bank shall send to Secured Party copies of all returned and dishonored Receipts promptly upon Bank's receipt thereof, and upon Secured Party's request the Bank shall provide Secured Party with copies of the regular monthly bank statements provided to the Company and such other information relating to the Blocked Account as shall reasonably be requested by Secured Party. The Bank shall also deliver a copy of all notices and statements required to be sent to the Company pursuant to any agreement governing or related to the Blocked Account to Secured Party at such times as provided therein.

6.    **Fees.**    The Secured Party agrees to pay on demand all usual and customary service charges, transfer fees and account maintenance fees (collectively, "Fees") of the Bank in connection with the Blocked Account. In the event the Secured Party fails to timely make a payment to the Bank of any Fees, the Bank may thereafter exercise its right of set-off against the Blocked Account for such amounts. The Company has no obligation to pay Fees under this Agreement.

7.    **Uncollected Funds.**    If any Receipts deposited in the Blocked Account are returned unpaid or otherwise dishonored the Bank shall have the right to charge any and all such returned or dishonored items against the Blocked Account or to demand reimbursement therefor directly from the Secured Party.

8.    **Set-off.**    The Bank hereby agrees that, prior to the effective date of a termination of this Agreement pursuant to Section 10, the Bank will not exercise or claim any right of set-off or banker's lien against the Blocked Account or any Receipts on deposit therein, and the Bank hereby further waives until such date any such right or lien which it may have against any Receipts deposited in the Blocked Account, except to the extent expressly set forth in paragraphs 6 and 7 above.

A - 2

**CONFIDENTIAL**

**NMLLC 01283**

9.    **Exculpation of Bank; Indemnification by Company.**  The Company and Secured Party agree that the Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of the Bank.  In no event shall the Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond the Bank's reasonable control or for indirect, special or consequential damages.  The Secured Party agrees to indemnify the Bank and hold it harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of the Bank, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorney's fees and disbursements) incurred as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any transaction conducted or service provided by the Bank through the use of any account at the Bank pursuant to the procedures provided for or contemplated by this Agreement.

The Bank shall be obligated to perform only such duties as are expressly set forth in this Agreement.  No implied covenants or obligations shall be inferred from this Agreement against the Bank.

The Bank makes no representation as to the validity, value, genuineness or collectibility of any Receipts, security or other document or instrument held by or delivered to it.

The Bank shall not be called upon to advise any party as to selling or retaining, or taking or refraining from taking any action with respect to, any Receipts, securities or other property deposited hereunder.

The Bank shall be entitled to rely upon any order, judgment, certification, instruction, notice or other writing delivered to it in compliance with the provisions of this Agreement without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity or service thereof.  The Bank may act in reliance upon any instrument comporting with the provisions of this Agreement or signature believed by it to be genuine and may assume that any person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

The Bank may act pursuant to the advice of counsel chosen by it with respect to any matter relating to this Agreement and shall not be liable for any action taken or omitted in accordance with such advice.

If adverse or conflicting claims are made with respect to the Receipts on deposit or credited to the Blocked Account, the Bank may refuse to comply with any demands made upon it with respect thereto until such claims are resolved by mutual agreement or finally disposed of in appropriate legal proceedings, and in so doing, the Bank shall not incur any liability to any party or person interested in the subject matter of this Agreement.

10.    **Termination.**

CONFIDENTIAL

NMLLC 01284

A - 3

(a)    This Agreement may be terminated by the Company only upon delivery to the Bank of a written notification thereof jointly executed by the Company and Secured Party.

(b)    This Agreement may be terminated by Secured Party at any time, with or without cause, upon its delivery of written notice thereof to each of the Company and the Bank.

(c)    This Agreement may be terminated by the Bank at any time on not less than 30 days prior written notice delivered to each of the Company and Secured Party.

Upon termination of this Agreement, the Bank will:   (A) immediately transmit to the Concentration Account (i) all funds, if any, then on deposit in, or otherwise to the credit of, the Blocked Account, and (ii) upon receipt, all funds received after such notice for deposit in, or otherwise to the credit of, the Blocked Account; (B) deliver directly to Secured Party all Receipts consisting of checks, money orders, drafts and other instruments or items of value, whether then in the possession of the Bank or received by the Bank after such notice, without depositing such Receipts in the Blocked Account or any other account, and (C) not permit the Company to open any new accounts with the Bank.   The provisions of paragraphs 2, 3 and 8 shall survive termination of this Agreement unless and until specifically released by Secured Party in writing. All rights of the Bank under paragraphs 6, 7 and 9 shall survive any termination of this Agreement.

11.    **Irrevocable Agreements.**   The Company acknowledges that the agreements made by it and the authorizations granted by it in paragraphs 2, 3, and 4 hereof are irrevocable and that the authorizations granted in paragraphs 2, 3 and 4 hereof are powers coupled with an interest.

12.    **Notices.**   All notices, requests or other communications given to the Company, Secured Party or the Bank shall be given in writing at the address specified below:

|  |  |
|---|---|
| Secured Party: | NMC Acquisition LLC<br>122 S. Michigan Avenue, Suite 1700<br>Chicago, Illinois 60603<br>Attention:    Andrew Kalnow<br>Facsimile: (312) 322-9808<br>Confirmation: (312) 322-9800 |
| The Company: | The National Machinery Company<br>P.O. Box 648<br>Tiffin, OH  44883 |
| The Bank: | _____<br>_____<br>_____<br>Attention:<br>Telephone:<br>Facsimile: |

CONFIDENTIAL

NMLLC 01285

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this paragraph 12. Each notice, request or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this paragraph 12 and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, (c) if given by registered or certified U.S. mail, return receipt requested, within five (5) days after deposit in the U.S. mail, or (d) if given by any other means, when delivered at the address specified in this paragraph 12.

13.    **Miscellaneous.**

(a)    This Agreement may be amended only by a written instrument executed by Secured Party, the Bank, and the Company acting by their respective duly authorized representatives.

(b)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither the Company nor the Bank shall be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Secured Party.

(c)    This Agreement may be executed in any number of several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(d)    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS (WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAW RULES).

**CONFIDENTIAL**

140747.6 049579-13175

**NMLLC 01286**

EXHIBIT A

IN WITNESS WHEREOF, each of the parties has executed and delivered this control Agreement as of the day and year first above set forth.

**FIFTH THIRD BANK**

By:_____
Its:_____

**NMC HOLDING COMPANY**

By:_____
Its:_____

**NMC ACQUISITION LLC**

By:_____
Its:_____

**CONFIDENTIAL**

A - 1

**NMLLC 01287**

**EXHIBIT B**

## DEED IN LIEU OF FORECLOSURE AGREEMENT

This Agreement is made as of the ___ day of October, 2002, by and among **THE NATIONAL MACHINERY COMPANY**, an Ohio corporation ("Borrower"), and **NMC ACQUISITION LLC**, a Delaware limited liability company ("Secured Party").

### R E C I T A L S :

A.      Borrower is the owner of certain real estate located in the City of Tiffin, Seneca County, Ohio and legally described in Exhibit A attached hereto (the "Land") and all improvements situated thereon (the "Improvements"). The Land and the Improvements, together with all easements, leases and other rights of Borrower pertaining to the Land and the Improvements are hereinafter sometimes collectively referred to as the "Real Property".

B.      The First National Bank of Chicago, as agent (now known as Bank One, NA) ("Agent"), and certain institutions (collectively, the "Lenders") heretofore agreed to provide certain term loans and a revolving credit facility in the maximum aggregate principal amount of $55,000,000 (the "Loans"), which are evidenced, secured or otherwise governed, in part, by the following documents (collectively, the "Loan Documents"), all dated as of November 6, 1998.

(1)      that certain Credit Agreement by and among Borrower, Agent, and the Lenders (as amended, modified and supplemented from time to time (the "Credit Agreement");

(2)      Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases (the "Mortgage") made by Borrower to Agent, as agent on behalf of the Lenders, and recorded on November 10, 1998 in Volume 36, Page 94, of the Official Records in the Office of the Recorder of Seneca County, Ohio (the "Recorder"); and

(3)      Guaranty made by NMC Holding Company, Calg Corp. and Carjan Corp. and a Guaranty made by National Machinery-Europe, Inc., and The National Machinery Company-Michigan (collectively, the "Guarantors") in favor of Agent for the ratable benefit of the Lenders.

C.      Pursuant to a certain Assignment of Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents and Leases dated February 12, 2002 made by Agent, as contractual representative for its benefit and for the benefit of the Lenders, in favor of Secured Party and recorded on February 12, 2002 in Volume 183, Page 773, of the Official Records of the Recorder, Secured Party acquired all of the right, title and interest of Agent and Lenders in, to and under the Loans and the Loan Documents.

D.      As of February 12, 2002, the amount due under the Loan Documents was $34,617,381.01 of which $34,067,078.93 was unpaid principal and $550,302.08 was accrued and unpaid interest and fees. Interest continues to accrue on the unpaid principal at a rate of 7 ¾ % per annum.

E.      Borrower has defaulted on the Loans and Secured Party is entitled to exercise all of its rights and remedies under the Loan Documents, including, without limitation, the foreclosure of its mortgage lien and other liens on and security interests in the Real Property.

**CONFIDENTIAL**

3179.8 049579-21124

**NMLLC 01288**

EXHIBIT B

F.  Secured Party filed that certain mortgage foreclosure complaint in the Common Pleas Court of Seneca County, Ohio on February 15, 2002.

G.  On February 26, 2002, Secured Party completed a secured party sale of substantially all of Borrower's and the Guarantor's assets, excluding the Real Property, pursuant to Ohio Revised Code §1309.601 et seq. for a bid price of $16,000,000.

H.  As of July 31, 2002, the amount due under the Loan Documents, after taking into account the bid described in Recital G above, is $19,866,230.70, which consists of unpaid principal and accrued and unpaid interest and attorneys' fees.

I.  Secured Party and Borrower, together with their respective affiliates, are parties to several pieces of litigation including the Seneca County foreclosure action.  Concurrently with their execution of this Agreement, Secured Party, Borrower and several of their affiliates·are entering into a Global Settlement Agreement and Mutual Release (the "Settlement Agreement"), pursuant to which all pending litigation is to be resolved.  In accordance with the Settlement Agreement, Borrower has requested that Secured Party accept a conveyance by Borrower of all of its right, title and interest in and to the Real Property, subject to and conditioned upon the terms, provisions and conditions set forth in this Agreement.

J.  Borrower and Secured Party have agreed to enter into this Agreement (and certain other documents) to provide for the transfer to Secured Party (or its nominee) of all of Borrower's right, title and interest in and to the Real Property pursuant to the Settlement Agreement and in lieu of Borrower and Secured Party incurring the time, expense and inconvenience involved with foreclosure.

K.  Borrower and Secured Party are of the good faith opinion that the value to Borrower of the Settlement Agreement and the benefits of Borrower's entering into the agreements contained therein is more than the reasonably equivalent value of the Real Property and constitutes fair consideration therefor.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in the Settlement Agreement and the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereto hereby agree as follows:

1.  **Incorporation of Recitals.**  The foregoing Recitals are hereby incorporated into the body of this Agreement as if fully set forth herein.

2.  **Transfers; Consideration.**  Borrower agrees to transfer all of its right, title and interest in the Real Property to Secured Party or Secured Party's nominee or designee free of any right of redemption or any other right or interest of anyone other than Secured Party claiming by, through Borrower.  Such transfer shall occur concurrently with the execution of this Agreement pursuant to such deeds, assignments and other transfer documents as Secured Party may reasonably require, which documents must be satisfactory to Secured Party in form and content.  Secured Party hereby designates its affiliate, NMC Real Estate LLC, an Ohio limited liability company ("Designee"), as the transferee of the Real Property.  The consideration given by Secured Party and/or received by Borrower in connection with the transfer of the Real Property from Borrower to Secured Party includes, without limitation, the cost savings to Borrower of not having to engage in legal proceedings relating to the exercise of remedies under the Mortgage by Secured Party and the mutual covenants, agreements and limited releases set forth in the Settlement Agreement.

**CONFIDENTIAL**

3179.8 049579-21124

**NMLLC 01289**

**3. Closing.** The consummation of the transactions contemplated hereunder (the "Closing") shall occur simultaneously with the execution and delivery of this Agreement through a New York-style escrow with Lawyers Title Insurance Corporation (the "Title Company") pursuant to escrow instructions consistent with this Agreement and in form and substance satisfactory to the parties.

**4. Delivery of Documents.** Concurrently herewith, the parties hereto are executing and delivering the documents described in Exhibit B attached hereto to facilitate the transfer of the Real Property to Designee and to otherwise more fully express the agreements of the parties relating to such transfer (the "Other Closing Documents").

**5. Representations and Warranties.** Borrower represents and warrants to Secured Party as follows:

(a)  This Agreement and the Other Closing Documents to be executed by Borrower have been duly authorized, executed and delivered by Borrower and are legal, valid and binding obligations, sufficient to convey title where appropriate, and are enforceable in accordance with their respective terms, and do not violate any provisions of any agreement executed by or otherwise affecting Borrower or the Real Property.

(b)  Borrower owns fee title to the Real Property, and, to the best of Borrower's knowledge, Borrower owns the Real Property free and clear of any liens or encumbrances except for those matters disclosed in that certain Updated Preliminary Certificate of Title Examination to Real Property attached hereto as Exhibit C.

(c)  The execution of this Agreement and the Other Closing Documents and the performance of the provisions hereof and thereof will not violate or result in any breach or violation of, or constitute a default under, any law or court order or any agreement, indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument to which Borrower is a party or by which it is bound.

(d)  The transfer of the Real Property is made voluntarily by Borrower with no intent to defraud any of its creditors. There are no pending or, to the best of Borrower's knowledge, threatened bankruptcy, reorganization, insolvency, receivership, creditor assignment or other similar proceedings concerning Borrower, whether voluntary or involuntary.

Borrower agrees to indemnify, defend and hold Designee and its successors and assigns harmless from and against all losses, costs, damages and expenses, including reasonable attorneys fees and court costs, suffered or incurred by any of such indemnitees as a result of or in connection with any breach of any of the representations and warranties set forth herein or in any of the Other Closing Documents.

**6. Statement of Intent; No Merger.** Secured Party and Borrower expressly state that it is their desire and intention that no merger or other termination or extinguishment of titles, estates or other interests shall occur as a result of any of the assignments, conveyances or other transfers contemplated hereunder or under the Other Closing Documents, even though Secured Party and its affiliate, Designee, will become the owner and holder of multiple interests in the Real Property which together could constitute a single greater interest, and, accordingly, the Mortgage and all of the other Loan Documents shall continue in full force and effect after the acquisition of the Real Property by Designee. Without intending to limit the generality of the foregoing sentence, it is the desire and intention of Secured Party and Borrower that each title, estate and other interest held by Secured Party or Designee pursuant to a separate instrument shall be completely separate and distinct from each other title, estate or interest, and,

B - 3

3179.8 049579-21124

CONFIDENTIAL

NMLLC 01290

more specifically, Designee's title to the Real Property obtained pursuant to the Other Closing Documents shall not merge with Secured Party's liens and security interests in the Real Property obtained pursuant to the Loan Documents. Nothing in the Settlement Agreement or in this Agreement shall (i) constitute a release of or operate to release, satisfy or discharge the indebtedness, obligations or liabilities evidenced or secured by the Loan Documents or any of the liens, mortgages and security interests created thereby, (ii) render ineffective or unenforceable Secured Party's right to foreclose the Mortgage or to pursue any of its other rights or remedies under the Loan Documents in any manner except to the extent provided under the Settlement Agreement, or (iii) otherwise affect the provisions of the Loan Documents. The conveyance to be made by Borrower is at the request of Borrower that the grantee named in the Deed accept the Deed and is the free and voluntary act of Borrower. In executing and delivering the Deed, Borrower is not acting under a misapprehension as to the effect thereof, nor under any duress, undue influence or misrepresentations by Secured Party. Borrower acknowledges that it has been represented by competent and experienced legal counsel in connection with the negotiation of this Agreement.

7. **Indemnification.** Borrower hereby agrees to indemnify, defend (with counsel reasonably satisfactory to Secured Party) and hold Designee, Secured Party and their respective successors and assigns harmless from and against any and all losses, damages, claims, liability, costs and expenses (including reasonable attorneys' fees and court costs) that may be suffered or incurred by, Designee, Secured Party or their successors or assigns as a result of or in connection with any suit, action, claim or proceeding that has been or is commenced or made by or on behalf of any of the Guarantors or Borrower or any of their respective successors or assigns (A) to enjoin, rescind or otherwise set aside the transfer of all or any portion of the Real Property to Designee or any other transactions consummated pursuant to this Agreement and the Other Closing Documents, (B) to challenge the validity or enforceability of the transfer of the Real Property to Designee or any of such other transactions or (C) which might otherwise adversely affect the validity or enforceability of the transfer of the Property to Designee or any of such other transactions (any such suit, action, claim or proceeding being hereinafter referred to as an "Adverse Proceeding"). To the extent Borrower is determined to owe any amount to Secured Party pursuant to this Section 7, such amount shall be added to the amount due to Secured Party stated in Recital H of this Agreement. No CVC Party (as defined in the Settlement Agreement) or Anderson (as defined in the Settlement Agreement) shall owe any amount to Secured Party pursuant to this Section 7. Notwithstanding the foregoing, Borrower shall not indemnify Designee, Secured Party or their respective successors or assigns with respect to any Adverse Proceeding caused by, resulting from, or arising out of, the willful misconduct or gross negligence of such person.

8. **Consent to Foreclosure; Assurance of Cooperation by Borrower.**

(a)    Borrower agrees that Secured Party shall have the absolute right to exercise its rights and remedies under the Loan Documents, at law and in equity, including without limitation, the right to foreclose the Mortgage and pursue all claims which have been or may be alleged by Secured Party and the right to obtain a judgment of foreclosure against the interests of Borrower in the Real Property and the Guarantors. Borrower hereby consents and stipulates to the entry and confession of judgment of foreclosure in favor of Secured Party and its successors and assigns with respect to foreclosure against Borrower's interest in the Real Property and hereby releases all errors and waives all right to appeal as to any judgment of foreclosure entered pursuant to the Mortgage and the other Loan Documents. Borrower acknowledges and agrees that the entry of any judgment of foreclosure permitted hereby is not intended to be and shall not be construed to be a waiver of any of Secured Party's rights under the Mortgage and the other Loan Documents or an election of remedies by Secured Party, and if any judgment of foreclosure shall be entered pursuant to this Paragraph 8, Secured Party and its successors and assigns shall have the right, to pursue all other rights and remedies available to them pursuant to the Mortgage,

**CONFIDENTIAL**

B - 4

**NMLLC 01291**

the other Loan Documents, at law and in equity, including against the Guarantors.  Borrower agrees that it will not take any actions or interpose or assert any defenses, claims, counterclaims or cross-claims against Secured Party which would in any way impair the ability of Secured Party to foreclose the Mortgage, enforce its other rights and remedies under the Loan Documents or exercise and pursue the other claims which have been or may be asserted by Secured Party or which are otherwise contrary to the acknowledgments and agreements contained in this Agreement.

(b)    Borrower recognizes, acknowledges and agrees that Secured Party shall have the absolute right, such right to be exercised in the sole and absolute discretion of Secured Party, to settle any matters which have been or may be asserted by or against Secured Party and relating to the Loan Documents and/or the Real Property upon any such terms, provisions and conditions as Secured Party shall determine.

(c)    Borrower recognizes, acknowledges and agrees that Secured Party shall have the absolute right, to be exercised in the sole and absolute discretion of Secured Party, to sell the Real Property, or any portion thereof, to any party, including without limitation, any one or more (in any combination) of the Guarantors, upon such sales price and upon such other terms and conditions as are acceptable to Secured Party (including, without limitation, the provision of financing in such principal amount, at such interest rate and upon such other terms and conditions as may be acceptable to Secured Party), without any duty or obligation whatsoever to Borrower or the Guarantors.  The foregoing provision shall not in any way be construed as a grant of any right to any of the Guarantors to purchase the Real Property, or any portion thereof, and Secured Party shall have no obligation to submit to Borrower or any of the Guarantors any offers to purchase, notices or other documents which Secured Party may receive with respect to the Real Property, or any portion thereof.

(d)    Borrower covenants and agrees that it will at any time and from time to time do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, documents and instruments as may reasonably be required by Secured Party or any successor in interest thereto in order to carry out fully and effectuate the transactions herein contemplated in accordance with the provisions of this Agreement.  Borrower will cooperate fully at any time and from time to time with Secured Party or any successor in interest thereto to enable Secured Party or said successor to foreclose the Mortgage, enforce Secured Party's other rights and remedies under the Loan Documents and otherwise exercise and pursue the other claims which have been or may be asserted by Secured Party.  In the event that Borrower is obligated to provide cooperation to Secured Party pursuant to this Section 8(d) or pursuant to Section 9 hereof, the reasonable out-of-pocket expenses incurred by the Borrower in rendering such assistance will be paid by Secured Party.  Upon the reasonable request of Borrower, Secured Party will provide and pay for the cost of legal counsel for Borrower.  Borrower may alternatively elect to employ counsel of its own choice in connection with its required cooperation, provided that the expenses of such counsel shall be borne solely by Borrower.

(e)    Borrower acknowledges and agrees that money damages may not be an adequate remedy for a breach of this Agreement, the Other Closing Documents or the Settlement Agreement and that Secured Party and its nominee shall have the absolute right to the remedies of injunctive relief and specific performance, both temporary and permanent, without bond, to enforce the obligations, covenants and agreements of Borrower under this Agreement, the Other

**CONFIDENTIAL**

NMLLC 01292

Closing Documents or the Settlement Agreement, which relief shall be cumulative and not exclusive of any right, remedy or relief otherwise available to Secured Party at law or in equity.

**9. Future Assurances.** Borrower agrees that it shall hereafter execute and deliver, or cause to be executed and delivered, and do or cause to be done such further acts as may reasonably be deemed by Secured Party to be necessary or desirable to carry out and effectuate the intent of this Agreement, the Other Closing Documents and the Settlement Agreement. In the event that Borrower is obligated to provide cooperation to Secured Party pursuant to Section 8(d) hereof or pursuant to this Section 9, the reasonable out-of-pocket expenses incurred by the Borrower in rendering such assistance will be paid by Secured Party. Upon the reasonable request of Borrower, Secured Party will provide and pay for the cost of legal counsel for Borrower. Borrower may alternatively elect to employ counsel of its own choice in connection with its required cooperation, provided that the expenses of such counsel shall be borne solely by Borrower.

**10. Remedies.** In the event of a breach or default by Borrower of any agreements, covenants, representations, warranties, indemnities or other duties or obligations hereunder or under any of the Other Closing Documents or the Settlement Agreement, Secured Party and Designee shall be entitled to exercise any and all rights and remedies available at law, in equity or otherwise. In the event of a breach or default by Secured Party of any of its agreements, covenants, representations, warranties, indemnities or other duties or obligations hereunder or under any of the Other Closing Documents, Borrower shall be entitled to exercise any and all rights and remedies available at law, in equity or otherwise.

**11. Survival.** The obligations and liabilities of the parties hereunder and under the Other Closing Documents are intended to survive without limitation on duration of time and shall not be deemed to be merged into any deed or any other document delivered in connection with the Closing.

**12. Applicable Law.** This Agreement and the Other Closing Documents shall be construed and enforced in all respects in accordance with the laws of the State of Ohio, excluding its choice of law rules.

**13. Time.** Time is of the essence of this Agreement.

**14. Entire Agreement.** This Agreement, the Other Closing Documents, the Settlement Agreement and the other agreements and releases expressly contemplated therein contain the entire agreement between the parties relating to the transaction contemplated hereby, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged herein.

**15. Successors.** This Agreement shall be binding on and inure to the benefit of the parties hereto, and their respective heirs, legatees, executors, estates, legal representatives, assigns and other successors. Secured Party and Designee shall have the right to assign their rights, title, obligations, duties and interests in this Agreement and the Other Closing Documents directly or indirectly to any other person or entity. Borrower shall have no right to assign its obligations, duties or liabilities arising in connection with this Agreement or the Other Closing Documents directly or indirectly without the prior written consent of Secured Party.

**16. Counterparts.** This Agreement may be executed in any number of counterparts and each of such counterparts shall, for all purposes, be deemed to be an original, and all such counterparts shall together constitute but one and the same agreement.

**CONFIDENTIAL**

3179.8 049579-21124

**NMLLC 01293**

**EXHIBIT B**

**17. Severability.**  If any provision of this Agreement or the Other Closing Documents or the application thereof to any party or circumstance shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement and the Other Closing Documents or the application of such provision to persons or circumstances, other than those as to which it is determined invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement and the Other Closing Documents shall be valid and shall be enforced to the fullest extent permitted by law.

**18. Captions.**  The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.

**19. Attorney's Fees.**  In the event that any dispute between the parties hereto should result in any legal action or proceeding, the prevailing party shall be reimbursed by the losing parties for all reasonable costs and attorneys' fees, including, but not limited to, attorneys, fees incurred in the course of appeal.

**20. Notices.**  Any notice, request or demand given or made under this Agreement or any of the Other Closing Documents shall be in writing and shall be hand delivered or sent by Federal Express or other reputable courier service or by postage prepaid registered or certified mail, return receipt requested, and shall be deemed given (i) when received at the following applicable addresses if hand delivered or if sent by Federal Express or other reputable courier service, and (ii) three (3) business days after being postmarked and addressed as follows if sent by registered or certified mail, return receipt requested:

| | |
|---|---|
| If to Borrower: | The National Machinery Company |
| | 161 Greenfield Street |
| | P.O. Box 747 |
| | Tiffin, Ohio 44883 |
| | Attn:    Chief Financial Officer |
| | |
| If to Secured Party or Designee: | NMC Acquisition LLC |
| | 122 S. Michigan Avenue, Suite 1700 |
| | Chicago, Illinois 60603 |
| | Attn:    Andrew Kalnow |
| | |
| Copy to: | Schwartz, Cooper, Greenberger & Krauss, Chtd. |
| | 180 North La Salle Street |
| | Suite 2700 |
| | Chicago, Illinois 60601 |
| | Attn:    James J. Greenberger, Esq. |

Any addresses or names specified above may be changed by a notice given by the party desiring the change to the other parties in accordance with the foregoing provisions.

**21. Transfers Absolute; No Duress.**

(a)    Borrower acknowledges and agrees that: (i) the transfer of the Real Property to Designee is an absolute conveyance and transfer of all of the right, title and interest of Borrower in and to the Real Property in fact as well as form and is not intended as a mortgage, trust conveyance, deed of trust or security instrument of any kind; (ii) the consideration for such transfer is legally adequate and provides a reasonably equivalent value for such transfer; and (iii)

**CONFIDENTIAL**

3179.8 049579-21124

**NMLLC 01294**

**EXHIBIT B**

Borrower has no further interest (including rights of redemption) or claims in or to the Real Property or to the proceeds and profits which may be derived therefrom, of any kind whatsoever.

(b)     The transfer of the Real Property to Designee and the other acts taken and to be taken by Borrower pursuant to this Agreement and the Other Closing Documents are the free and voluntary acts of Borrower, and that in executing and delivering this Agreement and the Other Closing Documents and in directing the execution thereof, Borrower is not acting under a misapprehension as to the effect thereof, nor under any duress, undue influence or misrepresentation by Secured Party or Designee.

**22.  Obligations to Third Parties.**     The parties hereto acknowledge and agree that neither acceptance by Designee of title to the Real Property nor any of the other transactions provided in this Agreement or the Other Closing Documents shall create any obligation or liability on the part of Designee or Secured Party to third parties which have claims of any kind whatsoever against Borrower, or the Real Property with respect to matters pertaining to the Real Property and accruing prior to the Closing.  No person or entity that is not a party to this Agreement shall have any third party beneficiary rights or other rights hereunder.

**23.  WAIVER OF RIGHT TO TRIAL BY JURY.**     TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, SECURED PARTY AND BORROWER HEREBY KNOWINGLY AND VOLUNTARILY MUTUALLY (A) WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, COUNTERCLAIM, CROSS-CLAIM, THIRD-PARTY CLAIM, DISPUTE, DEMAND, SUIT OR PROCEEDING ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND (B) AGREE THAT ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY.

**BORROWER:**                                    **SECURED PARTY:**

**THE NATIONAL MACHINERY COMPANY,**     NMC ACQUISITION LLC, a Delaware limited
an Ohio corporation                              liability company

By: _____           By: _____
Print Name: _____   Print Name: _____
Title: _____        Title: _____

**CONFIDENTIAL**

3179.8 049579-21124

**NMLLC 01295**

### SCHEDULE OF EXHIBITS

A   -   Legal Description of Real Estate Owned by Borrower

B   -   List of Other Closing Documents

C   -   Updated Preliminary Certificate of Title Examination to Real Property

**CONFIDENTIAL**

**NMLLC 01296**

<div align="right">**EXHIBIT B**</div>

<div align="center">

**EXHIBIT A**

**LEGAL DESCRIPTION**

</div>

**PARCEL 1**

Being a parcel of land situated in Lots 665 (referred to previously, by scrivener's error, as 664) to 685 inclusive of Frost's Addition (Tiffin Plat Volume 1, page 30) and Outlots 4 to 7 of Hedges (Block T) Survey of Lands (Seneca Plat Volume 7, Page 16) and part of vacated Alleys, a street and part of S.S.T.P.A. Railroad right-of-way, the First Ward of the City of Tiffin, Seneca County, Ohio

**BEGINNING** at a found iron pipe marking the southwesterly corner of Lot 665;

thence N 22° 36' 06" E one hundred sixty and zero hundredths (160.00) feet along the west line of Lot 665 to a found iron rod marking the northwesterly corner thereof and the southerly right-of-way of a sixteen (16) foot wide Alley;

thence S 67° 31' 01" E fifty-seven and thirty-one hundredths (57.31) feet along said alley right-of-way to a set iron rod marking the northeasterly corner of Lot 665;

thence N 22° 35' 33" E sixteen and zero hundredths (16.00) feet to a set nail marking the northerly right-of-way of a sixteen (16) foot wide alley and the southerly line of Lot 667;

thence N 67°31' 01" W one hundred fourteen and sixty-one hundredths (114.61) feet along said right-of-way and said lot line to a set nail marking the easterly right-of-way of a sixteen (16) foot Wide Alley;

thence N 22°36' 39" E four hundred twenty-eight and fifty-six hundredths (428.56) feet along said right-of-way to a found iron pipe marking the northwesterly corner of Lot 674;

thence S 75° 36' 25" E one hundred seventy-three and forty-three hundredths (173.43) feet along the north line of Lot 674 to a set iron rod marking the westerly right-of-way of vacated Stanton Street;

thence S 22° 34' 44" W five and twenty-six hundredths (5.26) feet along said right-of-way to a set nail on a concave curve to the right having a radius of 10,424.11 feet;

thence along said curve **Southeasterly** one thousand five hundred sixty-six and thirty hundredths (1566.30) feet (chord bearing - S 65° 23' 28" E, chord distance - 1564.83 feet) to a set nail marking the centerline of Holmes Street;

thence S 22° 35' 39" W seventeen and sixty-one hundredths (17.61) feet along said centerline to a set nail on a concave curve to the right having a radius of 10406.61 feet;

thence **Southeasterly** two hundred forty-five and sixty-six hundredths (245.66) feet (chord bearing - S 60° 23' 59" E, chord distance 245.66 feet) to a set iron rod marking a westerly line of a parcel of land now or formerly owned by Paul Warnement as described in Seneca County Deed Volume 446, page 919;

thence S 23° 42' 37" W one hundred seventy-six and thirty-six hundredths (176.36) feet along said Warnement's line to a found iron pipe;

thence N 66° 17' 23" W two hundred forty and forty-three hundredths (240.43) feet along said Warnement's line to a set nail marking the centerline of Holmes Street;

<div align="right">

**CONFIDENTIAL**

</div>

3179.8 049579-21124

<div align="right">

**NMLLC 01297**

</div>

EXHIBIT B

thence **S 22° 35' 39" W** three hundred eighty-two and thirty-three hundredths **(382.33)** feet along said centerline to a set nail marking the centerline of Greenfield Street, passing a found stone on the northerly right-of-way of said street;

thence **N 66° 45' 08" W** four hundred forty one and sixty-one hundredths **(441.61)** feet along said centerline to a found iron pipe;

thence **N 67° 31' 01" W** eight hundred seventy-four and eleven hundredths **(874.11)** feet along said centerline to a set nail;

thence **N 22° 35' 39" E** thirty and zero hundredths **(30.00)** feet to a set iron rod marking the northerly right-of-way of Greenfield Street;

thence **N 75° 36' 25" E** one hundred seventy-three and forty-three hundredths **(173.43)** to along said right-of-way to **THE POINT OF BEGINNING.**

Containing in all, **26.223** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed South 22° 35' 39" West.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 26.223 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
    Q53-01-106652-00-00 Lot 665
    Q53-01-108244-00-00 Lot 666 & VAC St. & Alley
    Q53-01-108332-00-00 Lot 667
    Q53-01-108304-00-00 Lot 668 & VAC St.
    Q53-01-108380-00-00 Lot 669 &VCA
    Q53-01-108344-00-00 Lots 670 & VAC St. &    Alley
    Q53-01-108396-00-00 Lot 671 & VAC St.
    Q53-01-108216-00-00 PT VCA & VCA STANTON ST
    Q53-01-108288-00-00 Lots 673 &674 VCA
    Q53-01-108204-00-00 PT Lots 675-676-677
    Q53-01-108284-00-00 PT Lot 678 & VCA
    Q53-01-108456-00-00 PT Lot 678 & VAC St.
    Q53-01-108188-00-00 PT Lots 679 & 680
    Q53-01-108252-00-00 Lot 681 & VCA
    Q53-01-108220-00-00 Lots 682-683-684-685 &VCA
    Q53-01-108232-00-00 RR Siding Stanton St. & O.L. 4-5-6 Blk T
    Q53-01-108412-00-00 PT O.L. 7 Blk T

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108232-00-00.**

Prior Instrument References

**CONFIDENTIAL**

**NMLLC 01298**

Deeds Volume 83, Pages 139,518 and 519; Volume 84, Page 183; Volume 110, Page 139; Volume 115, Pages 10 & 564; Volume 134, Page 365; Volume 139, Page 233; Volume 159, Page 66; Volume 158, Page 582; Volume 164, Page 229; Volume 157, Page 375; Volume 187, Page 535; Volume 182, Page 280; Volume 236, Page 372; Volume 245, Page 507; Volume 262, Pages 265, 266 and 284; Volume 270, Pages 336 and 349; Volume 279, Page 114; Volume 264, Page 135; Volume 260, Page 521; Volume 282, Page 52; Volume 293, Page 368; Volume 299, Pages 76 and 119; Volume 300, Page 510; Volume 302, Page 217; Volume 303, Pages 21 and 492; Volume 258, Page 70; Volume 410, Page 284; Official Records Book 75, Page 361. See also vacation ordinances and easements in Seneca Deeds Volume 209, Page 431; Volume 281, Page 200; Volume 305, Page 260; Volume 319, Pages 615 and 616; and Official Records Book 125, Page 850

## PARCEL 2

Being a parcel of land situated in Part of Lot 40 of Walker's Addition (Tiffin Plat Volume 1, Page 37), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set drill hole marking the northeasterly corner of said Lot 40 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of a 16.5 foot wide Vacated Alley;

thence S 22° 28' 59" W one hundred seven and seventy-two hundredths **(107.72)** feet along the easterly line of said Lot 40 and the westerly right-of-way of said 16.5 foot wide Vacated Alley to a set iron rod marking the southeasterly corner of a 0.29 acre parcel of land now or formerly owned by National Machinery Co., Deed Volume 397, Page 772;

thence N 68° 27' 46" W thirty-six and eighty-four hundredths **(36.84)** feet along the southerly line of said 0.29 acre parcel to a set iron rod;

thence N 62° 12' 00" W eighty-three and thirty-six hundredths **(83.36)** feet along the southerly line of said 0.29 acre parcel to a set iron rod marking the southwest corner thereof;

thence S 88° 51' 25" W ninety-seven and twenty-seven hundredths **(97.27)** feet along the southerly line of said Lot 40 to a set iron rod marking the southwesterly corner of said Lot 40 and the easterly right-of-way of a 16.5 foot wide Alley;

thence N 22° 22' 48" E one hundred thirty-six and zero hundredths **(136.00)** feet along the westerly line of said Lot 40 and said right-of-way to a set nail marking the northwesterly corner of said Lot 40 and the southerly right-of-way of Greenfield Street;

thence S 67° 31' 01" E two hundred ten and sixty-eight hundredths **(210.68)** feet along said lot line and said right-of-way to **THE POINT OF BEGINNING.**

Containing in all, **0.537** acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

CONFIDENTIAL

EXHIBIT B

This 0.537 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
    Q53-01-108156-00-00 60' W PT
    Q53-01-108272-00-00 30' W mid pt
    Q53-01-106756-01-00 N pt .290 AC

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108156-00-00**

Prior Instrument References: Seneca Deeds Volume 314, Page 266; Volume 342, Page 537; Volume 397, Page 772 and Official Records Volume 75, Page 364.

## PARCEL 3

Being a parcel of land situated in Lots 3, 4 and part of Lot 2 in Sheely's Replat (Tiffin Plat Volume 3, Page 54), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 4 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of a 12 foot wide Alley;

thence **S 22° 28' 59" W** one hundred fifty-eight and zero hundredths **(158.00)** feet along the easterly line of said Lot 4 and the westerly right-of-way of said Alley to the centerline of a vacated alley, from which a set iron rod for reference bears N 22°28'59" E eight and zero hundredths (8.00) feet;

thence **N 67° 31' 01" W** one hundred ten and zero hundredths **(110.00)** feet along said centerline, from which a set iron rod for reference bears N 22°28'59" E eight and zero hundredths (8.00) feet;

thence **N 22° 28' 59" E** one hundred fifty-eight and zero hundredths **(158.00)** feet along a parcel of land now or formerly owned by Heidelberg College as recorded in Seneca Deed Volume 260, Page 461 to a set iron rod marking the north line of Lot 2 and the southerly right-of-way of Greenfield Street;

thence **S 67° 31' 01" E** one hundred ten and zero hundredths **(110.00)** feet along the northerly line of part of Lot 2, Lots 3, 4 and said right-of-way to **THE POINT OF BEGINNING.**

Containing in all **0.399**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.399 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Included in Parcel 3 is all of the grantor's interest in the vacated alley being the southerly portion of the above described Parcel 3 which alley was vacated by Tiffin City Ordinance 1951 recorded November 15, 1960 in Seneca Deeds Volume 315, Page 210.

**CONFIDENTIAL**

**NMLLC 01300**

**EXHIBIT B**

Parcel Numbers
     Q53-01-108336-00-00 Pt Lot 2 & 4 Lot 3
     Q53-01-108372-00-00 Pt Lot 4 & N ½ VCA

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108336-00-00**

Prior Instrument References:  Seneca Deeds Volume 321, Page 380 Volume 322, Page 302 and Volume 315, Page 210.

## PARCEL 4

Being a parcel of land situated in Lots 43.5, 43, 45, and 46 of Walker's Addition (Tiffin Plat Volume 1, Page 37), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set drill hole marking the northeasterly corner of said Lot 45 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of Summit Street;

thence **S 05° 42' 15" E** two hundred seventy-five and ninety-eight hundredths **(275.98)** feet along the easterly line of Lots 45, 46 and the westerly right-of-way of Summit Street to a set iron rod marking The southeasterly corner of said Lot 4 and the northerly right-of-way of Main Street;

thence **S 84° 28' 42" W** three hundred seventy-six and ninety hundredths **(376.90)**      feet along the southerly line of Lots 46, 43 and said right-of-way to a set drill hole marking the southwesterly corner of said Lot 43 and the easterly right-of-way of Prospect Street;

thence **N 05° 37' 40" W** four hundred seventy-six and forty-three hundredths **(476.43)** feet along the westerly line of Lots 43, 43.5 and said right-of-way to a set drill hole marking the northwesterly corner of said Lot 43.5 and the southerly right-of-way of Greenfield Street;

thence **S 67° 31' 01" E** four hundred twenty-six and eighty-nine hundredths **(426.89)** feet along the northerly line of Lots 43.5, 45 and said right-of-way to **THE POINT OF BEGINNING.**

Containing in all **3.253**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 3.253 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
     Q53-01-108148-00-00 Pt Lot 43 ½
     Q53-01-108264-00-00 Lot 43
     Q53-01-108248-00-00 Lot 45
     Q53-01-108256-00-00 Lot 46

**CONFIDENTIAL**

**NMLLC 01301**

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108148-00-00**

Prior Instrument References:  Seneca Deeds Volume 188, Page 370.  For alley vacation ordinance see Seneca Deeds Volume 246, Page 208.

## PARCEL 5

Being a parcel of land situated in Outlots 4, 5 and 6 of Block "T" in Hedges Survey of Lands,  (Seneca Plat Volume 7, Page 16) First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

Commencing at a found stone marking the intersection of the centerline of Holmes Street and the north right-of-way line of Greenfield Street;

thence N 22° 35' 39" W six hundred twenty and thirty-five hundredths (620.35) feet along the centerline of Holmes Street to a set nail marking the beginning of a concave curve to the left having a radius of 10,472.61 feet and marking the north right-of-way line of the S.S.C.P.A. railroad and the **POINT OF BEGINNING**.

thence along said curve **Northwesterly** one thousand four hundred seven and fourteen hundredths **(1407.14)** feet (chord bearing - N 64° 57' 55" W, chord distance - 1406.08 feet) along the north right of way of said railroad to a set iron rod marking the south right-of-way of the C.S.X. Railroad and  a concave curve to the left having a radius of 4874.10 feet, passing a set iron rod on the westerly right-of-way of said railroad;

thence along said curve **Southeasterly** nine hundred twelve and thirty-nine hundredths **(912.39)** feet (chord bearing - S 82° 33' 28" E, chord distance - 911.05') along said south right-of-way to a set iron rod;

thence S 87° 46' 43" E five hundred sixty and forty-eight hundredths **(560.48)** feet along said south right-of-way to a set survey nail marking the centerline of Holmes Street passing a set iron rod on the westerly right-of-way of said street;

thence S 22° 35' 39" W four hundred ninety-three and twelve hundredths **(493.12)** feet along the centerline of Holmes Street to **THE POINT OF BEGINNING**.

Containing in all **6.612** acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 6.612 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Number Q53-01-108424-00-00

Prior Instrument References:  Seneca Deeds Volume 134, Page 365;  Volume 139, Page 233;  Volume 158, Page 582;  Volume 157, Page 375;  Volume 187, Page 535

**CONFIDENTIAL**

**NMLLC 01302**

EXHIBIT B

## PARCEL 6

Being a parcel of land situated in part of Site 1 of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of Site 1 in Baldwin's Subdivision (Plat Volume 3, page 17) and the westerly right-of-way of Holmes Street;

thence S 02° 20' 44" W eighty-six and forty-three hundredths (86.43) feet along the easterly line of said Site 1 and said right-of-way to a set iron rod marking the northerly right-of-way of the C.S.X. Railroad as described in Seneca County Deed Volume 133, Page 245;

thence N 88° 30' 15" W three hundred fifty-three and forty-four hundredths (353.44) feet along the north line of said railroad right-of-way to a set iron rod marking the easterly right-of-way of a 50 foot wide Street;

thence N 00° 37' 44" E eighty-one and four hundredths (81.04) feet along the westerly line of said Site 1 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of a fourteen (14) foot wide Alley;

thence S 89° 22' 16" E three hundred fifty-five and ninety-eight hundredths (355.98) feet along the north line of said Site 1 and said right-of-way to **THE POINT OF BEGINNING**.

Containing in all, **0.682** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed S 02° 20' 44" W.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC.
Driven flush.

This 0.682 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Number Q53-01-108224-00-00 OL1
Prior Instrument Reference: Seneca Deeds Volume 291, Page 600

## PARCEL 7

Being a parcel of land situated in Lots 17 - 25 inclusive of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 25 in Baldwin's Subdivision and the westerly right-of-way of Holmes Street;

thence S 02° 20' 44" W one hundred twenty and five hundredths (120.05) feet along the east line of Lot 25 and said right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

CONFIDENTIAL

NMLLC 01303

EXHIBIT B

thence N 89° 22' 16" W three hundred fifty-six and forty hundredths (356.40) feet along said Alley right-of-way to a set iron rod marking the southwesterly corner of said Lot 17 and the easterly right-of-way of a 50 foot wide Street;

thence N 00° 37' 44" E one hundred twenty and zero hundredths (120.00) feet along the west line of said Lot 17 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 22' 16" E three hundred sixty and zero hundredths (360.00) feet along said right-of-way to **THE POINT OF BEGINNING.**

Containing in all, **0.987** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed S 02° 20' 44" W.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC.
Driven flush.

This 0.987 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
     Q53-01-108428-00-00 Lot 17
     Q53-01-108448-00-00 Lot 18
     Q53-01-108228-00-00 Lot 19
     Q53-01-108432-00-00 Lot 20
     Q53-01-108316-00-00 Lot 21
     Q53-01-108212-00-00 Lot 22
     Q53-01-108356-00-00 Lot 23
     Q53-01-108208-00-00 Lot 24
     Q53-01-108184-00-00 Lot 25

**All of the above parcels are to be combined for real estate tax purposes using parcel number # Q53-01-108184-00-00**

Prior Instrument Reference:  Seneca Deeds Volume 291, Page 600

**PARCEL 8**

Being a parcel of land situated in part of Site 2 of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of Site 2 in Baldwin's Subdivision  and the westerly right-of-way of a 50' Street;

thence S 00° 37' 44" W eighty and twenty-eight  hundredths (80.28) feet along the east line of Site 2 and said right-of-way to a set iron rod marking the northerly right-of-way of the C.S.X. Railroad as described in Seneca County Deed Volume 133, page 245;

**CONFIDENTIAL**

**NMLLC 01304**

EXHIBIT B

thence N 88° 30' 15" W four hundred seventy-one and sixty-five hundredths **(471.65)** feet along said railroad right-of-way to a set iron rod marking the easterly right-of-way of Lewis Street;

thence N 17° 04' 19" E seventy-six and seven hundredths **(76.07)** feet along the west line of Site 2 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of a fourteen (14) foot Alley;

thence S 89° 24' 41" E two hundred seventy and twenty-two hundredths **(270.22)** feet along the north line of said Site 2 and said right-of-way to a set iron rod;

thence S 89° 22' 16" E one hundred seventy-nine and eighty-five  hundredths **(179.85)** feet along the north line of Site 2 and said right-of-way to **THE POINT OF BEGINNING**.

Containing in all, **0.812** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed South 02° 20' 44" West.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.812 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972,  in November, 1998.

Parcel Number Q53-01-108340-00-00

Prior Instrument Reference:  Seneca Deeds Volume 291, Page 600

## PARCEL 9

Being a parcel of land situated in Lots 12 to 16 inclusive of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County,  Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 16 and the westerly right-of-way of a 50' Street;

thence S 00° 37' 44" W one hundred twenty and zero hundredths **(120.00)** feet along the east line of said Lot 16 and said right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

thence N 89° 22' 16" W two hundred and zero hundredths **(200.00)** feet along said right-of-way to a set iron rod marking the southwesterly corner of Lot 12 and the easterly right-of-way of a fourteen (14) foot wide Alley;

thence N 00° 37' 37" E one hundred twenty and zero hundredths **(120.00)** feet along the west line of Lot 12 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 22' 16" E two hundred and zero hundredths **(200.00)** feet along said right-of-way to **THE POINT OF BEGINNING**.

CONFIDENTIAL

NMLLC 01305

EXHIBIT B

Containing in all, **0.551** acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 22' 16" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.
This 0.551 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
      Q53-01-108400-00-00 Lot 12
      Q53-01-108276-00-00 Lot 13
      Q53-01-108236-00-00 Lot 14
      Q53-01-108136-00-00 Lot 15
      Q53-01-108436-00-00 Lot 16

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108136-00-00**

Prior Instrument References:   Seneca Deeds Volume 291, Page 600

## PARCEL 10

Being a parcel of land situated in Lots 7 to 11 inclusive of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 11 and the westerly right-of-way of a fourteen (14) foot wide Alley and the southerly right-of-way of Greely Street;

thence S 00° 37' 44" W one hundred twenty and zero hundredths (**120.00**) feet along the east line of said Lot 11 and said alley right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

thence N 89° 22' 16" W five and seventy-seven hundredths (**5.77**) feet along said alley right-of-way to a set iron rod;

thence N 89° 24' 41" W two hundred twenty-six and fifteen hundredths (**226.15**) feet along said alley right-of-way to a set iron rod marking the southwesterly corner of said Lot 7 and the easterly right-of-way of Lewis Street;

thence N 17° 04' 19" E one hundred twenty-five and fourteen hundredths (**125.14**) feet along the west line of Lot 7 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 24' 41" E one hundred ninety and sixty-nine hundredths (**190.69**) feet along said right-of-way to a set iron rod;

thence S 89° 22' 16" E five and eighty-two hundredths (**5.82**) feet along said right-of-way to **THE POINT OF BEGINNING.**

CONFIDENTIAL

NMLLC 01306

EXHIBIT B

Containing in all, **0.590** acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 22' 16" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC.
Driven flush.

This 0.590 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
        Q53-01-108312-00-00 Lot 7
        Q53-01-108404-00-00 Lot 8
        Q53-01-108196-00-00 Lot 9
        Q53-01-108364-00-00 Lot 10
        Q53-01-108408-00-00 Lot 11

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108196-00-00**

Prior Instrument Reference: Seneca Deeds Volume 291, Page 600

## PARCEL 11
Being a Lots 1 through 6 inclusive in Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) and part of Vacated Stanton Street, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northeast corner of said Lot 6;

thence S 17° 04' 19" W one hundred twenty-five and fourteen hundredths (**125.14**) feet along the east line of said Lot 6 to a set iron rod marking the southeast corner thereof;

thence N 89° 24' 41" W two hundred twenty-two and nine hundredths (**222.09**) feet along the south line of said Lots to a set iron rod marking the southwest corner of said Lot 1;

thence N 00° 35' 19" E one hundred twenty and zero hundredths (**120.00**) feet along the west line of said Lot 1 to a set iron rod marking the northwest corner thereof;

thence S 89° 24' 41" E two hundred fifty-seven and sixty hundredths (**257.60**) feet along the north line of said Lots to **THE POINT OF BEGINNING**.

Containing in all **0.661**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC.
Driven flush.

This 0.661 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**CONFIDENTIAL**

**NMLLC 01307**

EXHIBIT B

Parcel Numbers
      Q53-01-108240-00-00 Lot 1
      Q53-01-108300-00-00 Lot 2
      Q53-01-108384-00-00 Lot 3
      Q53-01-108416-00-00 Lot 4
      Q53-01-108452-00-00 Lot 5
      Q53-01-108368-00-00 Lot 6

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108300-00-00**

Prior Instrument Reference:  Seneca Deeds Volume 291, Page 600

## PARCEL 12

Being a parcel of land situated in part of Site 3 and 4 of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeast corner of said Site 4;

thence **S 00° 35' 19" W** one hundred thirty-four and zero hundredths **(134.00)** feet along the east line of said Lot 6 to a set iron rod;

thence **S 89° 24' 41" E** two hundred thirty-one and ninety-five hundredths **(231.95)** feet along the south line of said Alley to a set iron rod marking the west line of Lewis Street;

thence **S 14° 04' 19" W** sixty-nine and thirty hundredths **(69.30)** feet along the west line of Lewis Street to a set iron rod marking the north right-of-way of the C.S.X. Railroad and a concave curve to the right having a radius of 4808.10 feet;

thence along said curve **Northwesterly** three hundred sixty-seven and fifty-eight hundredths **(367.58)** feet (chord bearing - N 80° 43' 13" W, chord distance - 367.49 feet) along said railroad right-of-way to a set iron rod marking the southeasterly corner of a parcel of land now or formerly owned by Ohio Power Company as recorded in Seneca Deed Volume 348, Page 293;

thence **N 20° 01' 59" E** one hundred fifty-three and sixty-eight hundredths **(153.68)** feet along the easterly line of said Ohio Power parcel to the south right-of-way of Greely Street, referenced by a found rod southwesterly 0.34 feet thereof;

thence **S 89° 24' 41" E** ninety-nine and eighty-two hundredths **(99.82)** feet along the south right-of-way of Greely Street to **THE POINT OF BEGINNING.**

Containing in all **0.737**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

**CONFIDENTIAL**

**NMLLC 01308**

EXHIBIT B

This 0.737 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
> Q53-01-108292-00-00 OL3
> Q53-01-108296-00-00 Pt OL4

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108296-00-00**

Prior Instrument Reference: Seneca Deeds Volume 291, Page 600

## PARCEL 13

Being a parcel of land situated in part of Site 4 of Baldwin's Subdivision (Tiffin Plat Volume 3, Page 17) and part of Vacated Stanton Street, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a found pin in concrete marking the intersection of the south right-of-way of Greely Street and the east right-of-way of Vacated Stanton Street;

thence S 22° 34' 44" W one hundred ten and ninety-four hundredths (110.94) feet along the east line of Vacated Stanton Street to the north right-of-way of C.S.X. Railroad and a concave curve to the right having a radius of , referenced by a found pin 0.3 feet south and 0.1 foot east thereof;

thence along said curve **Northwesterly** two hundred forty-nine and sixty-nine hundredths (249.69) feet (chord bearing N 80° 43' 13" W, chord distance 367.49') along said railroad right-of-way to a found monument,

thence N 73° 31' 24" W one hundred forty-three and thirty-six hundredths (143.36) feet along said railroad right-of-way to a set iron rod marking the south right-of way of Greely Street;

thence S 89° 24' 41" E four hundred twenty and eighty-four hundredths (420.84) feet along the south right-of-way of Greely Street to **THE POINT OF BEGINNING.**

Containing in all **0.511**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.511 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Numbers
> Q53-01-108176-00-00
> Q53-01-108268-00-00

**CONFIDENTIAL**

**NMLLC 01309**

EXHIBIT B

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108268-00-00**

Prior Instrument Reference: Seneca Deed Volume 291, Page 604. See also easement recorded in Seneca Deeds Volume 362, Page 592.

## PARCEL 14

Being a parcel of land situated in Lots 1 to 6, 12 to 19 and 26 to 30 inclusive and a vacated Alley and part of vacated Crayon Street in J.J. Fleck's Subdivision (Plat Volume 3, page 6), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northwesterly corner of said Lot 1 and the intersection of the westerly right-of-way of Holmes and the southerly right-of-way of a 30' Street;

thence S 87° 46' 43" E three hundred fourteen and fifty-eight hundredths **(314.58)** feet along the southerly right-of-way of a 30' Street to a set iron rod marking the northwesterly corner of said Lot 26;

thence S 78° 42' 54" E one hundred twenty and sixty-five hundredths **(120.65)** feet along the northerly line of Lot 26 to a set iron rod marking the northeasterly corner of said Lot 26 and the easterly line of J.J. Fleck's Subdivision;

thence S 22° 28' 47" W two hundred twelve and five hundredths **(212.05)** feet along the easterly line of said J.J. Fleck's Subdivision to a set iron rod marking the southeasterly corner of Lot 30;

thence N 67° 20' 26" W one hundred eighteen and forty-seven hundredths **(118.47)** feet along the southerly line of Lot 30 to a set iron rod marking the southwesterly corner thereof and the easterly right-of-way of Crayon Street;

thence N 68° 41' 42" W forty and one hundredths **(40.01)** feet to a set iron rod marking the northeasterly corner of Lot 16 and the westerly right-of-way of Crayon Street;

thence S 22° 31' 03" W one hundred fifty-nine and six hundredths **(159.06)** feet along said right-of-way to a set iron rod marking the southeasterly corner of Lot 19 and the northerly right-of-way of a fifteen (15) foot wide Alley;

thence N 67° 24' 42" W two hundred fifty-five and thirty-seven hundredths **(255.37)** feet along said alley right-of-way to a set iron rod marking the southwesterly corner of Lot 6 and the easterly right-of-way of Holmes Street;

thence N 22° 35' 39" two hundred thirty-eight and seventy-three hundredths (238.73) feet along said right-of-way to **THE POINT OF BEGINNING.**
Containing in all, **2.386** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed North 22° 35' 39" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

**CONFIDENTIAL**

**NMLLC 01310**

**EXHIBIT B**

This 2.386 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in October, 1998.

Parcel Numbers
      Q53-01-108352-00-00 Lot 26 & VAC St.
      Q53-01-108308-00-00 Lot 27 & VAC St.
      Q53-01-108140-00-00 Lot 28 & VAC St.
      Q53-01-108192-00-00 Lot 29 & VAC St.
      Q53-01-108124-00-00 Lot 30 & VAC St.
      Q53-01-108320-00-00 Lot 1 & VCA
      Q53-01-108440-00-00 Lot 2 & VCA
      Q53-01-108360-00-00 Lot 3 & VCA
      Q53-01-108116-00-00 Lot 4 & VCA
      Q53-01-108164-00-00 Lot 5 & VCA
      Q53-01-108132-00-00 Lot 6 & VCA
      Q53-01-108128-00-00 Lot 12 & VCA
      Q53-01-108120-00-00 Lot 13
      Q53-01-108444-00-00 Lot 14 & VAC St.
      Q53-01-108152-00-00 Lot 15 & VCA & St.
      Q53-01-108112-00-00 Lot 16
      Q53-01-108420-00-00 Lot 17 & VCA
      Q53-01-108392-00-00 Lot 18 & VCA
      Q53-01-108348-00-00 Lot 19 & VCA

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108320-00-00**

Prior Instrument References: Seneca Deeds Volume 291, Pages 601, 602 and 603. See vacation ordinance recorded in Deed Volume 344, Page 247.

## PARCEL 15

Being a parcel of land situated in Lots 7 to 11 inclusive and 20 to 24 inclusive and a vacated Alley of J.J. Fleck's Subdivision (Tiffin Plat Volume 3, page 6) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set nail marking the northwesterly corner of said Lot 7 and the intersection of the easterly right-of-way of Holmes Street and the southerly right-of-way of a fifteen (15) foot wide Alley;

thence S 67° 24' 42" E two hundred fifty-five and thirty-nine hundredths (255.39) feet along the southerly right-of-way of a fifteen (15) foot wide Alley to a set iron rod marking the northeasterly corner of Lot 20 and the intersection of the southerly right-of-way of a fifteen (15) foot wide Alley and the westerly right-of-way of Crayon Street;

thence S 22° 31' 03" W two hundred thirty and seventy-seven hundredths (230.77) feet along said right-of-way to a set iron rod marking the southeasterly corner of Lot 24 and the intersection of the westerly right-of-way of Crayon Street and the northerly right-of-way of an eighteen (18) foot wide Alley;

thence N 59° 43' 20" W four and eighty-five hundredths (4.85) feet along the south line of Lot 24 and said alley right-of-way to a set iron rod;

**CONFIDENTIAL**

**NMLLC 01311**

thence northwesterly two hundred fifty-two and eighty-two hundredths (**252.82**) feet along said alley right-of-way to a set iron rod marking the southwesterly corner of Lot 11 and the intersection of the northerly right-of-way of an eighteen (18) foot wide Alley and the easterly right-of-way of Holmes Street, chord bearing N 60° 19' 35" W, chord distance two hundred fifty-two and eighty-two hundredths (252.82) feet;

thence **N 22° 35' 39" E** one hundred ninety-eight and ninety-four hundredths (**298.94**) feet along the easterly right-of-way of said Holmes Street to **THE POINT OF BEGINNING.**

Containing in all, **1.257** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed North 22° 35' 39" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 1.257 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in October, 1998.

Parcel Numbers

      Q53-01-108168-00-00 Lot 7 & VCA
      Q53-01-108180-00-00 Lots 6 & 8 & VCA
      Q53-01-108172-00-00 Lot 9 & VCA
      Q53-01-108200-00-00 Lot 10 & VCA
      Q53-01-108160-00-00 Lot 11 & VCA
      Q53-01-108388-00-00 Lot 20 & VCA
      Q53-01-108376-00-00 Lot 21 & VCA
      Q53-01-108260-00-00 Lot 22 & VCA
      Q53-01-108324-00-00 Lot 23 & VCA
      Q53-01-108328-00-00 Lot 24 & VCA

**All of the above parcels are to be combined for real estate tax purposes using parcel number Q53-01-108168-00-00**

Prior Instrument Reference: Seneca Deeds Volume 300, Page 689

**PARCEL 16**

Being a parcel of land situated in part of Outlots 8 and 9 of Block "T" of Hedges Estate (Seneca Plat Volume 7, Page 16) the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the southeasterly corner of Lot 40 in J.J. Fleck's Subdivision (Plat Volume 3, page 6);

thence **N 22° 28' 47" E** six hundred forty-five and fifty-one hundredths (**645.51**) feet along the easterly line of said Fleck's Subdivision to a set iron rod marking the southwesterly corner of a 0.286 acre parcel of land now or formerly owned by C.S.X. Railroad as described in Seneca County Deed Volume 276, page 514;

**CONFIDENTIAL**

NMLLC 01312

<div align="right">**EXHIBIT B**</div>

thence S 87° 46' 43" E two hundred nineteen and forty-two hundredths **(219.42)** feet along said C.S.X. Railroad's southerly line to a set iron rod marking the southeasterly corner thereof and the westerly line of Gist's Outlots (Plat Volume 1, page 8) and the existing corporation line of the City of Tiffin;

thence S 00° 53' 53" W eight hundred fifty-two and thirty-seven hundredths **(852.37)** feet along said Gist's Outlots westerly line and said corporation line to a set iron rod marking the northerly right-of-way of S.S.T.P.A. Railroad;

thence N 59° 43' 20" W five hundred twenty-four and twenty-one hundredths **(524.21)** feet along said railroad right-of-way to **THE POINT OF BEGINNING.**

Containing in all, **5.994** acres of land, more or less, subject to all legal highways and easements.

The bearing of the east line of J.J. Fleck's Subdivision is assumed North 22° 28' 47" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 5.994 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

Parcel Number Q53-01-106488-00-00

Prior Instrument Reference: Seneca Official Records Volume 36, Page 92

<div align="right">**CONFIDENTIAL**</div>

<div align="right">**NMLLC 01313**</div>

<div align="right">EXHIBIT B</div>

## EXHIBIT B

## LIST OF OTHER CLOSING DOCUMENTS

1.  Limited Warranty Deed to be executed by Borrower.

2.  Owner's Affidavit to be executed by Borrower.

3.  Affidavit to be executed by NMC Real Estate LLC.

4.  Statement of Exception from Real Property Conveyance Fee to be executed by NMC Real Estate LLC.

<div align="right">

**CONFIDENTIAL**

</div>

<div align="right">

**NMLLC 01314**

</div>

EXHIBIT C                                                    EXHIBIT B

Re\Prelim\02\NationalMachinery.ud

**UPDATED**
**PRELIMINARY**
**CERTIFICATE OF TITLE EXAMINATION**
**TO REAL PROPERTY**

To:    Mary Ward
       **Clerk of Courts**
       **Seneca County**

RE:    **The National Machinery Company**
       **161 Greenfield St.**
       **Tiffin, Ohio 44883**

**Permanent Parcel #'s:** Q53-01-108444-00-00; Q53-01-108448-00-00; Q53-01-108452-00-00; Q53-01-108456-00-00; Q53-01-106488-00-00; Q53-01-108416-00-00; Q53-01-108420-00-00; Q53-01-108424-00-00; Q53-01-108428-00-00; Q53-01-108432-00-00; Q53-01-108436-00-00; Q53-01-108440-00-00; Q53-01-108388-00-00; Q53-01-108392-00-00; Q53-01-108396-00-00; Q53-01-108440-00-00; Q53-01-108404-00-00; Q53-01-108408-00-00; Q53-01-108412-00-00; Q53-01-108360-00-00; Q53-01-108364-00-00; Q53-01-108368-00-00; Q53-01-108372-00-00; Q53-01-108376-00-00; Q53-01-108380-00-00; Q53-01-108384-00-00; Q53-01-108332-00-00; Q53-01-108336-00-00; Q53-01-108340-00-00; Q53-01-108344-00-00; Q53-01-108348-00-00; Q53-01-108352-00-00; Q53-01-108356-00-00; Q53-01-108304-00-00; Q53-01-108308-00-00; Q53-01-108312-00-00; Q53-01-108316-00-00; Q53-01-108320-00-00; Q53-01-108324-00-00; Q53-01-108328-00-00; Q53-01-108272-00-00; Q53-01-108276-00-00; Q53-01-108284-00-00; Q53-01-108288-00-00; Q53-01-108292-00-00; Q53-01-108296-00-00; Q53-01-108300-00-00; Q53-01-108244-00-00; Q53-01-108248-00-00; Q53-01-108252-00-00; Q53-01-108256-00-00; Q53-01-108260-00-00; Q53-01-108264-00-00; Q53-01-108268-00-00; Q53-01-108216-00-00; Q53-01-108220-00-00; Q53-01-108224-00-00; Q53-01-108228-00-00; Q53-01-108232-00-00; Q53-01-108236-00-00; Q53-01-108240-00-00; Q53-01-108188-00-00; Q53-01-108192-00-00; Q53-01-108196-00-00; Q53-01-108200-00-00; Q53-01-108204-00-00; Q53-01-108208-00-00; Q53-01-108212-00-00; Q53-01-108160-00-00; Q53-01-108164-00-00; Q53-01-108168-00-00; Q53-01-108172-00-00; Q53-01-108176-00-00; Q53-01-108180-00-00; Q53-01-108184-00-00; Q53-01-106188-00-00; Q53-01-108136-00-00; Q53-01-106652-00-00; Q53-01-106756-01-00; Q53-01-108112-00-00;   Q53-01-108116-00-00;   Q53-01-108120-00-00

1.    **PRESENT LEGAL TITLE.** Based upon an examination of the public records of Seneca County, Ohio, as disclosed by the public indexes relating to the premises in accordance with the Ohio Marketable Title Act, the present legal record title to the real estate described herein is certified to be in the name of **The National Machinery Company, aka The National Machinery Co., aka National Machinery Co., aka National Machinery Company,** see attached Exhibit "A" for deed references. The record title is certified to be marketable and free from liens and encumbrances, except as to those matters set forth herein, and within the time periods set forth.

2.    **MORTGAGES, LIENS AND ENCUMBRANCES.** The indexes to the public records of Seneca County reveal the following claims as mortgages, liens or encumbrances upon the real estate:

There is a certain open-end mortgage for up to $100,000,000.00, executed and delivered by The National Machinery Company to The First National Bank of Chicago dated November 6, 1998 and filed for record November 10, 1998 at 11:59 A.M. in Volume 36, Page 94 of the Mortgage Records of Seneca County, Ohio. This mortgage was assigned to NMC Acquisition, LLC, a Delaware limited liability company dated February 12, 2002 and filed for record February 13, 2002 at 3:48 P.M. in Volume 183, Page 773 of the Official Records of Seneca County, Ohio. Except for statutory liens for taxes and assessments said mortgage is the first and best lien on said premises except as might otherwise be indicated.

There is a certain UCC Fixture Filing Financing Statement #2740, executed and delivered by The National Machinery Company to The First National Bank of Chicago, filed November 17, 1998 at 1:42 P.M. in the Office of the Recorder of Seneca County, Ohio. Said Financing Statement was further assigned as Financing Statement #8111 to NMC Acquisition, LLC filed for record on February 13, 2002 at 3:48 P.M. Except for statutory liens for taxes and assessments said mortgage is the second best lien on said premises except as might otherwise be indicated.

There is a certain Affidavit for Mechanic's Lien, executed and delivered by KCI KONECRANES, INC., to The National Machinery Company, in the amount of $36,379.50, filed March 4, 2002 at 1:35 P.M. in the Office of the Recorder of Seneca County, Ohio. A copy of this Affidavit is attached. **This Affidavit**

CONFIDENTIAL

NMLLC 01315

was filed after the present foreclosure complaint (Case #54337) was filed and therefore may not be a valid lien upon the subject premises, pursuant to the doctrine of Lis pendens.

There was a certain judgment obtained against The National Machinery Company on June 27, 2002 in the amount of $41,497.33 plus interest, in favor of Northwest Controls, Plaintiff. The case number is 54228. However, as of the date of this opinion, no praecipe for a Certificate of Judgment has been filed.

**3. REAL ESTATE TAXES, ASSESSMENTS.** The current tax duplicate of the Treasurer of Seneca County describes the real property as follows, with the following taxes and special assessments shown to be unpaid.

**Permanent parcel #: Q53-01-108444-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108448-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108452-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108456-00-00**
Taxes for the entire year 2001 in the amount of $25.33, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108488-00-00**
Taxes for the entire year 2001 in the amount of $84.98, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108416-00-00**
Taxes for the entire year 2001 in the amount of $17.58, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108420-00-00**
Taxes for the entire year 2001 in the amount of $23.61 half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108424-00-00**
Taxes for the entire year 2001 in the amount of $488.84, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108428-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108432-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108436-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108440-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108388-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

CONFIDENTIAL

NMLLC 01316

**Permanent parcel #: Q53-01-108392-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108396-00-00**
Taxes for the entire year 2001 in the amount of $39.94, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108400-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108404-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108408-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108412-00-00**
Taxes for the entire year 2001 in the amount of $87.51, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108360-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108364-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108368-00-00**
Taxes for the entire year 2001 in the amount of $33.22, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108372-00-00**
Taxes for the entire year 2001 in the amount of $20.31, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108376-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108380-00-00**
Taxes for the entire year 2001 in the amount of $45.87, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108384-00-00**
Taxes for the entire year 2001 in the amount of $17.58, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108332-00-00**
Taxes for the entire year 2001 in the amount of $39.94, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108336-00-00**
Taxes for the entire year 2001 in the amount of $41.31, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108340-00-00**

CONFIDENTIAL

NMLLC 01317

Taxes for the entire year 2001 in the amount of $19.39, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108344-00-00**
Taxes for the entire year 2001 in the amount of $45.87, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108348-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108352-00-00**
Taxes for the entire year 2001 in the amount of $30.69, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108356-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108304-00-00**
Taxes for the entire year 2001 in the amount of $39.94, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108308-00-00**
Taxes for the entire year 2001 in the amount of $24.28, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108312-00-00**
Taxes for the entire year 2001 in the amount of $36.93, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108316-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108320-00-00**
Taxes for the entire year 2001 in the amount of $32.71, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108324-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108328-00-00**
Taxes for the entire year 2001 in the amount of $31.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108272-00-00**
Taxes for the entire year 2001 in the amount of $14.84, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108276-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108284-00-00**
Taxes for the entire year 2001 in the amount of $13.46, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108288-00-00**
Taxes for the entire year 2001 in the amount of $68.24, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

CONFIDENTIA

**Permanent parcel #: Q53-01-108292-00-00**
Taxes for the entire year 2001 in the amount of $61.85, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108296-00-00**
Taxes for the entire year 2001 in the amount of $50.44, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108300-00-00**
Taxes for the entire year 2001 in the amount of $200.83, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108244-00-00**
Taxes for the entire year 2001 in the amount of $73.72, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108248-00-00**
Taxes for the entire year 2001 in the amount of $97.68, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108252-00-00**
Taxes for the entire year 2001 in the amount of $46.33, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108256-00-00**
Taxes for the entire year 2001 in the amount of $124.15, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108260-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108264-00-00**
Taxes for the entire year 2001 in the amount of $124.15, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108268-00-00**
Taxes for the entire year 2001 in the amount of $161.81, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108216-00-00**
Taxes for the entire year 2001 in the amount of $54.09, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108220-00-00**
Taxes for the entire year 2001 in the amount of $163.18, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108224-00-00**
Taxes for the entire year 2001 in the amount of $78.74, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108228-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108232-00-00**
Taxes for the entire year 2001 in the amount of $68,858.59, per half, are paid.  Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108236-00-00**

CONFIDENTIAL

NMLLC 01319

Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108240-00-00**
Taxes for the entire year 2001 in the amount of $17.58, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108188-00-00**
Taxes for the entire year 2001 in the amount of $132.37, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108192-00-00**
Taxes for the entire year 2001 in the amount of $24.28, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108196-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108200-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108204-00-00**
Taxes for the entire year 2001 in the amount of $104.98, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108208-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108212-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108160-00-00**
Taxes for the entire year 2001 in the amount of $24.45, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108164-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108168-00-00**
Taxes for the entire year 2001 in the amount of $27.99, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108172-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108176-00-00**
Taxes for the entire year 2001 in the amount of $64.75, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108180-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108184-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**CONFIDENTIAL**

**NMLLC 01320**

**Permanent parcel #: Q53-01-106188-00-00**
Taxes for the entire year 2001 in the amount of $742.40, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108136-00-00**
Taxes for the entire year 2001 in the amount of $30.19, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-106756-01-00**
Taxes for the entire year 2001 in the amount of $102.70, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108112-00-00**
Taxes for the entire year 2001 in the amount of $23.61, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108116-00-00**
Taxes for the entire year 2001 in the amount of $23.44, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

**Permanent parcel #: Q53-01-108120-00-00**
Taxes for the entire year 2001 in the amount of $22.60, per half, are paid. Taxes for the entire year 2002 are by Ohio law a lien, but have not yet been ascertained.

Attached to this Preliminary Title Opinion is an appraisal of permanent parcels Q53-01-108323-00-00, et. al, dated July 1, 1999, owned by The National Machinery Company. Also attached is a copy of the Auditor's duplicate for all eighty-eight (88) parcels.

4. **DESCRIPTION OF REAL PROPERTY.** The following is a proper description of the real property, based upon prior descriptions in the public records during the period listed for this search, but subject to errors in the metes and bounds descriptions, as will be revealed by an examination of the real property by a surveyor or engineer:

See Exhibit "B", attached hereto.

5. **ZONING.** The premises is located in the City of Tiffin and is subject to the zoning rules and regulations of said City.

6. **EASEMENTS, RESTRICTIONS, COVENANTS, LEASES AND OTHER CONDITIONS.**

A. There is a certain easement for a building overhang from the Sandusky County - Seneca County - City of Tiffin Port Authority to The National Machinery Company, dated September 13, 1999 and filed for record October 29, 1999 at 1:13 P.M. in **Volume 75, Page 366** of the Official Records in the Office of the Recorder of Seneca County, Ohio.

B. There is a certain perpetual easement and right of way for ingress and egress to pass on foot or/and vehicles of every description from Heidelberg College to The National Machinery Company, dated September 10, 1999 and filed for record October 29, 1999 at 1:13 P.M. in **Volume 75, Page 364** of the Official Records in the Office of the Recorder of Seneca County, Ohio.

C. There is a certain easement for the right for construction, maintenance, and use of certain crossings and occupations over, across, along, or under the land and tracks of the railroad line at various locations from Sandusky County - Seneca County - City of Tiffin Port Authority to The National Machinery Company, dated October 22, 1999 and filed for record November 16, 1999 at 2:57 P.M. in **Volume 77, Page 63** of the Official Records in the Office of the Recorder of Seneca County, Ohio.

D. There is a certain easement for the right for construction, maintenance, and use of a certain drainage tile over, across, along, or under the land and tracks of the railroad lines at various locations from Sandusky County - Seneca County - City of Tiffin Port Authority to The National Machinery Company, dated March 5, 2001 and filed for record March 12, 2001 at 3:36

**CONFIDENTIAL**

**NMLLC 01321**

P.M. in **Volume 125, Page 850** of the Official Records in the Office of the Recorder of Seneca County, Ohio.

E.      There is a certain Affidavit of Surveyor, dated November 10, 1998, filed November 10, 1998 at 9:48 A.M. in the Official Records of Seneca County, Ohio. A copy is attached hereto. This affidavit purports to describe the re-survey of the real estate titled the name of The National Machinery Co., filed in **Plat Cabinet 2, Slots 12A to 13B** on November 10, 1998 at 9:40 A.M. in the Office of the Recorder of Seneca County, Ohio.

F.      There is a certain lease between The National Machinery Co. and Pennsylvania Company for the construction and operation of a side track, and located on a strip of land 219 feet wide off the west side of Lot Number Four (4) in Block "T" of the Hedges Estate. This lease is dated May 25, 1883, filed on May 29, 1883 and recorded in **Volume 2, Page 442** of the Lease Records in the Office of the Recorder of Seneca County, Ohio.

G.      There is a certain Agreement between the Pennsylvania Company and The National Machinery Company for the construction and operation of a side track. This Agreement is dated December 20, 1909, filed on April 22, 1910 and recorded in **Volume 162, Page 241** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

H.      There is a certain easement for installation and maintenance of a ten (10) inch sewer pipe from Marvin S. Gooding and Peggy Lou Gooding, husband and wife, to The National Machinery Company dated February 21, 1958, filed on February 21, 1958 at 2:20 P.M. and recorded in **Volume 302, Page 466 and Volume 302, Page 246** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

I.      There is a certain easement for installation and maintenance of a ten (10) inch sewer pipe from Lida S. Bacon to The National Machinery Company dated February 21, 1958, filed on February 21, 1958 at 2:20 P.M. and recorded in **Volume 302, Page 466 and Volume 302, Page 467** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

J.      There is a certain agreement between The National Machinery Company and The Ohio Cities Water Company, whereby National agrees to allow Ohio Cities eight (8) inch cast iron water main to remain as now located and National agrees to indemnify Ohio Cities from all liability for loss, damage, inconvenience or expense which may result from the breaking of said main. This agreement is dated August 31, 1958, filed on September 29, 1958 at 3:30 P.M. and recorded in **Volume 305, Page 454** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

K.      There is a certain easement for installation and maintenance of an 18 inch sewer line from Heidelberg College to The National Machinery Company dated November 7, 1963, filed on November 12, 1963 at 4:25 P.M. and recorded in **Volume 327, Page 542** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

L.      There is a certain easement for an electric transmission line and pump and anchors from The National Machinery Company to Ohio Power Company, dated December 7, 1965, filed on December 27, 1965 at 10:35 A.M. and recorded in **Volume 337, Page 725** of the Deed Records in the Office of the Recorder of Seneca County, Ohio.

M.      There is a certain easement for encroachment on Greeley Street right-of-way from City of Tiffin, Ohio to The National Machinery Company, dated September 15, 1972, filed on November 13, 1972 at 3:23 P.M. and recorded in **Volume 362, Page 592** of the Deed Records in the Office of the Recorder of Seneca County, Ohio

The following litigation actions have been filed of record which may or may not result in a lien on the subject real estate:

N.      Pending Litigation: There was filed a certain Complaint on Account in the amount of $41,497.73 in case #54228, captioned Northwest Controls, P.O. Box 8, Defiance, Ohio 43512 vs. National Machinery Co., Tiffin, Ohio. The Complaint was filed on January 11, 2002 and served on January 15, 2002. ON June 27, 2002, judgment was rendered in favor

**CONFIDENTIA**

**NMLLC 01322**

of the Plaintiff and against the Defendant in the amount of $41,497.73 plus interest. As of the date of this opinion, no praecipe for a Certificate of Judgment has been filed.

.O.    Pending Litigation: There was filed a certain Shareholder's Derivative Suit asking for specified damages exceeding $25,000.00 in case #54267, Andrew H. Kalnow, et. al. vs. National Machinery Co., et. al. The complaint was filed on January 23, 2002. Federal Judge James Carr's order was filed on June 11, 2002. The Federal Court Case number is 3:02CV7272. On July 11, 2002, the United States Federal Court, Northern District, Western Division assumed jurisdiction.

P.    There is certain Pending Litigation captioned NMC Acquisition VS. National Machinery Company, Case #54337, Seneca County Common Pleas Court. A preliminary pre-trial was held on August 1, 2002.

Q.    Pending Litigation: There was a certain Complaint filed in Seneca County Common Pleas Court in the amount of $37,134.99 plus interest at 10% from date of Judgment and costs in case #54600, Columbia Gas of Ohio, Inc., 200 Civic Center Drive, Columbus, Ohio 43215 vs. National Machinery Co., Tiffin, Ohio. The Complaint was filed on May 20, 2002. An answer was filed on June 24, 2002. A pre-trial is set for August 28, 2002 at 10:50 A.M.

R.    Pending Litigation: There was a certain Complaint on Account filed in the amount of $49,873.30 plus interest at the rate of 10% from January 24, 2002 which amounts to $1,694.33 for a total of $51,567.63 plus costs and interest from the date of filing of the Complaint in case #54651, captioned Sunsource Inc., 2301 Windsor Court, Addison, IL 60101 vs. National Machinery Co., Tiffin, Ohio. The Complaint was filed on May 31, 2002 and served on May 31, 2002. Answer of Defendant was filed on July 1, 2002. A motion for judgment on the pleadings was filed on August 15, 2002. A pre-trial is set for August 7, 2002 at 10:15 A.M.

7. DEFECTS NOT SHOWN BY EXAMINATION OF RECORDS. There are excepted from this Certificate of Title a report of prescriptive easements; easements of necessity; "appurtenances" granted to neighboring lands by former common owners; claims by adverse possession; rights of parties in possession; highway and utility easements; restrictions arising from zoning and platting ordinances and government regulations and regional planning; exercise of governmental powers; liens, encumbrances and adverse claims declared by Courts of the United States and of the State of Ohio outside Seneca County and recorded elsewhere than in Seneca County; liens asserted by the United States and State of Ohio, their agencies and officers under the Ohio Solid and Hazardous Waste and Disposal Act and Federal Super Fund Amendments, and under Racketeering Influence and Corrupt Organization acts and receivership liens and recorded elsewhere than in Seneca County; mistakes in the indexes to the public records; liens and encumbrances asserted by governmental agencies and not of record in Seneca County; matters not of record; such claims and liens which have arisen prior to the starting time of this examination; questions which a correct survey or inspection would disclose; rights to file mechanics' liens; special taxes and assessments not shown by the public records of the County Treasurer (despite the existence of such assessment in other public offices of Seneca County); liens of Federal and State estate, inheritance and gift taxes; changes of interpretations and holdings of courts from previous case decisions; change of name of record owner, without correction of Tax Lists and recording of appropriate documents in Deed Books; fraud in the verification and execution of instruments affecting title; and variances of spelling in name of grantors and grantees in the chain of title (even though a Court, by application of doctrine of "idemsonans," might declare the differently spelled names to by synonymous).

8)    INSPECTIONS. No inspection of the subject premises has been made to determine whether toxic waste or any other waste or any hazardous substance is present or has been deposited upon or in the subject premises and no liability is assumed for matters related thereto. No inspection of the subject premises has been made to determine structural, drainage, termite or pest, well, septic or radon gas conditions and no liability is assumed for matters related thereto.

9)    CLOSING TIME OF SEARCH. The examination of indexes to the public records for the purpose of this Certificate was closed as of July 16, 2002 at 7:59 A.M.

10)    BEGINNING TIME OF EXAMINATION. The indexes to the public records for the purposes of deeds, mortgages and leases were searched for a period of over forty (40) years.

**CONFIDENTIA**

NMLLC 01323

All other public records upon which this examination is based were searched for a period of six (6) years prior to the closing time.

Dated: July 16, 2002 at 7:59 A.M.

James R. Gucker
Attorney at Law

CONFIDENTIAL

NMLLC 01324

Exhibit "A"

PRIOR DEED REFERENCES AS RECORDED IN DEED RECORDS OF SENECA
COUNTY, OHIO:

Volume 83, Page 139
Volume 83, Page 518
Volume 84, Page 183
Volume 110, Page 139
Volume 115, Page 10
Volume 115, Page 564
Volume 134, Page 365
Volume 139, Page 233
Volume 159, Page 66
Volume 158, Page 582
Volume 164, page 229
Volume 157, Page 375
Volume 187, Page 535
Volume 188, Page 370
Volume 182, Page 280
Volume 236, Page 372
Volume 245, Page 507
Volume 258, Page 70
Volume 262, Page 265
Volume 262, Page 266
Volume 262, Page 284
Volume 264, Page 135
Volume 270, Page 336

Volume 279, Page 114
Volume 270, Page 349
Volume 260, Page 521
Volume 282, Page 32
Volume 291, Page 600
Volume 291, Page 601
Volume 291, Page 602
Volume 291, Page 603
Volume 291, Page 604
Volume 293, Page 368
Volume 299, Page 76
Volume 299, Page 119
Volume 300, Page 510
Volume 300, Page 689
Volume 302, Page 217
Volume 303, Page 21
Volume 303, Page 492
Volume 314, Page 266
Volume 321, Page 380
Volume 322, Page 302
Volume 342, Page 537
Volume 397, Page 772
Volume 410, Page 284

PRIOR DEED REFERENCES AS RECORDED IN THE OFFICIAL RECORDS OF SENECA
COUNTY, OHIO:

Volume 36, Page 92

**CONFIDENTIAL**

**NMLLC 01325**

Exhibit "B"

**PARCEL 1**

Being a parcel of land situated in Lots 665 to 685 inclusive of Frost's Addition (Plat Volume 1, page 30) and Outlots 4 to 6 of Hedges (Survey of Lands) and part of vacated Alleys and a street, the First Ward of the City of Tiffin, Seneca County, Ohio

BEGINNING at a found iron pipe marking the southwesterly corner of Lot 665;

thence N 22° 36' 06" E one hundred sixty and zero hundredths (160.00) feet along the west line of Lot 665 to a found iron rod marking the northwesterly corner thereof and the southerly right-of-way of a sixteen (16) foot wide Alley;

thence S 67° 31' 01" E fifty-seven and thirty-one hundredths (57.31) feet along said alley right-of-way to a set iron rod marking the northeasterly corner of Lot 665;

thence N 22° 35' 33" E sixteen and zero hundredths (16.00) feet to a set nail marking the northerly right-of-way of a sixteen (16) foot wide alley and the southerly line of Lot 667;

thence N 67° 31' 01" W one hundred fourteen and sixty-one hundredths (114.61) feet along said right-of-way and said lot line to a set nail marking the easterly right-of-way of a sixteen (16) foot wide Alley;;

thence N 22° 36' 39" E four hundred twenty-eight and fifty-six hundredths (428.56) feet along said right-of-way to a found iron pipe marking the northwesterly corner of Lot 674;

thence S 75° 36' 25" E one hundred seventy-three and sixty-eight hundredths (173.68) feet along the north line of Lot 674 to a set iron rod marking the westerly right-of-way of vacated Stanton Street;

thence S 22° 34' 44" W twenty-two and seventy-eight hundredths (22.78) feet along said right-of-way to a set nail on a concave curve to the right having a radius of 10,406.61 feet;

thence along said curve **Southeasterly** sixty and four hundredths (60.04) feet (chord bearing - S 69° 32' 04" E, chord distance - 60.04 feet) to a set nail marking the easterly right-of-way of vacated Stanton Street;

thence N 22° 34' 44" E seventeen and thirteen hundredths (17.13) feet along said right-of-way to a set nail marking the westerly extension of the northerly face of an existing building;

thence S 67° 31' 51" E two hundred twenty-six and ninety-eight hundredths (226.98) feet along the face of said building;

thence N 22° 24' 14" E four and forty-four hundredths (4.44) feet along the face of said building;

thence S 67° 35' 46" E thirty-seven and sixty-two hundredths (37.62) feet along the face of said building;

thence S 22° 24' 14" W five and thirteen hundredths (5.13) feet along the face of said building;

thence S 68° 37' 15" E fifteen and eighty-seven hundredths (15.87) feet along the face of said building;

thence S 22° 24' 14" W eleven and fifty-seven hundredths (11.57) feet along the face of said building to the southerly right-of-way of the S.S.C.P.A. Railroad and a point on a concave curve to the right having a radius of 10,406.61 feet;

thence along said curve **Southeasterly** three hundred forty-four and fifty-seven hundredths (344.57) feet leaving the face of said building and along said railroad right-of-way (chord bearing - S 66° 52' 32" E, chord distance - 344.56 feet) to the westerly line of Outlot 5;

CONFIDENTIAL

NMLLC 01326

thence S 22° 35' 39" W eleven and zero hundredths (11.00) feet along said outlot to the southwesterly corner of a parcel of land now or formerly owned by S.S.C.P.A. Railroad as described in Seneca County Deed Volume 160, page 228;

thence S 72° 40' 41" E ninety and twenty-four hundredths (90.24) feet along said railroad right-of-way to a point on a concave curve to the right having a radius of 10,406.61 feet;

thence Southeasterly three hundred eighty-one and twenty-seven hundredths (381.27) feet (chord bearing - S 64° 22' 57" E, chord distance - 381.25 feet) to the northerly face of an existing building;

thence S 66° 51' 01" E thirty-one and fifty-one hundredths (31.51) feet along the face of said building;

thence S 23° 08' 59" W one and ninety-eight hundredths (1.98) feet along the face of said building to the southerly right-of-way of said railroad a point on a concave curve to the right having a radius of 10,406.61 feet;

thence Southeasterly six hundred twenty-four and five hundredths (624.05) feet along said railroad right-of-way (chord bearing - S 61° 26' 29" E, chord distance - 623.96 feet) to a set iron rod marking the west line of a parcel of land now or formerly owned by Paul Warnement as described in Seneca County Deed Volume 446, page 919, passing a set iron rod on the easterly right-of-way of Holmes Street;

thence S 23° 42' 37" W one hundred seventy-six and thirty-six hundredths (176.36) feet along said Warnement's line to a found iron pipe;

thence N 66° 17' 23" W two hundred forty and forty-three hundredths (240.43) feet along said Warnement's line to a set nail marking the centerline of Holmes Street;

thence S 22° 35' 39" W three hundred eighty-two and thirty-three hundredths (382.33) feet along said centerline to a set nail marking the centerline of Greenfield Street, passing a found stone on the northerly right-of-way of said street ;

thence N 66° 45' 08" W four hundred forty-one and sixty-one hundredths (441.61) feet along said centerline to a found iron pipe;

thence N 67° 31' 01" W eight hundred seventy-four and eleven hundredths (874.11) feet along said centerline to a set nail;

thence N 22° 35' 39" E thirty and zero hundredths (30.00) feet to a set iron rod marking the northerly right-of-way of Greenfield Street;

thence N 67° 30' 60" W three hundred sixty-two and sixty-seven hundredths (362.67) to along said right-of-way to **THE POINT OF BEGINNING.**

Containing in all, 25.676 acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed South 22° 35' 39" West.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 25.676 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

PARCEL 2
Being a parcel of land situated in Part of Lot 40 of Walker's Addition (Plat Volume 1, Page 37), First Ward of the City of Tiffin, Seneca County,  Ohio, described as follows:

**BEGINNING** at a set drill hole marking the northeasterly corner of said Lot 40 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of a 16.5 foot wide Vacated Alley;

CONFIDENTIAL

NMLLC 01327

thence S 22° 28' 59" W one hundred seven and seventy-two hundredths (107.72) feet along the easterly line of said Lot 40 and the westerly right-of-way of said 16.5 foot wide Vacated Alley to a set iron rod marking the southeasterly corner of a 0.29 acre parcel of land now or formerly owned by National Machinery Co., Deed Volume 397, Page 772;

thence N 68° 27' 46" W thirty-six and eighty-four hundredths (36.84) feet along the southerly line of said 0.29 acre parcel to a set iron rod;

thence N 62° 12' 00" W eighty-three and thirty-six hundredths (83.36) feet along the southerly line of said 0.29 acre parcel to a set iron rod marking the southwest corner thereof;

thence S 88° 51' 25" W ninety-seven and twenty-seven hundredths (97.27) feet along the southerly line of said Lot 40 to a set iron rod marking the southwesterly corner of said Lot 40 and the easterly right-of-way of a 16.5 foot wide Alley;

thence N 22° 22' 48" E one hundred thirty-six and zero hundredths (136.00) feet along the westerly line of said Lot 40 and said right-of-way to a set nail marking the northwesterly corner of said Lot 40 and the southerly right-of-way of Greenfield Street;

thence S 67° 31' 01" E two hundred ten and sixty-eight hundredths (210.68) feet along said lot line and said right-of-way to THE POINT OF BEGINNING.

Containing in all, 0.537 acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.537 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

PARCEL 3
Being a parcel of land situated in Lots 3, 4 and part of Lot 2 in Sheely's Replat, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northeasterly corner of said Lot 4 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of a 12 foot wide Alley;

thence S 22° 28' 59" W one hundred fifty and zero hundredths (150.00) feet along the easterly line of said Lot 4 and the westerly right-of-way of said Alley to a set iron rod marking the southeasterly corner thereof;

thence N 67° 31' 01" W one hundred ten and zero hundredths (110.00) feet along the southerly line of Lots 4, 3, part of Lot 2, and said centerline to a set iron rod marking the southeast corner of a parcel of land now or formerly owned by Heidelberg College as recorded in Seneca Deed Volume 260, Page 461;

thence N 22° 28' 59" E one hundred fifty and zero hundredths (150.00) feet along said Heidelberg's parcel to a set iron rod marking the north line of Lot 2 and the southerly right-of-way of Greenfield Street;

thence S 67° 31' 01" E one hundred ten and zero hundredths (110.00) feet along the northerly line of part of Lot 2, Lots 3, 4 and said right-of-way to THE POINT OF BEGINNING.

Containing in all 0.379, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

**CONFIDENTIAL**

**NMLLC 01328**

This 0.379 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**PARCEL 4**
Being a parcel of land situated in Lots 43.5, 43, 45, and 46 of Walker's Addition, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set drill hole marking the northeasterly corner of said Lot 45 and the intersection of the southerly right-of-way of Greenfield Street and the westerly right-of-way of Summit Street;

thence S 05° 42' 15" E two hundred seventy-five and ninety-eight hundredths (275.98) feet along the easterly line of Lots 45, 46 and the westerly right-of-way of Summit Street to a set iron rod marking the southeasterly corner of said Lot 46 and the northerly right-of-way of Main Street;

thence S 84° 28' 42" W three hundred seventy-six and ninety hundredths (376.90) feet along the southerly line of Lots 46, 43 and said right-of-way to a set drill hole marking the southwesterly corner of said Lot 43 and the easterly right-of-way of Prospect Street;

thence N 05° 37' 40" W four hundred seventy-six and forty-three hundredths (476.43) feet along the westerly line of Lots 43, 43.5 and said right-of-way to a set drill hole marking the northwesterly corner of said Lot 43.5 and the southerly right-of-way of Greenfield Street;

thence S 67° 31' 01" E four hundred twenty-six and eighty-nine hundredths (426.89) feet along the northerly line of Lots 43.5, 45 and said right-of-way to THE POINT OF BEGINNING.

Containing in all 3.253, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 3.253 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**PARCEL 5**
Being a parcel of land situated in Outlots 4, 5 and 6 of Block "T" in Hedges (Survey of Lands), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

Commencing at a found stone marking the intersection of the centerline of Holmes Street and the north right-of-way line of Greenfield Street;

thence N 22° 35' 39" W six hundred twenty and thirty-five hundredths (620.35) feet along the centerline of Holmes Street to a set nail marking the beginning of a concave curve to the left having a radius of 10,472.61 feet and marking the north right-of-way line of the S.S.C.P.A. railroad and the POINT OF BEGINNING.

thence along said curve Northwesterly one thousand four hundred seven and fourteen hundredths (1407.14) feet (chord bearing - N 64° 57' 55" W, chord distance - 1406.08 feet) along the north right of way of said railroad to a set iron rod marking the south right-of-way of the C.S.X. Railroad and a concave curve to the left having a radius of 4874.10 feet, passing a set iron rod on the westerly right-of-way of said railroad;

thence along said curve Southeasterly nine hundred twelve and thirty-nine hundredths (912.39) feet (chord bearing - S 82° 33' 28" E, chord distance - 911.05') along said south right-of-way to a set iron rod;

thence S 87° 46' 43" E five hundred sixty and forty-eight hundredths (560.48) feet along said south right-of-way to a set survey nail marking the centerline of Holmes Street passing a set iron rod on the westerly right-of-way of said street;

CONFIDENTIA

NMLLC 01329

thence S 22° 35' 39" W four hundred ninety-three and twelve hundredths (493.12) feet along the centerline of Holmes Street to **THE POINT OF BEGINNING**.

Containing in all **6.612** acres of land, more or less, subject to all legal highways and easements.

The bearing of Greenfield Street is assumed South 67° 31' 01" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 6.612 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

### PARCEL 6
Being a parcel of land situated in part of Site 1 of Baldwin's Subdivision (Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of Site 1 in Baldwin's Subdivision (Plat Volume 3, page 17) and the westerly right-of-way of Holmes Street;

thence S 02° 20' 44" W eighty-six and forty-three hundredths (86.43) feet along the easterly line of said Site 1 and said right-of-way to a set iron rod marking the northerly right-of-way of the C.S.X. Railroad as described in Seneca County Deed Volume 133, Page 245;

thence N 88° 30' 15" W three hundred fifty-three and forty-four hundredths (353.44) feet along the north line of said railroad right-of-way to a set iron rod marking the easterly right-of-way of a 50 foot wide Street;

thence N 00° 37' 44" E eighty-one and four hundredths (81.04) feet along the westerly line of said Site 1 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of a fourteen (14) foot wide Alley;

thence S 89° 22' 16" E three hundred fifty-five and ninety-eight hundredths (355.98) feet along the north line of said Site 1 and said right-of-way to **THE POINT OF BEGINNING**.

Containing in all, **0.682** acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed S 02° 20' 44" W.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.682 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

### PARCEL 7
Being a parcel of land situated Lots 17 - 25 inclusive of Baldwin's Subdivision (Plat Volume 3, Page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 25 in Baldwin's Subdivision and the westerly right-of-way of Holmes Street;

thence S 02° 20' 44" W one hundred twenty and five hundredths (120.05) feet along the east line of Lot 25 and said right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

thence N 89° 22' 16" W three hundred fifty-six and forty hundredths (356.40) feet along said Alley right-of-way to a set iron rod marking the southwesterly corner of said Lot 17 and the easterly right-of-way of a 50 foot wide Street;

**CONFIDENTIAL**

**NMLLC 01330**

thence N 00° 37' 44" E one hundred twenty and zero hundredths (120.00) feet along the west line of said Lot 17 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 22' 16" E three hundred sixty and zero hundredths (360.00) feet along said right-of-way to THE POINT OF BEGINNING.

Containing in all, 0.987 acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed S 02° 20' 44" W.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.987 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

## PARCEL 8

Being a parcel of land situated in part of Site 2 of Baldwin's Subdivision (Plat Volume 3, page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northeasterly corner of Site 2 in Baldwin's Subdivision and the westerly right-of-way of a 50' Street;

thence S 00° 37' 44" W eighty and twenty-eight hundredths (80.28) feet along the east line of Site 2 and said right-of-way to a set iron rod marking the northerly right-of-way of the C.S.X. Railroad as described in Seneca County Deed Volume 133, page 245;

thence N 88° 30' 15" W four hundred seventy-one and sixty-five hundredths (471.65) feet along said railroad right-of-way to a set iron rod marking the easterly right-of-way of Lewis Street;

thence N 17° 04' 19" E seventy-six and seven hundredths (76.07) feet along the west line of Site 2 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of a fourteen (14) foot Alley;

thence S 89° 24' 41" E two hundred seventy and twenty-two hundredths (270.22) feet along the north line of said Site 2 and said right-of-way to a set iron rod;

thence S 89° 22' 16" E one hundred seventy-nine and eighty-five hundredths (179.85) feet along the north line of Site 2 and said right-of-way to THE POINT OF BEGINNING.

Containing in all, 0.812 acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed South 02° 20' 44" West.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.812 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

## PARCEL 9

Being a parcel of land situated in Lots 12 to 16 inclusive of Baldwin's Subdivision (Plat Volume 3, page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northeasterly corner of said Lot 16 and the westerly right-of-way of a 50' Street;

thence S 00° 37' 44" W one hundred twenty and zero hundredths (120.00) feet along the east line of said Lot 16 and said right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

CONFIDENTIA

NMLLC 01331

thence N 89° 22' 16" W two hundred and zero hundredths (200.00) feet along said right-of-way to a set iron rod marking the southwesterly corner of Lot 12 and the easterly right-of-way of a fourteen (14) foot wide Alley;

thence N 00° 37' 37" E one hundred twenty and zero hundredths (120.00) feet along the west line of Lot 12 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 22' 16" E two hundred and zero hundredths (200.00) feet along said right-of-way to THE POINT OF BEGINNING.

Containing in all, 0.551 acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 22' 16" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.551 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**PARCEL 10**
Being a parcel of land situated in Lots 7 to 11 inclusive of Baldwin's Subdivision (Plat Volume 3, page 17) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the northeasterly corner of said Lot 11 and the westerly right-of-way of a fourteen (14) foot wide Alley and the southerly right-of-way of Greely Street;

thence S 00° 37' 44" W one hundred twenty and zero hundredths (120.00) feet along the east line of said Lot 11 and said alley right-of-way to a set iron rod marking the southeasterly corner thereof and the northerly right-of-way of a fourteen (14) foot wide Alley;

thence N 89° 22' 16" W five and seventy-seven hundredths (5.77) feet along said alley right-of-way to a set iron rod;

thence N 89° 24' 41" W two hundred twenty-six and fifteen hundredths (226.15) feet along said alley right-of-way to a set iron rod marking the southwesterly corner of said Lot 7 and the easterly right-of-way of Lewis Street;

thence N 17° 04' 19" E one hundred twenty-five and fourteen hundredths (125.14) feet along the west line of Lot 7 and said right-of-way to a set iron rod marking the northwesterly corner thereof and the southerly right-of-way of Greely Street;

thence S 89° 24' 41" E one hundred ninety and sixty-nine hundredths (190.69) feet along said right-of-way to a set iron rod;

thence S 89° 22' 16" E five and eighty-two hundredths (5.82) feet along said right-of-way to THE POINT OF BEGINNING.

Containing in all, 0.590 acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 22' 16" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.590 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**PARCEL 11**
Being a Lots 1 through 6 inclusive in Baldwin's Subdivision (Plat Volume 3, Page 17) and part of Vacated Stanton Street, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**CONFIDENTIA**

NMLLC 01332

BEGINNING at a set iron rod marking the northeast corner of said Lot 6;

thence S 17° 04' 19" W one hundred twenty-five and fourteen hundredths (125.14) feet along the east line of said Lot 6 to a set iron rod marking the southeast corner thereof;

thence N 89° 24' 41" W two hundred twenty-two and nine hundredths (222.09) feet along the south line of said Lots to a set iron rod marking the southwest corner of said Lot 1;

thence N 00° 35' 19" E one hundred twenty and zero hundredths (120.00) feet along the west line of said Lot 1 to a set iron rod marking the northwest corner thereof;

thence S 89° 24' 41" E two hundred fifty-seven and sixty hundredths (257.60) feet along the north line of said Lots to THE POINT OF BEGINNING.

Containing in all 0.661, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.661 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

## PARCEL 12
Being a parcel of land situated in part of Site 3 and 4 of Baldwin's Subdivision (Plat Volume 3, Page 17), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northeast corner of said Site 4;

thence S 00° 35' 19" W one hundred thirty-four and zero hundredths (134.00) feet along the east line of said Lot 6 to a set iron rod;

thence S 89° 24' 41" E two hundred thirty-one and ninety-five hundredths (231.95) feet along the south line of said Alley to a set iron rod marking the west line of Lewis Street;

thence S 14° 04' 19" W sixty-nine and thirty hundredths (69.30) feet along the west line of Lewis Street to a set iron rod marking the north right-of-way of the C.S.X. Railroad and a concave curve to the right having a radius of 4808.10 feet;

thence along said curve Northwesterly three hundred sixty-seven and fifty-eight hundredths (367.58) feet (chord bearing - N 80° 43' 13" W, chord distance - 367.49 feet) along said railroad right-of-way to a set iron rod marking the southeasterly corner of a parcel of land now or formerly owned by Ohio Power Company as recorded in Seneca Deed Volume 348, Page 293;

thence N 20° 01' 59" E one hundred fifty-three and sixty-eight hundredths (153.68) feet along the easterly line of said Ohio Power parcel to the south right-of-way of Greely Street, referenced by a found rod southwesterly 0.34 feet thereof;

thence S 89° 24' 41" E ninety-nine and eighty-two hundredths (99.82) feet along the south right-of-way of Greely Street to THE POINT OF BEGINNING.

Containing in all 0.737, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.737 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

CONFIDENTIA

**PARCEL 13**
Being a parcel of land situated in part of Site 4 of Baldwin's Subdivision (Plat Volume 3, Page 17) and part of Vacated Stanton Street, First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a found pin in concrete marking the intersection of the south right-of-way of Greely Street and the east right-of-way of Vacated Stanton Street;

thence S 22° 34' 44" W one hundred ten and ninety-four hundredths (110.94) feet along the east line of Vacated Stanton Street to the north right-of-way of C.S.X. Railroad and a concave curve to the right having a radius of , referenced by a found pin 0.3 feet south and 0.1 foot east thereof;

thence along said curve Northwesterly two hundred forty-nine and sixty-nine hundredths (249.69) feet (chord bearing N 80° 43' 13" W, chord distance 367.49') along said railroad right-of-way to a found monument,

thence N 73° 31' 24" W one hundred forty-three and thirty-six hundredths (143.36) feet along said railroad right-of-way to a set iron rod marking the south right-of-way of Greely Street;

thence S 89° 24' 41" E four hundred twenty and eighty-four hundredths (420.84) feet along the south right-of-way of Greely Street to **THE POINT OF BEGINNING**.

Containing in all **0.511**, acres of land, more or less, subject to all legal highways and easements.

The bearing of Greely Street is assumed South 89° 24' 41" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 0.511 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in November, 1998.

**PARCEL 14**
Being a parcel of land situated in Lots 1 to 6, 12 to 19 and 26 to 30 inclusive and a vacated Alley and part of vacated Crayon Street in J.J. Fleck's Subdivision (Plat Volume 3, page 6), First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set iron rod marking the northwesterly corner of said Lot 1 and the intersection of the westerly right-of-way of Holmes and the southerly right-of-way of a 30' Street;

thence S 87° 46' 43" E three hundred fourteen and fifty-eight hundredths (314.58) feet along the southerly right-of-way of a 30' Street to a set iron rod marking the westerly line of said Lot 26;

thence N 22° 31' 03" E thirty-one and ninety-nine hundredths (31.99) feet along the west lines of Lot 25 and 26 to a set iron rod marking the southerly right-of-way of the C. S. X. Railroad;

thence S 87° 46' 43" E one hundred twenty-six and thirteen hundredths (126.13) feet along said railroad right-of-way to the northwesterly corner of a 0.286 acre parcel of land now or formerly owned by the C.S.X. Railroad as described in Seneca County Deed Volume 276, page 514;

thence S 22° 28' 47" W two hundred sixty-four and twenty-eight hundredths (264.28) feet along the easterly line of said J.J. Fleck's Subdivision to a set iron rod marking the southeasterly corner of Lot 30;

thence N 67° 20' 26" W one hundred eighteen and forty-seven hundredths (118.47) feet along the southerly line of Lot 30 to a set iron rod marking the southwesterly corner thereof and the easterly right-of-way of Crayon Street;

thence N 68° 41' 42" W forty and one hundredths (40.01) feet to a set iron rod marking the northeasterly corner of Lot 16 and the westerly right-of-way of Crayon Street;

CONFIDENTIA

NMLLC 01334

thence S 22° 31' 03" W one hundred fifty-nine and six hundredths (159.06) feet along said right-of-way to a set iron rod marking the southeasterly corner of Lot 19 and the northerly right-of-way of a fifteen (15) foot wide Alley;

thence N 67° 24' 42" W two hundred fifty-five and thirty-seven hundredths (255.37) feet along said alley right-of-way to a set iron rod marking the southwesterly corner of Lot 6 and the easterly right-of-way of Holmes Street;

thence N 22° 35' 39" E two hundred thirty-eight and seventy-three hundredths (238.73) feet along said right-of-way to THE POINT OF BEGINNING.

Containing in all, 2.501 acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed North 22° 35' 39" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 2.501 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in October, 1998.

<u>PARCEL 15</u>
Being a parcel of land situated in Lots 7 to 11 inclusive and 20 to 24 inclusive and a vacated Alley of J.J. Fleck's Subdivision (Plat Volume 3, page 6) in the First Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

BEGINNING at a set nail marking the northwesterly corner of said Lot 7 and the intersection of the easterly right-of-way of Holmes Street and the southerly right-of-way of a fifteen (15) foot wide Alley;

thence S 67° 24' 42" E two hundred fifty-five and thirty-nine hundredths (255.39) feet along the southerly right-of-way of a fifteen (15) foot wide Alley to a set iron rod marking the northeasterly corner of Lot 20 and the intersection of the southerly right-of-way of a fifteen (15) foot wide Alley and the westerly right-of-way of Crayon Street;

thence S 22° 31' 03" W two hundred thirty and seventy-seven hundredths (230.77) feet along said right-of-way to a set iron rod marking the southeasterly corner of Lot 24 and the intersection of the westerly right-of-way of Crayon Street and the northerly right-of-way of an eighteen (18) foot wide Alley;

thence N 59° 43' 20" W four and eighty-five hundredths (4.85) feet along the south line of Lot 24 and said alley right-of-way to a set iron rod;

thence northwesterly two hundred fifty-two and eighty-two hundredths (252.82) feet along said alley right-of-way to a set iron rod marking the southwesterly corner of Lot 11 and the intersection of the northerly right-of-way of an eighteen (18) foot wide Alley and the easterly right-of-way of Holmes Street, chord bearing N 60° 19' 35" W, chord distance two hundred fifty-two and eighty-two hundredths (252.82) feet;

thence N 22° 35' 39" E one hundred ninety-eight and ninety-four hundredths (298.94) feet along the easterly right-of-way of said Holmes Street to THE POINT OF BEGINNING.

Containing in all, 1.257 acres of land, more or less, subject to all legal highways and easements.

The bearing of Holmes Street is assumed North 22° 35' 39" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND ASSOC. Driven flush.

This 1.257 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972, in October, 1998.

**CONFIDENTIAL**

NMLLC 01335

**PARCEL 16**
Being a parcel of land situated in part of Outlots 8 and 9 of Block "T" of Hedges Estate the First
Ward of the City of Tiffin, Seneca County, Ohio, described as follows:

**BEGINNING** at a set iron rod marking the southeasterly corner of Lot 40 in J.J. Fleck's Subdivision
(Plat Volume 3, page 6);

thence N 22° 28' 47" E six hundred forty-five and fifty-one hundredths (645.51) feet along the
easterly line of said Fleck's Subdivision to a set iron rod marking the southwesterly corner of a 0.286
acre parcel of land now or formerly owned by C.S.X. Railroad as described in Seneca County Deed
Volume 276, page 514;

thence S 87° 46' 43" E two hundred nineteen and forty-two hundredths (219.42) feet along said
C.S.X. Railroad's southerly line to a set iron rod marking the southeasterly corner thereof and the
westerly line of Gist's Outlots (Plat Volume 1, page 8) and the existing corporation line of the City
of Tiffin;

thence S 00° 53' 53" W eight hundred fifty-two and thirty-seven hundredths (852.37) feet along said
Gist's Outlots westerly line and said corporation line to a set iron rod marking the northerly right-of-
way of S.S.C.P.A. Railroad;

thence N 59° 43' 20" W five hundred twenty-four and twenty-one hundredths (524.21) feet along
said railroad right-of-way to **THE POINT OF BEGINNING.**

Containing in all, 5.994 acres of land, more or less, subject to all legal highways and easements.

The bearing of the east line of J.J. Fleck's Subdivision is assumed North 22° 28' 47" East.
Bearings are assumed and for angular measurement only.
All iron rods set are 5/8" diameter by 30" length with personalized caps marked HANK AND
ASSOC. Driven flush.
This 5.994 acre legal description is based upon a survey done by James G. Homan, Jr., P.S. #6972,
in November, 1998.

**CONFIDENTIAL**

**NMLLC 01336**

EXHIBIT C

## MUTUAL GENERAL RELEASE

**THIS RELEASE** (this "Release") is made and entered into as of the ___ day of October 2002, by and among Citicorp Venture Capital, Ltd, a New York corporation ("CVC"), CCT Partners V, L.P., a Delaware limited partnership ("CCT"), Charles E. Corpening ("Corpening"), David F. Thomas ("Thomas"; together with CVC, CCT, Corpening and Thomas, the "CVC Parties"), Steven A. Anderson ("Anderson"), and the parties identified on the signature page hereof as "Kalnow Parties" who are, or who from time to time hereafter become, signatories hereto (the "Kalnow Parties"). The CVC Parties and the Kalnow Parties are sometimes collectively referred to as the "Parties".

**WHEREAS,** the CVC Parties and Anderson are parties to a certain Global Settlement Agreement and Mutual Release, dated October __, 2002 (the "Settlement Agreement"), among the CVC Parties, Anderson and certain affiliates of the Kalnow Parties, pursuant to which the CVC Parties and Anderson have agreed to deliver a mutual general release in favor of the Kalnow Parties upon their delivery of the same release in favor of the CVC Parties and Anderson; and

**WHEREAS,** the Kalnow Parties desire to enter into this Release in favor of the CVC Parties and Anderson and the CVC Parties and Anderson desire to enter into this Release in favor of the Kalnow Parties;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, and intending to be legally bound, the Parties agree as follows:

1.    Mutual General Release.

    (a)    Release by the CVC Parties and Anderson. Each of the CVC Parties and Anderson, for themselves and each of their respective present, former and future shareholders, directors, managing directors, officers, employees, accountants, advisors, agents, consultants, attorneys, administrators, partners, servants, subsidiaries, divisions, subcontractors, affiliates, representatives, predecessors, successors, assigns and all other persons or entities acting on their respective behalf or at their respective direction or control (collectively, the "CVC/Anderson Releasors"), hereby release, remise, acquit, satisfy and forever discharge each of the Kalnow Parties and each of their present, former and future shareholders, directors, managing directors, officers, employees, accountants, advisors, agents, consultants, attorneys, administrators, partners, servants, subsidiaries, divisions, subcontractors, affiliates, representatives, predecessors, successors, assigns and all other persons or entities acting on their respective behalf or at their respective direction or control (collectively, the "Kalnow Releasees") of and from all, and all manner of obligations, liabilities, action and actions, cause and causes of action, suits, debts, accounts, bills, interests, costs, agreements, damages, judgments, executions, claims and demands whatsoever, in law or in equity, known or unknown on, prior to or after the date hereof, that any CVC/Anderson Releasor has or may at any time have against or with respect to any or all of the Kalnow Releasees, which arise out or are related to The National Machinery Company, an Ohio corporation, or NMC Holding

CONFIDENTIAL

NMLLC 01337

140979.3 049579-21124

Company, a Delaware corporation, arising from the beginning of time to the date hereof except with respect to obligations arising under or contemplated by the Settlement Agreement (the "CVC/Anderson Released Subject Matter").

(b)    Release by the Kalnow Parties.  Each of the Kalnow Parties, for themselves and each of their respective present, former and future shareholders, directors, managing directors, officers, employees, accountants, advisors, agents, consultants, attorneys, administrators, partners, servants, subsidiaries, divisions, subcontractors, affiliates, representatives, predecessors, successors, assigns and all other persons or entities acting on their respective behalf or at their respective direction or control (the "Kalnow Releasors"), hereby release, remise, acquit, satisfy and forever discharge each of Anderson and the CVC Parties, each of their present, former and future shareholders, directors, managers, managing directors, officers, employees, accountants, advisors, agents, consultants, attorneys, administrators, partners, servants, subsidiaries, divisions, subcontractors, affiliates, representatives, predecessors, successors, assigns and all other persons or entities acting on their respective behalf or at their respective direction or control (collectively, the "CVC/Anderson Releasees") of and from all, and all manner of obligations, liabilities, action and actions, cause and causes of action, suits, debts, accounts, bills, interests, costs, agreements, damages, judgments, executions, claims and demands whatsoever, in law or in equity, known or unknown on, prior to or after the date hereof, that any Kalnow Releasor has or may at any time have against or with respect to any or all of the CVC/Anderson Releasees, which arise out of or relate to The National Machinery Company, an Ohio corporation, or NMC Holding Company, a Delaware corporation, arising from the beginning of time to the date hereof except with respect to obligations arising under or contemplated by the Settlement Agreement (the "Kalnow Released Subject Matter").

2.    Mutual Covenant Not to Sue.

(a)    By the CVC/Anderson Releasors.  Each CVC/Anderson Releasor represents, covenants and agrees that it has not and will not in the future initiate or maintain any action or file any complaint, lawsuit or proceeding of any kind in or by way of legal proceedings or otherwise at any time on or after the date hereof against any Kalnow Releasee for any matter arising out of the CVC/Anderson Released Subject Matter.  Each CVC/Anderson Releasor further represents and warrants that, as of the date of this Release, no matters released hereunder or subject to the within covenant not to sue have been assigned, transferred or conveyed to any other person or entity.

(b)    By Kalnow Releasors.  Each Kalnow Releasor represents, covenants and agrees that it has not and will not in the future initiate or maintain any action or file any complaint, lawsuit or proceeding of any kind in or by way of legal proceedings or otherwise at any time on or after the date hereof against any CVC/Anderson Releasee for any matter arising out of the Kalnow Released Subject Matter.  Each Kalnow Releasor further represents and warrants that, as of the date of this Release, no matters released hereunder or subject to the within covenant not to sue have been assigned, transferred or conveyed to any other person or entity.

**CONFIDENTIAL**

140979.3 049579-21124

**NMLLC 01338**

3.    <u>Miscellaneous</u>.

    (a)    <u>Entire Agreement</u>.  As of the date hereof, this Release embodies the entire agreement and understanding between the Parties relating to the subject matter hereof and supersedes any prior agreements and understandings relating to the subject matter hereof.

    (b)    <u>Counterparts</u>.  This Release may be executed in any number of counterparts, each of which shall be deemed an original, but all of which collectively shall constitute one and the same instrument representing this Release between the Parties and it shall not be necessary for the proof of this Release that any Party produce or account for more than one such counterpart.  This Release may be executed using facsimiles of signatures, and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

    (c)    <u>Binding Effect and Assignment</u>.  This Release shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Neither this Release nor any right created hereby or in any agreement entered into in connection with the transactions contemplated hereby shall be assignable by any Party.

    (d)    <u>Section Headings</u>.  The section headings contained in this Release are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Release.  Unless otherwise specified, all section references contained herein shall be to sections of this Release.

*[The next page is the signature page]*

**CONFIDENTIAL**

140979.3 049579-21124

**NMLLC 01339**

IN WITNESS WHEREOF, the Parties hereto have executed this Release, as of the date first written above.

THE CVC PARTIES AND ANDERSON:

CITICORP VENTURE CAPITAL, LTD.


By:_____
Title:

              _____
               Charles E. Corpening

CCT PARTNERS V, L.P.


By:_____
Title:

               _____
               David F. Thomas

               Steven A. Anderson


THE KALNOW PARTIES:

CALG CORPORATION

CARL F. KALNOW U/A OF AUGUST 20, 1958


By:_____
Title:

By:_____
          Successor Trustee

CARJAN CORPORATION

TRUST U/W JANE FROST KALNOW F/B/O ANDREW H. KALNOW


By:_____
Title:

By:_____
          Trustee

TRUST EST. 12/28/72 FBO GERTRUDE K. CHISHOLM

TRUST U/W JANE FROST KALNOW F/B/O CARL F. KALNOW


By:_____
          Co-Trustee

By:_____
          Trustee

**CONFIDENTIAL**

**NMLLC 01340**

GERTRUDE KALNOW U/A OF AUGUST 20, 1958

By:_____
      Successor Trustee

GERTRUDE K. CHISHOLM 1997 QUALIFIED ANNUITY TRUST

By:_____
      Trustee

TRUST EST. 12/28/72 FBO ANDREW H. KALNOW

By:_____
      Co-Trustee

ANDREW J. KALNOW U/A OF AUGUST 20, 1958

By:_____
      Successor Trustee

TRUST EST. 12/28/72 FBO CARL F. KALNOW

By:_____
      Co-Trustee

LORETTA K. KAPLAN 1990 IRREVOCABLE TRUST AGREEMENT DATED AUGUST 21, 1990

By:_____
      Trustee

TRUST U/W JANE FROST KALNOW F/B/O GERTRUDE K. CHISHOLM

By:_____
      Trustee

TRUST U/W JANE FROST KALNOW F/B/O LORETTA K. KAPLAN

By:_____
      Trustee

ANDREW H. KALNOW 1990 GENERATION SKIPPING TRUST DATED 12/19/90

By:_____
      Co-Trustee

KELSEY GOEBEL KALNOW TRUST

By:_____
      Trustee

CAROLINE JANE KALNOW TRUST

By:_____
      Trustee

CARL F. KALNOW, JR. TRUST

By:_____
      Trustee

140979.3 049579-21124

**CONFIDENTIAL**

**NMLLC 01341**

PRUINA CORPORATION

By:_____
Title:


_____
        Paul N. Aley



_____
        Larry F. Baker



_____
        John H. Bolte III



_____
John H. Bolte or Geraldine M. Bolte, trustees
or their successors in trust under the John H.
Bolte Living Trust dated December 27, 1999



_____
        Kurt Eckstein


TRUST EST. 12/28/72 FBO LORETTA K.
KAPLAN


By:_____
            Co-Trustee

LORETTA KALNOW U/A OF AUGUST 20,
1958


By:_____
        Successor Trustee



_____
        Robert J. Foster



_____
        Thomas E. Hay

J & K INVESTMENTS L.P.



By:_____
Its:


140979.3 049579-21124

CONFIDENTIAL

NMLLC 01342

EXHIBIT D

## AFFIDAVIT OF PATRICK A. BOWERS

Patrick A. Bowers, being duly sworn, states as follows:

1.    The facts set forth in this Affidavit are based upon my personal knowledge, and if sworn as a witness, I would testify competently to them.

2.    I was the Controller of The National Machinery Company, an Ohio corporation. In that capacity, a facsimile copy of my signature appeared on substantially all checks issued by The National Machinery Company during 2001 to its vendors and other payees.

3.    I authorized all checks of The National Machinery Company with the bona fide intention of paying its debts.

4.    I authorized all checks of The National Machinery Company in the belief that there was sufficient availability of funds to cover payment of such checks.  No check authorized by me was issued in violation of ORC Ann. 2913.11 (Anderson 2002).

_____

PATRICK A. BOWERS

SUBSCRIBED and SWORN to
before me this ____ day of August 2002

_____

Notary Public

My Commission Expires:

**CONFIDENTIAL**

141171.1 049579-21124

**NMLLC 01343**

EXHIBIT D

## AFFIDAVIT OF ROBERT J. FOSTER

Robert J. Foster, being duly sworn, states as follows:

1.    The facts set forth in this Affidavit are based upon my personal knowledge, and if sworn as a witness, I would testify competently to them.

2.    I was the Chief Executive Officer and the principal in charge of financial affairs of The National Machinery Company, an Ohio corporation.

3.    I authorized all checks of The National Machinery Company with the bona fide intention of paying its debts.

4.    I authorized all checks of The National Machinery Company in the belief that there was sufficient availability of funds to cover payment of such checks.  No check authorized by me was issued in violation of ORC Ann. 2913.11 (Anderson 2002).


_____
ROBERT J. FOSTER

SUBSCRIBED and SWORN to
before me this 1st day of October 2002


_____
                Notary Public

My Commission Expires:.


**CONFIDENTIAL**

NMLLC 01344

# EXHIBIT 5

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

SALVATORE VACIRCA,
          Plaintiff

v.

NATIONAL MACHINERY COMPANY,
and NATIONAL MACHINERY, LLC,
          Defendants.

CIVIL ACTION NO. 05-11419-MLW

## ANSWERS OF DEFENDANT,
## NATIONAL MACHINERY COMPANY,
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, National Machinery Company ("NMC"), hereby responds in accordance with Fed. R. Civ. P. 33 and Local Rule 33.1 to the First Set of Interrogatories Propounded By Plaintiff, Salvatore Vacirca, as follows.

### GENERAL OBJECTIONS

1.     NMC objects to the definitions set forth in the Plaintiff's First Set of Interrogatories to the extent they impose upon NMC a burden greater than, or inconsistent with, the Federal Rules of Civil Procedure. NMC will respond to the Plaintiff's First Set of Interrogatories in accordance with the Federal Rules of Civil Procedure.

2.     NMC objects to the definitions set forth in the Plaintiff's First Set of Interrogatories to the extent that they are vague, ambiguous, and seek to define terms in an expansive and overly broad manner beyond the meaning given to those terms in general usage.

3.     NMC objects to the Plaintiff's First Set of Interrogatories to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

4.     NMC objects to the Plaintiff's First Set of Interrogatories to the extent it seeks information that is confidential, commercial and otherwise proprietary in nature.

5.     The answers below shall not be deemed to constitute a waiver of any claims of privilege or immunity that NMC may have as to any response, document, or thing, or of any objection to competency, relevancy, materiality, or admissibility, or any other evidentiary objection NMC may assert.

6.      Discovery in this matter is ongoing, and accordingly NMC reserves the right to modify, amend, or supplement any of the answers below.

7.      The following answers and specific objections to the Interrogatories are made subject to these general objections.

**INTERROGATORY NO. 1:**

Please identify yourself, giving your full name, social security number, residential address, complete business address and occupation, the capacity in which you answer these interrogatories on behalf of National Machinery Company, and if the defendant, National Machinery Company, is a corporation, the office you hold with the defendant including your titles and duties as of the date of the incident.

**ANSWER TO INTERROGATORY NO. 1:**

Mark Cohen and Robert Maselek, The McCormack Firm, Defense Counsel for NMC

**INTERROGATORY NO. 2:**

Please describe in full and complete detail how the alleged incident occurred, based upon information available to you, and identify the sources of your information by giving the full name and complete residential and business address of each such source.

**ANSWER TO INTERROGATORY NO. 2:**

NMC objects to this interrogatory on the ground that it is vague and overly broad. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 3:**

If the defendant is, or was at any time, aware of any written or printed industry or trade standards, tests, procedures or practices (hereinafter collectively referred to as "industry standards") which regulate, or give guidance as to the repair, assembly, evaluation, maintenance, testing and/or inspection, use or safety of the subject Maxipress machine, please give the following information:

a.      state the full citation of each such industry standard;

b.      specify the date upon which the defendant first became aware of each such industry standard;

c.      state whether or not the defendant purports to adhere to or follow each such industry test or standard; and

2

d.    specify how, if at all, the Maxipress machine violated or failed to comply with any such industry standard

**ANSWER TO INTERROGATORY NO. 3:**

NMC objects to this interrogatory on the ground that it is vague and overly broad. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 4:**

Describe with specificity any label, tag, warning, instructions, directions or other writings affixed, attached or accompanying at any time the subject Maxipress machine, including but not limited to:

a.    its purpose;
b.    the design of the label, including the size and color of tape used;
c.    the inclusive dates during which each such labeling design was in effect;
d.    the full text of the warning or instructions affixed or accompanying the subject Maxipress machine; and
e.    the identity of the person who was responsible for promulgating the warning or instruction scheme.

**ANSWER TO INTERROGATORY NO. 4:**

NMC objects to this interrogatory on the ground that it is vague and overly broad. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 5:**

Please describe in full and complete detail what types of Maxipress machine are repaired, altered, evaluated, maintained, tested and/or inspected by the defendant National Machinery Company.

3

**ANSWER TO INTERROGATORY NO. 5:**

NMC objects to this interrogatory on the ground that it is vague and overly broad, and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 6:**

At the time of the repair, assembly, evaluation, maintenance, testing and/or inspection of the subject Maxipress machine referred to in the Complaint, did defendant in any way warrant or guarantee said Maxipress machine? If so, state the substance and content of all such warranties or guarantees and the manner in which said warranties or guarantees were given.

**ANSWER TO INTERROGATORY NO. 6:**

NMC objects to this interrogatory on the ground that it is vague, overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 7:**

Describe with specificity the safety features, safety devices, safety measures, safety appliances or safety equipment with which the Maxipress machine was equipped:
a.    at the time the Maxipress machine was distributed, sold or transferred by the defendant; and
b.    at the time of the accident.

4

**ANSWER TO INTERROGATORY NO. 7:**

NMC objects to this interrogatory on the ground that it is vague and overly. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 8:**

Describe with specificity any warnings given by defendant regarding any known, suspected, or supposed hazard, danger, defect, or defective condition of the Maxipress machine, including but not limited to:

a.    the hazard, danger, defect, or defective condition with which the warnings were concerned;

b.    the nature of the warning which was given;

c.    the identity of the person who gave the warning; and

d.    the date the warning was given

**ANSWER TO INTERROGATORY NO. 8:**

NMC objects to this interrogatory on the ground that it is vague and overly broad. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 9:**

If the defendant has in-house standards, tests, procedures or practices (hereinafter referred to collectively as "in-house standards") whether reduced to writing or not, which it purports to follow and which relate to the quality or safety of the subject Maxipress machine that it repaired, altered, evaluated, maintained, tested and/or inspected, please give the following information in full and complete detail:

a.    The identity of each document which constitutes, refers to or relates to each

such in-house standard;

b. The identity of person(s) who drafted or established each such in-house standard;

c. specify the date that each such in-house standard was established or drafted;

d. explain the purpose of each such standard; and

e. specify how, if at all, the Maxipress machine violated or failed to comply with any such standard

**ANSWER TO INTERROGATORY NO. 9:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 10:**

At the time of the repair, alteration, evaluation, maintenance, testing and/or inspection of the Maxipress machine referred to in the Complaint, did defendant have in its employ, or contract for the services of, any human factors consultant or safety engineer to advise defendant concerning any inherent design hazards, risks or dangers, indicated warnings or other matters pertaining to the safe use of the Maxipress machine by the consuming public? If so, give the full name, last known address, occupation and title of each such person.

**ANSWER TO INTERROGATORY NO. 10:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 11:**

Either before or after the accident, did the defendant receive from any source any oral communication or any document wherein the Maxipress machine, any component part of the Maxipress machine, or any identical or similar Maxipress machine was commented upon or criticized with respect to safety to the user or to persons or property in the area of use or was said to have been involved in any accident wherein bodily injury or property damage was suffered, please describe in full and complete detail:

a.      the date each such communication or document was received;

b.      the identity of who initiated and who received each such communication or document;

c.      the identity of and describe the substance of each such communication or document;

d.      a description of the defendant's response to each such communication or document; and

e.      specify and describe the Maxipress machine involved in each such communication or document.

**ANSWER TO INTERROGATORY NO. 11:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 12:**

If the defendant has ever been named as a party to any civil action involving any claim that a product was defective or presented safety hazards to the user or to persons or property in the area of use, please give the following information in full and complete detail:

a.      list each such case by caption, court and docket number;

b.      identify counsel for the plaintiff(s) in each such case;

c.      specify the date upon which each such case was filed and the date upon which the defendant was served with process;

d.      identify each present or former officer, director, agent, servant and employee of the defendant who testified either at a deposition or at trial in any such case, and specify the case;

e.      identify each expert witness who testified on behalf of the plaintiff or on your behalf in each such action;

f.      specify and describe the product involved in each such case; and

7

g.      specify the defects or safety hazards of each such product alleged in any such case, and specify the case.

**ANSWER TO INTERROGATORY NO. 12:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 13:**

Please describe all repairs, assembly, alterations, machine evaluations, maintenance, testing and/or inspection performed either before or after August 2, 2001 by the defendant or on the defendant's behalf on the Maxipress machine or on any component part of the Maxipress machine, describing in full and complete detail:

a.      the date of each such inspection and/or test;
b.      the purpose of each such inspection and/or test;
c.      the observations made during each such inspection and/or summary of the results of each such test;
d.      the identity of who conducted each such inspection and/or test.

**ANSWER TO INTERROGATORY NO. 13:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 14:**

Please describe in full and complete detail any and all professional, trade or industrial organizations of which the defendant National Machinery Company is a member and/or subscriber.

8

**ANSWER TO INTERROGATORY NO. 14:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 15:**

Please describe in full and complete detail any and all liability insurance policies and agreements, both primary and excess, including declarations pages, jackets, riders and endorsements, which do or may provide coverage for the occurrences set forth in the plaintiff's Complaint.

**ANSWER TO INTERROGATORY NO. 15:**

NMC objects to this interrogatory on the ground that it is vague and overly broad. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

St. Paul Travelers Surplus Lines Insurance Company issued a Products and Completed Work Liability Protection policy, number LC0 55 26462, to The National Machinery Company, Inc. for the policy period 9/24/00 to 9/24/00. The policy has limits of liability of $1 million per occurrence and in the aggregate, and a $175,000 self-insured retention amount.

RLI Insurance Company issued a Commercial Umbrella Liability policy to the National Machinery Company for the policy period 9/24/00 to 9/24/01, policy number OUL0044693. The policy has limits of liability of $15 million, excess of $1 million.

**INTERROGATORY NO. 16:**

Please state the full and complete name and last known residential and business address, giving street, number, city and State of every witness known to National Machinery Company or to its attorneys or representatives who has knowledge regarding the facts and circumstances surrounding the happening of the events alleged in the plaintiff's complaint, including, but not limited to eyewitnesses to such events and other persons having knowledge thereof.

9

**ANSWER TO INTERROGATORY NO. 16:**

NMC objects to this interrogatory on the ground that it is overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. In addition, NMC objects to this Request to the extent that it attempts to elicit information which is protected from disclosure by: (a) the attorney-client privilege or (b) the work product doctrine. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

To the best of NMC's present knowledge, responsive information is contained in the Plaintiff's Initial Disclosures. Thus, the Plaintiff is referred to those documents for an answer to this interrogatory, in accordance with and pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 17:**

If defendant, or any representative of defendant, has any photographs which relate in any way to this claim, please identify the photographer, please state the number of photographs in existence, please state the date the photographs were taken, and please identify (by full name, residential address and business address) the current custodian of any such photographs.

**ANSWER TO INTERROGATORY NO. 17:**

NMC objects to this interrogatory on the ground that it is vague, overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. In addition, NMC objects to this Request to the extent that it attempts to elicit information which is protected from disclosure by: (a) the attorney-client privilege or (b) the work product doctrine. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, other than those documents produced by other parties in this litigation. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 18:**

Please describe in full and complete detail the name, residential and business address, and job title(s), of the person(s) most knowledgeable to National Machinery Company, regarding the following:

a.     the plaintiff's incident on August 2, 2001;
b.     any and all repairs, alterations, maintenance, testing and/or inspection of the subject Maxipress machine, Serial Number 18225, either before or after August 2, 2001;
c.     any and all contract and/or business agreement between the defendant National Machinery Company and plaintiff's employer Thermo Electron Corporation;

10

d.      the relationship and/or interconnection between the entities known as National Machinery Company and National Machinery, LLC.

**ANSWER TO INTERROGATORY NO. 18:**

NMC objects to this interrogatory on the ground that it is vague, overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 19:**

Please identify, in full and complete detail, any and all repairs, alterations, maintenance, testing and/or inspection of the subject Maxipress machine, Serial Number 18225, either before or after August 2, 2001.

**ANSWER TO INTERROGATORY NO. 19:**

NMC objects to this interrogatory on the ground that it is vague, overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

**INTERROGATORY NO. 20:**

Please describe in full and complete detail whether the defendant, National Machinery Company, anyone acting on its behalf, or any other person or entity has investigated the incident alleged in the plaintiff's complaint, including but not limited to:

a.      the full name and complete residential and business address of each such person who conducted or participated in each such investigation; and

b.      the results or conclusions of each such investigation

11

**ANSWER TO INTERROGATORY NO. 20:**

NMC objects to this interrogatory on the ground that it is vague, overly broad and seeks information that is not relevant and is not designed to lead to the discovery of admissible evidence. In addition, NMC objects to this Request to the extent that it attempts to elicit information which is protected from disclosure by: (a) the attorney-client privilege or (b) the work product doctrine. Subject to and without waiving said objections or the General Objections, NMC responds as follows:

NMC is unable to respond to this interrogatory because on or about February 2002, National Machinery, LLC purchased the assets of NMC, including, upon information and belief, any and all documents and other business records from which this response might be ascertained, including the identity of any former employees who may have knowledge responsive to this interrogatory. Counsel for NMC has made good faith efforts to obtain any relevant records from National Machinery, LLC and has not obtained any to date.

## VERIFICATION

The foregoing Answers of Defendant, National Machinery Company, to Plaintiff's First Set of Interrogatories have been signed on behalf of National Machinery Company by *Robert Maselek* who states that:  he has been retained as defense counsel for National Machinery Company; the matters stated therein are not within his personal knowledge; and he is informed that the facts stated therein are true.

SIGNED under penalty of perjury, this _22nd_ day of _May_, 2006.

As to Objections

Mark E. Cohen          [BBO #089800]
Robert J. Maselek      [BBO #564690]
The McCormack Firm
One International Place - 7th Floor
Boston, MA  02110
Ph: 617•951•2929
Fax: 617•951•2672
**Attorneys for Defendant**
**National Machinery Company**

12

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Answers of Defendant, National Machinery Company, To Plaintiff's First Set of Interrogatories has been served upon all counsel of record by depositing a copy hereof, postage prepaid, with the United States Postal Service, addressed to:

Richard J. Sullivan, Esq.
**Sullivan & Sullivan, LLP**
31 Washington Street
Wellesley, MA 02481

William F. Ahern, Jr., Esq.
**Clark, Hunt & Embry**
55 Cambridge Parkway
Cambridge, MA      02142

Daniel E. Morrison
**Sachnoff & Weaver, Ltd.**
10 South Wacker Drive 40th Floor
Chicago, IL 60606-7507

**DATED** this 22nd day of May,  2006.

Robert J. Maselek, Esq.

#83566v1<MEBOS> -Vacirca v NMC- answers to plaintiff's first set of

13